# EXHIBIT 3

2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                       MARSHALL DIVISION

 4   HEADWATER RESEARCH, LLC ,  )(

 5       PLAINTIFF,             )(   CIVIL ACTION NO.

 6                             )(   2:22-CV-422-JRG-RSP

 7   VS.                       )(   MARSHALL, TEXAS

 8                             )(

 9   SAMSUNG ELECTRONICS AMERICA, )(   JULY 25, 2024

10   INC., ET AL.,            )(

11       DEFENDANTS.          )(   9:06 A.M.

12                EVIDENTIARY HEARING

13        BEFORE THE HONORABLE ROY S. PAYNE

14        UNITED STATES MAGISTRATE JUDGE

15

16   FOR THE PLAINTIFF:    Mr. Kristopher R. Davis
                           Mr. Benjamin T. Wang
17                         Mr. Reza Mirzaie
                           Mr. Jason Wietholter
18                         Russ August & Kabat
                           12424 Wilshire Boulevard
19                         12th Floor
                           Los Angeles, CA 90025
20

21   FOR THE DEFENDANTS:   Mr. Thad C. Kodish
                           Mr. Benjamin K. Thompson
22                         Fish & Richardson PC
                           1180 Peachtree Street NE
23                         21st Floor
                           Atlanta, GA 30309
24

25
```

```
 1   FOR THE DEFENDANTS:    Mr. John W. Thornburgh
                           Fish & Richardson PC
 2                         12860 El Camino Real
                           Suite 400
 3                         San Diego, CA 92130

 4                         Mr. Gil Gillam
                           Gillam & Smith, LLP
 5                         303 South Washington Avenue
                           Marshall, TX 75670
 6
                           Mr. Leonard Davis
 7                         Fish & Richardson PC
                           1717 Main Street
 8                         Suite 5000
                           Dallas, TX 75201
 9

10   COURT REPORTER:       Ms. Shelly Holmes, CSR, TCRR
                           Official Court Reporter
11                         Honorable Robert W. Schroeder III
                           United States District Judge
12                         Eastern District of Texas
                           Texarkana Division
13                         500 North State Line Avenue
                           Texarkana, Texas 75501
14                         shelly_holmes@txed.uscourts.gov

15
     (Proceedings recorded by mechanical stenography, transcript
16   produced on a CAT system.)

17

18

19

20

21

22

23

24

25
```

3

```
 1        COURT SECURITY OFFICER:  All rise.

 2        THE COURT:  Good afternoon.  Please be seated.

 3        For the record, we're here for the evidentiary

 4   hearing on the motions relating to standing in the case of

 5   Headwater Research versus Samsung Electronics, et al., Case

 6   No. 2:22-422 on our docket.

 7        Would counsel state their appearances for the

 8   record?

 9        MR. KRIS DAVIS:  Good afternoon, Your Honor.  This

10   is Kris Davis from Russ August & Kabat on behalf of

11   Plaintiff, Headwater Research LLC.  With me are my

12   colleagues, Reza Mirzaie, Ben Wang, and Jason Wietholter.

13   And also with me is Dr. Greg Raleigh, who is the founder of

14   Headwater and will be testifying today.

15        THE COURT:  All right.  Thank you, Mr. Davis.

16        MR. GILLAM:  Good afternoon, Your Honor.  For

17   Samsung, I'm Gil Gillam.  I'll go around the table here,

18   it's Thad Kodish, John Thornburgh, Ben Thompson, Leonard

19   Davis.  Also have with us from Samsung Mr. Jong Choi back

20   here.  And also appearing today is Charles Walker, outside

21   counsel for Qualcomm.  We're ready to proceed, Your Honor.

22        THE COURT:  All right.  Thank you, Mr. Gillam.

23        Let me call on counsel to advise me of the

24   witnesses that will be called.  I understand that

25   Dr. Raleigh is going to testify.
```

4

```
 1        Does the Plaintiff have any other witnesses?

 2        MR. KRIS DAVIS:  Yes, Your Honor.  So the parties

 3   have conferred, and the witnesses will be Dr. Raleigh.  And

 4   we also have a very short deposition play from

 5   Mr. Raissinia, who is another inventor on the asserted

 6   patents.

 7        THE COURT:  I've seen the excerpts from Mr. -- or

 8   Dr. Raissinia's deposition that were in the record, but I'm

 9   happy to hear whatever else from that deposition that the

10   parties have to offer.

11        MR. KRIS DAVIS:  Thank you.

12        THE COURT:  That's all in terms of witnesses that

13   Headwater will offer?

14        MR. KRIS DAVIS:  That's right, Your Honor.

15        THE COURT:  All right.  Thank you, Mr. Davis.

16        MR. THORNBURGH:  Good afternoon, Your Honor.  John

17   Thornburgh.

18        We would -- we are going to only call Dr. Raleigh.

19   We would suggest that Headwater go first since they have

20   the burden of proof on standing.  And so they call

21   Dr. Raleigh on direct, and then we'll do cross, if that's

22   acceptable to the Court.

23        THE COURT:  All right.  Thank you, Mr. Thornburgh.

24        MR. THORNBURGH:  And I'm prepared to give a very

25   brief opening statement to preview what the evidence will
```

6

1  show, and then I would also propose a very brief closing
2  after the testimony, if that's -- if that's agreeable.
3       THE COURT:  I know I want to hear a closing
4  argument.  As far as an opening, is the Plaintiff prepared
5  to proceed in that fashion as well?
6       MR. KRIS DAVIS:  Your Honor, this is news to us.
7  We can do so if you like.  You know, Your Honor may be
8  familiar enough from the briefing, if you'd like to get
9  into the evidence straightaway.
10      THE COURT:  Well, Mr. Thornburgh, I'll -- let's
11 just hold the argument, then, until after I hear the
12 evidence, and then I'll want all the argument you have to
13 offer.
14      MR. THORNBURGH:  Thank you, Your Honor.  That's
15 very good.
16      THE COURT:  All right.  And I agree with the
17 suggestion that I would rather proceed with the Plaintiff
18 questioning Dr. Raleigh first.  I understand if the Defense
19 does it, they'll jump right into something, whereas I'll
20 get a little more context normally out of the Plaintiff.
21      So if there's nothing else we need to address
22 first, we'll get Dr. Raleigh to come forward.
23      All right.  Dr. Raleigh, would you come up to the
24 witness stand to be sworn?
25      (Witness sworn.)

1       MR. KRIS DAVIS:  And, Your Honor, we have some
2  exhibits for Dr. Raleigh as well.  Would you -- would it be
3  okay with the Court if we approach to hand Dr. Raleigh the
4  exhibits and also the Court?
5       THE COURT:  Yes.  And I assume you have a copy for
6  the Defense as well?
7       MR. KRIS DAVIS:  We do, Your Honor.
8       THE COURT:  All right.
9       MR. KRIS DAVIS:  And, Ms. Andrews, can we please
10 have the Plaintiff's table as well?  Thank you.
11      THE COURT:  Have a seat, sir.
12      And if you would, just pull that microphone up to
13 you, and we'll be able to hear you well.
14      Go ahead, Mr. Davis.
15      GREG RALEIGH, PLAINTIFF'S WITNESS, SWORN
16               DIRECT EXAMINATION
17 BY MR. DAVIS:
18 Q.  All right.  Good afternoon, Dr. Raleigh.
19      Could you please introduce yourself to the Court,
20 including what your role is in this case?
21 A.  My name is Greg Raleigh.  I'm the lead inventor and
22 founder of Headwater Research.
23 Q.  All right.  And as you know, we're here because Samsung
24 alleges that Qualcomm has an ownership interest in
25 Headwater's patents.

7

1       How do you respond to that?
2  A.  Well, it's an entirely false allegation that I don't
3  believe is supported by the meaningful evidence in the case
4  whatsoever.  I guess I can go into some of the details as
5  to why.  It probably won't be exhaustive.
6       But, you know, first and foremost, I know for
7  certainty -- 100 percent certainty that I invented the --
8  conceived and invented the claimed inventions after I left
9  Qualcomm.  I know this because there was a -- if you will,
10 an ah-ha moment, a spark after I left Qualcomm.  I know
11 where I was at the time.  I know when it was.  And it was a
12 radically different notion than anything I had thought of
13 in this area before.  It was radically different than
14 anything I was aware of in the industry.  And it's why I
15 got excited in this area.  And it was counterintuitive and
16 led to a completely different direction.
17      And although that was not in and of itself an
18 invention, that spark, that ah-ha, and the ah-ha was it's
19 not a good idea to do these things that we do at Headwater
20 in the network.  It's better to do it on the device, which
21 led to an entirely new field for me.
22      Over time, that was reduced to practice, and the
23 record is clear on that, how long it took to reduce to
24 practice, make embodiments, create patents, claim patents,
25 and that's clear in the record.  And there's -- since that

8

1  ah-ha moment happened after Qualcomm, I can be 100 percent
2  certain there could not be any meaningful evidence that
3  anything happened at Qualcomm.
4       I guess second, we have clear and free title on
5  the patents.  We did all the diligence we needed to do to
6  file the appropriate assignments.  We were diligent in
7  maintaining our title.  And Headwater owns the patents.
8       There was a vague insinuation at some point by
9  someone inside of Qualcomm that maybe I had invented some
10 of the stuff while I was at Qualcomm, perhaps because it
11 hadn't been very long since I left.
12      But Qualcomm has never made any claim, and they've
13 known about -- they're the first entity I brought the
14 patents and the inventions and the ideas back to.  We
15 described them in great detail, and we provided Qualcomm
16 with my timeline.  We provided them with all the key
17 essential elements, embodiments, disclosures of what the
18 inventions were.  We explained how to work them -- how they
19 would work in the market.  And then on multiple occasions
20 since then, we've disclosed the patent portfolio
21 development to Qualcomm on multiple engagements.
22      Qualcomm has never made a claim against the
23 patents.  Contrary to behaving as an owner, they behaved as
24 a buyer.  On multiple occasions they offered to purchase
25 the patents.  They referred to the patents as Headwater's

10

```
01:31:16   1   patents in written documents offering to purchase the
01:31:20   2   patents.  They offered to invest in the company.  They
01:31:28   3   offered to co-develop products based on the patents.
01:31:28   4        At no time has Qualcomm made a claim.  Qualcomm
01:31:32   5   further gave us comfort in an engagement we had with them
01:31:38   6   in 2017 that the allegation or insinuation of some kind --
01:31:43   7   perhaps because I had just left Qualcomm, we're not really
01:31:46   8   sure -- that that had gone away, that they had consciously
01:31:51   9   allowed the statute of limitations to expire, and that
01:31:55  10   because the statute of limitations had expired, they had
01:31:58  11   full knowledge that they could not make a claim.  And so
01:32:01  12   that gave us comfort to engage two more times with Qualcomm
01:32:06  13   while Qualcomm considered purchasing the patents and/or the
01:32:10  14   company.
01:32:10  15        Third, I'm a well-known and I would say successful
01:32:15  16   inventor.  I've invented in four different fields.  My
01:32:20  17   inventions are used by billions of people every day in very
01:32:25  18   meaningful and well-known ways in their lives.  I'm very
01:32:29  19   good at invention.  I can invent in any area I want.  My
01:32:34  20   talents are sought after.  I've started many companies, and
01:32:38  21   I can start more.
01:32:39  22        For the Court to believe Samsung's theory, the
01:32:43  23   Court would have to believe that, first of all, I'm amoral,
01:32:47  24   and essentially a criminal, that I would take something
01:32:49  25   that doesn't belong to me, essentially steal.
```

```
01:52:52   1        Second, given all my options as a good inventor,
01:52:57   2   that I would spend 13 years of my life on this planet
01:53:02   3   working on patents, inventions, product, businesses that
01:53:08   4   don't belong to me or don't belong to my company.  So
01:53:12   5   that's quite a stretch, I believe, given my record and the
01:53:17   6   things that I've done.
01:53:18   7        Fourth, which is quite curious, Samsung's
01:53:22   8   attorneys hang their hat on this passing comment I made in
01:53:27   9   a panel session.  I'm sure they've looked at everything
01:53:31  10   I've ever said in my life.  They say that my passing
01:53:39  11   comment proves that I showed Paul Jacobs something,
01:53:44  12   Paul Jacobs being the then CEO of Qualcomm, Dr. Paul
01:53:50  13   Jacobs, CEO -- likely -- arguably the most powerful
01:53:55  14   wireless technology company in the world, likely the most
01:53:58  15   powerful intellectual property company in the U.S., that I
01:54:03  16   pitched to Paul Jacobs, before I left Qualcomm in 2008, the
01:54:07  17   same quote, unquote, ideas that I went off and patented and
01:54:13  18   then came back to Paul in 2009, six months later, and
01:54:18  19   although Paul wasn't interested at all in the ideas in
01:54:22  20   2008, he was suddenly very interested in the ideas in 2009,
01:54:27  21   so much so that he assembled a team to see if he could
01:54:30  22   acquire and/or invest in the company and partner with us on
01:54:34  23   our products.
01:54:34  24        So that assumes someone not sophisticated would
01:54:41  25   not, A, recognize it's the same invention, would change
```

11

```
01:54:43   1   their mind about the invention, and also not recognize that
01:54:46   2   since I pitched it when I was there, it belonged to
01:54:49   3   Qualcomm.
01:54:50   4        There are many other reasons that I think this is
01:54:53   5   baseless and that the record shows that.  There's a
01:54:57   6   handful.
01:54:58   7   Q.  All right.  Thank you.
01:54:59   8        Now, has any person or company ever filed a claim
01:55:04   9   alleging that it owns any Headwater patents?
01:55:07  10   A.  Never has it been filed, nor has it been alleged to us
01:55:13  11   verbally.
01:55:13  12   Q.  Now, over the course of your career, about how many
01:55:16  13   patents or patent applications name you as an inventor?
01:55:20  14   A.  Roughly 600.
01:55:21  15   Q.  Can you briefly tell us about your educational
01:55:24  16   background?
01:55:24  17   A.  I have an electrical engineering Bachelor's of Science
01:55:31  18   from California Polytechnics, San Luis Obispo, and a
01:55:32  19   master's degree and a Ph.D. from Stanford University.
01:55:36  20   Q.  And what did you do after Stanford?
01:55:39  21   A.  I started my first company, Clarity Wireless.
01:55:44  22   Q.  Did you invent anything during your time at Clarity?
01:55:49  23   A.  At Clarity, we invented what is now the core technology
01:55:50  24   in all mobile phones.  It's in 4G, 5G, and 6G.  It's called
01:55:55  25   MIMO-OFDM.  And we proved the technology worked and
```

12

```
01:56:00   1   developed the first prototypes.
01:56:02   2   Q.  Were you named as an inventor on any patents as part of
01:56:06   3   that work at Clarity?
01:56:07   4   A.  Yes, roughly three dozen patents that are the core
01:56:11   5   seminal patents in MIMO-OFDM.
01:56:17   6   Q.  And was Clarity acquired by another company?
01:56:19   7   A.  Clarity was acquired by Cisco Systems.
01:56:21   8   Q.  And what did you do after your time at Clarity and
01:56:24   9   Cisco?
01:56:24  10   A.  I started my second company, Airgo Networks.
01:56:29  11   Q.  Did you invent anything while you were at Airgo?
01:56:32  12   A.  We did.  We invented a brand new way to do WiFi.  The
01:56:37  13   industry became excited about it and created a standard
01:56:38  14   called 802.11(n) around the technology we created.  And we
01:56:44  15   had patented inventions that dealt with various smart
01:56:48  16   antenna techniques to improve WiFi and adaptations of MIMO
01:56:52  17   so that it would work in a WiFi environment.  And those
01:56:58  18   technologies are now in every WiFi device today.
01:57:00  19   Q.  And were you named as an inventor on those patents you
01:57:03  20   mentioned?
01:57:03  21   A.  I was.  I was a named inventor on three patents at
01:57:07  22   Airgo.
01:57:08  23   Q.  Was Airgo acquired?
01:57:10  24   A.  Airgo was acquired by Qualcomm.
01:57:12  25   Q.  And after the acquisition by Qualcomm, did you stay on
```

14

```
01:17:16   1   at Qualcomm?
01:17:17   2   A.  I did.  I stayed with Qualcomm for two years after the
01:17:21   3   acquisition.
01:17:22   4   Q.  Did you invent anything while you were at Qualcomm?
01:17:24   5   A.  I did not.  My job was not technical.  They separated
01:17:30   6   the engineering team at Airgo and placed them under the
01:17:33   7   engineering leadership at Qualcomm.  And they asked me to
01:17:37   8   take a business strategy and various business roles relying
01:17:43   9   more on my entrepreneurial background as opposed to my
01:17:47  10   inventor/engineering background.
01:17:49  11   Q.  Now, while you were at Qualcomm, did you work on end
01:17:53  12   user applications for mobile devices like are claimed in
01:17:57  13   the patents here?
01:17:57  14   A.  No.
01:17:58  15   Q.  Did you work on determining whether applications are
01:18:01  16   running in the foreground or background, like claimed in
01:18:04  17   the patents here?
01:18:05  18   A.  No, nothing like that.
01:18:07  19   Q.  Did you work on determining whether applications are
01:18:10  20   interacting with a user as claimed in the patents here?
01:18:13  21   A.  No.
01:18:15  22   Q.  Did you work on differential traffic control policies
01:18:18  23   as claimed in the patents here?
01:18:20  24   A.  Not at all.
01:18:20  25   Q.  Did you work on application program interfaces that
```

15

```
01:19:33   1   a reference to U.S. Patent No. 9,143,976?
01:19:41   2   A.  I see that.
01:19:42   3   Q.  Can you explain what this document shows?
01:19:43   4   A.  This document is the USPTO patent assignment record for
01:19:49   5   the '976 patent which is at issue here in this case.
01:19:53   6   Q.  Okay.  And what are the assignments that are referenced
01:19:56   7   here?
01:19:56   8   A.  Assignment 1 is the assignment from myself and the
01:20:01   9   other two co-inventors, Ali Raissinia and James Lavine, to
01:20:07  10   a company called Headwater Partners I, which was the
01:20:13  11   first company that I actually started after leaving
01:20:15  12   Qualcomm.
01:20:15  13       And then there's an Assignment 2 that assigns from
01:20:21  14   Headwater Partners I to Headwater Research, which was the
01:20:23  15   merger of Headwater Partners I with a separate company we
01:20:27  16   had for essentially administerial work, accounting, and so
01:20:33  17   on.  So we merged those together to form Headwater
01:20:36  18   Research, and this maintains the ownership from Partners I
01:20:40  19   to Headwater Research.
01:20:41  20   Q.  Okay.
01:20:42  21       MR. KRIS DAVIS:  Let's go on to Exhibit 2.
01:20:43  22   Q.  (By Mr. Davis)  Do you see this references U.S. Patent
01:20:48  23   No. 9,277,445?
01:20:50  24   A.  Yes.
01:20:51  25   Q.  And what does this document show?
```

16

```
01:18:25   1   indicate network access conditions to a mobile device
01:18:28   2   application like claimed in the patents here?
01:18:30   3   A.  Nothing at all like that.
01:18:33   4   Q.  Okay.  Now, after you left Qualcomm, where did you
01:18:35   5   work?
01:18:36   6   A.  So after Qualcomm, I started Headwater Research, and we
01:18:42   7   also started a closely related company, ItsOn.  Headwater
01:18:48   8   was in charge of invention and patenting the technology,
01:18:53   9   licensing the technology, and ItsOn had a license to the
01:18:58  10   technology and developed products.
01:18:59  11   Q.  And approximately how many patents does -- or patent
01:19:02  12   applications does Headwater have?
01:19:03  13   A.  Patents and patent applications?
01:19:05  14   A.  Yes.
01:19:06  15   A.  Roughly 500.
01:19:06  16   Q.  All right.  And roughly how many of those name you as
01:19:10  17   an inventor?
01:19:10  18   A.  I believe all, or if not all, virtually all.
01:19:14  19   Q.  Are there any assignment records identifying Headwater
01:19:18  20   Research as the owner of the asserted patents?
01:19:20  21   A.  Yes, each and every patent is properly assigned to
01:19:25  22   Headwater Research.
01:19:23  23   Q.  Okay.
01:19:28  24       MR. KRIS DAVIS:  Let's pull up Exhibit 1.
01:19:29  25   Q.  (By Mr. Davis)  And do you see near the top of the page
```

```
01:20:52   1   A.  '445 is another patent asserted in this case.  And,
01:20:58   2   again, this is the same set of assignments, first from the
01:21:03   3   inventors to Headwater Partners I, and then from Headwater
01:21:07   4   Partners I to Headwater Research after the -- or during and
01:21:09   5   after the merger.
01:21:09   6   Q.  Okay.  And now Exhibit 3, do you see this references
01:21:14   7   U.S. Patent No. 9,271,184?
01:21:19   8   A.  Yes.
01:21:19   9   Q.  And what does this show?
01:21:20  10   A.  '184, another patent in the case, and it's the same
01:21:25  11   assignment process.
01:21:27  12   Q.  Okay.
01:21:28  13       MR. KRIS DAVIS:  Let's pull up Exhibit 4.
01:21:30  14   Q.  (By Mr. Davis)  That refers to U.S. Patent No.
01:21:35  15   9,609,544.
01:21:36  16       Do you see that?
01:21:36  17   A.  Yes.
01:21:37  18   Q.  What does this show?
01:21:38  19   A.  For the '544 patent, which is also asserted here, this
01:21:43  20   has the same assignment process.
01:21:45  21   Q.  All right.  Now, were any of the claimed inventions
01:21:49  22   that are at issue here conceived or reduced to practice
01:21:52  23   while you were at Qualcomm?
01:21:54  24   A.  No.
01:21:55  25   Q.  Did you use any Qualcomm resources to conceive or
```

18

```
01:21:59   1   reduce to practice any Headwater inventions?
01:22:02   2   A.  No.  And, again, because I'm absolutely certain of the
01:22:06   3   ah-ha moment and it took time after the ah-ha moment to
01:22:11   4   create the concepts and inventions in the patents, I was
01:22:16   5   gone from Qualcomm at that point in time.  And since I was
01:22:19   6   gone from Qualcomm, I had no access to any resources at
01:22:22   7   Qualcomm.
01:22:22   8   Q.  When specifically did you leave Qualcomm?
01:22:24   9   A.  I left Qualcomm on September 19th, 2008.
01:22:27  10   Q.  And what prompted you to leave Qualcomm?
01:22:32  11   A.  Well, the main reason I left is when I first joined
01:22:36  12   Qualcomm, when they purchased my company, they said I would
01:22:41  13   be able to work in Northern California near my home, but
01:22:45  14   they -- because they assigned me managerial duties,
01:22:48  15   strategy duties, I had to interact with many people down in
01:22:52  16   the corporate offices in San Diego, and it just proved
01:22:54  17   ineffective for me to try to work remotely.
01:22:54  18        So I ended up working at Qualcomm Monday through
01:22:58  19   Friday every week, and then flying home to be with my
01:23:00  20   family on the weekends.  My daughter was graduating from
01:23:04  21   high school that year, and it was the last year she was
01:23:07  22   going to be with us at home.  And I told Qualcomm I had to
01:23:11  23   be home for my daughter's senior year.
01:23:14  24   Q.  And when you were starting to consider leaving
01:23:18  25   Qualcomm, did you discuss that with anyone at the company?
```

19

```
01:24:53   1   comment as proof of that.
01:24:54   2   Q.  Now, when you talked with Dr. Jacobs in 2008, was he
01:25:01   3   interested in what you were discussing with him?
01:25:03   4   A.  He was not on this particular thing.  Again, we looked
01:25:09   5   at many things together.
01:25:10   6        So specifically what I shared with him, I was
01:25:12   7   aware of a market need for new mobile -- mobile value added
01:25:21   8   network operators, MVNO.  What that is it's basically a
01:25:29   9   service provider that wholesales bandwidth from a wireless
01:25:33  10   carrier and then redistributes it in some way.
01:25:35  11        And many companies in the market wanted technology
01:25:41  12   to enhance what the value added network operators could do,
01:25:45  13   and I thought that was an interesting area and might add
01:25:50  14   value to Qualcomm if Qualcomm were to do that.
01:25:51  15        The technology involved was improvements to mobile
01:25:55  16   network operating systems.  So it was various types of
01:25:59  17   network equipment and operating systems to essentially
01:26:04  18   manipulate traffic from applications.
01:26:07  19        I didn't know very much about it.  It was outside
01:26:09  20   of my field.  I was well aware of the market need because
01:26:14  21   it was something that, you know, many people in the
01:26:17  22   industry were aware of.  Many people were working on it,
01:26:21  23   mostly equipment suppliers.  So I suggested perhaps I would
01:26:23  24   go research in that direction, see if I could come up with
01:26:26  25   something and -- that would be a value to Qualcomm.
```

20

```
01:23:20   1   A.  I did.  Primarily Dr. Jacobs.  I had done some strategy
01:23:24   2   work for him.  He liked my --
01:23:29   3   Q.  I'm sorry, who is Dr. Jacobs again?
01:23:33   4   A.  Again, as I mentioned earlier, Paul Jacobs was the CEO
01:23:35   5   of Qualcomm at the time.
01:23:36   6   Q.  Thank you.
01:23:38   7   A.  So he liked some work that I had done for him.  He
01:23:40   8   wanted me to stay and be on his staff.  We went through a
01:23:46   9   series of potential projects I would work on at Qualcomm to
01:23:50  10   see if there was something that I was interested in that
01:23:53  11   would benefit Qualcomm in his view.  And he said I could
01:23:55  12   have an office in the Bay Area and work, you know, very
01:23:59  13   close to home to do this work for him.
01:24:01  14        So we explored over probably a four-month period a
01:24:05  15   pretty wide variety of projects, and we couldn't come up
01:24:08  16   with anything that he thought was viable to Qualcomm that I
01:24:13  17   was interested in, so I left.
01:24:15  18   Q.  Has your conversation with Dr. Jacobs in 2008 come up
01:24:20  19   in Samsung's allegations in this case?
01:24:22  20   A.  It has.  And this is this, you know, unsupportable
01:24:29  21   theory that somehow this passing comment I made in this
01:24:35  22   panel session explains what I talked to Dr. Jacobs about
01:24:41  23   before I left and that I had talked to Dr. Jacobs about
01:24:44  24   these -- conceiving these specific inventions, and I
01:24:48  25   suppose others, and they're referencing that passing
```

```
01:26:29   1        So that was the specific conversation I had with
01:26:32   2   Paul before I left Qualcomm that I was referencing in that
01:26:37   3   panel session.
01:26:38   4   Q.  Okay.  Now, was there anything besides wanting to be at
01:26:43   5   home more and your conversations with Dr. Jacobs that drove
01:26:47   6   the timing of when you left Qualcomm?
01:26:48   7   A.  Yeah.  There was another event.  So as I was discussing
01:26:53   8   with Paul and we hadn't found anything yet, what I might
01:26:59   9   work on, I had mentioned to Best Buy that I might be
01:27:02  10   leaving Qualcomm, and Best Buy was very interested in
01:27:07  11   having me help them with an MVNO that they wanted to build.
01:27:12  12   So they asked me if I would be willing to help them
01:27:18  13   evaluate vendor solutions for network equipment and
01:27:22  14   potentially start a company that would take the other
01:27:24  15   vendor equipment and integrate it together into a
01:27:28  16   comprehensive solution for Best Buy.
01:27:32  17        Because I was interested in this general area, I
01:27:35  18   thought, you know, that might be worth doing.  And I also
01:27:37  19   that, well, here I'm going to be able to sit in for a few
01:27:42  20   days on vendor presentations that they were going to have
01:27:44  21   and have state of the art presented to me on Best Buy's
01:27:47  22   side of the table, and in a few days, I could replace, you
01:27:51  23   know, months and months of research on my part by seeing
01:27:55  24   exactly what state of the art was in the industry from
01:27:58  25   these network equipment vendors, these mobile network
```

22

```
01:27:58   1   operating systems.
01:28:03   2        So I told them I might -- oh sorry.
01:28:06   3        I told them I could possibly do that, but then
01:28:08   4   when it became clear with Paul that there was not going to
01:28:11   5   be something I wanted to work on at Qualcomm, that put a
01:28:15   6   bit of a time pressure on me to leave Qualcomm in time to
01:28:19   7   do some cursory preparation and get to the Best Buy meeting
01:28:24   8   so that, you know, I would have a corporate entity to, you
01:28:28   9   know, represent, and I could sit on Best Buy's side of the
01:28:31  10   table to listen to these vendor presentations.
01:28:35  11   Q.  So after you saw these vendor presentations at the Best
01:28:39  12   Buy meetings, what did that lead you to?
01:28:42  13   A.  So it's very interesting.  They were all pitching, you
01:28:47  14   know, what I was somewhat aware of, state of the art to do
01:28:50  15   these MVNO application-specific type services, activation
01:28:57  16   services, and so on.
01:28:58  17        And one of the things Best Buy asked me to do was
01:29:01  18   ask pointed questions, form an opinion, and give them a
01:29:02  19   debrief.  So I did that.  And, you know, once the
01:29:05  20   presentations were over, I felt strongly that they were not
01:29:08  21   going to do a very good job -- these equipment solutions
01:29:11  22   were not going to do a very good job of satisfying the
01:29:14  23   market needs that Best Buy had identified.
01:29:17  24        So I told Best Buy that in the debrief after the
01:29:20  25   vendors had presented, and they asked me, okay, well, what
```

23

```
01:30:46   1   direction.  That's also the spark that didn't exist at
01:30:50   2   Qualcomm, and that's why I know for a fact 100 percent
01:30:54   3   nothing was invented at Qualcomm.  Nothing was conceived at
01:30:57   4   Qualcomm.
01:30:57   5        So the conversation with Paul was a research
01:31:01   6   direction, not something that could be owned.  And not
01:31:04   7   only was it a research direction, it wasn't even the
01:31:08   8   right direction.  And that's why when I came back and
01:31:12   9   showed him something else, he was excited, and why he
01:31:18  10   wasn't excited when I showed it to him the first time -- or
01:31:20  11   not even showed it to him.  The "it" was the market need.
01:31:23  12   And, you know, here's a direction we could go, the
01:31:27  13   conventional direction, network operating systems,
01:31:30  14   network technology, and he didn't like that because it
01:31:33  15   wasn't his business, whereas something on the device was
01:31:37  16   his business.
01:31:38  17   Q.  Okay.
01:31:40  18        MR. KRIS DAVIS:  Let's pull up Exhibit 5.
01:31:41  19   Q.  (By Mr. Davis)  Now, if you look at the top left
01:31:45  20   corner, do you see Application No. 61/206,354?
01:31:50  21   A.  Yes.
01:31:51  22   Q.  And do you see next to that a filing date of January
01:31:54  23   28th, 2009?
01:31:56  24   A.  Yes.
01:31:56  25   Q.  Did you have any co-inventors on this '354 application?
```

24

```
01:29:24   1   do you want to do?  And I said, you know, let me think
01:29:27   2   about it.  I'll give it some thought, I'll go away, see if
01:29:32   3   maybe I can come up with an answer.  And if I can, I'll
01:29:35   4   come back and see if we can work together on a better
01:29:37   5   solution.
01:29:38   6        So I was excited because the kind of thing I like
01:29:44   7   to do is something the rest of the world hasn't thought
01:29:48   8   about, and it's counterintuitive for the world.  So I
01:29:51   9   started thinking through what are the other approaches that
01:29:54  10   you could pursue here to solve these market needs?
01:29:58  11        And it was -- actually the ah-ha moment for me was
01:30:02  12   on the airplane on the way back from that Best Buy meeting.
01:30:06  13   It hit me that, you know, the problem is you're trying to
01:30:08  14   do things in the network where you don't have enough
01:30:11  15   information about what the applications are doing, but if
01:30:15  16   you move -- if you could find a way to move technology onto
01:30:19  17   the device -- and there was a lot of challenges with
01:30:21  18   that -- but if you could find a way to move technology onto
01:30:25  19   the device and try to solve the problem there, it would
01:30:27  20   open up a whole new world of opportunity for products,
01:30:33  21   inventions, et cetera.
01:30:34  22        So that was the spark that got me going in the
01:30:38  23   direction of these claimed inventions and many others.
01:30:41  24   These claimed inventions came, you know, almost two years
01:30:44  25   later, but that was the spark that got me going in this
```

24

```
01:32:03   1   A.  No.  At this point I was the only inventor.  It was
01:32:09   2   before we had financing to hire other people.
01:32:12   3   Q.  Okay.
01:32:13   4        MR. KRIS DAVIS:  Now let's pull up Exhibit 6.
01:32:15   5   Q.  (By Mr. Davis)  And if you look at the top left corner,
01:32:17   6   do you see Application No. 61/348,022?
01:32:22   7   A.  Yes.
01:32:22   8   Q.  And next to that is a filing date of May 25th, 2010.
01:32:26   9   Do you see that?
01:32:27  10   A.  Yes.
01:32:27  11   Q.  Did you have any co-inventors on this '022 application?
01:32:31  12   A.  Yes.  This is the provisional -- it had -- the first
01:32:36  13   place we had all the embodiments for the asserted claims in
01:32:40  14   this case.  And my other co-inventors were, again, Ali
01:32:44  15   Raissinia and James Lavine, as we discussed earlier.
01:32:47  16   Q.  And did Mr. Lavine or Mr. Raissinia ever work at
01:32:54  17   Qualcomm?
01:32:54  18   A.  Jim Lavine did not.  Ali Raissinia did.
01:33:00  19   Q.  Okay.  Did you ever work with Mr. Raissinia on any
01:33:04  20   inventions of any kind while either of you were at
01:33:07  21   Qualcomm?
01:33:07  22   A.  No.  Again, the Airgo engineering team, he was a member
01:33:11  23   of the Airgo engineering team.  They were separated from my
01:33:16  24   group, and I was in an entirely different group working on
01:33:21  25   different matters.  We saw each other very infrequently in
```

```
01:33:25   1   summary meetings discussing, you know, WiFi product
01:33:26   2   progress, but never really interacted much there.  And we
01:33:30   3   certainly didn't interact on any sort of technology.
01:33:34   4   Q.  All right.
01:33:35   5        MR. KRIS DAVIS:  Now, let's pull up Exhibit 8.
01:33:37   6   Q.  (By Mr. Davis)  And if we focus on the middle of this
01:33:40   7   first page, do you see the document is titled:  Plaintiff
01:33:44   8   Headwater Research LLC's 7th Supplemental Objections and
01:33:47   9   Responses to Defendants' First Set of Interrogatories,
01:33:50  10   Nos. 1 through 12?
01:33:52  11   A.  I see that heading, yes.
01:33:55  12   Q.  Okay.
01:33:56  13        MR. KRIS DAVIS:  Let's turn to Page 36.
01:33:57  14   Q.  (By Mr. Davis)  Do you see at the bottom of Page 36
01:34:03  15   there's a heading:  Fourth Supplemental Response to
01:34:05  16   Interrogatory No. 2, March 15th, 2024?
01:34:08  17   A.  I see that.
01:34:11  18   Q.  Okay.  And I believe on the screen, we have the
01:34:13  19   response that continues on the next page.  Can you read for
01:34:16  20   us that response?
01:34:16  21   A.  Subject and without waiving the foregoing objections --
01:34:24  22   subject to, sorry -- Headwater contends for purposes of
01:34:26  23   this action, that the asserted patents are entitled to a
01:34:29  24   priority date of May 25th, 2010.
01:34:33  25   Q.  Are you aware of Samsung ever disputing that the
```

```
01:34:36   1   priority date of the asserted patents is May 25th, 2010?
01:34:40   2   A.  Not to my knowledge.
01:34:41   3   Q.  Now, let's turn to Page 8 of this same exhibit.
01:34:51   4        Do you see the heading near the bottom of the page
01:34:51   5   that reads:  First Supplemental Response to Interrogatory
01:34:54   6   No. 1, dated June 8th, 2023?
01:34:57   7   A.  Yes.
01:34:58   8   Q.  Okay.  Now, that response continues on to the next
01:35:03   9   page, Page 9.  And I wanted to point out about six lines
01:35:10  10   from the bottom of Page 9, there's a sentence that begins
01:35:12  11   with the phrase "various features."  Do you see that?
01:35:14  12   A.  Yes, I see it highlighted.
01:35:16  13   Q.  Can you read that for us?
01:35:17  14   A.  Various features of the inventions of the asserted
01:35:21  15   patents were conceived of and reduced to practice by the
01:35:24  16   named inventors between Fall 2008 and no later than the
01:35:28  17   filing of the '354 application.
01:35:31  18   Q.  All right.  And the '354 application, was that the one
01:35:34  19   filed in January of 2009 with only you as an inventor?
01:35:38  20   A.  Yes.  That was my first provisional.
01:35:42  21   Q.  Okay.  Can you explain why this response says that
01:35:44  22   various features of the asserted patents were conceived
01:35:48  23   prior to filing the application?
01:35:50  24   A.  Yes.  It's saying that some aspects in the disclosure
01:35:56  25   and in the embodiments that are required to support perhaps
```

```
01:35:59   1   some of the claimed limitations were in the '354
01:36:04   2   applications but not all.
01:36:05   3        MR. KRIS DAVIS:  All right.  Now let's pull up
01:36:06   4   Exhibit 7.
01:36:07   5   Q.  (By Mr. Davis)  Do you see this is U.S. Patent No.
01:36:13   6   9,143,976?
01:36:14   7   A.  Yes.
01:36:15   8   Q.  This is one of the asserted patents here?
01:36:17   9   A.  Yes.  This is -- this is what came from the provisional
01:36:21  10   '022.
01:36:22  11   Q.  Okay.  Now, just below the title of the patent, who are
01:36:25  12   listed as the inventors?
01:36:28  13   A.  Yes, again, the same three inventors, myself, James
01:36:31  14   Lavine, and Ali Raissinia.
01:36:33  15   Q.  All right.  So let's go to the end of the document so
01:36:36  16   that we can look at Claim 1.
01:36:39  17   Q.  Can you give me an example of an element of '976,
01:36:44  18   Claim 1, that was conceived after the '354 application in
01:36:48  19   January 2009?
01:36:57  20   A.  So I won't take the time to read the whole claim again,
01:37:02  21   but I do see several.  I'll start with one, and then I
01:37:06  22   can -- I can do more if you would like.  I'll start with
01:37:06  23   the first one.
01:37:09  24        So there's Limitation 1, a wireless wide area
01:37:16  25   network, et cetera; Limitation 2, wireless local area
```

```
01:37:19   1   network, et cetera; and then a third limitation, under a
01:37:23   2   display device starting with one or more processors
01:37:26   3   configured to.  And then this limitation here:  Classify,
01:37:29   4   for a first end-user application capable of interacting in
01:37:34   5   the device display foreground with a user and capable of at
01:37:37   6   least some Internet service activity when not interacting
01:37:40   7   in a device display foreground with the user, whether or
01:37:46   8   not the first end-user application, when running, is
01:37:46   9   interacting in the device display foreground with user.
01:37:53  10        So that's a limitation that requires the
01:37:54  11   embodiment support that is in '022 which then the '976
01:38:02  12   followed from that provisional.
01:38:03  13   Q.  And do you recall whether you conceived of the -- this
01:38:07  14   user interaction feature by yourself or in conjunction with
01:38:09  15   any co-inventors?
01:38:11  16   A.  Yes.  The '022 provisional was a collaboration between
01:38:16  17   myself, James Lavine, and Ali Raissinia, and we all
01:38:20  18   collaborated and brainstormed the embodiments, you know,
01:38:25  19   the descriptions, the texts, the specs, and we also all
01:38:30  20   worked with attorneys to conceive what, you know, claims --
01:38:37  21   the claim limitations might be.  And we did that in a very
01:38:39  22   collaborative matter.  We, you know, brainstormed and then
01:38:44  23   overlooked each other's work.
01:38:45  24   Q.  I see.  And that '022 application with your
01:38:49  25   co-inventors, that was filed May 25th, 2010; is that right?
```

30

```
01:38:52   1   A.  Yes, I believe that's right.
01:38:54   2   Q.  How long after you left Qualcomm was the '022
01:38:59   3   application filed?
01:38:59   4   A.  So May 2010 to May 29 would be 12 months, and then May
01:39:08   5   28 would be 24.  I left in September.  So that'd be 20
01:39:13   6   months.
01:39:13   7   Q.  20 months you said?
01:39:15   8   A.  Yeah, 20 months.
01:39:16   9   Q.  Okay.  All right.  So now since the time you left
01:39:20   10  Qualcomm in September 2008, have you had interactions with
01:39:22   11  Qualcomm relating to Headwater?
01:39:25   12  A.  Many.
01:39:27   13  Q.  All right.  Let's start with the first of those
01:39:30   14  interactions.
01:39:30   15       Can you explain what that was?
01:39:31   16  A.  Well, the first series interaction -- I mean, we have
01:39:36   17  good -- we've always had good relationships with Qualcomm,
01:39:38   18  despite this -- whatever this insinuation was at some
01:39:43   19  point.  So we stayed in close touch, and, you know, I
01:39:47   20  regularly briefed my colleagues on progress.
01:39:50   21       And then in 2017, Qualcomm was interested in
01:39:52   22  purchasing --
01:39:52   23  Q.  Oh, I'm sorry, can you name the -- was 2017 the first
01:39:54   24  interaction?
01:39:56   25  A.  Oh, the first interaction?  Oh, I'm sorry.  So the very
```

```
01:39:59   1   first interaction was 2009.  So -- okay.  So in 2009, as I
01:40:04   2   mentioned earlier -- I thought you were asking about
01:40:09   3   subsequent -- I brought the ideas back to Qualcomm that I
01:40:16   4   had come up with since I left.
01:40:20   5       And I called Paul Jacobs, and I said:  Paul, you
01:40:25   6   know, I think I've come up with something important that
01:40:27   7   might be of interest to Qualcomm, and I think there's a way
01:40:32   8   for us to work together on this and maybe have mutual
01:40:34   9   benefit for the company that I've started in Qualcomm.
01:40:39   10  Would you be willing to sign an NDA and have a team, you
01:40:43   11  know, look at what I've created and see if we can do
01:40:43   12  business together.
01:40:43   13       And so he said:  Sure.  And he put together a
01:40:46   14  technical team and a business team and an intellectual
01:40:50   15  property team.  I then came back a month or two later to
01:40:56   16  San Diego, and I pitched to Paul and the people -- the
01:41:01   17  executive leadership that I brought together to evaluate
01:41:05   18  our technology, and I went through my timeline as to, you
01:41:10   19  know, where this came from, discussed with them, you know,
01:41:12   20  looked at the network, the technology didn't seem to work,
01:41:17   21  came up with this notion.  And then here's all the
01:41:20   22  important embodiments, here's the kind of inventions we can
01:41:23   23  create with this, here's some of the first claims we're
01:41:26   24  working on, and here's what we think we can do with you in
01:41:30   25  the market.  We can integrate this into your chipset, and
```

31

```
01:41:33   1   this will be -- we think this will be a value to Qualcomm.
01:41:35   2       So Paul got very, very excited, and he asked the
01:41:39   3   team to move forward with me.  And he said:  I just want to
01:41:43   4   do this.  Let's do a deal.
01:41:45   5   Q.  And now when Samsung refers to your video remarks in
01:41:49   6   2021, were those remarks about a conversation you had with
01:41:53   7   the same Paul Jacobs in 2008?
01:41:56   8   A.  Right.  That -- that's the part that doesn't hold any
01:42:00   9   water.
01:42:00   10      So they say that in 2008 when in reality what I
01:42:03   11  talked to Paul about was a research direction in the area
01:42:06   12  of network equipment technology, it's supposed to be the
01:42:10   13  same thing that I then brought back to him six months later
01:42:14   14  after I went off and patented it and all of a sudden he
01:42:17   15  didn't like it in 2008.  Six months later he loved it.
01:42:21   16      The reason he loved it in 2009 is because it was
01:42:25   17  entirely different, completely unrelated in every way.  Was
01:42:32   18  not conceived at Qualcomm, something very different.
01:42:36   19  Q.  Now, did --
01:42:38   20  A.  If I may -- sorry, if I may be --
01:42:40   21  Q.  Oh, sure.
01:42:43   22  A.  Just specifically, 2008, the research direction was in
01:42:43   23  networks.  That's not Qualcomm's business.  2009, the
01:42:50   24  actual invention that I had come up with was one on
01:42:57   25  devices.  So devices was Qualcomm's business, and that was
```

32

```
01:42:59   1   the big switch.  And it was something that he could see was
01:43:02   2   going to work.
01:43:03   3   Q.  I see.  And when you say devices, are you referring to
01:43:07   4   like a mobile device, a smartphone?
01:43:10   5   A.  Yes.  Network equipment versus an end-user device that
01:43:15   6   connects to the network.
01:43:17   7   Q.  Okay.
01:43:18   8   A.  And Qualcomm's main business is chipsets, and this is
01:43:20   9   something we could put into the software that goes with the
01:43:24   10  chipsets.  And that's why it was so compelling for him.
01:43:27   11  Q.  Now, did Headwater ultimately reach a deal with
01:43:30   12  Qualcomm through that discussion in 2009?
01:43:33   13  A.  No.  There was goodwill on both sides.  The group Paul
01:43:37   14  assigned wanted to do a deal.  We discussed many different
01:43:43   15  possibilities, starting with possible acquisition, leading
01:43:47   16  to various offers to invest in Headwater and ItsOn.  And
01:43:52   17  ultimately we decided that we couldn't do a deal with
01:43:54   18  Qualcomm.
01:43:54   19  Q.  And why was that?
01:43:56   20  A.  Well, the main reason was that there was this -- so at
01:44:01   21  some point, our business contacts told us it was -- I think
01:44:08   22  it was after they said they wanted to acquire -- first,
01:44:11   23  Paul wanted to acquire, and we were talking about an
01:44:14   24  acquisition offer.  And then they said:  Oh, well, someone
01:44:16   25  inside of Qualcomm, someplace in the organization has --
```

34

```
01:44:22   1   you know, made the insinuation maybe you came up with some
01:44:26   2   of this while you were at Qualcomm.  You know, it's been
01:44:29   3   very little time since you left.  And how can you invent
01:44:32   4   all of this in a short period of time?  And so this
01:44:35   5   insinuation arose.
01:44:38   6          So to summarize, we got to a point where we said:
01:44:44   7   You know, we're not going to do business with you unless
01:44:46   8   you remove this insinuation because, you know, you're
01:44:51   9   essentially using it as leverage to try to get more things
01:44:53  10   from us than you otherwise would.
01:44:57  11   Q.  And did your business contacts within Qualcomm ever
01:45:02  12   tell you specifically who made this insinuation?
01:45:04  13   A.  Never.
01:45:05  14   Q.  Did your business contact ever send you any alleged
01:45:08  15   evidence that Qualcomm had that you did something improper?
01:45:12  16   A.  No, we -- the first thing we said is this is
01:45:15  17   impossible.  It didn't happen.  We know exactly the moment
01:45:19  18   that the ah-ha happened that led to the inventions.  Since
01:45:23  19   that was after Qualcomm, it's impossible anything could be
01:45:27  20   at Qualcomm.  If you think you have something, show it to
01:45:30  21   us.
01:45:30  22   Q.  And did you ever give Qualcomm any information that you
01:45:33  23   believed showed that you conceived the inventions after you
01:45:36  24   left Qualcomm?
01:45:36  25   A.  Yes, yes.  I spelled out all of the facts I'm
```

35

```
01:47:06   1   Q.  (By Mr. Davis)  It looks like this is a PowerPoint
01:47:08   2   titled:  ItsOn Business Strategy Re-Synch.
01:47:14   3          Do you see that?
01:47:14   4   A.  I do.
01:47:15   5   Q.  And do you have any understanding of when this document
01:47:17   6   was produced to Samsung in this case?
01:47:18   7   A.  Yes, I know that this was one of the very first
01:47:21   8   documents we produced to Samsung over a year ago.
01:47:27   9          MR. KRIS DAVIS:  Now, let's turn to the page
01:47:29  10   labeled 13720.
01:47:32  11   Q.  (By Mr. Davis)  Do you see that this slide is titled:
01:47:32  12   Agreement Needed on Approach to QC and Future Diligence?
01:47:40  13   A.  Yes.
01:47:40  14   Q.  All right.  And, Dr. Raleigh, if you could just speak
01:47:42  15   up a little bit more.
01:47:43  16   A.  Sorry.
01:47:43  17   Q.  Thank you.
01:47:43  18   A.  I'm not used to a microphone.
01:47:43  19   Q.  No problem.
01:47:48  20          Who does QC refer to?
01:47:49  21   A.  Qualcomm.
01:47:50  22   Q.  All right.  And I see the third top level bullet reads:
01:47:53  23   Options on QC approach if they do not drop former
01:47:58  24   employment insinuation.
01:48:00  25          Does that refer to the insinuation that we've been
```

36

```
01:48:04   1   talking about that someone made at Qualcomm?
01:48:07   2   A.  Yes, it does.  You can see in the bullet point above
01:48:10   3   that Qualcomm had made an offer to invest.  And we
01:48:17   4   essentially told Qualcomm we're -- you know, we don't want
01:48:21   5   to hear anymore about this insinuation.  It's getting in
01:48:24   6   the way of business.  It's not good for Qualcomm.  It's not
01:48:28   7   good for Headwater.  So you need to release that
01:48:31   8   insinuation completely, or we're not going to do business
01:48:35   9   with you.
01:48:36  10          And then this bullet is, okay, what if they don't
01:48:40  11   release the insinuation, what should we do?
01:48:44  12   Q.  I see.  So you were trying to get Qualcomm to drop the
01:48:47  13   insinuation, and the options below are additional steps?
01:48:50  14   A.  Yeah.  Again, Qualcomm was essentially using the
01:48:53  15   insinuation to try to extract more from us on a business
01:48:56  16   deal, and we said you can't do that.
01:48:58  17          So we talked to our attorneys, and they put
01:49:01  18   together what they felt was an exhaustive list of all of
01:49:04  19   our options, and that's what this represents.  So we just
01:49:08  20   talked through the list --
01:49:09  21   Q.  Okay.
01:49:09  22   A.  -- at this meeting, I believe.
01:49:11  23   Q.  So I see the first subbullet refers to:  Seek
01:49:14  24   declaratory relief.
01:49:15  25          Can you explain that?
```

```
01:45:40   1   testifying to here.  You know, here's how I decided that it
01:45:45   2   was better to do on the device.  Here's the timeline from
01:45:49   3   the time I came up with that notion to the time I
01:45:53   4   researched the prior art, I researched other possibilities,
01:45:57   5   that I started to write rudimentary embodiments, that those
01:45:57   6   rudimentary embodiments were developed into mature
01:46:03   7   embodiments that I could then reduce to practice, and then
01:46:05   8   my first patent filing.
01:46:08   9          They had all the material from that first patent
01:46:12  10   filing.  They had full disclosure from me.  I was open and
01:46:15  11   honest with them about the whole thing, and I felt I had
01:46:17  12   proven beyond any reasonable doubt that the timeline was
01:46:20  13   accurate.
01:46:21  14   Q.  And back in 2009, did you disclose to anyone besides
01:46:26  15   attorneys that someone at Qualcomm had made this
01:46:26  16   insinuation?
01:46:29  17   A.  Yes.  You know, I've started many companies.  So as a
01:46:33  18   matter of practice, whenever something like this comes up,
01:46:38  19   we always list it on our schedule of disclosures for any
01:46:41  20   potential investors.  So we would say Qualcomm made a vague
01:46:46  21   insinuation, never made a claim against anything of
01:46:49  22   ownership at the company, but if you'd like to know more,
01:46:52  23   we can disclose more under attorney privilege.
01:46:57  24          MR. KRIS DAVIS:  All right.  Let's pull up
01:46:59  25   Exhibit 9.  For the record, this is HW_00013712.
```

38

1  A. Right. So this is the most aggressive approach, and we
2  were very reluctant to do something like this, because as I
3  said, we had good relationships with Qualcomm, but
4  nonetheless we explored it.
5     So in this case, we knew Qualcomm couldn't have
6  anything because nothing was invented at Qualcomm, nothing
7  was conceived at Qualcomm. So we could go to a judge and
8  say that we're seeking declaratory relief because they've
9  made this insinuation, and we want to dispatch it.
10    A judge could force Qualcomm to produce whatever
11  evidence they had, and then the judge would look at the
12  evidence and say: Okay, this -- sorry, this is not
13  conception for an invention. And then that would be that.
14    We decided not to do this because it's -- first of
15  all, we felt it was unnecessary. It was clear to us by
16  this time Qualcomm was not going to make a claim. They
17  were using the insinuation essentially to -- they'd had
18  plenty of time to look at all the details. They had not
19  made any claims. They were asking for extra things to
20  dispatch the insinuation.
21    So we said, you know, we would like to still do
22  business with Qualcomm somehow in the future. Let's not
23  punch them in the nose and take them to court. And, again,
24  we have good relationships, and we still do.
25    So it just wasn't something we were willing --

1  that kind of aggressive approach is not something we were
2  willing to do.
3  Q. Okay.
4  A. It wasn't necessary. It just wasn't necessary. There
5  was no encumbrance on the title. Nothing was claimed. It
6  was just vague insinuations that they couldn't do anything
7  with and wouldn't do anything with.
8  Q. I see. And the fifth subbullet reads: Protect legal
9  standing by sending QC a letter outlining situation and
10  demanding that they put up their evidence or go away,
11  tortious interference setup.
12    Can you explain that?
13  A. Yes. So our attorneys explained to us that if a large
14  company makes an insinuation like this and then kind of
15  hangs around the hoop without doing anything, that could be
16  a tortious interference claim. So this is just half a step
17  less aggressive to put Qualcomm on notice in a way that
18  they would clearly see it was an tortious interference
19  setup.
20    Again, we didn't think it was necessary. There
21  was no encumbrance on the title. No claims had been made.
22  It would have been another punch in the nose to Qualcomm,
23  and we just decided it wasn't necessary.
24  Q. Okay. And I know you explained you gave Qualcomm
25  information about your timeline and technical details. But

39

1  can you explain the last subbullet that says: Do nothing?
2  A. Right. So we felt that, you know, we had shown them
3  everything we had to show them to show -- to prove that the
4  inventions weren't developed at Qualcomm. They had had
5  months to produce whatever evidence that they thought might
6  be behind this vague insinuation. They hadn't produced any
7  evidence. They were -- they were offering to invest in a
8  variety of ways. They wanted to work together. So it was
9  clear to us there was nothing there.
10    So we said, okay, we've done enough. There is no
11  challenge to title. Let's try to keep the relationship in
12  tact, and let's just move forward. Let's see what we can
13  do just to move forward. Maybe work with them later.
14  Q. Okay. Are you aware that some emails between you and
15  Qualcomm from the 2009 time frame were recently produced in
16  this case?
17  A. Yes.
18  Q. Do any of those emails include any evidence that
19  Qualcomm has an ownership interest in any Headwater
20  patents?
21  A. Not in the least.
22  Q. All right.
23    MR. KRIS DAVIS: Let's pull up Exhibit 10. For
24  the record, this is HW_000 -- I'm sorry, 00104077.
25  Q. (By Mr. Davis) Do you see this is an email chain with

40

1  the subject line ItsOn that began on April 21st, 2009?
2  A. Yes.
3  Q. So I see that the first email on April 21 came from
4  Gina Lombardi.
5    Can you tell me who that is?
6  A. Yes. Gina Lombardi was a senior business development
7  executive appointed by the CEO of Qualcomm, Paul Jacobs, to
8  shepherd our deal with them.
9  Q. All right. And I see that the email is directed to Jim
10  Straight and mimoguy@mac.com.
11    Who were those people?
12  A. Right. So Jim was one of my business partners in
13  Headwater and ItsOn. And mimoguy@mac.com was my email that
14  I was using at the time.
15  Q. All right. And I see David Wise is copied on the
16  email.
17    Who is that?
18  A. Yes. David Wise was senior business strategy executive
19  at Qualcomm, and Paul appointed David to essentially
20  determine whether -- manage the engineering team and the
21  lawyers to determine whether -- that the opportunity was
22  interesting to Qualcomm. If so, create a business model
23  between the two companies and then negotiate a deal.
24  Q. All right. And in the list of bullets that you see
25  here in Ms. Lombardi's email, the fourth one says:

42

```
 1   Resolution of IP ownership issue.
 2         Do you see that?
 3   A.  Yes.
 4   Q.  Does that refer to the same insinuation we've been
 5   talking about?
 6   A.  Yes.
 7   Q.  Okay.  Let's scroll up to the response to this, which
 8   is an April 22 email from Jim Straight.
 9         Do you see the second sentence that begins with:
10   As we discussed?
11   A.  Yes.
12   Q.  What was discussed that Jim Straight is referring to?
13   A.  Well, he's, you know, saying when you brought this up,
14   we told in no uncertain terms that it was absolutely false,
15   that there's no way this insinuation could be true.  We
16   know exactly when conception happened.  Nothing was
17   invented at Qualcomm.  We're very confident in that, and,
18   you know, so show us what you have.
19   Q.  I see.  So Mr. Straight says:  We are confident of our
20   ownership of our intellectual property.
21         Is that right?
22   A.  Yes.
23   Q.  All right.  Now, let's go -- further down in
24   Mr. Straight's email, he has a list of some diligent --
25   diligence items action list.  Do you see the fourth item
```

43

```
 1   email with the subject line:  Moving Forward?
 2   A.  Yes.
 3   Q.  And I see this came from David Wise; is that right?
 4   A.  Yes.
 5   Q.  That was your business contact at Qualcomm?
 6   A.  Yes.
 7   Q.  All right.  About halfway through the paragraph, I see
 8   a sentence that reads:  To resolve the IP concerns, we
 9   would like to agree that Qualcomm get an additional
10   5 percent ownership interest in ItsOn.
11         Do you see that?
12   A.  Yes.
13   Q.  And what was your reaction to that?
14   A.  Well, you know, it wasn't a huge amount, and they
15   weren't even asking for ownership in the patent entity,
16   which was interesting.  But our reaction was, well, no,
17   that's not fair to the other investors.  You have nothing.
18   We're not going to pay something for nothing.
19         So at this point, we began to realize that, you
20   know, they were essentially using this as leverage.  We
21   knew that there was good faith, but, you know, for whatever
22   reasons internal to Qualcomm, they were using this as
23   leverage.
24         So we said:  Listen, this -- we need this to go
25   away.  You can't use this as leverage.  So you're going to
```

44

```
 1   need to sign some sort of release, because we just -- we
 2   don't -- you're not managing your own internal process.
 3   It's interfering with our business relationship.  You need
 4   to sign a release.  We want this to go away.
 5   Q.  Okay.
 6         MR. KRIS DAVIS:  Let's pull up Exhibit 12.  And
 7   for the record, this is HW_00104071.
 8   Q.  (By Mr. Davis)  Do you see this is an email dated May
 9   19, 2009 with the subject line:  Release?
10   A.  Yes.
11   Q.  And can you explain what this document is?
12   A.  Yes.  So after the request for 5 percent extra in the
13   company ItsOn, I told David:  We're going to need a
14   release.
15         He said:  Okay.  We can look at a release.
16         He said -- you know, he also said:  Maybe we need
17   less than 5 percent.  Maybe it can be a couple percent or
18   maybe 1 percent.
19         So I said:  Look, let's work on the release.
20         So we went to our lawyers -- well, first of all,
21   David said:  Sure.  Let's see what you have.
22         We went to our lawyers, and we said -- we gave
23   them the following instruction:  We want a release that
24   precludes someone inside of Qualcomm from making these
25   insinuations, period.  We just -- we don't want someone to
```

```
 1   refers to Qualcomm and ItsOn/HPI?  I believe that's
 2   Headwater?
 3   A.  Headwater Partners I, yes.
 4   Q.  Okay.  Will have a face-to-face meeting for Qualcomm to
 5   disclose to ItsOn/Headwater the facts, documents, and any
 6   other information that Qualcomm possesses, that Qualcomm
 7   believes support the Qualcomm claim that it may own some
 8   portion of ItsOn's IP?
 9   A.  Yes.
10   Q.  Can you explain that?
11   A.  Yes.  By this time, they were hinting that they
12   wanted -- in order to resolve this insinuation, they wanted
13   more from us somehow.  We said, no, let's see what you
14   have.  We don't want to give you any more.  There's nothing
15   that we need from you.  So show us what you have, and let's
16   talk about it.
17   Q.  And did this meeting take place?
18   A.  It never took place.
19   Q.  Not in 2009 and not anytime after?
20   A.  Qualcomm has never shown us any evidence to support the
21   original insinuation.
22   Q.  All right.
23         MR. KRIS DAVIS:  Now, let's pull up Exhibit 11.
24   All right.  This is HW_00104069.
25   Q.  (By Mr. Davis)  Do you see this is a May 7th, 2009
```

46

```
01:59:06   1   cause more mischief that doesn't want to get the deal done
01:59:11   2   or what you have.
01:59:12   3        So the lawyers came up with this.  And this
01:59:14   4   specifically said, you know, whether you think it was
01:59:19   5   developed at Qualcomm or after Qualcomm or otherwise, you
01:59:24   6   release all claims.
01:59:25   7        And we told Qualcomm:  You're not giving anything
01:59:28   8   up.  You know, by now you know you don't have anything
01:59:31   9   showing the invention at Qualcomm.  This just prevents more
01:59:35  10   mischief.  This just prevents more insinuations.
01:59:38  11   Q.  And did Qualcomm sign the release?
01:59:40  12   A.  No.  They said it was too broad and that maybe I would
01:59:43  13   come up with something -- a different invention at
01:59:47  14   Headwater that read on their core chipset business or some
01:59:51  15   scenario like that.  It was too broad.  We want to sign a
01:59:58  16   narrower release.
01:59:59  17   Q.  And did any of your business contacts at Qualcomm speak
02:00:03  18   to you after refusing that release about still wanting to
02:00:07  19   make a deal?
02:00:07  20   A.  Yeah, they still wanted to make a deal.  We talked
02:00:10  21   about various releases, and we just felt that the breadth
02:00:14  22   they wanted in the release would still allow the mischief.
02:00:17  23   And so we just said, look, let's just not do business right
02:00:20  24   now.  We're not going to have this held over our head
02:00:24  25   anymore.
```

47

```
02:01:39   1   specifically.
02:01:39   2   Q.  And why is that?
02:01:42   3   A.  So I started to mention earlier that we kept in close
02:01:46   4   touch and, you know, informed them of progress.  And then
02:01:52   5   in 2017, Qualcomm became interested in acquiring
02:02:00   6   Headwater's patent portfolio and/or Headwater as a company.
02:02:05   7        MR. KODISH:  Your Honor, I want to state an
02:02:08   8   objection for the record, that we move to exclude or
02:02:11   9   prevent any testimony relating to a 2017 offer.
02:02:15  10        Your Honor may recall at the pretrial conference
02:02:18  11   on July 2nd, DTX-224 was sought to be excluded by
02:02:25  12   Headwater.  They explained that the offer in that time
02:02:28  13   frame was an unsigned, undated offer to Headwater from
02:02:32  14   Qualcomm to purchase patents that was not accepted.  And
02:02:37  15   Your Honor then did indeed grant that objection and exclude
02:02:43  16   that.  We think that Headwater is trying to use the very
02:02:48  17   offer it successfully excluded.  The sword -- sword/shield
02:02:51  18   law does not permit it.  There's Fifth Circuit case law we
02:02:56  19   cite in support that I'm glad to read, but...
02:02:59  20        THE COURT:  As I recall, the issue was whether it
02:03:03  21   could be admitted for the jury to consider on infringement?
02:03:11  22        MR. KODISH:  What was the last word, Your Honor?
02:03:13  23        THE COURT:  On infringement?
02:03:15  24        MR. KODISH:  No, it related to damages issues.
02:03:19  25        THE COURT:  All right.  On the damages arising
```

48

```
02:00:20   1        MR. KRIS DAVIS:  All right.  Let's pull up
02:00:25   2   Exhibit 13, and this is HW_00104070.
02:00:31   3   Q.  (By Mr. Davis)  Do you see this is an August 3rd, 2009
02:00:36   4   email with the subject line:  Qualcomm's Proposal?
02:00:39   5   A.  Yes.
02:00:41   6   Q.  And in the second paragraph, do you see the sentence
02:00:44   7   that says:  Qualcomm continues to reserve all rights and
02:00:48   8   does not waive any rights to Qualcomm's intellectual
02:00:50   9   property, including any Qualcomm intellectual property
02:00:53  10   incorporated in patent applications filed by Greg, ItsOn,
02:00:57  11   or Headwater Partners I?
02:00:59  12   A.  Yes.
02:01:00  13   Q.  And what's your understanding of that statement?
02:01:02  14   A.  Well, our understanding was that they're just saying:
02:01:05  15   Hey, we've traded a lot of release ideas back and forth.
02:01:09  16   You guys sent us a written release.  We're just letting you
02:01:12  17   know we haven't signed any releases.  We don't want any
02:01:15  18   confusion on that.
02:01:16  19   Q.  I see.  After the negotiation with Qualcomm ended in
02:01:20  20   2009, did Qualcomm ever bring any claim asserting ownership
02:01:25  21   over Headwater patents?
02:01:26  22   A.  Never.
02:01:27  23   Q.  Do you know whether Qualcomm can bring a claim against
02:01:32  24   Headwater now alleging ownership?
02:01:34  25   A.  They cannot, and they acknowledged that to us
```

```
02:03:22   1   from infringement, but in any event, the decision that was
02:03:33   2   made there related to the jury trial.  I will note your
02:03:35   3   objection, and I may at some point consider that this
02:03:37   4   exhibit should not be considered.  But I'm going to allow
02:03:42   5   them to offer it in connection with this hearing.
02:03:45   6        MR. KODISH:  Sure.  I understand.  We're glad to
02:03:48   7   provide case law if need be.
02:03:49   8        THE COURT:  All right.  Thank you, Mr. Kodish.
02:03:55   9   Q.  (By Mr. Davis)  All right.  Continue, Dr. Raleigh.  We
02:03:58  10   were talking about a 2017 engagement with Qualcomm.
02:04:03  11   A.  Yes.  Qualcomm became interested in either acquiring
02:04:07  12   Headwater's patent portfolio or perhaps the whole company,
02:04:10  13   including, of course, the portfolio.
02:04:14  14        THE WITNESS:  Am I speaking loud enough?  Okay.
02:04:17  15        MR. KRIS DAVIS:  Yes.
02:04:17  16   Q.  (By Mr. Davis)  All right.  And did -- was there any
02:04:22  17   conversation with Qualcomm about this insinuation from back
02:04:25  18   in 2009?
02:04:25  19   A.  Yes.  So by 2017, we had a very large patent portfolio,
02:04:31  20   and we had -- made a tremendous amount of progress.  And,
02:04:34  21   of course, we were wary about the potential for more
02:04:39  22   insinuations to be made, you know, make progress and then
02:04:42  23   more insinuations and attempts to gain leverage from that.
02:04:46  24        So we said we want to make sure that this isn't
02:04:50  25   going to happen again.  And their executives assured us of
```

50

```
02:04:53   1    several things.
02:04:54   2        So they said:  First, nothing came of the
02:04:57   3    insinuations and Qualcomm took no action.
02:05:01   4        Second, Qualcomm had knowingly, with all the
02:05:07   5    evidence they had -- you know, we gave them everything
02:05:11   6    about the original patent concepts, ideas, et cetera, and
02:05:15   7    filings, embodiments, and knowing everything they knew
02:05:17   8    about the Headwater portfolio, they hadn't consciously
02:05:20   9    allowed the statute of limitations to expire.
02:05:23  10        And then third, because the statute of limitations
02:05:27  11    had expired, they had no recourse whatsoever to file any
02:05:30  12    sort of claim against Headwater's patents.
02:05:32  13        This, of course, gave us great comfort, and we
02:05:34  14    engaged back in the conversation and went through months of
02:05:40  15    diligence on the portfolio so that they could evaluate a
02:05:44  16    potential acquisition.
02:05:45  17    Q.  And did Qualcomm ultimately make any kind of offer to
02:05:49  18    buy Headwater's patents?
02:05:51  19    A.  They did.  They made a verbal offer, and they said they
02:05:54  20    wanted to float the offer prior to getting it approved by
02:05:56  21    the board to see if we would accept it.  And the verbal
02:06:01  22    offer was 25 million, and we immediately said on the call
02:06:07  23    that was not going to be nearly enough.
02:06:09  24        They said, okay.  And they hinted, what if we went
02:06:12  25    up to 75 million, would that be enough?
```

51

```
02:07:35   1    document to the document that you excluded at the July 2nd
02:07:41   2    hearing, other than it has a date on it, which is April
02:07:44   3    4th, 2022.  But this document bearing Bates number
02:07:49   4    Headwater 92649 is identical to the one that was excluded
02:07:54   5    which is Headwater 92578.  Thank you.
02:07:56   6        THE COURT:  And, Mr. Kodish, you're talking about
02:07:59   7    the hearing regarding trial exhibits?
02:08:03   8        MR. KODISH:  That's right.
02:08:05   9        THE COURT:  All right.  I think the issues are
02:08:08  10    entirely different regarding whether an exhibit is proper
02:08:13  11    at this hearing and whether it's proper for the jury trial.
02:08:17  12    If you have an objection that is based on this hearing and
02:08:24  13    the admissibility of an exhibit to this hearing, I'd be
02:08:29  14    happy to hear it.  But I don't think there's any relevance
02:08:32  15    as to whether something was excluded as a trial exhibit.
02:08:39  16        So you can just consider that all of those
02:08:43  17    objections are preserved to you.  But if you have one that
02:08:47  18    you think relates to this hearing, I'd be happy to hear it.
02:08:50  19        MR. KODISH:  Sure.  I was just referencing common
02:08:53  20    law -- Fifth Circuit law the Randle v. Telecom case,
02:09:00  21    3:97-CV-334.
02:09:01  22        THE COURT:  And are you saying that that's a case
02:09:04  23    that says that exhibits that are excluded from a jury trial
02:09:08  24    cannot be considered in connection with standing?
02:09:10  25        MR. KODISH:  Sorry.  No, it's for the higher level
```

52

```
02:06:14   1        And we said, well, let us think about it.  We
02:06:18   2    discussed it internally and went back and said that won't
02:06:20   3    be enough, so you don't need to bother going to your board.
02:06:32   4    Q.  All right.  And do you recall any later negotiations
02:06:32   5    with Qualcomm after 2017?
02:06:35   6    A.  Again, many discussions, but there was another offer
02:06:40   7    made in 2022.
02:06:42   8    Q.  Okay.
02:06:43   9        MR. KRIS DAVIS:  Let's pull up Exhibit 14.  This
02:06:50  10    is labeled HW_00092648.
02:06:54  11    Q.  (By Mr. Davis)  This appears to be an email chain from
02:06:57  12    April 2022, with a subject line:  Letter of Interest.
02:07:00  13        Do you see that?
02:07:00  14    A.  I do.
02:07:01  15    Q.  And focusing on the bottom email in the chain, can you
02:07:04  16    explain what this shows?
02:07:05  17    A.  This is the president of Qualcomm Technology and
02:07:12  18    Licensing.  It's a cover letter saying here's the offer.
02:07:16  19    Q.  Okay.
02:07:16  20        MR. DAVIS:  Let's go on to Exhibit 15.  That is
02:07:19  21    labeled HW_00092649.
02:07:26  22    Q.  (By Mr. Davis)  And what is that document?
02:07:27  23    A.  That is the actual offer.
02:07:29  24        MR. KODISH:  Your Honor, sorry to object.  Just
02:07:32  25    to -- for the record, to note that this is an identical
```

```
02:09:14   1    premise of the use of evidence that was sought to be
02:09:18   2    excluded by one party now attempted to be used subsequently
02:09:23   3    in related proceedings.
02:09:25   4        But I understand Your Honor's position and
02:09:28   5    appreciate noting it on the record.  I merely was standing
02:09:32   6    up to make sure it was clear on the record that this
02:09:34   7    document now being examined is an identical document, save
02:09:38   8    for the fact that it is dated with the one that Your Honor
02:09:40   9    ruled on on July 2nd.
02:09:43  10        THE COURT:  All right.  Well, I am happy to assume
02:09:45  11    that all of these exhibits have been excluded from the jury
02:09:52  12    trial.  And if it is improper for the Court to consider
02:09:57  13    them in this trial, then so be it.  But I just don't
02:10:00  14    believe that's the law.
02:10:03  15        MR. KRIS DAVIS:  And, Your Honor, if I may just
02:10:05  16    very briefly, two things.  You know, we believe, of course,
02:10:10  17    that this is probative of the state of mind of Qualcomm,
02:10:15  18    that it would not, as I think you --
02:10:17  19        THE COURT:  Mr. Davis, at this point, I have
02:10:20  20    admitted it.  If you want to talk me out of that --
02:10:21  21        MR. KRIS DAVIS:  No, I'm sorry.
02:10:22  22        The only other thing I wanted to say, Your Honor,
02:10:25  23    is just to avoid any potential confusion, the parties
02:10:29  24    have -- I think because there was some confusion at
02:10:33  25    deposition and the deposition exhibit used was undated --
```

54

```
02:30:36  1   like Mr. Kodish mentioned, he thought that was the 2017
02:30:42  2   offer.  There were actually two separate negotiations.
02:30:45  3   2017 did not result in this letter of interest.  This was a
02:30:50  4   separate engagement in 2022.
02:30:54  5          THE COURT:  All right.  I think we have a witness
02:30:57  6   here.  So you don't need to tell me about it.  You can ask
02:31:00  7   a question and have the witness tell me.
02:31:02  8          MR. KRIS DAVIS:  Okay.
02:31:03  9   Q.  (By Mr. Davis)  So, Dr. Raleigh, I believe you said
02:31:08 10   this is the letter of interest from Qualcomm; is that
02:31:10 11   right?
02:31:10 12   A.  Yes.
02:31:12 13   Q.  All right.  So let's focus on the opening sentence and
02:31:17 14   Clause (i).  This says that it is the desire of Qualcomm to
02:31:22 15   acquire the Headwater patents.
02:31:25 16          Why was Qualcomm referring to those as Headwater
02:31:27 17   patents?
02:31:27 18   A.  Because they belong to Headwater.
02:31:32 19   Q.  And what about the insinuation from 2009?
02:31:36 20   A.  The insinuation from 2009 was dispatched by 2017 for
02:31:42 21   sure, and there was no further insinuation.  And they fully
02:31:47 22   admitted these belonged to Headwater.
02:31:50 23   Q.  All right.  And in this 2022 letter, I see an offer
02:31:54 24   of -- it looks like $9 million; is that right?
02:31:57 25   A.  Yes.
```

55

```
02:33:20  1   the following entities.  And it goes on to say Headwater.
02:33:24  2          Do you see that?
02:33:25  3   A.  Yes.  Headwater Research, Headwater Partners II, which
02:33:31  4   is a separate entity that has some of my medical technology
02:33:35  5   patents, and ItsOn.
02:33:41  6   Q.  Do you believe that Qualcomm would send you an offer
02:33:44  7   saying that the Headwater patents are owned by Headwater if
02:33:48  8   it believed Qualcomm owned the patents?
02:33:50  9   A.  No.
02:33:54 10   Q.  All right.  Would you have reengaged in negotiations in
02:33:58 11   2017 and 2022 if there was any insinuation about patent
02:34:03 12   ownership still being made?
02:34:04 13   A.  No.  That would have been a very substantial risk
02:34:09 14   because we had made, as I mentioned, lots of progress.  We
02:34:12 15   had many new patents.  The diligence included, of course,
02:34:17 16   all the background material that goes into the patents, you
02:34:22 17   know, information that's not publicly available.  And if we
02:34:30 18   thought that there might be someone laying in wait to make
02:34:30 19   another vague insinuation, we would not have entered that
02:34:35 20   discussion.
02:34:36 21          So we required the conversation upfront that I
02:34:38 22   testified to a moment ago.
02:34:39 23   Q.  All right.  So we've heard a bit already about the 2021
02:34:42 24   video remarks.
02:34:44 25          Let me first ask you:  Did Samsung's counsel ever
```

56

```
02:31:58  1   Q.  And what was this a $9 million to acquire?
02:32:02  2   A.  It was a $9 million offer to acquire the Headwater
02:32:08  3   patents -- 
02:32:08  4   Q.  Okay.
02:32:09  5   A.  -- or patent portfolio.
02:32:10  6   Q.  And was this the letter of interest that was referenced
02:32:16  7   in Mr. Rogers's email on the prior exhibit?
02:32:23  8   A.  Yes, it was attached.  It was first attached undated,
02:32:23  9   and that probably sounds like what was circulating.  And
02:32:27 10   then his assistant, Gaby Boy, sent me the signed version.
02:32:27 11   Alex was on travel at the time he sent the first one, and
02:32:34 12   he couldn't sign it and PDF it.
02:32:37 13   Q.  Okay.  At any point in those 2017 and 2022
02:32:41 14   conversations, did Qualcomm ever assert that it already
02:32:46 15   owned any of the Headwater patents that it was offering to
02:32:48 16   buy for millions of dollars?
02:32:50 17   A.  In 2017 and 2022?
02:32:52 18   Q.  Yes.
02:32:53 19   A.  As I said, in 2017, not only did they not assert that,
02:32:57 20   they gave us great comfort by saying they could never
02:33:00 21   assert that.
02:33:03 22   Q.  All right.  And before we depart from this exhibit, do
02:33:07 23   you see at the beginning of Clause (i) it reads in:  It is
02:33:14 24   the desire of Qualcomm to acquire the following:  All
02:33:17 25   worldwide patents and patent applications that are owned by
```

```
02:34:48  1   ask you about those 2021 remarks in any of your four
02:34:52  2   depositions?
02:34:52  3   A.  Curiously, no.
02:34:57  4   Q.  All right.  I believe you said those were part of a
02:34:57  5   panel; was that right?
02:35:01  6   A.  Yes.
02:35:02  7   Q.  Who moderated the panel?
02:35:04  8   A.  It was moderated by a high-level executive at Qualcomm
02:35:11  9   named Kirti Gupta, and I believe she was chief economist at
02:35:16 10   Qualcomm at the time.
02:35:16 11   Q.  Do you recall approximately how long Dr. Gupta had
02:35:20 12   worked at Qualcomm at the time?
02:35:21 13   A.  Over 20 years, I believe.
02:35:26 14   Q.  All right.  Now we have a snippet of the video that
02:35:29 15   we'll play in just a moment.
02:35:30 16          MR. KRIS DAVIS:  For the record, I believe Samsung
02:35:32 17   submitted the full video to the Court as Docket No. 236-1.
02:35:37 18   The portion that we'll play runs from 43:22 through 46:53.
02:35:43 19          (Videoclip played.)
         20          Large corporations generally do not create the big
         21   breakthroughs that really change society and the world.
         22   And I am -- a case study in this -- and I'll just briefly
         23   explain, you know, what -- what -- what my career has
         24   shown.
         25          So I went back -- after being a chief scientist at
```

58

1 a medium-sized corporation, I went back for my Ph.D and
2 discovered, you know, theory in multiple input/multiple
3 output wireless that changed and upended a hundred years of
4 thought about how wireless things worked.  And because I
5 had experience, I was able to, you know, explain the
6 electronic structures and document and patent those
7 structures that would allow us to take advantage of that.
8       So I was on a fellowship, and my intellectual
9 property was owned by the company that sponsored me, so I
10 went back to the president of the company, and I said, you
11 know, I've come up with this.  It's -- it's going to change
12 everything.  You know, be in every wire -- important
13 wireless standard moving forward.  And it was too far
14 afield.  It was too risky.  There were a lot of academics
15 questioning the theory at the time.  That's all since
16 proven out, but at the time it was iffy.
17       And so they said please come back and just run one
18 of our divisions, you know, just as Dr. Barnett said.  I
19 had to leave, and fortunately they were gracious enough to
20 give me the rights to my own patents for 3 percent of what
21 we created.  And I guess three and a half years later, that
22 company sold to Cisco after proving out MIMO theory and
23 prototypes for more market cap than the original company
24 was worth.
25       That company was bought.  That was Clarity

1 Wireless.  It was bought by Cisco.  Again after a couple of
2 years at Cisco running their product lines and developing
3 our products for them, I said, look, we need to
4 revolutionize WiFi, and I had some vague notions of
5 inventions we could create that would make WiFi 10 times
6 faster and 10 times better coverage.
7       Once again, I took it to the top brass at Cisco.
8 Too risky.  Too far afield.  Too disruptive.  Please
9 continue running the division you're already running.  So I
10 left, and I started a company called Airgo, and we advanced
11 MIMO further and added additional technologies that we put
12 into chipsets.  We tried to get the technology accepted
02:18:10  13 into a standard.  The standard rejected it, the IEEE, until
02:18:11  14 we had the chips, and it really was 10 times faster and 10
02:18:15  15 times better coverage.
02:18:16  16       Suddenly the world had accepted it.  We created
02:18:18  17 the 802.11(n) standard.  That company was purchased by
02:18:23  18 Qualcomm.  At Qualcomm, you know, one of the most
02:18:26  19 innovative companies in the world, I had this idea that,
02:18:29  20 hey, we've gone -- you know, the MIMO revolution will take
02:18:33  21 place now, and it's in full swing.  So the next step is
02:18:38  22 operating system technology to manage the way applications
02:18:43  23 connect on these new smartphones because without that,
02:18:46  24 there's going to be a disaster on the network.
02:18:48  25       I took it to the then CEO of Qualcomm.  Again, too

59

02:18:52  1 far afield.  Qualcomm is a chipset company, too risky, too
02:18:55  2 disruptive.  Here's another idea for you.  Go run this new
02:18:59  3 group that we're going to create for you over here that's
02:19:01  4 closer to the technology that we do now.  So I left
02:19:04  5 Qualcomm to start Headwater.  We developed that operating
02:19:08  6 system technology.  We distributed it to carriers, pitched
02:19:12  7 it to OEMs, and it's now in every smartphone on the plant.
02:19:17  8 So I am 0 for 3.
02:19:20  9       (Videoclip concluded.)
02:19:20  10 Q.  (By Mr. Davis)  All right.  Now, Dr. Raleigh, do these
02:19:22  11 remarks show that you conceived of the inventions of any
02:19:26  12 Headwater patents while you were Qualcomm?
02:19:27  13 A.  No, not in any way.
02:19:29  14 Q.  All right.  And, again, you're aware that Samsung
02:19:31  15 asserts that those video remarks admitted that you
02:19:35  16 conceived of Headwater's inventions while you were at
02:19:38  17 Qualcomm?
02:19:38  18 A.  I'm aware of that false interpretation.
02:19:42  19 Q.  All right.  I believe you said the moderator of the
02:19:44  20 panel, Dr. Gupta, was a Qualcomm senior executive and
02:19:48  21 20-year employee of Qualcomm; is that right?
02:19:51  22 A.  Yes.
02:19:52  23 Q.  After, according to Samsung, you admitted to this
02:19:56  24 Qualcomm executive moderating the panel that you conceived
02:19:59  25 inventions while at Qualcomm, did Qualcomm take any action

60

02:20:03  1 against you or Headwater?
02:20:05  2 A.  No, as I testified earlier.
02:20:08  3 Q.  All right.  Now, I also, just for reference, wanted to
02:20:14  4 put on the screen the text corresponding to a portion of
02:20:17  5 what we just saw.
02:20:21  6       So focusing on this first paragraph, I see the
02:20:26  7 word "idea" that I know Samsung has focused on.  What was
02:20:30  8 the idea referenced here?
02:20:31  9 A.  Yeah.  Again, you know, the context here is a panel.
02:20:36  10 You know, we were instructed, as normal in these types of
02:20:39  11 things, to keep our comments brief.  And in roughly three
02:20:44  12 minutes, I described 30 years of my career.  So I made a
02:20:49  13 lot of passing comments, and this was one of those passing
02:20:52  14 comments.
02:20:57  15       What it referred to was, in fact, actual events.
02:20:57  16 So the passing comment referred to the 2008 conversation I
02:21:01  17 had with Dr. Jacobs, the CEO of Qualcomm, that I've already
02:21:05  18 testified to.  And in that conversation, I said, hey,
02:21:09  19 here's a research direction, mobile network operating
02:21:14  20 systems and equipment to enhance MVNOs with
02:21:20  21 application-specific services and other things, as I
02:21:22  22 testified.  It -- not only was it not an invention, as I
02:21:27  23 testified earlier, not only was it not a concept for an
02:21:30  24 invention, it was an idea for a research direction that I
02:21:35  25 thought would be fruitful because I knew there was a market

62

```
1   need.  It wasn't even the right direction.
2         The direction itself, which is not ownable, I want
3   to research in this direction.  That's my idea.  That's not
4   a concept of anything that can be owned.  It was also 180
5   degrees from where I ended up.  It is entirely divorced
6   from the claimed inventions in this case.
7   Q.  Now, at this time in 2008 when you were talking with
8   Dr. Jacobs, what solution, if any, did you have?
9   A.  I had a desire to research.  I had a desire to research
10  a market need.  I thought it was going to be network
11  equipment technology.  I thought it would be enhancements
12  to mobile network operating systems.  It turned out that is
13  not at all the direction I took.
14        And I was interested in learning about it.  I'm a
15  quick study, so I said:  I don't know a lot about this, but
16  I can learn about it, and I'm sure I can invent something.
17  Q.  Okay.  Now, shifting gears a bit, do you know whether
18  Qualcomm has produced any documents in this case?
19  A.  They've produced a couple, I believe.
20  Q.  All right.
21        MR. KRIS DAVIS:  Let's pull up Exhibit 16.  This
22  is titled:  Non-Party Qualcomm Incorporated's Objections
23  and Responses to Defendants' Subpoena Duces Tecum.
24        Do you see that?
25  A.  Yes.
```

63

```
1   A.  Yes -- well, I don't know if I did.  But he went back
2   to Qualcomm after working at Headwater for a while.
3   Q.  I see.  Do you know about how long he's been at
4   Qualcomm?
5   A.  Well, he's been at Qualcomm since roughly another --
6   he's been there for another -- has it been that long?
7   Q.  How long, I'm sorry?
8   A.  Well, I'm just -- it's been a long time, it turns out,
9   so maybe 14 years he's been back at Qualcomm since he left
10  Headwater.
11  Q.  Okay.  Now, do you know whether anyone at --
12  A.  Actually, no, wait.  2011, roughly.  So, yeah, 13
13  years.
14  Q.  Okay.  Do you know whether anyone at Qualcomm has ever
15  alleged that Mr. Raissinia ever conceived of any Headwater
16  inventions while he was still working at Qualcomm?
17  A.  That's never been alleged as far as I know, and I'm
18  pretty confident if something like that happened, Ali would
19  give me a call.
20  Q.  Based on your experience at Qualcomm, do you think
21  Qualcomm would employ Mr. Raissinia today if they thought
22  he took Qualcomm's intellectual property and patented it
23  for someone else?
24  A.  Qualcomm is the most serious intellectual property
25  company I know of.  I have worked at Qualcomm.  I know
```

```
1   Q.  Do you have an understanding of what Samsung asked
2   Qualcomm to produce here?
3   A.  Generally, my understanding is Samsung's attorneys
4   asked Qualcomm to produce anything and everything that
5   Qualcomm had in its records regarding anything I may have
6   invented, any ideas I may have conceived while I was at
7   Qualcomm, and any documents that would pertain to my
8   intellectual property assignments and my start and stop
9   time at Qualcomm.
10  Q.  And what did Qualcomm produce?
11  A.  They produced my -- a document they say that I signed
12  in a click-through, an electronic click-through when I was
13  onboarded from Airgo into Qualcomm, and that was
14  intellectual property and mutual -- or a nondisclosure
15  agreement, not mutual.  And then my start and stop date.
16  That's all they produced.
17  Q.  Did Qualcomm produce any documents showing work that
18  you did while you were at Qualcomm?
19  A.  No.
20  Q.  Okay.  Do you know whether Qualcomm provided any
21  deposition testimony in response to a subpoena from
22  Samsung?
23  A.  Not to my knowledge.
24  Q.  Okay.  Now, I believe you mentioned earlier that
25  Mr. Raissinia works at Qualcomm today; is that right?
```

64

```
1   their intellectual property attorneys very, very well.  I
2   have no doubt that if Qualcomm thought someone took their
3   intellectual property, they would not hire them, they would
4   not work with them.
5   Q.  All right.
6         MR. KRIS DAVIS:  And let's pull up our final
7   exhibit, No. 17.
8   Q.  (By Mr. Davis)  This is titled:  Invention Disclosure,
9   Confidentiality & Proprietary Rights Agreement.
10        Do you see that?
11  A.  I do.
12  Q.  Do you understand this is a copy of the agreement that
13  Qualcomm produced in response to the subpoena we saw?
14  A.  Yes.
15  Q.  Now, given your invention timeline, does this agreement
16  give any rights to Qualcomm to any Headwater patents?
17  A.  None whatsoever.
18  Q.  Why do you say that?
19  A.  Well, first, the entire agreement doesn't apply because
20  it hinges on conception at Qualcomm.  And as I've testified
21  here as carefully as I can, nothing in the Headwater patent
22  portfolio was conceived of at Qualcomm.
23        There's other reasons.  I mean, all I see right
24  here is the heading.  But I --
25  Q.  All right.
```

66

```
1   A.  It all hinges on the idea that it's conceived of at
2   Qualcomm for Qualcomm to have any ownership.
3   Q.  I see.
4        MR. KRIS DAVIS:  Now, let's take a look at
5   Paragraph 1.4.
6   Q.  (By Mr. Davis)  And this refers to a one-year
7   presumption.  Do you recall that?
8   A.  Yes.
9   Q.  And if we skip ahead just a bit in the quotation, it
10  says:  Shall be presumed to be an invention subject to the
11  terms of this agreement unless proved by me to have been
12  conceived and first reduced to practice by me following the
13  termination of my employment with the company.
14       Do you see that?
15  A.  Yes.
16  Q.  Do you understand this Paragraph 1.4 to give Qualcomm
17  any rights to any Headwater patents?
18  A.  None whatsoever.
19  Q.  And why do you say that?
20  A.  Well, there's many reasons.  So first, I think I very
21  clearly showed and proved to Qualcomm on multiple occasions
22  my timeline for the initial inventions during my -- the
23  period where I had left for one year, and I think I've
24  already testified to that here, so I won't repeat it all.
25       Second, we have free and clear title.  Qualcomm
```

```
1   has known everything there is to know about the patents
2   from the perspective of ownership and timeline,
3   embodiments, et cetera, and they've never made a claim.
4        Third, they allowed the statute of limitations to
5   expire on any claim they might make, so they can't make a
6   claim.
7        And, fourth, as an employer, I am -- you know,
8   have employed, I don't know, maybe a couple thousand
9   engineers and other people in California, and we took this
10  sort of thing out of our agreements because it's my
11  understanding that you can't -- in California, you can't
12  enforce this kind of thing.  If you try to get an employee
13  to prove a negative, prove they invented something after
14  they left, my understanding is that's not enforceable.
15  Q.  All right.  Dr. Raleigh, has Qualcomm's conduct over
16  the years indicated to you that the company believes it
17  owns Headwater's inventions?
18  A.  No.  As I said, Qualcomm -- you know, we entered many
19  good-faith negotiations them, we attempted to do business
20  with them on several occasions, and they've always acted as
21  a buyer of our patents, not an owner.
22  Q.  And over the past 14 years, has anyone at Qualcomm
23  raised the insinuation from 2009 or asserted ownership of
24  Headwater patents?
25  A.  No.  It was just that one first engagement, and as I
```

67

```
1   said, they dispatched the insinuation in the 2017
2   engagement.
3   Q.  And over that period of 14 years or so, how many people
4   have you interacted with at Qualcomm during that time?
5   A.  I know a lot of people at Qualcomm.  You know, a
6   hundred, maybe.
7   Q.  Okay.  Now, was your comment in the 2021 video a
8   statement that you conceived an inventive idea at Qualcomm
9   that led to a Headwater patent?
10  A.  The video in 2021?
11  Q.  Right.
12  A.  No.  It was, again, a passing comment that's completely
13  misconstrued by the Samsung attorneys.
14  Q.  Okay.  And my final question for you:  At any point in
15  time, have you ever been shown evidence that a Headwater
16  invention was conceived while you or Mr. Raissinia were
17  working at Qualcomm?
18  A.  No, never.
19  Q.  All right.  Thank you, Dr. Raleigh.
20       MR. KRIS DAVIS:  I'll pass the witness.
21       THE COURT:  All right.  We'll take the afternoon
22  recess before we proceed with cross.  And that will be 15
23  minutes.
24       COURT SECURITY OFFICER:  All rise.
25       (Recess.)
```

68

```
1        COURT SECURITY OFFICER:  All rise.
2        THE COURT:  Thank you.  Please be seated.
3        Have a seat, Dr. Raleigh.
4        MR. KODISH:  All right.  Your Honor, Thad Kodish
5   for Samsung.  We have a binder of materials as well.
6        THE COURT:  Great.  If you would pass it up, that
7   would be helpful.
8                    CROSS-EXAMINATION
9   BY MR. KODISH:
10  Q.  Good afternoon, Dr. Raleigh.
11  A.  Good afternoon.
12  Q.  That binder I've handed you, you've seen that binder
13  before, right?
14  A.  We were just glancing at it when you had it up here,
15  and then you took it back --
16  Q.  Who was just glancing at it?
17  A.  Ben and I.
18  Q.  You and your attorney, Mr. Wang?
19  A.  Yes.
20  Q.  And you were talking through it and flipping the pages
21  through it?
22  A.  We were just flipping through to see what it was, yeah.
23  Q.  Okay.  What did you talk about?
24  A.  Nothing.  I mean, it was like, oh, look at this is
25  here.  I was looking at a couple of the things you have in
```

70

```
02:48:49   1    your exhibits.  I was -- I was curious.
02:48:51   2    Q.  Okay.  Could we tilt the microphone a little bit closer
02:48:55   3    to your mouth?  It's just really quiet.
02:48:57   4    A.  Sure.  How is this?
02:48:59   5    Q.  That's much better.  Thank you.
02:49:00   6         MR. KODISH:  All right.  Well, we object to
02:49:02   7    discussions with your attorneys on the break about the
02:49:05   8    materials and the subject of the testimony, but with that
02:49:08   9    we'll dive in.
02:49:08  10    A.  I didn't have any discussions.
02:49:10  11    Q.  (By Mr. Kodish)  So to confirm, you're the managing
02:49:13  12    board member of the Plaintiff, Headwater Research; is that
02:49:15  13    right, Dr. Raleigh?
02:49:18  14    A.  My title is actually -- I believe it's lead inventor --
02:49:21  15    or chief inventor, I think it is.
02:49:22  16    Q.  Sure.  Do you have any reason to disagree that your
02:49:27  17    LinkedIn also shows that you are -- describe yourself as
02:49:30  18    founder and managing board member of Headwater Research?
02:49:32  19    A.  Yeah, I apologize.  I haven't updated that for
02:49:36  20    probably, I don't know, 15 years or something or 14 years.
02:49:39  21    So it's probably not accurate anymore.  I literally haven't
02:49:44  22    looked at it for 14 years.
02:49:49  23    Q.  All right.  Well, that record is reflected at Tab 1 of
02:49:49  24    your binder, Docket 236-18 at Page 2.
02:49:53  25         We'll continue on though, Dr. Raleigh.
```

71

```
02:50:58   1    A.  I certainly get a percentage of the outcome.  I'm not
02:51:02   2    exactly sure what it might be.
02:51:03   3    Q.  Oh, you don't even know what your percentage is, is
02:51:06   4    that your testimony?
02:51:07   5    A.  I think it's more than 5.  You know, it's not something
02:51:10   6    I look at every day.
02:51:11   7    Q.  Okay.  Out of curiosity, have you calculated what
02:51:16   8    5 percent of $3.1 billion is?
02:51:18   9    A.  I can.  It's on the order of $150 million or so.
02:51:22  10    Q.  Okay.  Yeah, bingo, that's right.
02:51:24  11         Dr. Raleigh, are patents important when you start
02:51:30  12    a new technology company?
02:51:31  13    A.  Undoubtedly.
02:51:33  14    Q.  Why is that?
02:51:35  15    A.  Well, that's what the U.S. invention system is all
02:51:39  16    about, a spark of ingenuity and a lot of hard work.  And if
02:51:46  17    you can own what you produce, then you're incentivized to
02:51:51  18    make money, as you say, and to help the world by owning,
02:51:54  19    you know, those inventions.  That's what I love about our
02:51:57  20    system.
02:51:57  21    Q.  And patents give you really protection for your ideas
02:52:02  22    and the right to exclude others from practicing them; is
02:52:06  23    that fair?
02:52:06  24    A.  Yeah, in theory.  In today's world, it doesn't quite
02:52:09  25    work that way.  You have to go to trial.  We used to have
```

72

```
02:49:54   1         You are one of two employees of Headwater
02:49:57   2    Research; is that right?
02:50:00   3    A.  Two permanent employees, yes.
02:50:04   4         Sorry, for the noise.
02:50:06   5    Q.  Dr. Raleigh, do you know what the damages demand is by
02:50:09   6    Headwater in this action?
02:50:11   7    A.  Approximately.
02:50:12   8    Q.  What is it, to your knowledge?
02:50:15   9    A.  I think it's on the order of $2 billion.
02:50:18  10    Q.  You said 2 billion?
02:50:19  11    A.  I think so.
02:50:20  12    Q.  Would it surprise you to learn that the ask is as much
02:50:25  13    as $3.1 billion?
02:50:26  14    A.  You know, I'm not a damage expert.  It's simple.  It's
02:50:29  15    how much is it worth per device, and how many devices do
02:50:36  16    you ship, and that's the damage number.
02:50:36  17    Q.  Okay.  So you're not even aware that your company that
02:50:38  18    has two employees is requesting $3.1 billion in this case?
02:50:41  19    Is that your testimony?
02:50:41  20    A.  It sounds like it's been updated since I last looked.
02:50:43  21    As I mentioned, you know, I'm an inventor.  I understand
02:50:47  22    roughly how damages work.  I'm not a damage expert.
02:50:49  23    Q.  Okay.  You stand to receive up to 5 percent of the
02:50:52  24    outcome of this case in which Headwater is seeking up to
02:50:56  25    $3.1 billion; is that right?
```

```
02:52:12   1    injunction, which, you know, was a lot easier, but now we
02:52:15   2    have to do things like this.
02:52:17   3    Q.  All right.  And it sounds like you have some decent
02:52:20   4    familiarity with the patent law.
02:52:21   5         Are you familiar with the first to invent rule
02:52:23   6    when it comes to U.S. patent law?
02:52:24   7    A.  That used to be the law, yeah.
02:52:24   8    Q.  Yeah.
02:52:27   9    A.  But now it's first to file, yeah.
02:52:30  10    Q.  Do you know when the law changed?
02:52:32  11    A.  I know I gathered my notes and filed quite a few
02:52:40  12    provisionals at the time it was changing because we wanted
02:52:42  13    to be able to claim priority to my notes.  But I don't
02:52:48  14    really recall the year.
02:52:49  15    Q.  Well, you knew -- you know that the first to invent
02:52:53  16    rule in U.S. patent law existed in 2008; is that right?
02:52:58  17    A.  I think it did, yeah.
02:52:58  18    Q.  Yeah.
02:52:59  19    A.  In 2008, yeah.
02:53:00  20    Q.  And you know that it existed in 2009; is that right?
02:53:03  21    A.  I'll take your word for it.
02:53:06  22    Q.  Can you describe for me what the first to invent rule
02:53:10  23    is?
02:53:11  24    A.  Well, it's -- it basically says that if you can show
02:53:14  25    that you reduced to practice and, you know, you had all the
```

74

| | |
|---|---|
| 02:53:19 1 | embodiments necessary to show conception and reduction to |
| 02:53:22 2 | practice and those were documented, then you could claim |
| 02:53:27 3 | back to that date. |
| 02:53:30 4 | Q.  Right.  So -- |
| 02:53:32 5 | A.  Claim priority back to that date. |
| 02:53:33 6 | Q.  I see.  So you're describing a scenario where an |
| 02:53:37 7 | inventor may use the documentation to move earlier than the |
| 02:53:43 8 | actual filing of the patent application to demonstrate the |
| 02:53:47 9 | point of conception that may have been earlier than that |
| 02:53:49 10 | time; is that right? |
| 02:53:50 11 | A.  Yes. |
| 02:53:52 12 | Q.  Okay.  And you understood back in 2000 -- in the 2000s |
| 02:53:59 13 | and really to this day, it sounds like, that under the |
| 02:54:02 14 | first to invent system, you might lose out to someone who |
| 02:54:06 15 | had an idea later than you but wrote their idea down before |
| 02:54:10 16 | you filed your patent application, right? |
| 02:54:13 17 | A.  Yeah, I'm not so sure about that.  That's a matter of |
| 02:54:16 18 | law. |
| 02:54:16 19 | Q.  Okay.  Well, it was important for you in your general |
| 02:54:25 20 | practice in 2008 to make sure that you would start |
| 02:54:28 21 | documenting because it is possible that those notes in |
| 02:54:33 22 | those days in 2008 might be there to demonstrate first to |
| 02:54:39 23 | invent and it's possible you might be able to use them to |
| 02:54:42 24 | swear back to earlier dates than the actual application |
| 02:54:46 25 | that was filed; is that fair? |

| | |
|---|---|
| 02:54:48 1 | A.  Could you say it again? |
| 02:54:51 2 | Q.  Sure.  You understood that in 2008, you could rely on |
| 02:54:53 3 | your notes, if earlier than the date of the patent |
| 02:54:57 4 | application, to try and demonstrate that you invented |
| 02:55:00 5 | what's in that patent application earlier than the date of |
| 02:55:02 6 | its filing, fair? |
| 02:55:03 7 | A.  Generally, yeah.  But my practice is primarily to try |
| 02:55:07 8 | to get the patent -- the provisional patents filed as soon |
| 02:55:10 9 | as possible, because that's, you know, an irrefutable |
| 02:55:14 10 | record of your inventive ideas. |
| 02:55:17 11 | Q.  All right. |
| 02:55:17 12 | A.  And it's just -- I've never tried to go back to my |
| 02:55:21 13 | notes.  It's much more difficult, and it's easier to be |
| 02:55:25 14 | challenged. |
| 02:55:25 15 | Q.  So it's your testimony that -- that you do not rely on |
| 02:55:31 16 | notes to demonstrate your date of first conception out of, |
| 02:55:38 17 | you know, consideration for this first to invent system? |
| 02:55:40 18 | A.  I don't think that's what I said.  I said I've never |
| 02:55:43 19 | had to go back to my notes. |
| 02:55:45 20 | Q.  Okay.  Now I understand. |
| 02:55:47 21 |     So it is your practice to create the notes, but |
| 02:55:49 22 | you haven't had an instance where you needed to go back to |
| 02:55:52 23 | them to demonstrate earlier conception; is that fair? |
| 02:55:55 24 | A.  Correct. |
| 02:55:59 25 | Q.  Okay.  You were designated to testify on behalf of |

75

| | |
|---|---|
| 02:56:01 1 | Headwater as a Rule 30(b)(6) witness on all 95 topics that |
| 02:56:06 2 | Samsung noticed in this case; is that right? |
| 02:56:08 3 | A.  I think that's correct, yeah. |
| 02:56:10 4 | Q.  Okay.  And one topic you were designated on was |
| 02:56:14 5 | conception of the asserted patents; is that right? |
| 02:56:17 6 | A.  I'll take your word for it.  There was a very long list |
| 02:56:22 7 | of things that you guys gave us. |
| 02:56:23 8 | Q.  Sure.  Let's -- let's make sure you're absolutely |
| 02:56:25 9 | certain. |
| 02:56:27 10 |     MR. KODISH:  Mr. Compton, if you could be given |
| 02:56:30 11 | access to the screen.  Thank you so much. |
| 02:56:33 12 | Q.  (By Mr. Kodish)  We're looking Tab 4 of your binder. |
| 02:56:35 13 | It's the Deposition Exhibit 1 at Page 8 of your March 7th, |
| 02:56:45 14 | 2024 deposition. |
| 02:56:45 15 |     And you understand now from looking at Topic No. 4 |
| 02:56:51 16 | that this is a topic that concerned the conception of the |
| 02:56:58 17 | subject matter in each of -- each asserted claim of the |
| 02:57:02 18 | asserted patents.  Do you see that? |
| 02:57:03 19 | A.  I do. |
| 02:57:04 20 | Q.  All right.  So you understand now and are refreshed |
| 02:57:07 21 | that you were, in fact, designated on the subject of |
| 02:57:10 22 | conception of the asserted patents for Headwater, right? |
| 02:57:14 23 | A.  It looks like it. |
| 02:57:14 24 | Q.  Yeah.  What is your understanding of which Samsung |
| 02:57:17 25 | features are accused in this case? |

76

| | |
|---|---|
| 02:57:19 1 | A.  Well, that -- that's -- that's in the infringement |
| 02:57:24 2 | information.  I -- you know, if you'd like me to read the |
| 02:57:28 3 | infringement information, I can, but I don't want to, you |
| 02:57:31 4 | know, hazard to say off the top of my head what's |
| 02:57:33 5 | infringed. |
| 02:57:35 6 | Q.  Okay.  Are you even aware that Headwater has accused |
| 02:57:37 7 | aspects of the Google Android operating system running on |
| 02:57:41 8 | Samsung phones? |
| 02:57:42 9 | A.  No, I know the -- I know the features in the phones |
| 02:57:44 10 | that are accused.  You know, I think some of those features |
| 02:57:48 11 | are in the Google operating system. |
| 02:57:50 12 | Q.  And do those accused features manage the way the |
| 02:57:54 13 | Samsung phones are able to connect to the network? |
| 02:57:56 14 | A.  That's an extremely broad statement that just about |
| 02:58:02 15 | anything fits under.  I'd have to think about it. |
| 02:58:04 16 | Q.  Oh, so you don't know one way or the other whether the |
| 02:58:07 17 | Android operating system manages the way Samsung phones are |
| 02:58:11 18 | able to connect to the network? |
| 02:58:12 19 | A.  I mean, again, that's so broad.  The answer is |
| 02:58:16 20 | certainly there are aspects of the Samsung phones that are |
| 02:58:19 21 | managed by aspects of the Google operating system.  But |
| 02:58:24 22 | you're asking a very broad question.  I'm not sure what |
| 02:58:27 23 | you're looking for. |
| 02:58:28 24 | Q.  You know, you talked in detail about one of your |
| 02:58:42 25 | patents, and you went through the claims and explained, you |

78

```
02:58:45   1    know, some perspective on what those claims mean.  I
02:58:49   2    believe it was the '976 patent, one of the asserted patents
02:58:56   3    in this case; is that right?
02:58:57   4    A.  We did, yes.
02:58:58   5    Q.  Yeah.  A deposition in this case taken by Samsung, you
02:59:06   6    could actually not tell us what the asserted patents were
02:59:08   7    about, could you?
02:59:09   8    A.  No, I think that's completely untrue.  I offered to go
02:59:13   9    through the claims with you, and you wanted me to summarize
02:59:16  10    them in my own words.  And I said I would have to very
02:59:19  11    carefully do that.  And, you know, the claims are what they
02:59:22  12    are.  They say what they say.  That's the owner -- that's
02:59:26  13    the invention that's owned.
02:59:28  14    Q.  All right.
02:59:28  15    A.  You wanted something else.  I don't even recall what it
02:59:32  16    was.
02:59:32  17    Q.  And you couldn't tell us what the -- whether the
02:59:41  18    asserted patents related to networking, could you?
02:59:43  19    A.  I'm not sure what you're asking me.
02:59:46  20    Q.  Oh, you don't know what networking is?
02:59:48  21    A.  Of course I do.
02:59:49  22    Q.  Okay.  So do the asserted patents relate to networking?
02:59:53  23    Do you recall when you were asked that at your deposition
02:59:55  24    what your answer was?
02:59:56  25    A.  I don't recall, but it's -- it's an odd question.
```

79

```
03:01:00   1            MR. KODISH:  Sure.  We do believe the relevance
03:01:03   2    will be made clear, Your Honor.  And I am glad to impeach
03:01:08   3    him on the answer to the last question.
03:01:11   4            Mr. Compton, if you would go ahead and play the
03:01:17   5    November 15th, 2023 --
03:01:17   6            THE COURT:  What is the question that you're
03:01:18   7    putting to the witness here?
03:01:19   8            MR. KODISH:  Sure.  That he couldn't explain a
03:01:21   9    single concept that he came up with in the asserted
03:01:24  10    patents, which is a surprising turnabout from his ability
03:01:27  11    to explain and go through the claim elements of his '976
03:01:35  12    patent here today.
03:01:35  13    A.  Yeah, I'm sorry, I told you that the core concept was
03:01:39  14    device-assisted services at various portions of my
03:01:42  15    deposition.  I explained that that was a core concept.  I
03:01:45  16    explained that it was the idea of moving things from the
03:01:47  17    network to the device.  So I imagine you're going to play
03:01:50  18    some other portion of my deposition.
03:01:53  19    Q.  (By Mr. Kodish)  We asked you --
03:01:56  20            MR. KRIS DAVIS:  Your Honor, if I may.  Can we
03:01:56  21    have the -- which transcript and page?
03:02:00  22            MR. KODISH:  Sure.  I thought I recited it.  But
03:02:00  23    the November 15th, '23 deposition transcript, 64:21 through
03:02:11  24    25.
03:02:12  25    Q.  (By Mr. Kodish)  We asked you --
```

80

```
02:59:59   1            What is the question exactly?
03:00:01   2    Q.  Well, the question now is you could not tell us whether
03:00:03   3    the asserted patents related to networking at your
03:00:06   4    deposition, right?
03:00:06   5    A.  I have no idea what you're asking me.  That's such a
03:00:10   6    broad question that's, in my opinion, ill-defined.
03:00:14   7    Q.  Okay.  So you just don't understand that question.  I
03:00:16   8    understand.
03:00:16   9    A.  Again, it could mean many different things, and I'm
03:00:20  10    testifying under oath, and I'm going to be very precise
03:00:22  11    about my answers.
03:00:24  12    Q.  Okay.  So you stand by the testimony that you don't
03:00:27  13    know how to answer that question?
03:00:30  14    A.  You know, I don't know about that.
03:00:30  15    Q.  You couldn't explain at your deposition a single
03:00:35  16    concept you came up with in the asserted patents.  Do you
03:00:35  17    recall that at your deposition?
03:00:40  18    A.  I think that's a mischaracterization.  I think I -- I
03:00:41  19    discussed the inventive spark.  I discussed many things in
03:00:42  20    my deposition.
03:00:43  21            THE COURT:  Mr. Kodish, if you want to impeach him
03:00:45  22    with his deposition, ask him a question, and if he answers
03:00:50  23    it differently than his deposition, you can impeach him.
03:00:54  24    But the subject of this examination is not what he said in
03:00:59  25    his deposition.
```

```
03:02:13   1    A.  I'm sorry, where are we?
03:02:15   2    Q.  Oh, I was just responding to a question from your
03:02:17   3    counsel.
03:02:18   4    A.  I would like to know, too.
03:02:20   5    Q.  But now I'm back to you.  I was indulging your counsel
03:02:23   6    with a response.
03:02:23   7    A.  Can I know where we are?
03:02:23   8    Q.  Yeah.
03:02:24   9    A.  Is that okay?
03:02:25  10    Q.  So the question now to you is:  You couldn't say --
03:02:28  11    A.  Could you please tell me where we are in my deposition
03:02:31  12    so that I can look at it with you?
03:02:32  13    Q.  Oh, we're not looking at a particular part of your
03:02:35  14    deposition right this moment.  But I have a brand new
03:02:38  15    question, and then we will.
03:02:39  16    A.  You guys interviewed me for, I think, 28 hours.
03:02:42  17            THE COURT:  Dr. Raleigh, just hang on.  He's going
03:02:45  18    to eventually ask a question.
03:02:46  19            THE WITNESS:  Oh, I hope so.  Okay.  Thank you,
03:02:48  20    sir.
03:02:49  21    Q.  (By Mr. Kodish)  You couldn't say how you would
03:02:51  22    describe the asserted patents if the judge asks, correct?
03:02:55  23    A.  I'm sorry, what's the question now?
03:02:57  24    Q.  We asked you:  If the judge in this case is overseeing
03:03:00  25    the trial and he turns to you and says, Mr. Raleigh --
```

82

```
03:03:03   1   Dr. Raleigh, you got a lot of patents in this case.  Can
03:03:07   2   you tell me at a high level what these nine patents are
03:03:10   3   about, what do you say?
03:03:12   4        Do you remember that question being posed to you?
03:03:14   5   A.  I don't.
03:03:15   6   Q.  Okay.
03:03:15   7        MR. KODISH:  Mr. Compton, if you could play from
03:03:20   8   the March 7th, 2024 deposition at Page 162, Line 13 through
03:03:25   9   23.
03:03:27  10        (Videoclip played.)
03:03:39  11   Q.  If the judge in this case is overseeing the trial and
03:03:38  12   he turns to you and says, Mr. Raleigh, you've got a lot of
03:03:41  13   patents in this case, can you tell me at a high level what
03:03:44  14   these nine patents are about, what do you say?
03:03:45  15   A.  That's speculation.
03:03:47  16   Q.  You're going to say:  I don't know, Your Honor?
03:03:51  17   A.  I'm telling you that you're speculating about some
03:03:54  18   future event that may or may not happen, and I don't know.
03:03:58  19   You're just speculating.
03:04:00  20        (Videoclip ends.)
03:04:01  21   Q.  (By Mr. Kodish)  That's your testimony, right,
03:04:03  22   Dr. Raleigh?
03:04:03  23   A.  Yeah.  I was saying that you're speculating on what a
03:04:07  24   judge might ask me, and it would depend on the context of
03:04:12  25   the question.
```

```
03:04:12   1   Q.  Well, we heard your testimony, Your Honor --
03:04:14   2   A.  Okay.
03:04:15   3   Q.  -- Dr. Raleigh.  And you stand by that testimony,
03:04:17   4   correct?
03:04:17   5   A.  Yeah, I suppose.  I mean --
03:04:19   6   Q.  Thank you, Dr. Raleigh.
03:04:23   7        You joined Qualcomm in 2006 after they acquired
03:04:26   8   your previous company Airgo, as you mentioned, correct?
03:04:29   9   A.  Yes.
03:04:30  10   Q.  And at Qualcomm, you were vice president of mobile
03:04:33  11   Internet, right?
03:04:34  12   A.  I think that was one of my titles.
03:04:34  13   Q.  And you also had characterized your job as VP of
03:04:41  14   Wireless Internet at your deposition, correct?
03:04:44  15   A.  Something -- yeah, it's a title.  It's something that
03:04:47  16   goes on your business card.
03:04:48  17   Q.  And you've explained you left Qualcomm in 2008, right?
03:04:53  18   A.  Yes.
03:04:53  19   Q.  And to be very specific -- and if we could bring it up
03:04:57  20   from Tab 7 of your binder.
03:04:57  21        MR. KODISH:  Mr. Compton, if you could bring up on
03:05:03  22   the screen for Dr. Raleigh's benefit.  This is Docket
03:05:07  23   236-17, a document that describes -- you know, it's
03:05:11  24   produced by Qualcomm, it's the job/supervisor history
03:05:14  25   report.
```

83

```
03:05:16   1   Q.  (By Mr. Kodish)  And I believe you testified it showed,
03:05:17   2   you know, the time that you were at Qualcomm.  And do you
03:05:20   3   agree with me this document shows that apparently your last
03:05:23   4   date was September 19th, 2008?
03:05:26   5   A.  That's what it says, yeah.
03:05:30   6   Q.  You don't have any reason to have a different opinion
03:05:33   7   on that?
03:05:34   8   A.  I think that's when I -- what my last date was.
03:05:37   9   Q.  Yeah.
03:05:38  10   A.  I think I testified to that earlier.
03:05:40  11   Q.  All right.  Thank you.
03:05:40  12        All right.  I have some questions about your
03:05:42  13   company ItsOn, Inc.
03:05:44  14        Where did the name ItsOn come from?
03:05:48  15   A.  Yeah, it's -- we did a marketing study and came up with
03:05:51  16   ItsOn.
03:05:52  17   Q.  So you did a marketing study.  And who is we?  Who did
03:05:56  18   that marketing study?
03:05:57  19   A.  Just -- you know, it was informal.  There was a group
03:06:00  20   of us coming up with a name for a shell company that we
03:06:05  21   were going to eventually populate with products.
03:06:07  22   Q.  All right.  Can you tell me who was in the group?
03:06:11  23   A.  It would have been me.  I probably would have been
03:06:13  24   brainstorming with -- you know, it's hard to recall.  I
03:06:18  25   think this is 16 years ago, but probably brainstorming
```

84

```
03:06:21   1   with, for example, my wife, Charlie Giancarlo perhaps, and
03:06:27   2   I don't really remember who I brainstormed with.
03:06:30   3   Q.  And how did you conduct the marketing study?  What were
03:06:32   4   the mechanics of that?
03:06:35   5   A.  What do you think of this name?  Oh, I like it.  I
03:06:42   6   don't like it.  Okay.  How about this name?  Oh, that's
03:06:42   7   interesting.
03:06:43   8   Q.  All right.  So any other aspects of that marketing
03:06:48   9   study, you know, if we were to get the documents that
03:06:50  10   related to it that we can see?
03:06:52  11   A.  When we start companies, a lot of times we change
03:06:56  12   names.  So, for example, Airgo started off as Woodside
03:06:59  13   Networks, and it was just, okay, let's call it Woodside.
03:07:04  14        I create a shell.  You know, the shell doesn't
03:07:06  15   really have anything in it.  We eventually start thinking
03:07:08  16   about what we're going to do.  Once we decide what we're
03:07:10  17   actually going to do with the company, then we say, okay,
03:07:13  18   does the name fit the company, and we may change the name
03:07:15  19   if it doesn't fit.
03:07:16  20   Q.  All right.  What were some of the other names you
03:07:18  21   considered?
03:07:18  22   A.  Boy, there's -- there's probably, you know, some notes
03:07:24  23   somewhere.  We just -- you think about a bunch of names
03:07:28  24   that sound cool, and then you go on the -- a search site
03:07:35  25   for trademarks, and you try to find something that's on
```

86

```
03:07:38  1  your list that's not already trademarked.  And then in the
03:07:42  2  early stages of the company, you settle on that.
03:07:44  3  Q.  Okay.  Okay.  And in addition to it sounded cool, you
03:07:49  4  know, was any part of that, you know, a sense of how it
03:07:53  5  will be good branding for the particular products that that
03:07:56  6  company is going to make?
03:07:57  7  A.  At that stage, no.  We weren't even sure what we were
03:08:02  8  going to do.  You know, when I started these shells, they
03:08:09  9  were just shells.  I needed a place to do business with
03:08:13  10 Best Buy because I knew I was going to go talk to Best Buy.
03:08:16  11 So there would have been no real research with respect to a
03:08:21  12 specific product.
03:08:21  13 Q.  All right.  So your testimony is --
03:08:23  14 A.  I might have thought about, okay, if I'm going to go do
03:08:27  15 something with Best Buy and they want an MVNO, then, you
03:08:31  16 know, we might have considered that as part of it.
03:08:33  17         Headwater had nothing to do with that.  It's just
03:08:35  18 I decided I was going to create an invention company, and
03:08:37  19 we've done several Headwaters.  So, you know, we've worked
03:08:41  20 in all sorts of fields.
03:08:43  21 Q.  So ItsOn, does it relate at all to the power state of a
03:08:49  22 device, whether it's on or it's off?
03:08:51  23 A.  No, that never crossed my mind.  It could have been
03:08:54  24 maybe about activation, because MVNOs -- you know,
03:08:57  25 activation services was really one of the big things at the
```

```
03:09:00  1  time --
03:09:00  2  Q.  Okay.
03:09:01  3  A.  -- that people were thinking about, like, you know,
03:09:03  4  it's on the network.  We did kind of pitch that to Best Buy
03:09:06  5  when we met with them.
03:09:09  6  Q.  And did you start ItsOn after you left Qualcomm?
03:09:13  7  A.  Well, I populated the shell after I left Qualcomm.  I
03:09:19  8  think I actually set the shell up about a week before I
03:09:22  9  left or maybe 10 days before I left because I knew I was
03:09:25  10 going to be talking to Best Buy, and I needed some
03:09:28  11 corporate protection.  I needed a business card and so on
03:09:31  12 to talk to Best Buy, and I knew that would take time to
03:09:33  13 file the Delaware paperwork and so on.
03:09:36  14 Q.  All right.  So you did all that, what you just
03:09:38  15 described, before you left Qualcomm, and certainly you did
03:09:40  16 your marketing study even before that, correct?
03:09:43  17 A.  It was all about the same time.  I just, you know,
03:09:45  18 asked the lawyers to -- you know, this is -- I've started
03:09:48  19 many companies.  I actually have some shells right now that
03:09:51  20 aren't doing anything.
03:09:53  21 Q.  Sure.
03:09:53  22 A.  I have a shell called Chilko that I haven't done
03:09:57  23 anything with.  I have a shell called -- what is it called?
03:10:02  24 Q.  Yeah, all right.
03:10:02  25 A.  You know, I have companies that I set up and then
```

87

```
03:10:05  1  eventually do something with.  They're just corporate
03:10:07  2  shells.
03:10:09  3  Q.  Yeah --
03:10:10  4  A.  Original Ventures, that's the other one.
03:10:13  5  Q.  Yeah.  So I just appreciate you answering the question
03:10:18  6  that I asked, Dr. Raleigh, which is you set up the company,
03:10:23  7  and you did your marketing study before you left Qualcomm,
03:10:28  8  yes or no?
03:10:28  9  A.  No, I wouldn't say that.
03:10:30  10 Q.  Okay.
03:10:30  11 A.  I would say that I opened a corporate shell, which is
03:10:33  12 not in my opinion setting up a company at all.
03:10:36  13 Q.  And you're saying you didn't do the marketing study
03:10:39  14 before you left Qualcomm either?
03:10:40  15 A.  We came up with a name.  So -- and, again, the
03:10:42  16 marketing study was literally asking my friends, my wife,
03:10:45  17 people I was thinking about doing business with, you know,
03:10:48  18 what do you think about these names?
03:10:49  19 Q.  All right.
03:10:52  20         MR. KODISH:  Let's go ahead, Mr. Compton, if you
03:10:54  21 could put on the screen the document at Tab 10 of the
03:10:57  22 binder, which is Exhibit 2 of your March 7th, 2024
03:11:03  23 deposition.
03:11:03  24 Q.  (By Mr. Kodish)  These documents are ItsOn corporate
03:11:08  25 records, correct?
```

88

```
03:11:08  1  A.  Looks like it, yeah.
03:11:11  2  Q.  Yeah.
03:11:11  3         MR. KODISH:  And if you could turn to Page 2,
03:11:16  4  Mr. Compton.
03:11:19  5  Q.  (By Mr. Kodish)  This has your electronic signature on
03:11:21  6  it, right?
03:11:21  7  A.  Looks like it.
03:11:23  8  Q.  Yeah.  And it states the name of the corporation is
03:11:26  9  ItsOn, Inc.  The corporation's original certificate of
03:11:27  10 incorporation was filed with the Secretary of State of the
03:11:28  11 state of Delaware on September 17, 2008.  Is that right?
03:11:32  12 A.  That's what it looks like, yes.
03:11:35  13 Q.  Yeah, so ItsOn was first incorporated on September
03:11:40  14 17th, 2008 before you left Qualcomm on September 19th,
03:11:43  15 2008, right?
03:11:43  16 A.  Yeah.  And as I said, the shell was set up before I
03:11:46  17 left Qualcomm so that I could have a, you know, calling
03:11:48  18 card for talking to Best Buy.
03:11:49  19 Q.  Right.  And the marketing study and the activities that
03:11:52  20 you described that marketing study concerned, that all
03:11:57  21 happened before you filed this document with the Secretary
03:12:01  22 of State of Delaware, correct?
03:12:02  23 A.  I talked to my wife and my friends to pick a name
03:12:05  24 before I left Qualcomm, yeah.
03:12:16  25         MR. KODISH:  We'll move to admit into evidence the
```

90

```
03:32:18   1   document at Tab 10 of the binder, the Secretary of State
03:32:22   2   filing for ItsOn, Inc., Your Honor.
03:32:23   3        THE COURT:  All right.  It's admitted.
03:32:25   4   Q.  (By Mr. Kodish)  Now, you've previously testified in
03:32:28   5   deposition that you formed Headwater and ItsOn before you
03:32:33   6   knew what they would do; is that right?
03:32:35   7   A.  Absolutely, yeah.
03:32:36   8   Q.  You said you told Charlie Giancarlo, quote, let's
03:32:40   9   create some shell companies, and we'll figure out what
03:32:43  10   we'll do later, end quote.
03:32:44  11        Does that sounds like your testimony to you?
03:32:46  12   A.  It sounds like something I could have said, yeah.  I
03:32:49  13   don't recall all the details of my testimony.
03:32:50  14   Q.  But, in fact, you already knew what ItsOn would do
03:32:53  15   before you left Qualcomm, correct?
03:32:54  16   A.  Not at all.
03:32:57  17        MR. KODISH:  Mr. Compton, could you bring up the
03:32:59  18   document on the screen at Tab 8 of the binder, which is
03:33:02  19   Exhibit 11 to Greg Raleigh's June 2024 deposition.
03:33:07  20   Q.  (By Mr. Kodish)  Dr. Raleigh, this is a slide deck
03:33:14  21   produced by Headwater.  It bears Bates Nos. HW103-00014613
03:33:23  22   through 619.  Do you see that?
03:33:26  23   A.  Uh-huh.
03:33:27  24   Q.  All right.  And you don't dispute that Headwater
03:33:29  25   produced this document, correct?
```

```
03:33:30   1   A.  Yeah, I'm sure they did -- or we did, yeah.
03:33:34   2   Q.  And if you look at Page 2 of this document --
03:33:37   3        MR. KODISH:  Mr. Compton if you could -- thank you
03:33:40   4   so much.
03:33:42   5   Q.  (By Mr. Kodish)  It's all about ItsOn.  Do you see
03:33:42   6   that?
03:33:43   7   A.  Yes.
03:33:43   8   Q.  Okay.  And that's ItsOn, Inc., the company that you
03:33:45   9   formed before you left Qualcomm, right?
03:33:46  10   A.  Yeah.  As I mentioned, Best Buy wanted me to work with
03:33:50  11   them.  They said, please, you know, set up some kind of a
03:33:53  12   company, and then let's get going.
03:33:55  13   Q.  And then if we flip to the next page of this exhibit,
03:33:58  14   That also is all about ItsOn, as well, the company that you
03:34:01  15   formed, right?
03:34:02  16   A.  These documents are created by Best Buy to tell us what
03:34:06  17   they wanted.  And, yes, that's what this says.  But this --
03:34:10  18   this was created by Best Buy, not me.
03:34:11  19   Q.  Oh, okay.  So all this information in this document was
03:34:18  20   created by Best Buy based on prior communications that you
03:34:18  21   and the folks at ItsOn had had with them telling them about
03:34:22  22   your company.  Is that your testimony?
03:34:27  23   A.  No.  No.  They knew who I was.  They were telling us
03:34:30  24   what they wanted us to do.
03:34:30  25   Q.  Okay.  So your testimony is what we just showed on
```

91

```
03:34:32   1   Pages 2 and 3 is just Best Buy's hypothesizing of what they
03:34:38   2   wanted to do as opposed to information that you gave to
03:34:41   3   them that they incorporated into the presentation?
03:34:43   4   A.  Can you flip to -- what are you talking about right
03:34:45   5   now?
03:34:46   6   Q.  Yeah, absolutely.
03:34:54   7   A.  Yeah, so this is discussing a business model that we
03:34:59   8   might pursue as we helped Best Buy, you know, integrate
03:35:05   9   this MVNO that they wanted to build.  And I had had
03:35:08  10   discussions with them regarding, you know, what do you have
03:35:11  11   in mind?  What kind of company do you want us to structure?
03:35:15  12   What is it that you want to do?  What are your market needs
03:35:19  13   and so on?
03:35:19  14        And as I mentioned, they had all these vendors
03:35:24  15   coming in to pitch the technology, and this is basically
03:35:27  16   setting -- what they thought the setup was for what we
03:35:30  17   would be doing.
03:35:31  18   Q.  So this document is reflective of conversations that
03:35:34  19   took place between you, your company, ItsOn, Inc., and the
03:35:38  20   folks at Best Buy before the creation of this document; is
03:35:41  21   that fair?
03:35:42  22   A.  They had mentioned all of this to me, yeah.  As I said,
03:35:45  23   they were trying to recruit me to build -- to essentially
03:35:49  24   be the system integrator for the MVNO that they wanted to
03:35:55  25   build.
```

92

```
03:35:55   1   Q.  All right.  If we look at the last page of this
03:35:58   2   document, it's at Bates ending at 619.  It's a document
03:36:02   3   entitled:  Next Steps.
03:36:04   4        You see that; is that right?
03:36:05   5   A.  Uh-huh.
03:36:06   6   Q.  And it states for September 9th through 11th, it says:
03:36:12   7   Meet/greet with Greg R. and no C, end quote.  Do you see
03:36:16   8   that?
03:36:16   9   A.  I do.
03:36:17  10   Q.  And Greg R. is you, right?
03:36:16  11   A.  That would be me, yeah.
03:36:21  12   Q.  If a next step is a meeting to happen between September
03:36:26  13   9 through 11, then there's no question that this
03:36:29  14   presentation was created before September 9th; isn't that
03:36:32  15   right?
03:36:33  16   A.  I would assume so, yeah.
03:36:36  17   Q.  And this refers to the year 2008, right?
03:36:38  18   A.  Yes.
03:36:42  19   Q.  How many months prior to September 9th were the ItsOn
03:36:47  20   folks and you talking to Best Buy about things that are
03:36:50  21   referenced in this presentation?
03:36:51  22   A.  It was very shortly before I left.  So I'm not exactly
03:36:54  23   sure what the timeline is, but, you know, as I said, they
03:36:57  24   were recruiting me to integrate this MVNO for them.  And
03:37:00  25   that's why I created a shell company, so that I would have
```

94

```
03:17:03   1   a calling card to do business with them.  I told them what
03:17:06   2   the name was going to be, and then they sent me this -- and
03:17:10   3   it looks like it was probably before September 9th.  I
03:17:13   4   don't remember the exact dates.
03:17:15   5   Q.  Yeah.  And ItsOn --
03:17:17   6   A.  By the way, I'm not even sure the dates are accurate.
03:17:20   7   I mean, this -- I don't know when they sent this to me.  It
03:17:23   8   could have been after September 9th.  I'd have to see
03:17:26   9   the -- you know, wherever this came from.
03:17:28  10   Q.  Sure.
03:17:32  11   A.  You know, I'm not sure I recall.  And Kuk Yi was their
03:17:41  12   investment person, and I don't -- I don't recall the first
03:17:42  13   time I met with him.  It could have been before I left
03:17:45  14   Qualcomm, but he would be the one to, you know, basically
03:17:47  15   provide funding to build the company that they wanted us to
03:17:51  16   build.
03:17:51  17        MR. KODISH:  Your Honor, we move to admit the
03:17:52  18   document at Tab 8 that we just went through, the Exhibit 11
03:17:57  19   to the Raleigh June 2024 deposition.
03:18:04  20        THE COURT:  All right.
03:18:05  21        MR. KRIS DAVIS:  No objection.
03:18:06  22        THE COURT:  It'll be admitted.
03:18:07  23   Q.  (By Mr. Kodish)  All right.  So we've established --
03:18:13  24   you were discussing a meeting with Best Buy at least as
03:18:16  25   early as the early September 8th time frame, and you had
```

```
03:18:21   1   previously met with Best Buy on behalf of Qualcomm who
03:18:24   2   wanted to get more of their chips into laptops; is that
03:18:26   3   right?
03:18:26   4   A.  I met with many people in that context.  And I think
03:18:31   5   that's how Best Buy came to know me, yeah.
03:18:39   6        MR. KODISH:  And let's go ahead and take a look at
03:18:41   7   the document, Mr. Compton, if we can bring it up on the
03:18:44   8   screen, the document at Tab 11 of the binder.
03:18:47   9   Q.  (By Mr. Kodish)  Dr. Raleigh, you're now looking at
03:18:50  10   Exhibit 9 from your June 14th, 2024 deposition.
03:18:57  11        And this is an ItsOn slide presentation dated
03:19:01  12   September 24th, 2008, right?
03:19:02  13   A.  Yes, this is one I put together.
03:19:05  14   Q.  Yeah, you authored this document, correct?
03:19:07  15   A.  Yeah, they authored the other one.  I authored this
03:19:10  16   one.
03:19:10  17   Q.  And September 24th, 2008, it's five days after your
03:19:15  18   last day at Qualcomm on September 19th, right?
03:19:19  19   A.  Yes.
03:19:19  20   Q.  And if we --
03:19:25  21        MR. KODISH:  Mr. Compton, turn to Slide 14 of this
03:19:27  22   18-slide deck, the one bearing Bates number ending in
03:19:33  23   15438.
03:19:33  24   Q.  (By Mr. Kodish)  You agree with me this is a block
03:19:37  25   diagram of the planned ItsOn, Inc., platform?
```

95

```
03:19:41   1   A.  Yeah, it's really a marketing slide.  It has concepts
03:19:45   2   that would fulfill Best Buy's needs.  You know, essentially
03:19:48   3   when they had a need, we'd draw a block and say, okay,
03:19:53   4   we're going to need something to fill that need.  For
03:19:54   5   example, a billing hub, device management hub, carrier hub.
03:19:59   6   These are all things that filled the marketing needs that
03:20:03   7   they had for their MVNO.  There's no technology here.  It's
03:20:08   8   just saying what we're going to try to build.
03:20:08   9   Q.  And it's marked "ItsOn Proprietary and Confidential" at
03:20:12  10   the bottom.  You see that, right?
03:20:13  11   A.  It is, yeah.  Uh-huh.
03:20:14  12        MR. KODISH:  Mr. Compton, if you could please take
03:20:16  13   us on the screen to the slide ending in Bates No. 436.
03:20:20  14   Q.  (By Mr. Kodish)  All right.  Well, let's take a look at
03:20:23  15   what you were telling Best Buy would be included in this
03:20:26  16   ItsOn platform.
03:20:27  17        We see that the slide presented -- it states the
03:20:36  18   ItsOn service platform components, right?
03:20:39  19   A.  Yeah.
03:20:40  20   Q.  The slide describes a, quote, core network, end quote,
03:20:46  21   component.  Do you see that?
03:20:47  22   A.  Uh-huh.
03:20:50  23   Q.  And under that, we see reference to, quote, service
03:20:52  24   policies, end quote, right?
03:20:54  25   A.  Uh-huh.
```

96

```
03:20:54   1   Q.  We also see reference to, quote, billing events, end
03:20:57   2   quote, under core network.  Do you see that?
03:21:00   3   A.  Yes.
03:21:00   4   Q.  Let's take a look at some more of the ideas that you're
03:21:05   5   presenting to this -- Best Buy at this time.
03:21:05   6        MR. KODISH:  Mr. Compton, if you could turn the
03:21:08   7   slide to the one ending in 437.
03:21:11   8   Q.  (By Mr. Kodish)  So, Dr. Raleigh, here on this slide,
03:21:16   9   you reference an, quote, On Service Developers Kit (OnSDK),
03:21:23  10   end quote.  Do you see that?
03:21:25  11   A.  Yes.
03:21:25  12   Q.  And that's an ItsOn service SDK you had in mind; is
03:21:29  13   that right?
03:21:29  14   A.  Yeah, it's basically something that goes on the device
03:21:30  15   to brand it for Best Buy.
03:21:32  16   Q.  And SDK stands for software development kit; is that
03:21:36  17   correct?
03:21:36  18   A.  Yes, yes.
03:21:37  19   Q.  I'm sorry, it was faint.  Did you say yes?
03:21:39  20   A.  Yes, of course.  Yes.
03:21:40  21   Q.  Okay.  Thank you.
03:21:41  22        We also see under that SDK entry discussion of
03:21:45  23   something called, quote, connection manager, end quote.  Do
03:21:48  24   you see that?
03:21:48  25   A.  Yes, that was a conventional term at the time, and it
```

98

```
03:21:52   1   meant something quite specific.
03:21:53   2   Q.  And a, quote, bandwidth management solution, end quote.
03:21:58   3   You see that's written as well?
03:21:59   4   A.  Yes.
03:22:00   5   Q.  And the slide also mentions the service policy solution
03:22:05   6   again, right?  Do you see that?
03:22:07   7   A.  Yes.
03:22:07   8   Q.  So we've looked at a few ideas here in this
03:22:10   9   presentation that you sent to Best Buy just days after
03:22:12  10   leaving Qualcomm.  We saw service policies, bandwidth
03:22:16  11   management solutions, billing events, and a connection
03:22:19  12   manager.  Those were all in there, right?
03:22:20  13   A.  Yeah, these are all counterparts that connect to the
03:22:24  14   network equipment, which is the core of the technology they
03:22:26  15   wanted us to develop.  And these would, you know, basically
03:22:30  16   communicate with the network equipment to try to get the
03:22:33  17   device onto the network --
03:22:36  18   Q.  Dr. Raleigh, that was a yes or no question.  We're
03:22:38  19   trying to move along here.
03:22:38  20   A.  Okay.  Sorry.  What was the question?
03:22:40  21   Q.  That's a fair response.  Let's try and -- I think you
03:22:42  22   answered the question, yes, but if you need --
03:22:45  23   A.  I'm sorry, what was the question?  I want to make sure
03:22:46  24   I understood before I answered.
03:22:48  25   Q.  We saw service policies, bandwidth management
```

```
03:22:50   1   solutions, billing events, and a connection manager
03:22:54   2   described in this -- this exhibit we just went through,
03:22:58   3   correct?
03:23:01   4   A.  These are conventional components that were in the
03:23:01   5   market at the time, and, yes, that's what it says.
03:23:05   6        MR. KODISH:  Move to admit the document at Tab 11,
03:23:08   7   Your Honor.
03:23:08   8        MR. KRIS DAVIS:  No objection.
03:23:09   9        THE COURT:  All right.  It's admitted.
03:23:11  10   Q.  (By Mr. Kodish)  So let's see -- let's see how those
03:23:13  11   ideas related to the provisional patent application you
03:23:16  12   filed just months later.
03:23:17  13        MR. KODISH:  Mr. Compton, if you could bring up
03:23:21  14   the document at Tab 24 of the binder, which is also, for
03:23:24  15   the Court's reference, Docket 236-26.  And we'll go ahead
03:23:26  16   and turn to Page 1.
03:23:26  17   Q.  (By Mr. Kodish)  Dr. Raleigh, this is the provisional
03:23:35  18   patent application you filed on January 28, 2009, right?
03:23:42  19   A.  It looks like it.
03:23:43  20   Q.  And, again, we're looking for how this provisional
03:23:45  21   application relates to the ideas you were presenting to
03:23:48  22   Best Buy, things like service policies, bandwidth
03:23:51  23   management, billing events, and a connection manager.
03:23:53  24        And so with that in mind, you see that the title
03:23:56  25   of the provisional patent is:  Service Policy Communication
```

99

```
03:24:00   1   System and Method.
03:24:00   2        Right?
03:24:01   3   A.  I do.
03:24:02   4   Q.  The provisional patent is all about service policies,
03:24:05   5   right?
03:24:05   6   A.  I'm sorry, the things that we pitched to Best Buy were
03:24:11   7   conventional things of the day.  And just because there's a
03:24:14   8   correlation in terms means nothing in terms of inventive
03:24:14   9   concepts.
03:24:19  10   Q.  All right.  I searched this provisional patent
03:24:22  11   application and the phrase "service policy" or "services
03:24:25  12   policy," and those words come up over 300 times.  Does that
03:24:30  13   surprise you?
03:24:30  14   A.  Not at all.  There's probably, you know, hundreds of
03:24:35  15   thousands of patents written on some form of service
03:24:37  16   policy, so you're simply correlating standard terms of art
03:24:41  17   and trying to draw conclusions that are incorrect.
03:24:44  18   Q.  Let's see what other ideas are embodied in the
03:24:46  19   provisional application.
03:24:49  20        MR. KODISH:  Let's go ahead, Mr. Compton, if we
03:24:51  21   could turn to Figure 18.
03:24:57  22   Q.  (By Mr. Kodish)  And we see right there in Figure 18,
03:24:59  23   the provisional application.  We've got the ItsOn, quote,
03:25:02  24   connection manager again, right, that's labeled Item No.
03:25:05  25   1804?
```

100

```
03:25:06   1   A.  Again, connection manager is a very standard term of
03:25:08   2   art that had existed for decades prior to this.
03:25:11   3   Q.  Uh-huh.  And we see a server for, quote, billing
03:25:16   4   events, end quote, labeled at 1662; is that right?
03:25:19   5   A.  Yes.
03:25:19   6   Q.  Two or more ideas that you were pushing on Best Buy
03:25:25   7   just days after you left Qualcomm are these concepts of a
03:25:28   8   connection manager and billing events, right?
03:25:30   9   A.  You know, you're just doing word matching between a
03:25:34  10   marketing document and a patent.  And, you know, what
03:25:36  11   matters is the embodiments and the actual inventions that
03:25:44  12   are unique in light of the prior art and when those were
03:25:47  13   conceived.
03:25:48  14        So these are just words that have descriptions,
03:25:51  15   and it really all comes down to, you know, what the
03:25:53  16   inventive content is.
03:25:55  17   Q.  So we'll talk -- we've talked about a few concepts that
03:25:59  18   are in both your predeparture from Qualcomm presentation
03:26:02  19   and thereafter and in this provisional application.  We
03:26:05  20   haven't talked yet about bandwidth management.
03:26:08  21        MR. KODISH:  Mr. Compton --
03:26:12  22   A.  Would you like to know what that was in the Best Buy
03:26:15  23   context?
03:26:17  24   Q.  (By Mr. Kodish)  So if you'll indulge me, today is my
03:26:17  25   day to ask questions.
```

101

```
03:26:17   1   A.  Sure.
03:26:20   2   Q.  My mom is very excited that I'm doing so.  So I'll go
03:26:22   3   ahead and just keep asking them if that's all right.
03:26:25   4   A.  All right.
03:26:35   5   Q.  So...
03:26:35   6        MR. KODISH:  Please turn us to the screen on
03:26:39   7   Paragraph 73, Mr. Compton, of the provisional.
03:26:44   8   Q.  (By Mr. Kodish)  Here the provisional recognizes that
03:26:46   9   in, quote, wireless access network, bandwidth capacity is a
03:26:51  10   valuable resource in the face of the increasing popularity
03:26:55  11   of devices, applications, and content types that consume
03:26:59  12   more bandwidth.
03:26:59  13        Do you see that language?
03:27:01  14   A.  Yes.
03:27:04  15        MR. KODISH:  And then, Mr. Compton, if we turn to
03:27:06  16   Paragraph 179 of the provisional application, Tab 28, Page
03:27:10  17   18.
03:27:10  18   Q.  (By Mr. Kodish)  Let's see what it has to say there.
03:27:13  19   There's the language saying, quote, low bandwidth network
03:27:17  20   browsing or using limited bandwidth, end quote.  You see
03:27:23  21   those concepts being discussed in your provisional?
03:27:24  22   A.  Yes, but those weren't in the Best Buy documents.  I
03:27:27  23   mean, what we did in this patent was not in the Best Buy
03:27:30  24   documents.
03:27:30  25   Q.  Dr. Raleigh, if you focus on my question, we'll have a
```

102

```
03:27:33   1   chance of getting through this today.  So thank you for
03:27:35   2   your answer, but listen carefully to what I have to say --
03:27:39   3   A.  Okay.
03:27:41   4   Q.  -- what I'm asking.
03:27:42   5        So these concepts that were described in your
03:27:44   6   provisional that we just looked at on the screen, these are
03:27:46   7   ways to manage a device's bandwidth, correct?
03:27:48   8   A.  There's many ways, and these are some, and there's a
03:27:50   9   lot more disclosed in the first provisional.
03:27:53  10   Q.  What the evidence shows us, Dr. Raleigh, is that your
03:27:59  11   January 28th, 2009, provisional patent application is
03:28:00  12   referencing many of the same ideas you were presenting to
03:28:02  13   Best Buy just days after leaving Qualcomm; isn't that
03:28:02  14   right?
03:28:05  15   A.  I think that's false.  The inventive concepts changed
03:28:10  16   after this.  And if you'd allow me to explain, I can.  But
03:28:15  17   if you want to keep, you know, wandering down this path, we
03:28:18  18   can do that, too.
03:28:19  19   Q.  Well, we'll get to some good portions that I think will
03:28:22  20   be great opportunities --
03:28:22  21   A.  Okay.
03:28:23  22   Q.  -- for you to give an explanation.
03:28:25  23        But you had started these conversations with Best
03:28:27  24   Buy about this project while you were at Qualcomm, right?
03:28:30  25   A.  Yeah, I testified to that earlier.  They were
```

103

```
03:28:35   1   recruiting me to try to be the system integrator for --
03:28:37   2   possibly be the system integrator for these network things
03:28:40   3   that they needed for their MVNO.
03:28:43   4   Q.  And you agree it would have been, quote, entirely
03:28:46   5   inappropriate and problematic, end quote, for you to meet
03:28:48   6   Best Buy and represent yourself or ItsOn while you worked
03:28:51   7   for Qualcomm?
03:28:52   8   A.  I completely disagree with that.  It's like a job
03:28:55   9   interview.  I totally disagree with what you --
03:28:58  10   Q.  You disagree with the statement that it would have been
03:29:01  11   entirely inappropriate and problematic for you to meet Best
03:29:04  12   Buy and represent yourself or ItsOn while you worked for
03:29:07  13   Qualcomm, you disagree with that statement?
03:29:09  14   A.  I do, totally.  Yeah, like people look for the next
03:29:14  15   thing they're going to do all the time before they leave a
03:29:17  16   company.  I even told Paul I was going to go work with Best
03:29:20  17   Buy.  I mean, I wasn't hiding this from anybody.  This is
03:29:23  18   normal course of business.
03:29:27  19   Q.  All right.
03:29:27  20        MR. KODISH:  Let's go ahead and, Mr. Compton, can
03:29:31  21   we play the portion of Dr. Raleigh's June 14th, 2024
03:29:38  22   deposition transcript at 263, Line 20, through 264, Line
03:29:43  23   24?
03:29:46  24        (Videoclip played.)
03:29:47  25   Q.  And I know you started developing this relationship
```

104

```
03:29:50   1   with Best Buy while you were at Qualcomm.
03:29:52   2        When did you start talking to Best Buy about this
03:29:54   3   MVNO idea?
03:29:56   4   A.  Yeah, I wouldn't say it that way.  That's not at all
03:30:00   5   how I would say it.  I met the Best Buy people in the
03:30:03   6   context of the other things.  They asked me, you know --
03:30:11   7   you know, hey, you're an inventor, and you're an
03:30:13   8   entrepreneur.  Are you going to stay at Qualcomm?
03:30:15   9        I said:  I wasn't sure.
03:30:16  10        They said:  Hey, why don't you come work with us?
03:30:19  11        I said:  Yeah, I don't know.
03:30:21  12        And then over probably a four-month period, I
03:30:25  13   talked -- as I mentioned to you, I talked to Paul about all
03:30:28  14   kinds of things, and it just really wasn't going anywhere.
03:30:32  15   And they were bugging me to come sit in on this meeting
03:30:35  16   with them, and they said this is your chance to come get in
03:30:39  17   on the ground floor and figure out what this thing is and
03:30:40  18   how you can help us.  So it kind of drove my timeline to
03:30:43  19   depart because as I said, I didn't want to -- it would have
03:30:46  20   been extremely inappropriate for me.
03:30:48  21        Then I -- then I would be doing things that were
03:30:51  22   inappropriate.  If I was at Qualcomm and I'm representing
03:30:55  23   myself at this meeting or representing this shell called
03:30:57  24   ItsOn or Headwater, that would have been entirely
03:31:00  25   inappropriate and problematic.
```

106

```
03:31:02   1           (Videoclip ends.)
03:31:03   2   A.  That's entirely consistent with what I said.
03:31:06   3   Q.  (By Mr. Kodish)  Let me get my question in, and then
03:31:08   4   you can respond.
03:31:09   5        My question is, that's your testimony, right,
03:31:11   6   Dr. Raleigh?
03:31:12   7   A.  Absolutely, yeah.
03:31:13   8   Q.  And you stand by it?
03:31:14   9   A.  100 percent.
03:31:15  10   Q.  All right.  And so Best Buy was bugging you, drove your
03:31:18  11   timeline to leave Qualcomm, as you described?
03:31:20  12   A.  Yes.  And just to be clear, what I said would be
03:31:24  13   problematic is if I showed up while I still worked at
03:31:27  14   Qualcomm and began working with Best Buy on their project
03:31:32  15   and beginning to innovate, then that would be entirely
03:31:36  16   inappropriate.
03:31:36  17   Q.  Right.
03:31:36  18   A.  But talking about an opportunity, listening to the
03:31:39  19   requirements, listening to what they wanted my company to
03:31:43  20   do, considering business probabilities, not inappropriate.
03:31:46  21   It's just like looking for your next job.
03:31:48  22   Q.  Please focus on my question.
03:31:51  23   A.  Sure.
03:31:51  24   Q.  We'll have a chance of getting through this.
03:31:54  25        So my next question is -- in fact, we can go back
```

107

```
03:33:09   1   Q.  Oh, so your testimony is that you didn't have anything
03:33:11   2   to do with this document, and those first couple of pages
03:33:14   3   that are all about ItsOn, are those just something they
03:33:16   4   came up with themselves?
03:33:16   5   A.  This is nothing about ItsOn.  This is a Best Buy
03:33:18   6   document, I believe.
03:33:19   7   Q.  Oh.  Well, let's refresh.  If we can go back to Pages 2
03:33:27   8   and 3.
03:33:27   9        You'll have a chance to answer my question,
03:33:27  10   Dr. Raleigh.
03:33:28  11        Pages 2 and 3, it's all about ItsOn, right?
03:33:28  12   A.  This one talks about ItsOn, yeah.
03:33:30  13   Q.  Okay.  And this is -- what we were looking at before
03:33:32  14   was just Page 5 of the same document?
03:33:34  15   A.  But that's a Best Buy document.  It's their own
03:33:37  16   document.
03:33:37  17   Q.  Okay.
03:33:37  18   A.  I think they had that for quite some time.
03:33:39  19   Q.  All right.
03:33:40  20   A.  And let me remind you that they were inviting equipment
03:33:43  21   vendors to come in and pitch -- they had a mature idea --
03:33:48  22   Q.  Dr. Raleigh, we're way off the grid here.  I'd like to
03:33:51  23   ask you my next question.
03:33:52  24   A.  Okay.
03:33:53  25        THE COURT:  All right.  You can ask your question,
```

106

```
03:31:57   1   to the ItsOn slide presentation that we looked at earlier.
03:32:01   2        MR. KODISH:  At Tab 8, if we could, Mr. Compton,
03:32:07   3   and let's go ahead and go to Page 5.
03:32:10   4   Q.  (By Mr. Kodish)  And what we see here is that you
03:32:14   5   generated -- this presentation that was generated well
03:32:18   6   before you left Qualcomm, it's mentioning in this diagram,
03:32:23   7   this concept of the connection manager, as well.  Do you
03:32:26   8   see that?
03:32:27   9   A.  Yeah.  And this had nothing to do with me, ItsOn.  This
03:32:30  10   is their own -- again, they had their own thinking about
03:32:33  11   all this stuff.
03:32:34  12   Q.  Uh-huh.
03:32:36  13   A.  This is their thinking.
03:32:36  14   Q.  Yeah.  All right.
03:32:38  15   A.  And, in fact, that's a really good example.  There's a
03:32:41  16   connection manager, what do you know?  That's not mine.
03:32:44  17   That's a standard term of art that you're --
03:32:47  18   Q.  Yeah, a connection manager --
03:32:47  19   A.  Is a standard term of art --
03:32:53  20   Q.  -- managed service partner connecting up with entities
03:32:54  21   like Sprint.  Sound familiar?
03:32:57  22   A.  What did I just say?  This is their document.  I don't
03:33:01  23   think -- look, I need to be careful.  I don't recall all
03:33:04  24   these events.  I doubt I had anything to do with this
03:33:07  25   document.  They had their own ideas.
```

108

```
03:33:56   1   Mr. Kodish.  And then I want you to let him answer.  And
03:33:58   2   when he's finished answering, you can ask your next
03:34:01   3   question.
03:34:01   4        MR. KODISH:  All right.
03:34:02   5        THE WITNESS:  Can I finish --
03:34:04   6        THE COURT:  Dr. Raleigh --
03:34:04   7        THE WITNESS:  Sorry.
03:34:04   8        THE COURT:  -- we're going to start again.
03:34:07   9        Ask a question, and then you answer.  And we'll
03:34:11  10   give you a chance to finish your answer.
03:34:14  11        THE WITNESS:  Understood.  Thank you.
03:34:16  12        MR. KODISH:  Mr. Compton, can we bring up the
03:34:20  13   document at Tab 45 of the binder?
03:34:24  14   Q.  (By Mr. Kodish)  Dr. Raleigh, this is an email between
03:34:35  15   you and Best Buy sent September 25th, 2008, correct?
03:34:37  16   A.  Looks like it, yes.
03:34:39  17   Q.  And the title is:  Contact and Actions So Far.
03:34:46  18        Right?  That's what the subject is?
03:34:48  19   A.  That's what it says.
03:34:49  20   Q.  Let's take a look at the first few items on this list.
03:34:53  21   The first item concerns ItsOn providing an outline for
03:34:56  22   getting a source code license in place so that ItsOn can
03:35:00  23   provide the flexibility that Best Buy needs, right?
03:35:02  24   A.  Yeah, that would be network source code.
03:35:05  25   Q.  And if we continue on, we see here that -- that you
```

110

```
03:35:12   1   already had in mind some source code that ItsOn would need
03:35:15   2   to license to work with Best Buy --
03:35:17   3   A.  Network source code, if we're going to try to do a
03:35:21   4   connection manager, we would do --
03:35:22   5        THE COURT:  Dr. Raleigh, do let him finish a
03:35:24   6   question, and then I'll make sure you get a chance to fully
03:35:28   7   answer, but you're interjecting while he's still putting
03:35:33   8   his question in.
03:35:34   9        THE WITNESS:  I'm sorry.  Yes, okay.  I'm here to
03:35:35  10   answer.  I apologize.
03:35:36  11   Q.  (By Mr. Kodish)  So this is a yes or no question.  And
03:35:38  12   it's that you already had in mind some source code that
03:35:42  13   ItsOn would need to license to work with Best Buy, correct?
03:35:45  14   A.  Network and device source code, yes.
03:35:47  15   Q.  And the due date for that action item was September
03:35:52  16   3rd, 2008, as you see reflected on this document, correct?
03:35:57  17   A.  Yeah, that's obviously a typo.
03:36:00  18   Q.  Ah, okay.  Well -- and this step was already done
03:36:05  19   before you left Qualcomm, correct?
03:36:06  20   A.  No, I'm sorry, it's a typo.  It's probably 10/3.
03:36:10  21   Q.  Okay.  And so if we look down, there are multiple other
03:36:14  22   action items that have been done so far, each with a
03:36:19  23   September 3rd and a September 1st date.  Do you see that?
03:36:24  24   A.  Yeah, but the email is dated September 25th.  So it
03:36:29  25   doesn't make any sense.
```

111

```
03:37:51   1   after you left Qualcomm, right?
03:37:52   2   A.  Yes.
03:37:52   3   Q.  And you authored this presentation?
03:37:54   4   A.  Yes.
03:37:54   5   Q.  At this point in October 2008, you had a pretty good
03:37:58   6   idea that you were having ItsOn go into the device-assisted
03:38:03   7   service direction, correct?
03:38:04   8   A.  At this point, I had a pretty clear idea to going that
03:38:08   9   direction, yes.
03:38:09  10   Q.  And in October 2008 time frame, you've testified you
03:38:12  11   were researching, writing, and looking at prior art,
03:38:17  12   correct?
03:38:17  13   A.  Among other things.  I was certainly thinking through
03:38:19  14   how I might go about implementing things along the lines of
03:38:23  15   what I had come up with in the ah-ha moment.
03:38:26  16   Q.  But -- ah, the ah-ha moment, I'm so glad you mentioned
03:38:31  17   that.
03:38:32  18        Do you have any of your invention notes from any
03:38:34  19   of that work that you were describing that led up to the
03:38:38  20   ah-ha moment or showed the ah-ha moment?
03:38:41  21   A.  I don't have anything that's not privileged.
03:38:44  22   Q.  Interesting.  So you have it, but you're withholding it
03:38:47  23   and not allowing Samsung to see it in this case?
03:38:50  24   A.  I need to be very careful here, -- so it's my practice
03:38:53  25   to have privileged communication as I develop patents.
```

112

```
03:36:31   1   Q.  Yeah, but the subject is:  Contacts and Actions So Far.
03:36:34   2   So it is talking about things that have happened in the
03:36:36   3   past, you agree with that?
03:36:37   4   A.  No, we hadn't -- no, we hadn't gotten any source code
03:36:40   5   or anything else by that time.
03:36:42   6   Q.  Okay.  So you think the way to read this is a document
03:36:45   7   that says actions so far, that refers to items in the same
03:36:51   8   month that are only in the month, that that just couldn't
03:36:53   9   be the right way to understand this document?
03:36:55  10   A.  You know, I'm just looking at the document, and knowing
03:36:59  11   the timeline, there -- no, it's not possible.
03:37:03  12   Q.  What month --
03:37:05  13   A.  So the document is dated September 25th, 2008, and the
03:37:08  14   due dates on things that had not happened yet were in the
03:37:12  15   past, so that doesn't make any sense.
03:37:14  16   Q.  Uh-huh.  All right.
03:37:19  17        Let's move on to another document.
03:37:26  18   A.  These are people I didn't even meet until, you know,
03:37:30  19   that meetings at Best Buy.
03:37:33  20   Q.  Thank you, Dr. Raleigh.
03:37:34  21        MR. KODISH:  Mr. Compton, if we could pull up the
03:37:36  22   document at Tab 12 of the binder, which is Exhibit 10 from
03:37:39  23   Dr. Raleigh's June 2024 deposition.
03:37:45  24   Q.  (By Mr. Kodish)  It's dated -- this is another ItsOn
03:37:48  25   slide deck.  It's dated October 23rd, 2008, about a month
```

```
03:38:57   1   So -- and for whatever reason, that -- yeah, anyway, I just
03:39:02   2   need to stop right there.  So I have to be careful with
03:39:06   3   privilege.
03:39:06   4   Q.  So your testimony is that you didn't disclose your
03:39:11   5   specific idea to Best Buy because you wanted to protect the
03:39:17   6   technology, right?
03:39:18   7   A.  I disclosed it to them in phases.  I slowly disclosed
03:39:22   8   it, and then after I had mature embodiments that were
03:39:27   9   documented with the attorneys, I began telling them more.
03:39:30  10   But I think I started telling them, hey, I have a new idea
03:39:33  11   fairly soon thereafter.
03:39:35  12   Q.  Right.  And those phases began well before you left
03:39:38  13   Qualcomm, right?
03:39:42  14   A.  That's just nonsense, I'm sorry.
03:39:42  15        MR. KODISH:  If we turn to Slide 4 of Tab 12 of
03:39:46  16   the document.
03:39:46  17   Q.  (By Mr. Kodish)  It shows a plan for an ItsOn, quote,
03:39:49  18   device-implemented network.  This is the Bates ending at
03:39:54  19   557.
03:39:58  20   A.  Yes.
03:39:59  21   Q.  Okay.
03:40:00  22        MR. KODISH:  And just for the record, pardon me,
03:40:02  23   Your Honor, I don't believe I did move to admit the prior
03:40:06  24   exhibit, which was the email string dated -- Contact and
03:40:11  25   Actions So Far.  I would ask that we are able to do that.
```

113

```
03:40:15   1              THE COURT:  As what?  What's the exhibit number on
03:40:18   2    that?
03:40:18   3              MR. KODISH:  The exhibit number -- it was Tab --
03:40:25   4    Tab 45 in the binder.  Thank you, Your Honor.
03:40:28   5              MR. KRIS DAVIS:  No objection, Your Honor.
03:40:29   6              THE COURT:  All right.  45 is admitted.
03:40:32   7    Q.  (By Mr. Kodish)  All right.  So we were talking about
03:40:37   8    Slide 4 of the Tab 12 document, and it shows a plan for an
03:40:42   9    ItsOn, quote, Device-Implemented Network.  That's right,
03:40:45  10    yes?
03:40:46  11    A.  Yeah, here I'm beginning to say, hey, I have a
03:40:50  12    different idea, and I'm showing some very general slides in
03:40:55  13    that direction.
03:40:55  14    Q.  Dr. Raleigh, you certainly will be able to answer
03:40:57  15    questions that your counsel might ask, but most of these
03:41:00  16    are yes or no --
03:41:01  17              THE COURT:  Mr. Kodish, I think that's a fair
03:41:03  18    answer to your question.
03:41:03  19              MR. KODISH:  Okay.  Thank you, Your Honor.
03:41:04  20    Q.  (By Mr. Kodish)  This says "ItsOn Proprietary and
03:41:08  21    Confidential" at the bottom, correct?
03:41:09  22    A.  It certainly does.
03:41:10  23    Q.  And you had an NDA with Best Buy at the time of these
03:41:13  24    slides, October 23rd, 2008, right?
03:41:15  25    A.  I think so.  That's one of the reasons I had to create
```

114

```
03:41:19   1    a company, so that we could sign NDAs and so on.
03:41:22   2              MR. KODISH:  And, Mr. Compton, if you could turn
03:41:25   3    to the last slide of this document at Bates ending in 566
03:41:28   4    of Tab 12.
03:41:30   5    Q.  (By Mr. Kodish)  And it says here, quote, patents in
03:41:33   6    process should file first in next week or so, end quote.
03:41:38   7              Do you see that?
03:41:38   8    A.  Yeah.  Well, that was optimistic, I guess.
03:41:41   9    Q.  And that's all --
03:41:41  10    A.  It took several months.
03:41:42  11    Q.  -- that's all connected to ItsOn, right?
03:41:43  12    A.  Yeah.  I mean, we could have filed, you know, very
03:41:47  13    preliminary PowerPoint-type notions, but we just decided
03:41:52  14    that there just wasn't enough there to -- you know, to be
03:41:57  15    patentable.  So we just decided to wait.  The concepts were
03:42:00  16    too raw at that point.
03:42:02  17    Q.  Yeah.  And the patent application that was in process,
03:42:04  18    this is referring to the same application you filed three
03:42:07  19    months later in January of 2009, correct?
03:42:09  20    A.  Yeah.  As I mentioned, I started researching
03:42:12  21    embodiments, researching all sorts of things, prior art,
03:42:15  22    researching, you know, potential ways to implement.  And so
03:42:19  23    all of that was in the context of communications with
03:42:23  24    counsel.  You know, as I mentioned, I do have a practice of
03:42:26  25    communicating with counsel as I develop things, and that's
```

115

```
03:42:29   1    all under privilege.
03:42:33   2              MR. KODISH:  Let's move to admit, Your Honor, this
03:42:34   3    document at Tab 12.
03:42:37   4              MR. KRIS DAVIS:  No objection, Your Honor.
03:42:37   5              THE COURT:  All right.  It is admitted.
03:42:41   6    Q.  (By Mr. Kodish)  So you've already talked about the
03:42:45   7    2021 video on your direct examination.  Do you recall that
03:42:48   8    testimony generally?
03:42:49   9    A.  Yes.
03:42:49  10    Q.  Right.  And that was you speaking.  There's no question
03:42:52  11    about that, right?
03:42:53  12    A.  Of course.
03:42:56  13    Q.  Okay.
03:42:59  14              MR. KODISH:  And if we could go ahead and -- well,
03:43:03  15    let's see here.
03:43:06  16    Q.  (By Mr. Kodish)  The statement that you made --
03:43:10  17              MR. KODISH:  And let's go ahead and put it on the
03:43:12  18    screen.  It's the text of the quote at Docket 236 at Page
03:43:15  19    3.
03:43:17  20    Q.  (By Mr. Kodish)  We have it up there.  Do you see it?
03:43:19  21    A.  I see the words, yes.
03:43:21  22    Q.  Right.  And it -- it goes from at Qualcomm, you know,
03:43:26  23    one of the most innovative companies in the world, I had
03:43:28  24    this idea.  It talks about how you took it to the then CEO
03:43:32  25    of Qualcomm.  It then talks about so you left Qualcomm to
```

116

```
03:43:36   1    start Headwater, and we developed that operating system
03:43:40   2    technology, we distributed it to carriers, we pitched it to
03:43:44   3    OEMs, and now it's in every smartphone on the planet.
03:43:49   4              You see that quote?
03:43:49   5    A.  I do.
03:43:52   6    Q.  Your statement?
03:43:52   7    A.  Again, passing remark, yeah.
03:43:54   8    Q.  Uh-huh.  And that statement was part of your argument
03:43:56   9    that established companies often reject disruptive
03:44:02  10    technologies, right?
03:44:02  11    A.  Not exactly.  The comment was things that I had wanted
03:44:05  12    to go research and explore, directions I wanted to go
03:44:11  13    weren't interesting to large companies.  That was the
03:44:14  14    general concept of what I was saying.
03:44:16  15    Q.  Well, it was specifically about how -- you know, these
03:44:19  16    companies, they feel it's not in their economic interest to
03:44:23  17    disrupt their own markets or it's to distract from the core
03:44:27  18    products that they are already making lots of money on,
03:44:28  19    that's your perspective, right?
03:44:30  20    A.  That's part of it, yeah.
03:44:31  21    Q.  What was the idea you had at Qualcomm that you took to
03:44:34  22    Headwater and is now in every smartphone on the planet?
03:44:36  23    A.  Again, the tie-in is the market need.  So this is a
03:44:41  24    passing comment that referred to very specific events.  So
03:44:45  25    what started as a conversation with Paul about a market
```

117

```
03:44:48   1   need that at the time was being attempted to be solved by
03:44:53   2   network equipment technology, mobile network operating
03:44:56   3   systems, that was a conversation I had with Paul in 2008.
03:45:00   4        And what I brought back to him in 2009 was
03:45:02   5   something very, very different, which was, hey, let's solve
03:45:06   6   the problem with device technology.  So that's the --
03:45:10   7   that's the conversation I was referring to with this
03:45:15   8   passing comment.
03:45:16   9   Q.  Yeah.  So I'll ask the exact same question because I
03:45:18  10   think you answered a different question, and it was:  What
03:45:22  11   was the idea you had at Qualcomm that you took to Headwater
03:45:25  12   and that is now in every smartphone on the planet?
03:45:28  13   A.  You're trying to equate a passing comment with the
03:45:31  14   actual facts, and I'm describing the facts.  And the
03:45:35  15   passing comment is exactly what it is, a passing comment.
03:45:39  16        And it's in the context of a panel session where
03:45:41  17   if I would have gone into all the detail we're going to
03:45:46  18   here, I would have been a horrible panel member.
03:45:46  19   Q.  You --
03:45:50  20   A.  I made an off-the-cuff passing comment that you're
03:45:53  21   trying to equate to the actual facts.
03:45:55  22   Q.  Okay.  You agree that what you said in the 2021 video
03:45:57  23   resembles what Headwater said in its complaint in this case
03:46:01  24   about the asserted patents, right?
03:46:02  25   A.  I don't know about that.
```

118

```
03:46:03   1   Q.  Well, in the -- in the video, you said, quote, we
03:46:07   2   developed that operating system technology.  We distributed
03:46:10   3   it to carriers, pitched it to OEMs, and now it's in every
03:46:16   4   smartphone on the planet.
03:46:16   5        That's what we're looking at on the screen, right?
03:46:19   6   A.  Is there a question?
03:46:22   7   Q.  Yeah, just making sure --
03:46:23   8   A.  Sure, that's what you're looking at on the screen.
03:46:25   9   Q.  Yes.
03:46:32  10        MR. KODISH:  Mr. Compton, if you could bring up
03:46:32  11   the document at Tab 22.  This is Docket 42, Paragraph 27.
03:46:33  12   It's Headwater's Second Amended Complaint.
03:46:37  13   Q.  (By Mr. Kodish)  And here, it reads -- and Headwater
03:46:40  14   said:  By the end of 2015, millions of Sprint devices,
03:46:44  15   including Samsung devices, were running the ItsOn
03:46:46  16   application, which was included in Headwater's intellectual
03:46:49  17   property.
03:46:49  18        You see that?
03:46:50  19   A.  I do.
03:46:58  20   Q.  Okay.  And so your testimony is that your remark, the
03:47:03  21   passing comment, that's not at all the ah-ha moment.  You,
03:47:08  22   on the heels of describing how you came up with MIMO, that
03:47:13  23   then you started talking about a research project on this
03:47:16  24   panel.  That's -- that's what we're being told by you?
03:47:18  25   A.  I'm not even quite sure what you're -- I'm not sure
```

119

```
03:47:23   1   that's how I would characterize it.  I'm just simply
03:47:26   2   telling you what the facts are.
03:47:28   3   Q.  Okay.  So you were telling the former head of the
03:47:33   4   Patent and Trademark Office, who was in the upper right
03:47:36   5   box, Andrei Iancu, about a research idea you had in a
03:47:41   6   passing comment?  That's your testimony?
03:47:43   7   A.  The passing comment referred to a conversation that I
03:47:46   8   had with Paul Jacobs where I discussed a potential research
03:47:50   9   direction to meet certain market needs that I had
03:47:53  10   identified and that were pretty well known and there were
03:47:57  11   conventional approaches that involved mobile network
03:48:01  12   operating system technology, mobile network hardware
03:48:05  13   technology, and I wanted to research in that direction.  So
03:48:07  14   the passing comment referred specifically to that
03:48:10  15   conversation.
03:48:11  16   Q.  Is the mobile value added network operating concept
03:48:18  17   that you described to Paul at Qualcomm, as you explained,
03:48:20  18   is that in every cell phone in the country?
03:48:22  19   A.  Well, not every cell phone is serviced by MVNOs.
03:48:32  20   Q.  Okay.  So -- but the idea that you brought to Paul, is
03:48:35  21   it in every cell phone?
03:48:37  22   A.  No.  I know you're trying to equate my passing comment
03:48:41  23   to the facts.  I've explained that if I had explained all
03:48:44  24   the facts in the panel session, it would have been
03:48:47  25   extremely disruptive.  It would have been boring to the --
```

120

```
03:48:51   1   to the audience.  It would not have been pertinent to the
03:48:54   2   point, and it would have been ludicrous for me to try to
03:48:57   3   explain all the details.
03:48:58   4        I made a passing comment in the process of making
03:49:02   5   a point.  The passing comment is very, very loosely -- if
03:49:08   6   you try to pick apart the words, it's loosely correlated
03:49:12   7   with the facts that I've described.
03:49:13   8   Q.  All right.
03:49:14   9   A.  It's a passing comment.  It's not -- it's not a fact in
03:49:17  10   and of itself.
03:49:17  11   Q.  Let's talk about another correlation.
03:49:22  12        MR. KODISH:  If we could go to the '354 patent
03:49:24  13   application at Tab 26 of the binder.
03:49:26  14   Q.  (By Mr. Kodish)  Would you -- would you be surprised to
03:49:31  15   learn that this MVNO concept that you talked about with
03:49:35  16   Paul appears in that application 95 times?
03:49:39  17   A.  So what are we looking at now?
03:49:43  18        MR. KODISH:  Yeah, if we pull up the '354 patent
03:49:46  19   application, the application you filed in January of 2009.
03:49:49  20   Q.  (By Mr. Kodish)  That it references this MVNO, this
03:49:53  21   mobile value network operator concept?
03:49:59  22        MR. KODISH:  Oh, excuse me.  That's Tab 24.  Let
03:50:01  23   me correct that for the record.  Apologies, Your Honor.
03:50:03  24   Q.  (By Mr. Kodish)  Tab 24, looking at that '354 patent
03:50:07  25   application, would it surprise you to learn that this
```

121

```
03:50:11   1   notion of an MVNO that you say you talked about with Paul
03:50:16   2   at Qualcomm before you left, that it appears 95 times in
03:50:22   3   this patent application?
03:50:23   4   A.  Not at all.  It's just like connection manager, it's a
03:50:23   5   standard term of art.
03:50:24   6   Q.  Okay.
03:50:24   7       MR. KODISH:  And if we turn to the '976 patent
03:50:28   8   itself, which, Mr. Compton, that's Tab 13 of the binder.
03:50:32   9   Q.  (By Mr. Kodish)  Would it surprise you to learn that
03:50:35  10   that concept is talked about nine times in that issued
03:50:38  11   patent, as well, that's asserted in this case?
03:50:41  12   A.  You're referencing standard terms of art that will
03:50:44  13   appear in many, many patents of many different kinds.  And,
03:50:47  14   again, that's -- you can't patent an MVNO.  That's well
03:50:51  15   known.  What you can patent is technologies that go way
03:50:55  16   beyond a standard term of art like that.
03:50:57  17       You might use a standard term of art, and then say
03:50:59  18   I'm going to do something else with it in the patent, but
03:51:02  19   we often anchor all of our patents with standard terms of
03:51:06  20   art because they're understandable, but we must go beyond
03:51:10  21   standard terms of art to have a patented invention.
03:51:13  22   Q.  Okay.  And what you describe as these unremarkable
03:51:17  23   concepts, these are the ones that you were talking about,
03:51:19  24   as you explained, with Paul in this moment that was worthy
03:51:22  25   of announcing on the 2021 video presentation, though,
```

122

```
03:51:25   1   right?
03:51:25   2   A.  What I discussed with Paul was MVNO technology that
03:51:31   3   would go beyond standard practices, would go beyond state
03:51:35   4   of art potentially.  I wasn't sure how.  And it would start
03:51:40   5   trying to solve some of the market needs people had that
03:51:43   6   they wanted to add to MVNOs.  So an MVNO couldn't be
03:51:49   7   possibly patented in those days.  It had been thrown for 35
03:51:55   8   years or 40 years or so.
03:51:55   9   Q.  I would also note --
03:51:55  10       MR. KODISH:  Mr. Compton, if you could bring up
03:52:00  11   one last time the Tab 13 document, the '976 patent?
03:52:00  12   Q.  (By Mr. Kodish)  At Figure 1, it also mentions this
03:52:05  13   MVNO concept in that issued patent.
03:52:05  14       MR. KODISH:  That's Tab -- there are we.  We could
03:52:07  15   probably highlight it.
03:52:19  16   A.  Is there a question?
03:52:19  17   Q.  (By Mr. Kodish)  Yeah, it's referencing this mobile
03:52:21  18   network -- MVNO concept in this Figure 1 of the '976
03:52:25  19   patent?
03:52:25  20   A.  Okay.  What's the question?
03:52:26  21   Q.  Just whether you agree or disagree.
03:52:28  22   A.  Yeah, this diagram shows a tremendous number of
03:52:33  23   different components in a system diagram that was described
03:52:38  24   in detail.  MVNO in and of itself, of course, isn't
03:52:43  25   patentable, but in the specification, I described things
```

123

```
03:52:48   1   you would do to make MVNOs work better, and it had
03:52:54   2   primarily to do with the things that I was doing on the
03:52:57   3   device side and moving things from the network that were
03:53:00   4   conventionally done on the network side.
03:53:03   5       MR. KODISH:  Mr. Compton, if you could bring up
03:53:05   6   the document at Tab 23 in the binder, bearing the
03:53:08   7   production number ending -- well, it's SAM-HW01013886.
03:53:21   8   Q.  (By Mr. Kodish)  This is -- Mr. Raleigh, do you have
03:53:24   9   any reason to doubt this is the LinkedIn page for
03:53:27  10   Headwater?
03:53:27  11   A.  Yes.  Again, it may not have been updated for quite
03:53:29  12   some time, but perhaps it's the LinkedIn page.
03:53:32  13   Q.  Yeah.  So -- and this page reads, and I quote, HWR --
03:53:38  14   that's Headwater, right?
03:53:39  15   A.  Yes, Headwater --
03:53:39  16   Q.  -- invented, commercialized, and is now licensing the
03:53:43  17   technology used in modern smartphone operating systems to
03:53:46  18   control and organize network access for multiple apps
03:53:49  19   running simultaneously on mobile devices, end quote.
03:53:54  20       Do you see that?
03:53:54  21   A.  I see it, yeah.
03:53:56  22   Q.  All right.
03:53:56  23       MR. KODISH:  Your Honor, we move to admit the
03:53:58  24   document at Tab 23 of the binder, this LinkedIn page.
03:54:02  25       MR. KRIS DAVIS:  No objection, Your Honor.
```

124

```
03:54:03   1       THE COURT:  All right.  23 is admitted.
03:54:05   2   Q.  (By Mr. Kodish)  Dr. Raleigh, you're a very experienced
03:54:08   3   inventor, correct?
03:54:09   4   A.  Yes.
03:54:09   5   Q.  You have hundreds of patents, as you mentioned, right?
03:54:13   6   A.  Yes.
03:54:13   7   Q.  And you've already talked about your propensity to
03:54:21   8   document right away due to the first to invent system in
03:54:25   9   U.S. patent law, correct?
03:54:27  10   A.  That's not exactly what I said, no.
03:54:29  11   Q.  Oh, is it not your policy to document right away in
03:54:32  12   view of the first to invent system?
03:54:35  13   A.  You're mixing a lot of things together.  It is my
03:54:39  14   practice to patent as soon as I can.  And it's my practice
03:54:42  15   to communicate with counsel so that they understand where I
03:54:48  16   am in the inventive process.  It's frankly primarily for
03:54:52  17   protection of our intellectual property.
03:54:54  18       For example, if I'm going to go meet with Best Buy
03:54:57  19   and there might be some inventive material that hasn't been
03:55:00  20   patented yet, I want a document that shows that this is
03:55:03  21   where I was in the concept and reduction to practice in the
03:55:07  22   invention so that if anybody ever tries to claim anything
03:55:10  23   later, we can go back and show that we had it before they
03:55:13  24   did.
03:55:14  25       But that -- that's my practice.  And I patent as
```

```
03:55:18   1   quickly as I could -- as quickly as I can.  In this case,
03:55:22   2   it took me roughly -- let me see, so October, November,
03:55:26   3   December, January, it took me four months to write my first
03:55:30   4   provisional and get this documented.
03:55:33   5        MR. KODISH:  Mr. Compton, if you could play the
03:55:36   6   clip from the 6/14/24 Raleigh deposition transcript at
03:55:43   7   182:19 through 183:6.
03:55:45   8        (Videoclip played.)
03:55:46   9   A.  So, you know, whether or not those -- and, you know, my
03:55:49  10   practice, I'm not going to say what I did here because
03:55:52  11   that's probably privileged -- I'm sure it's privileged.
03:55:56  12        My practice, when I come up with a new thing, is
03:55:58  13   to begin documenting as soon as I can with attorneys.  And
03:56:02  14   it's usually pretty rudimentary, but I start documenting
03:56:07  15   the, you know, big picture bullets that probably no one
03:56:10  16   would understand.  And then I start developing each bullet.
03:56:13  17   Each bullet ends up being classes of inventions, and I
03:56:18  18   start developing each bullet over a period of time.
03:56:21  19        (Videoclip ends.)
03:56:22  20   A.  I think that -- I think that's exactly what I just
03:56:23  21   said.
03:56:24  22        MR. KRIS DAVIS:  Your Honor, I just want to object
03:56:25  23   that we started this answer, I think, several paragraphs in
03:56:30  24   even.  This is an incomplete answer --
03:56:33  25        MR. KODISH:  Well, I think the witness just helped
```

```
03:56:56   1   us all out and said he -- that's exactly what he said.
03:56:39   2   A.  I said the same thing.  I -- as I develop, I send
03:56:43   3   information to my attorneys.
03:56:47   4   Q.  (By Mr. Kodish)  Okay.  And you were especially careful
03:56:50   5   to document inventions back in the 2008 time frame because
03:56:53   6   the law was first to invent back then?
03:56:55   7   A.  It's really the same for all my patents.
03:56:59   8   Q.  Okay.  So that's a yes, though?
03:57:01   9   A.  I have a practice that I've explained.
03:57:05  10   Q.  Is that a yes, sir?  It's not a --
03:57:07  11   A.  You keep talking about first to invent, and I'm not
03:57:10  12   sure that was top of mind.
03:57:12  13   Q.  Okay.
03:57:12  14        MR. KODISH:  Mr. Compton, if you could play the
03:57:15  15   portion of Dr. Raleigh's deposition, 6/14/24, beginning at
03:57:20  16   Page 187.
03:57:22  17        THE COURT:  Mr. Kodish, what is the point of this?
03:57:28  18   What I really wish you would get to is the documents -- I
03:57:34  19   think that what I really need to hear is what happened
03:57:50  20   between your exhibit from Tab 8 -- what happened between 8
03:57:50  21   and 12?  8 is the one that is done right afterwards.   Is
03:57:58  22   there a material difference between 8 and 12?  12 is the
03:58:02  23   one that apparently was after what the witness is
03:58:07  24   describing as an ah-ha moment.
03:58:10  25        If the -- if there's a change that's reflected in
```

```
03:58:16   1   between those two documents, between the invention being at
03:58:21   2   the network level versus being at the device level, that's
03:58:24   3   what I need to hear, not whether there's a difference
03:58:30   4   between his deposition and what he's saying now.
03:58:35   5        THE WITNESS:  If I may, Your Honor --
03:58:35   6        MR. KODISH:  If I may answer the question.
03:58:37   7        The context here is a contract that nobody
03:58:40   8   disputes has been signed that creates a burden for
03:58:45   9   Dr. Raleigh to have demonstrated and prove that he
03:58:48  10   conceived of this invention that was filed within one year
03:58:53  11   of his departing of Qualcomm.
03:58:55  12        And so he explains that he, under his first to
03:59:01  13   invent adherence, would take notes to make sure that he
03:59:07  14   could corroborate it to backdate, to show exactly when he
03:59:10  15   came up with the idea.
03:59:11  16        And yet we're in a case trying -- where
03:59:15  17   Dr. Raleigh suggests that it was Qualcomm that has the
03:59:18  18   burden or Samsung that has the burden to demonstrate that
03:59:22  19   these notes exist, that they corroborate anything in the
03:59:27  20   context where Dr. Raleigh is working under the name of
03:59:29  21   ItsOn, the company that he has taken the position in this
03:59:32  22   case over and over again is the company that has products
03:59:35  23   that practice the asserted patents and that he was working
03:59:39  24   with that company back well before he left Qualcomm in his
03:59:43  25   own personal stead with an eye toward the venture that had
```

```
03:59:49   1   nothing to do with Qualcomm, and so that is -- and then is
03:59:52   2   telling us that his inventor notes are privileged.
03:59:55   3        He has made a very big decision about these
03:59:57   4   inventor notes to withhold them from the Court, the ones
04:00:00   5   that he needs to show that they developed the concept --
04:00:04   6   they conceived the inventions after he left Qualcomm.
04:00:08   7        Why is it Samsung's burden to demonstrate that
04:00:11   8   those notes that he's decided to hide from us and from the
04:00:14   9   Court --
04:00:15  10        THE COURT:  You know, Mr. Kodish, this is a
04:00:17  11   combination of closing argument and an explanation of
04:00:20  12   points.
04:00:23  13        MR. KODISH:  Right.
04:00:24  14        THE COURT:  And what I'm frustrated about is we're
04:00:27  15   running out of time, and all I'm getting is a rehash of his
04:00:34  16   deposition, and not even for impeachment.  But I'm not sure
04:00:37  17   what you're trying to prove.
04:00:39  18        The point -- the reason we're having this hearing
04:00:42  19   is to find out whether this patent was conceived before he
04:00:53  20   left, and there is evidence that we can look at that will
04:00:57  21   cast some light on it.  And I wish you would use your time
04:01:01  22   on that.
04:01:02  23        MR. KODISH:  Understood, Your Honor.  I apologize.
04:01:04  24   I --
04:01:05  25        THE WITNESS:  If I --
```

```
04:01:05   1        THE COURT:  Dr. Raleigh, let him ask a question.
04:01:10   2        MR. KODISH:  I wafted into argument because I felt
04:01:14   3   like that's what you were asking for.  I apologize if I
04:01:17   4   misconstrued that.
04:01:17   5        Let's move on and --
04:01:19   6        THE WITNESS:  If I may add just one thing --
04:01:20   7        THE COURT:  No, Dr. Raleigh, wait until you get a
04:01:22   8   question.
04:01:22   9        THE WITNESS:  Okay.
04:01:23  10        THE COURT:  Otherwise, your side will get a chance
04:01:25  11   to ask you questions, things that you have forgotten to
04:01:28  12   say.  But I --
04:01:30  13        THE WITNESS:  That's not what -- No. 12 --
04:01:32  14        THE COURT:  Dr. Raleigh --
04:01:33  15        THE WITNESS:  Okay.  All right.
04:01:34  16        THE COURT:  -- don't make me tell you again to
04:01:37  17   wait for a question.
04:01:39  18        THE WITNESS:  Okay.
04:01:40  19        MR. KODISH:  All right.  So let's move on to Tab
04:01:42  20   25 of the binder, Mr. Compton.
04:01:44  21   Q.  (By Mr. Kodish)  These are Headwater's disclosures
04:01:46  22   under the Local Patent Rules 3-1 and 3-2.  And these were
04:01:52  23   served by Headwater near the beginning of the case, in
04:01:54  24   February 2023, by your counsel.
04:01:56  25        If you look, you can see -- those are Headwater's.
```

```
04:02:02   1   You don't dispute that, right?
04:02:05   2   A.  So what are you asking?
04:02:06   3   Q.  That this document is Headwater's, you know, local --
04:02:11   4   disclosure of asserted claims and infringement contentions
04:02:14   5   served in this case?
04:02:14   6   A.  That's what it looks like, yes.
04:02:18   7   Q.  All right.
04:02:19   8        MR. KODISH:  And if we turn to the last page.
04:02:20   9   Q.  (By Mr. Kodish)  We can see that it says February 28,
04:02:25  10   2023.
04:02:25  11        And Headwater -- do you see that there?
04:02:27  12   A.  Yes.
04:02:27  13   Q.  Headwater's disclosures said the asserted patents were
04:02:30  14   conceived in January 2009.  That's on Page 12 of this doc.
04:02:36  15   Do you see that?
04:02:36  16   A.  That -- is that what this is?  Oh, priority dates.
04:02:46  17   Q.  Okay.  Well, let's move on and clarify.  In fact --
04:02:48  18   A.  So these patents, that's what it says, January 2009.
04:02:52  19   Yeah.
04:02:54  20        My understanding, though, is that there's been
04:02:57  21   agreement that the priority date is May 10 -- or May 25,
04:03:02  22   2010.
04:03:02  23   Q.  In fact, Headwater's disclosures said it was unaware of
04:03:05  24   any documents that supported conception before those dates,
04:03:09  25   correct?
```

```
04:03:09   1   A.  Before what dates?
04:03:10   2   Q.  Before the dates we just showed, January 28, 2009.
04:03:15   3        We can go ahead and read this section, 3-2B, which
04:03:20   4   says:  Headwater is presently unaware of any documents that
04:03:24   5   evidence the conception, reduction to practice, design, or
04:03:27   6   development of the claimed inventions, which were created
04:03:29   7   on or before the application dates of the patents-in-suit
04:03:34   8   or priority date identified pursuant to Patent Rule 3-1(e)?
04:03:41   9        And those -- that's that date we've got up here,
04:03:41  10   January 28th, 2009.  Do you see this?
04:03:43  11   A.  That's what that says.  But you've already shown a
04:04:08  12   document that evidences conception.  So the thing you're
04:03:51  13   looking for is actually evidenced by the series of
04:03:53  14   documents you showed me in my deposition.  You can see the
04:03:57  15   progression of my thinking and what I presented to Best
04:04:02  16   Buy, including No. 12 that the Judge was asking about.
04:04:05  17   Q.  So you're disagreeing with Headwater's infringement
04:04:08  18   contentions; is that right?
04:04:10  19   A.  No, I'm not all that familiar with these documents that
04:04:14  20   you're showing me.  I'm not a lawyer.  I have never read
04:04:18  21   this part of it.
04:04:19  22   Q.  Okay.
04:04:21  23        MR. KODISH:  Mr. Compton, if you could please
04:04:23  24   bring up on the screen the document at Tab 26 of the
04:04:25  25   binder.
```

```
04:04:26   1   Q.  ( By Mr. Kodish)  These are Headwater's responses to
04:04:29   2   Samsung's interrogatories in this case, correct?  That's
04:04:31   3   Docket 236-28 at 1.
04:04:39   4        And if we go to Interrogatory No. 1, it asks for
04:04:43   5   all facts relating to conception of the asserted patent.
04:04:46   6   Do you see that there at Page 7?
04:04:50   7   A.  Okay.  I see the words, yeah.
04:04:53   8   Q.  Yeah.  And do you understand that Docket 236-28 was
04:04:56   9   Headwater's final response to this interrogatory that it
04:05:01  10   served near the end of discovery on March 15th, 2024?
04:05:05  11        MR. KODISH:  And, Mr. Compton, if you can go to
04:05:08  12   March -- show the date to Dr. Raleigh.
04:05:11  13   Q.  (By Mr. Kodish)  You see that, Dr. Raleigh; is that
04:05:15  14   right?
04:05:15  15   A.  Yes, I see the date.
04:05:20  16        MR. KODISH:  And if we turn to Page 8 of this
04:05:22  17   document.
04:05:22  18   Q.  (By Mr. Kodish)  And under the first supplemental
04:05:25  19   response to Interrogatory No. 1, it says, quote, the
04:05:28  20   inventions of each of the asserted patents were conceived
04:05:31  21   of on or before January 28th, 2009, which is the filing
04:05:35  22   date of the United States patent provisional application,
04:05:38  23   the '354 application.  You see that, right?
04:05:41  24   A.  I see that.  But we've already gone through previous
04:05:44  25   testimony that says that components of these patents were
```

133

```
04:05:49   1   conceived as then, and we actually went through some
04:05:52   2   elements that had to be supported by the '022 application.
04:05:57   3   So I'm not sure where you're going, but the '022
04:06:01   4   application is required to support --
04:06:03   5   Q.  Right.  And on Page 9 of this document, Headwater goes
04:06:05   6   on to say that, quote, conception and reduction to
04:06:08   7   practice certain portions of the claimed inventions
04:06:11   8   occurred as early as September 2008.
04:06:14   9          Do you see that?
04:06:14  10   A.  Yeah, as -- well, as early as September 2008.  I don't
04:06:19  11   know where that came from.  I didn't -- I mean, I had the
04:06:23  12   ah-ha -- would have been roughly way back from Best Buy.
04:06:29  13   So maybe that's what they're referring to, I'm not sure.
04:06:34  14          But I'm not sure there was -- certainly there
04:06:35  15   wasn't reduction to practice at that point, but there was
04:06:37  16   an ah-ha moment, and there was a notion of a direction to
04:06:41  17   go in.  So I'm not sure what they're referring to there.
04:06:45  18   Q.  I see.  They being Headwater, right?
04:06:47  19   A.  Yeah, whoever wrote this.
04:06:50  20   Q.  Okay.  Most of September of 2008, you were actually
04:06:54  21   employed at Qualcomm.  We've already covered that, correct?
04:06:57  22   A.  Yeah, but I've also testified that the ah-ha moment
04:07:01  23   occurred on the way back from Best Buy, so this must be
04:07:03  24   what they're referring to.
04:07:04  25   Q.  You also understand that the parties have agreed
```

134

```
04:07:06   1   interrogatory answers are treated as under oath, right?
04:07:06   2   A.  I guess I understand that, yeah.  Again, I'm not a
04:07:13   3   lawyer.  I mean, I'm not sure how all this works.
04:07:22   4   Q.  Okay.
04:07:22   5          MR. KODISH:  Mr. Compton, if we continue with this
04:07:24   6   document.
04:07:28   7   Q.  (By Mr. Kodish)  It also says on Page 9, quote, various
04:07:28   8   features of the inventions of the asserted patent were
04:07:29   9   conceived of and reduced to practice by the named inventors
04:07:35  10   between fall 2008 and no later than the filing of the '354
04:07:35  11   patent application.
04:07:38  12          Do you see that?
04:07:38  13   A.  Can we -- let's see, let's read the whole thing.
04:07:44  14          I mean, the other inventors weren't at Headwater
04:07:47  15   at that time, so I'm not sure what you're getting at.
04:07:52  16   Q.  Let's make sure it's highlighted on the screen so you
04:07:57  17   can see it.
04:07:58  18          Various features of the inventions, do you see
04:08:00  19   that, Mr. Compton (sic)?
04:08:03  20   A.  Okay.  Various features, yeah.
04:08:05  21   Q.  Yeah.  Various features of the inventions of the --
04:08:05  22   A.  Yeah.
04:08:06  23   Q.  -- asserted patents were conceived of and reduced to
04:08:08  24   practice by the named inventors between fall 2008 and no
04:08:14  25   later than the filing of the '354 application.
```

135

```
04:08:17   1          You see that, right?
04:08:18   2   A.  Yes.
04:08:18   3   Q.  Okay.
04:08:19   4   A.  And I testified to that earlier.  So there were certain
04:08:21   5   features that were in the '354 but not sufficient to
04:08:24   6   support the claim.  So the '022 provision was required to
04:08:28   7   support the claim.
04:08:29   8   Q.  I see.  And you agreed with this statement in your
04:08:31   9   deposition that we've got highlighted on the screen, right?
04:08:36  10   A.  I don't know.  Did you ask me about this in my
04:08:38  11   deposition?
04:08:38  12   Q.  Do you have any reason to think that you disagreed?
04:08:40  13   A.  I testified to this earlier, and I just testified to it
04:08:44  14   again.
04:08:44  15   Q.  Okay.
04:08:45  16   A.  So there were certain features supported in the '354.
04:08:48  17   There were other features where '022 is required, and
04:08:51  18   that's why the priority date is May 25.
04:08:55  19   Q.  And as Headwater's 30(b)(6) witness on conception, you
04:08:58  20   could not tell us anything more about conception dates than
04:09:01  21   what's reflected here, could you?
04:09:03  22   A.  As I mentioned, you actually have evidence of the
04:09:06  23   progression of my thinking and conception and reduction to
04:09:10  24   practice in the documents I shared with Best Buy, as I
04:09:13  25   testified in my -- my deposition.  And you were showing it
```

136

```
04:09:18   1   to me as if it was a problem, and I showed it to you as if
04:09:18   2   this shows you the progression of my thinking.
04:09:25   3   Q.  And you could not identify any documents showing the
04:09:32   4   conception date other than Headwater's interrogatory
04:09:32   5   response, correct?
04:09:33   6   A.  I just told you that you can infer conception from what
04:09:38   7   I presented to Best Buy.
04:09:40   8          THE COURT:  Doctor, the question is about
04:09:42   9   documents.
04:09:42  10          THE WITNESS:  About documents, and the
04:09:44  11   documents --
04:09:46  12          THE COURT:  Are there any other documents than the
04:09:47  13   ones that we have seen that support the date of conception?
04:09:52  14   A.  So there's -- when we're developing patents, we
04:09:57  15   communicate with the patent attorneys, right?  And that's
04:10:01  16   an iterative process, and the patents develop over time.
04:10:06  17          So those are -- those things I understand are
04:10:09  18   under privilege, and obviously there's communication -- the
04:10:12  19   patent doesn't just show up on, you know, January 28th,
04:10:22  20   2009.  There was a series of iterations with the patent
04:10:22  21   attorney prior to that.
04:10:24  22   Q.  (By Mr. Kodish)  All right.  Dr. Raleigh, ItsOn's
04:10:27  23   technical documents --
04:10:27  24          THE WITNESS:  I'm sorry.  Did I answer the
04:10:29  25   question?
```

137

```
04:30:30   1          THE COURT:  It's problematic.  But it answers the
04:30:35   2   question.  I'm not sure what to do with it.  This is the
04:30:38   3   first time I've heard that the Plaintiff is taking the
04:30:42   4   position that their evidence of conception is shielded by
04:30:50   5   privilege.
04:30:52   6          MR. KODISH:  I've not heard of it either, Your
04:30:52   7   Honor.
04:30:58   8          THE WITNESS:  So what I'm saying specifically is
04:31:00   9   that there was iterations of the patent document, and, you
04:31:06  10   know, those -- the patent didn't just appear on one day,
04:31:12  11   and there's a series of communications with the patent
04:31:16  12   attorneys.
04:31:18  13          THE COURT:  Well, if you choose to withhold
04:31:24  14   evidence of conception, you'll just have to deal with the
04:31:24  15   consequences of that.
04:31:26  16          MR. KODISH:  We've come at it every which way
04:31:29  17   asking for the docs.  Privilege is what we got.  You saw us
04:31:33  18   here, Your Honor, having many disputes about the privilege
04:31:35  19   log.  They've stared at it many, many times.
04:31:38  20          THE COURT:  Well, at this point, I'm just trying
04:31:40  21   to develop the record.
04:31:40  22          MR. KODISH:  Sure.
04:31:41  23          THE COURT:  So --
04:31:42  24          THE WITNESS:  So I can say with certainty there's
04:31:44  25   no evidence of conception, you know, prior to -- certainly
```

138

```
04:31:49   1   prior to my leaving Qualcomm and maybe sometime in October,
04:31:53   2   rudimentary ideas might have been written down.
04:31:57   3          THE COURT:  I understand that.  And you have
04:32:01   4   testified to that.
04:32:03   5          But what I'm also hearing from you is that you
04:32:03   6   have other evidence that you're withholding based on
04:32:07   7   privilege.
04:32:09   8          THE WITNESS:  Yeah, again, it's simply the
04:32:11   9   communication with the patent attorneys in the process of
04:32:13  10   filing the patents.  That's what we have.
04:32:15  11          THE COURT:  Okay.
04:32:16  12          MR. KODISH:  That's what we've heard as well.
04:32:16  13   Q.  (By Mr. Kodish)  All right.  You're the principal
04:32:19  14   inventor of the asserted patents, right, Dr. Raleigh?
04:32:21  15   A.  I'm the co-inventor of the asserted patents.
04:32:26  16   Q.  All right.  James Lavine and Ali Raissinia are listed
04:32:29  17   as co-inventors with you on the patents asserted in this
04:32:33  18   Headwater case, correct?
04:32:34  19   A.  Yes.  You know, we're all co-inventors.  We're all
04:32:40  20   equal inventors.
04:32:41  21   Q.  Yeah, okay.  And you worked with Mr. Raissinia, you
04:32:43  22   mentioned, at your previous company, Airgo, prior to 2006,
04:32:46  23   right?
04:32:46  24   A.  Yes.
04:32:47  25   Q.  And you also had experience with him at Qualcomm,
```

139

```
04:32:51   1   although not direct working experience day-to-day is what
04:32:54   2   you testified to, I guess?
04:32:55   3   A.  Yeah, I worked -- I didn't really work with Ali at all.
04:32:59   4   We saw each other in status meetings.
04:33:02   5   Q.  All right.  So we wanted to ask who contributed what to
04:33:07   6   the asserted patents, and we did so at your deposition.
04:33:09   7   And you explained that it is not possible for you to tell
04:33:12   8   us what aspect of the inventions of the asserted patents
04:33:17   9   Mr. Lavine, Mr. Raissinia, or you came up with.  That's
04:33:20  10   correct?
04:33:20  11   A.  Yes, it's our practice that we collaborate, and we --
04:33:23  12   I've never seen an organization that tries to keep a
04:33:27  13   record of -- a tally of contributions from the different
04:33:32  14   inventors --
04:33:32  15   Q.  And none of the conception documents Headwater has
04:33:34  16   identified in this case show what Mr. Lavine or
04:33:37  17   Dr. Raissinia contributed or when, correct?
04:33:39  18   A.  You know, no.  Again, we collaborate.  So what is in
04:33:45  19   the patent material, whatever we file, whatever we create,
04:33:47  20   that's created by all three of us.
04:33:47  21   Q.  All right.
04:33:50  22   A.  It's a collaboration.  We brainstorm.  We work
04:33:53  23   together.
04:33:54  24   Q.  All right.  And Headwater, in the documents we just had
04:33:58  25   up on the screen, the rog responses, for example, asserted
```

140

```
04:34:01   1   a conception date on or before January 2009 in this case,
04:34:05   2   even though it knew Dr. Raissinia joined after that,
04:34:08   3   correct?
04:34:08   4   A.  Well, again, that's not the conception date for the
04:34:13   5   claims in this patent.  The '022 application is required.
04:34:15   6   I don't know why the documents would say that, and I think
04:34:22   7   if you read further into the paragraph, that same
04:34:25   8   paragraph, it explains that portions of the patent were
04:34:30   9   conceived for that '354 application, meaning not all.
04:34:36  10   Q.  Let's try to pick --
04:34:36  11   A.  So I think that --
04:34:38  12   Q.  Oh, sorry --
04:34:38  13   A.  I'm sorry.  The clarifying sentence in that same
04:34:42  14   paragraph explains, and that's what I testified to earlier.
04:34:46  15   Q.  All right.  Let's try and pick up the pace with kind of
04:34:48  16   a last major section of --
04:34:50  17          MR. KODISH:  Mr. Compton, if you could put the
04:34:53  18   document Tab 29 on the screen.  This is Docket 236-25.
04:34:58  19   Q.  (By Mr. Kodish)  And I believe you saw these before and
04:35:01  20   agreed these are internal slides from ItsOn dated March
04:35:06  21   2010, right?
04:35:07  22   A.  Yes.
04:35:07  23   Q.  And on the second slide it mentions a session including
04:35:10  24   Greg concerning, quote, QC relationship, approaching and
04:35:14  25   positioning of QC behavior.
```

```
04:15:15   1         Right?
04:15:16   2   A.  Yes.
04:15:19   3   Q.  All right.  And Greg is you, correct?
04:15:21   4   A.  Yes.
04:15:22   5   Q.  QC is Qualcomm, right?
04:15:25   6   A.  Yes.
04:15:26   7   Q.  Slide 9, we see a discussion of the Qualcomm issue,
04:15:30   8   right?
04:15:30   9   A.  Yes.
04:15:30  10   Q.  And we've got here the mention of the former employment
04:15:37  11   insinuation from Qualcomm was maybe you did something while
04:15:42  12   at Qualcomm related to the work you were doing at the time
04:15:45  13   at Headwater, right?
04:15:46  14   A.  No, it was just maybe I did something while I was at
04:15:50  15   Qualcomm that -- and maybe something in the Headwater
04:15:53  16   portfolio could have been conceived while I was at
04:15:57  17   Qualcomm.  I think that was the insinuation.
04:16:00  18   Q.  Well, I can't tell if you agreed with me.  So I'll ask
04:16:03  19   the question one more time.
04:16:05  20   A.  Sure.
04:16:05  21   Q.  The former employment insinuation from Qualcomm was
04:16:09  22   maybe you did something while at Qualcomm related to the
04:16:12  23   work you were doing at the time at Headwater, right?
04:16:15  24   A.  Generally, I suppose that's a way to characterize it.
04:16:20  25   Q.  But at your deposition, you would not be more specific
```

```
04:16:23   1   about what Qualcomm insinuated you did wrong, correct?
04:16:27   2   A.  That's because there was nothing more specific.  They
04:16:30   3   didn't say I did something wrong.  They insinuated maybe,
04:16:33   4   you know, I conceived something while I was at Qualcomm
04:16:38   5   that ended up in something in the Headwater patents.
04:16:41   6   Q.  Right.
04:16:42   7   A.  So it was never made clear.  I can't be more specific
04:16:45   8   because it was never made clear.  That's -- that was the
04:16:48   9   insinuation.
04:16:49  10   Q.  And at your deposition, you described Qualcomm's
04:16:52  11   insinuation -- insinuation as -- I'm making an
04:16:58  12   abbreviation, BS, for what you said, though, correct?
04:17:00  13   A.  I did say that, yes.
04:17:02  14   Q.  Now that you said -- you termed it that way, Headwater
04:17:08  15   has not produced any communications from Headwater to
04:17:11  16   Qualcomm providing evidence that you conceived the ideas
04:17:15  17   for the asserted patents after leaving Qualcomm, correct?
04:17:17  18   A.  Again, I explained to Qualcomm the timeline, and the
04:17:25  19   patents themselves show conception, you know, on or before
04:17:32  20   January 28th.  So I'm not sure why you would say that.
04:17:37  21   Q.  Now, when we asked what people made the insinuation,
04:17:40  22   you could not tell us at your deposition.  Do you recall
04:17:43  23   that?
04:17:45  24   A.  Yeah, absolutely.  They never said who inside of
04:17:49  25   Qualcomm brought that to the attorneys.
```

```
04:17:52   1   Q.  And when we asked you when this insinuation occurred in
04:17:55   2   your June 24 depo, you said that Headwater had produced
04:17:58   3   that email to Samsung, right?
04:18:01   4   A.  I'm sorry, which email?
04:18:03   5   Q.  Yeah.  When we asked you at your deposition when this
04:18:05   6   insinuation occurred at your June 2024 depo, you said that
04:18:10   7   Headwater had produced that email?
04:18:13   8   A.  There was one email that I thought had been produced
04:18:17   9   that hadn't been produced, but there were others that were
04:18:19  10   produced.
04:18:20  11   Q.  Okay.  All right.  So there were a number of emails
04:18:22  12   that were not produced which ultimately got to us on July
04:18:27  13   2nd, July 8th, and July 15th of 2024.  You don't dispute
04:18:30  14   that, correct?
04:18:31  15   A.  Yeah, my understanding is they're cumulative to what
04:18:35  16   had already been produced, and they were due to different
04:18:39  17   search terms or something like that.  Oh, I remember, there
04:18:41  18   was -- there was a privilege issue.  Portions of the
04:18:45  19   strings were privileged and had got marked as privilege.
04:18:49  20   Q.  All right.  And so you answered maybe a second or third
04:18:51  21   question.  I just want to make sure I have it clear.
04:18:53  22         You understood that there were multiple documents
04:18:56  23   produced -- in regards to this insinuation, that were
04:18:58  24   produced to Samsung for the first time in July 2nd through
04:19:02  25   July 15th, correct, of 2024?
```

```
04:19:05   1   A.  I think that's probably correct.  I don't sit on top of
04:19:09   2   the details, but I believe we went through those documents
04:19:12   3   in my direct.
04:19:12   4   Q.  All right.
04:19:14   5   A.  I think those were the documents.
04:19:15   6   Q.  Let's take a look at them briskly -- at these newly
04:19:19   7   produced emails that no one had a chance to ask you
04:19:24   8   questions at your deposition about.
04:19:24   9         MR. KODISH:  Mr. Compton, if you could put up Tab
04:19:27  10   31 in the binder having Bates number Headwater 104069.
04:19:34  11   Q.  (By Mr. Kodish)  This is the May 7, 2009 email to you
04:19:37  12   from David Wise of Qualcomm, correct?
04:19:41  13   A.  Yes, we looked at this earlier.
04:19:42  14   Q.  And who is David Wise?
04:19:45  15   A.  He was my business strategy contact at Qualcomm that
04:19:49  16   Paul Jacobs assigned to get a deal done with us.
04:19:52  17   Q.  Okay.  And you know that David Wise left Qualcomm in
04:19:55  18   June of 2021?
04:19:56  19   A.  I heard he was gone from Qualcomm.
04:19:59  20   Q.  Yeah.  And returning to this email, Bates 104069,
04:20:08  21   Mr. Wise says:  QC's legal team continues to have concern
04:20:11  22   over the IP ownership issue, as we previously discussed,
04:20:16  23   end quote.
04:20:17  24         Do you see that?
04:20:18  25   A.  I do.
```

Q. All right. And what IP ownership issue had you
previously discussed?

A. The insinuation that we've been discussing.

Q. And he says: Qualcomm would nonetheless like to
resolve the issue and invest.

Right?

A. Correct.

Q. And he suggests Qualcomm would want, quote, an
additional 5 percent ownership interest in ItsOn, end
quote, to resolve the IP concern's dispute, right?

A. Yes.

Q. And he says the next step is he would like get access
to the patent application.

Do you see that?

A. Yes.

Q. And that's because at this point in May 2009, the '354
Headwater patent application filed in January of 2009 was
not yet public, right?

A. It was not yet public.

MR. KODISH: Move to admit this document at Tab
31, Your Honor.

THE COURT: All right. It's admitted.

MR. KODISH: Mr. Compton, please pull up on the
screen Tab 33 of the binder bearing Bates Headwater 104070.

Q. (By Mr. Kodish) Headwater also produced -- so this is

a document Headwater produced on July 2nd, 2024. And we've
got it on the screen.

This is -- Dr. Raleigh, this is an email dated
August 3rd, 2009 to you from Mark Snyder at Qualcomm,
right?

A. Yes.

Q. And mimoguy@mac.com, that's your email address. So
this was sent to you, right?

A. Yes.

Q. Who is Mark Snyder?

A. He's an attorney inside of Qualcomm.

Q. Okay. And he worked for Qualcomm up until January 2022
before he left. Do you understand that to be the case?

A. If you say so.

Q. Okay. You don't have any reason to deny that?

A. Oh, he worked at Qualcomm at this time.

Q. Uh-huh. Well, let's quickly bring up his LinkedIn to
make sure we understand who Mark Snyder is as best we can.

THE COURT: I'll give you 10 more minutes with
this witness. So if there's something you'd rather ask him
than reading a bunch of documents into the record, you
might do that.

Q. (By Mr. Kodish) Well, at this --

MR. KODISH: Well, thank you, Your Honor. I
appreciate that -- the heads-up.

Q. (By Mr. Kodish) At this point, Qualcomm and ItsOn had
failed to make a business deal, right?

A. We had declined to accept their offer.

Q. Uh-huh. And Mr. Snyder writes: Despite the failure of
the parties to consummate a mutually beneficial business
relationship, I need to make clear that Qualcomm continues
to reserve all its rights and does not waive any rights to
Qualcomm's intellectual property, including any Qualcomm
intellectual property incorporated in patent applications
filed by Greg, ItsOn, or Headwater Partners I, quote -- end
quote.

You see that, right?

A. Yeah. Again, this was clearing the air on all the
releases that had gone back and forth and saying we are not
signing any releases.

Q. So as of August 2009, Qualcomm was still concerned
about the Qualcomm intellectual property incorporated in
Headwater's patent applications, fair?

A. Again, I think this was clearing the air. I've
testified to what I think this is.

MR. KODISH: Move to admit the document at Tab 33,
Your Honor.

MR. KRIS DAVIS: No objection.

THE COURT: It's admitted.

MR. KODISH: Mr. Compton, let's return to the

ItsOn meeting slides, Tab 29, which is Docket 236-25.

Q. (By Mr. Kodish) And, again, these are March 2010, more
than six months after the August 2009 Qualcomm email we
just looked at, right?

A. Yes.

Q. All right.

MR. KODISH: And if we can go to Slide 9 quickly,
Mr. Compton.

Q. (By Mr. Kodish) So now March 2010, this document says
you were still trying to get Qualcomm --

A. Actually, that's interesting. Can you just go back to
the cover page? We didn't talk about the date before.

Q. We're looking at the first page of Tab 29. It reflects
it's March 22nd, 2010.

A. Yeah. Okay.

Q. So we're just flipping to Slide 9 of this very same
document. And we're seeing here that -- at this point, you
were try still trying to get Qualcomm to, quote, drop the
former employment insinuation, end quote?

A. I'm not exactly sure what the timing is. There must
have been additional discussions that went on after that --
business discussions that went on after that Snyder. I'd
have to go back and try to look at the record and figure
out what was going on.

Q. All right. And your counsel went through a bunch of

150

```
04:24:23   1   options you considered.  I'm not going to go through those
04:24:24   2   again.
04:24:24   3   A.  Yeah.
04:24:25   4   Q.  We have that clear.
04:24:27   5        And then you here today gave us all sorts of
04:24:30   6   information about what the attorneys advised you in that
04:24:33   7   regard.  But you've not produced any documents -- there are
04:24:38   8   many documents on your privilege log from the February
04:24:41   9   through April 2010 time frame.
04:24:43  10        You have any reason to dispute that?
04:24:45  11   A.  No.
04:24:47  12   Q.  No.
04:24:47  13   A.  I'm not sure where you're going, but no.
04:24:50  14   Q.  Uh-huh.  And --
04:24:54  15   A.  Again, these were just the -- this was the set of
04:24:58  16   options that the attorney said:  This is the exhaustive set
04:25:00  17   of options.
04:25:02  18   Q.  At your -- at your deposition, you told us that you
04:25:04  19   chose to do nothing of the options that were put on the
04:25:07  20   table by your lawyers, right?
04:25:08  21   A.  Nothing more.
04:25:09  22   Q.  Uh-huh.
04:25:10  23   A.  We had already done plenty, we thought.
04:25:12  24   Q.  Well, the option is do nothing?
04:25:15  25   A.  Do nothing more.  Obviously, we did all sorts of
```

151

```
04:26:41   1   claim, correct?
04:26:42   2   A.  Yeah, this is a legal document.  My understanding is
04:26:45   3   you have to have some form of consideration when someone
04:26:48   4   provides something back to you.
04:26:50   5   Q.  Right.  And the consideration you were talking about
04:26:52   6   was substantial.  It was in the 20 percent of the company
04:26:56   7   arena, correct?
04:26:56   8   A.  I think that's a mischaracterization.  We offered them
04:27:00   9   the same terms every other investor invested on.  So we
04:27:04  10   were saying, okay, we'll accept -- I want to be clear.  We
04:27:05  11   said we will accept an investment from you only if you sign
04:27:09  12   a release that precludes this kind of continued nonsense.
04:27:14  13        MR. KODISH:  Move to admit the document at Tab 35,
04:27:17  14   Your Honor.
04:27:17  15        MR. KRIS DAVIS:  No objection.
04:27:18  16        THE COURT:  All right.  It is admitted.
04:27:20  17   Q.  (By Mr. Kodish)  And Headwater produced this after the
04:27:23  18   hearing on our motion to dismiss for lack of standing,
04:27:23  19   correct?
04:27:27  20        Well, strike that.
04:27:27  21        Qualcomm never signed this release, right?
04:27:32  22   A.  No, Qualcomm did not.
04:27:32  23   Q.  All right.
04:27:34  24        MR. KODISH:  And if you can put on the screen,
04:27:36  25   Mr. Compton, next the document at Tab 38 of the binder.
```

152

```
04:27:39   1   It's emails Headwater 105075 through 080.
04:27:45   2   Q.  (By Mr. Kodish)  And here, it says:  Qualcomm is
04:27:48   3   considering a deal to acquire 20 percent stake in ItsOn,
04:27:52   4   right?
04:27:52   5   A.  Well, I haven't seen this document for a very long
04:27:57   6   time, so if I could read it.
04:28:05   7        All right.  This is a different document than the
04:28:06   8   one you just showed me.
04:28:06   9   Q.  You see there under the first bullet point it talks
04:28:10  10   about the --
04:28:11  11   A.  So your question is about this document, not the last
04:28:12  12   one?
04:28:12  13   Q.  Yeah, this is --
04:28:12  14   A.  Okay.
04:28:14  15   Q.  This document is Tab 38 of the binder.
04:28:16  16   A.  Yes.
04:28:17  17   Q.  And there it is describing how Qualcomm is considering
04:28:21  18   a deal to acquire a 20 percent stake in ItsOn, right?
04:28:24  19   A.  Yes.
04:28:25  20   Q.  But it also talks about the seed investment being
04:28:30  21   contingent on the resolution of the IP ownership issue.
04:28:33  22   You see that on fourth bullet point?
04:28:35  23   A.  Right.  And what they ended up saying is we want five
04:28:38  24   extra percent from ItsOn, not from Headwater.  And, you
04:28:42  25   know, we just don't think that that's evidence of someone
```

150

```
04:25:19   1   things, as you've read in the previous emails.  You know,
04:25:23   2   we demanded that they show us what they had.  We had
04:25:25   3   various business discussions and so on.  So we felt there
04:25:28   4   was really nothing there.  So we didn't need to do anything
04:25:32   5   more.  I wouldn't say we did nothing.  This was what more
04:25:35   6   do we need to do.
04:25:36   7   Q.  You sent Qualcomm a draft release, though, didn't you?
04:25:39   8   A.  Yes, we did.  Yes.
04:25:42   9        MR. KODISH:  Mr. Compton, if you can put that up
04:25:44  10   on the screen briskly.  That's Tab 35 bearing Bates No.
04:25:49  11   104071 through 74.
04:25:51  12   Q.  (By Mr. Kodish)  And this is the document that you sent
04:25:53  13   them, including this release, correct?
04:25:59  14   A.  Yes.  They were willing to sign a release, and we wrote
04:26:03  15   one, and we sent it over.
04:26:05  16   Q.  All right.  And this release has language at both
04:26:09  17   Paragraph C talking about Qualcomm now agrees to release
04:26:16  18   releasees from certain claims that it may have had
04:26:16  19   concerning the ownership of the technology.  You see that?
04:26:21  20   A.  Uh-huh.
04:26:21  21   Q.  And lots more language about consideration that was
04:26:25  22   going to be provided in the form of an equity purchase
04:26:29  23   agreement, and that is in the "now therefore," clause,
04:26:32  24   right?  So they were being offered consideration in the
04:26:35  25   form of equity in the company to release this IP ownership
```

154

```
04:28:44   1   who owns patents.  That's evidence of someone who is trying
04:28:48   2   to get a little better deal.
04:28:48   3   Q.  And if we look to the very last --
04:28:50   4   A.  If you owned the patents, you would ask for a hundred
04:28:52   5   percent, or, you know, 50 percent.  You wouldn't ask for
04:28:55   6   5 percent of the non-patent company to resolve the issue.
04:28:55   7   Q.  Right.
04:28:59   8   A.  That's just doesn't act -- that's not someone acting
04:29:01   9   like an owner.
04:29:02  10   Q.  And if you turn to the page ending in Bates 4077,
04:29:07  11   Ms. Lombardi at Qualcomm, she says:  Qualcomm needs to deal
04:29:11  12   with the IP ownership issue first.
04:29:13  13        Right?
04:29:14  14   A.  Yes.
04:29:16  15   Q.  Let's move --
04:29:18  16   A.  And, again, we asked for 5 percent.  That was what they
04:29:19  17   meant by that.
04:29:19  18        MR. KODISH:  Let's move to admit this document at
04:29:22  19   Tab 38 into evidence.
04:29:22  20   Q.  (By Mr. Kodish)  You agree with me that would not be
04:29:30  21   fair to say that Qualcomm has never asserted that they --
04:29:30  22        THE COURT:  Mr. Kodish --
04:29:31  23        MR. KODISH:  Oh, yeah.
04:29:31  24        THE COURT:  -- if you're asking for it to be
04:29:33  25   admitted, wait until it's admitted.
```

154

```
04:29:37   1        MR. KODISH:  Oh, I'm sorry, Your Honor.  I --
04:29:37   2   yeah, it was -- I apologize.
04:29:38   3        THE COURT:  I know.  You've been talking over me
04:29:40   4   the whole time.
04:29:40   5        MR. KODISH:  I apologize.  I said it, and I didn't
04:29:42   6   mean to do that even once.
04:29:43   7        THE COURT:  All right.  P38 -- or, I'm sorry, the
04:29:49   8   document at Tab 38 is admitted.
04:29:54   9   Q.  (By Mr. Kodish)  Last, you talked about some verbal
04:30:00  10   offers from Qualcomm in the 2020s.  Do you recall that
04:30:03  11   testimony on your direct exam?
04:30:05  12   A.  From 2020s?  I'm not sure.  We'd have to -- you'd have
04:30:09  13   to refresh my memory.
04:30:10  14   Q.  Yeah.  Well, you talked about a verbal offer of 25
04:30:13  15   million --
04:30:13  16   A.  Oh, in the -- yeah, roughly 25 million.  It was 25
04:30:16  17   million, yes.
04:30:17  18   Q.  Yeah.  And you talked about a verbal offer of 75
04:30:20  19   million, right?
04:30:20  20   A.  As I testified earlier, they hinted that they could go
04:30:24  21   up as high as 75 million if that might work.  They
04:30:27  22   didn't -- that was not firm.  The 25 was firm, and they
04:30:29  23   indicated they could go higher.
04:30:31  24   Q.  All right.  But the only documents that mention an
04:30:33  25   offer was for $9 million to acquire the entire Headwater
```

155

```
04:30:37   1   patent portfolio, right?
04:30:37   2   A.  Yes.  As I mentioned, they have to get board approval
04:30:41   3   for their offers, and they wanted to float the offer before
04:30:44   4   they asked for board approval on the 25 million.
04:30:58   5        MR. KODISH:  Sorry, Your Honor.  We're on the very
04:31:00   6   last question.  Just conferring with my colleague.
04:31:03   7   Q.  (By Mr. Kodish)  You were aware in 2009 and thereafter
04:31:05   8   of Headwater's standing problem created by Qualcomm's
04:31:08   9   assertion of patent ownership, right?
04:31:10  10   A.  Not whatsoever.  We were very confident in our title.
04:31:14  11   The title was clear.  There was never a claim against our
04:31:18  12   title.
04:31:18  13        There was an insinuation that was erased in 2017
04:31:23  14   when they told us, but they didn't have anything to go
04:31:27  15   forward or chose not to go forward; B, they were --
04:31:31  16   consciously allowed the statute of limitations to expire;
04:31:33  17   and, C, therefore, they had no recourse to ever file a
04:31:38  18   claim.  So what you just said is absolutely incorrect.
04:31:41  19   Q.  Right.  And you say that despite the fact that we read
04:31:44  20   that the mention of legal standing was in the internal
04:31:47  21   ItsOn document that we looked at today?
04:31:51  22   A.  Okay.  So let me understand.  Your theory is Qualcomm
04:31:55  23   is going to make an offer -- so let me just -- so you're
04:31:58  24   saying they're going to make a duplicitous offer forcing
04:32:05  25   the negotiation and then trick us because they're going to
```

156

```
04:32:06   1   say, well, you have a problem with us after they said that
04:32:08   2   the statute of limitations had expired and they had no
04:32:11   3   recourse?  Is that really what you're saying?
04:32:13   4   Q.  My question was:  You were aware in 2009 and thereafter
04:32:17   5   of Headwater's standing problem created by Qualcomm's
04:32:20   6   assertion of patent ownership, right?
04:32:23   7   A.  No.
04:32:24   8   Q.  Okay.  And if you --
04:32:26   9   A.  In 2009, we assessed that --
04:32:28  10        THE COURT:  All right.
04:32:28  11        THE WITNESS:  All right.
04:32:29  12        THE COURT:  You don't need to repeat it.
04:32:30  13        Thank you, Mr. Kodish.
04:32:31  14        MR. KODISH:  Okay.  No further questions, Your
04:32:38  15   Honor.  Thanks very much.
04:32:39  16        THE COURT:  All right.  Before any redirect, I
04:32:42  17   have some questions.
04:32:43  18        And if you would turn to what's behind Tab D --
04:32:49  19   Tab 8 in Samsung's exhibit.
04:32:02  20        THE WITNESS:  Yes, sir.
04:33:02  21        THE COURT:  That is the Best Buy presentation.
04:33:08  22        THE WITNESS:  Yes.
04:33:09  23        THE COURT:  Tell me what in that presentation
04:33:14  24   indicates that what you were discussing with them at that
04:33:19  25   time was not what underlies the asserted patents.  In other
```

```
04:33:29   1   words, that this is the idea you had before your ah-ha
04:33:35   2   moment.
04:33:38   3              THE WITNESS:  So I think this presentation, Your
04:33:43   4   Honor -- and I hope I get this right because it's not
04:33:45   5   dated.  This is what Best Buy sent me as to what they
04:33:50   6   wanted me to do for them.  So this is their proposal.
04:33:55   7   They're framing it for their investment people because they
04:34:00   8   wanted to convince their investment people to give me
04:34:03   9   funding to work with them and --
04:34:06  10              THE COURT:  Does this reflect what you were
04:34:09  11   discussing with them at that time?
04:34:12  12              THE WITNESS:  In general, yes.  This is mostly
04:34:17  13   business material.  There's some marketing slides -- again,
04:34:23  14   Best Buy-generated slides.
04:34:25  15              They had a mature concept for the MVNO that they
04:34:28  16   wanted to build, and I was stepping in at the stage where
04:34:31  17   they're actually bringing in vendors to pitch the
04:34:34  18   technology to satisfy that MVNO.  So there's slides here, 5
04:34:40  19   and 6, which are their generated slides saying this is the
04:34:45  20   kind of network we want to build.
04:34:51  21              And what's the specific question?
04:34:52  22              THE COURT:  Is there anything in this presentation
04:34:55  23   that you can point to that shows that this is not the
04:35:01  24   technology that you soon decided to put together for the
04:35:12  25   patents?
```

```
04:35:14   1              THE WITNESS:  Yeah, this is showing basically a
04:35:16   2   purely network-based solution.  So at this stage, they were
04:35:20   3   thinking they were going to bring in network equipment, and
04:35:22   4   they were going to string it together somehow to create
04:35:29   5   these blocks that they have on Slides 5 and 6.  And that's
04:35:29   6   really the only technical content, but it's purely
04:35:34   7   network-based.
04:35:34   8              THE COURT:  All right.
04:35:36   9              THE WITNESS:  So this is a network-based solution
04:35:39  10   that would have nothing to do whatsoever with the
04:35:41  11   patents-in-suit here.
04:35:42  12              THE COURT:  And what would I look at to conclude
04:35:51  13   that these Slides 5 and 6 are a purely network-based
04:35:51  14   solution?
04:35:52  15              THE WITNESS:  Well, they're showing a connection
04:35:57  16   to a bunch of different carriers through a managed service
04:36:02  17   partner.  There's absolutely no device technology
04:36:04  18   implemented anywhere.  There is a connection manager, which
04:36:08  19   would -- would go on the device.  That's the only thing
04:36:11  20   that would go on the device.
04:36:14  21              So -- and a connection manager, again, was a
04:36:16  22   standard state of the art project.  What a connection
04:36:20  23   manager did was essentially gain access to the wireless
04:36:24  24   network for authentication, admission, and control.
04:36:28  25              THE COURT:  All right.  Now, turn now to Tab 12,
```

```
04:36:37   1   which is an ItsOn presentation dated October 23.
04:36:45   2              This one is after what you have described as your
04:36:56   3   ah-ha moment?
04:36:57   4              THE WITNESS:  Yes, sir.
04:36:59   5              THE COURT:  And tell me what in that presentation
04:37:00   6   shows that.
04:37:01   7              THE WITNESS:  Right.  May I take just a few
04:37:03   8   minutes to look through it?  This would have been very
04:37:05   9   early, but there's probably some early indications here.
04:37:08  10              Yeah, so you look on -- I'm not sure what page it
04:37:14  11   is.  It's 00014558, Your Honor.
04:37:19  12              THE COURT:  Yes.
04:37:19  13              THE WITNESS:  And right at the top, it says:
04:37:22  14   Transform every device into a flexible wireless WAN service
04:37:27  15   offering platform.  So that's very clearly indicating, hey,
04:37:29  16   I have this idea to put technology now on a device to
04:37:35  17   replace those functions that were previously performed in
04:37:38  18   the network.
04:37:41  19              And, again, the next -- so the very next slide
04:37:46  20   mentions that again.  It looks -- it might be a duplicate,
04:37:54  21   let's see.  No, it's not quite a duplicate.  Yeah, it's
04:38:00  22   talking about features that are -- that end up being
04:38:03  23   described in the first patent.  So, for example, every
04:38:06  24   enterprise can set up its own secure private wireless
04:38:10  25   network, and that's referred to in the patent in a variety
```

```
04:38:13   1   of embodiments.
04:38:15   2              It talks about scaling back bandwidth.  The
04:38:18   3   earlier bandwidth manager, the concept there was you would
04:38:23   4   change wireless standard connection in a conventional way.
04:38:26   5   This is very different.  It's talking about scaling back
04:38:26   6   bandwidth with something on the device.  It's a software
04:38:31   7   package that goes on the device.  So there's several
04:38:35   8   references.
04:38:35   9              Now, I wasn't too descriptive because I was not
04:38:37  10   very far along in my embodiment development.  I knew
04:38:43  11   generally -- this shows I knew generally where I was going,
04:38:46  12   but I did not yet, you know, obviously have a patent that I
04:38:48  13   could file.
04:38:52  14              You know, it talks about the benefits.
04:38:52  15              THE COURT:  And so --
04:38:58  16              THE WITNESS:  An it also -- if -- Your Honor, if I
04:38:59  17   can, just to keep answering your question.
04:39:01  18              On the page that ends in 4562, they're -- one of
04:39:06  19   the really large challenges and one of the reasons nobody
04:39:09  20   ever really thought about this was how do you secure
04:39:13  21   network technology that you put on the device?  And at the
04:39:16  22   top bullet here, it talks about carrier grade security for
04:39:20  23   device implementation of service plan control.  And it has
04:39:24  24   a variety of, you know, descriptive elements there.
04:39:28  25              This was a major challenge that I had to overcome
```

161

```
04:39:30   1   to take this new direction.  So there's -- there's probably
04:39:34   2   more, and I can keep going if you would like.  This clearly
04:39:39   3   talks about something different.
04:39:39   4            THE COURT:  All right.  What was the purpose of
04:39:42   5   this slide presentation?
04:39:44   6            THE WITNESS:  So by this time, I had determined
04:39:48   7   that this was much bigger than a Best Buy MVNO, and this
04:39:52   8   was something that could really improve everything in the
04:39:56   9   wireless, you know, ecosystem.
04:39:58  10            And I was pitching this to Best Buy not just for
04:40:04  11   their MVNO but also for Best Buy venture capital investment
04:40:09  12   to invest in the company as one of our first investors so
04:40:13  13   that we could start developing this technology.  So I was
04:40:15  14   pitching beyond -- you know, as soon as I started
04:40:19  15   developing this, I realized it was much bigger than just
04:40:22  16   Best Buy.
04:40:23  17            THE COURT:  So you created this October 23
04:40:26  18   document for Best Buy?
04:40:28  19            THE WITNESS:  Yeah, I was pitching to the same
04:40:30  20   people that had asked me to help them on the MVNO, but I
04:40:35  21   was also pitching to Kuk Yi who was their venture capital
04:40:42  22   investment manager.
04:40:42  23            THE COURT:  Looking back at the Best Buy document
04:40:46  24   that was at Tab 8, on -- under the next steps page, which
04:40:53  25   is at the very end of that, it looks like that ran until
```

162

```
04:41:01   1   September 25.  Is that the date that --
04:41:05   2            THE WITNESS:  I think this 24/25 was where the
04:41:10   3   vendors pitched, if I recall correctly.
04:41:13   4            THE COURT:  And so your testimony is that it was
04:41:18   5   on your return from that on September 25 that you developed
04:41:24   6   what is reflected in the next document at Tab 12?
04:41:29   7            THE WITNESS:  Yes, sir.  So I need to verify that
04:41:32   8   that's actually the date that the vendor presentations
04:41:36   9   occurred.  But, yeah, after that set of vendor
04:41:38  10   presentations, I was -- realized it wasn't going to work
04:41:41  11   well and began thinking in a new direction.  And you can
04:41:44  12   see by some time in October, I had some rudimentary
04:41:47  13   descriptions of that.  And then by the time I get to the
04:41:50  14   end of January, I have a fulsome description.
04:41:53  15            There's another presentation that Samsung's
04:41:56  16   attorneys showed me in my deposition.  And what I tried to
04:41:59  17   say earlier is that in addition to 12, there's another Best
04:42:03  18   Buy presentation that shows a more fulsome maturity of the
04:42:08  19   ideas.  And these presentations serve in effect to document
04:42:13  20   the timeline of the invention because you can see how far
04:42:17  21   along I am based on how much I'm disclosing.
04:42:20  22            THE COURT:  And in addition to these
04:42:23  23   presentations, do you have notes that you kept yourself
04:42:27  24   about your ongoing developing ideas?
04:42:31  25            THE WITNESS:  I don't do that.  What I do is I
```

163

```
04:42:34   1   work with the patent attorney, and I say:  Okay, here's
04:42:38   2   some ideas that I have to develop and that have to go into
04:42:42   3   the patent.  And those are, you know -- we communicate
04:42:45   4   those under privilege.  It's just always been my practice.
04:42:48   5   But I communicate back and forth with the attorneys as the
04:42:52   6   embodiments develop.
04:42:55   7            THE COURT:  So you're saying that the notes you
04:42:55   8   keep are just correspondence with your lawyers?
04:43:02   9            THE WITNESS:  Yeah.  What I'll do is I'll create
04:43:05  10   a -- often a Word document, maybe with some PowerPoint --
04:43:09  11   well, often -- almost always with some PowerPoint drawings
04:43:11  12   and so on.  And if it's a brand new idea, that'll be the
04:43:15  13   first Word document I send.  I'll say:  Okay.  Here are
04:43:18  14   some new ideas.  I need to get these into the patent.  And
04:43:21  15   if it's something that I've already done before, I'll say:
04:43:24  16   Okay.  Here's an update to the Word document and the
04:43:26  17   drawing package that we did before.
04:43:28  18            Often the attorneys will say:  Okay, I'm going to
04:43:30  19   improve your drawings.  I'm going to make them a little
04:43:33  20   better.  I'm going to start numbering the elements on the
04:43:35  21   drawings.  And they'll start perhaps, you know, working on
04:43:38  22   my language in the embodiments and so on.  So it's a back
04:43:43  23   and forth using primarily Word documents.
04:43:45  24            THE COURT:  Are you saying that there are
04:43:48  25   communications to your lawyers about this technology that
```

164

```
04:43:54   1   are before this October 23 slide presentation?
04:44:00   2            THE WITNESS:  Before October 23, there would
04:44:02   3   likely be some rudimentary, you know, things:  Hey, here's
04:44:08   4   a notion.  Here's a couple of bullets that would start off
04:44:11   5   as very high-level bullets.  I've had this idea.  You know,
04:44:15   6   put things on the device.  Maybe do things like this.  And
04:44:20   7   so, you know --
04:44:21   8            THE COURT:  All right.
04:44:22   9            THE WITNESS:  Yeah.
04:44:24  10            THE COURT:  Thank you, Doctor.
04:44:25  11            If you have, Mr. Davis, any redirect, you've got a
04:44:32  12   few minutes.
04:44:34  13            MR. KRIS DAVIS:  Thank you, Your Honor.
04:44:34  14                    REDIRECT EXAMINATION
04:44:34  15   BY MR. DAVIS:
04:44:34  16   Q.  Picking up around where we left off, Dr. Raleigh, you
04:44:40  17   recall Judge Payne asking you about Tab 12 in Samsung's
04:44:45  18   binder?
04:44:46  19   A.  Yes.
04:44:46  20   Q.  I wanted to direct your attention to the page ending in
04:44:51  21   14557.
04:44:54  22            Can you read the title of this slide?
04:44:57  23   A.  I'm sorry, 14 --
04:44:59  24   Q.  Oh, yes, I'm sorry.
04:45:00  25   A.  -- 557?
```

165

```
04:45:02   1   Q.  Yes.  Can you read the title of this slide?
04:45:04   2   A.  Yes.  In fact, this is another slide.
04:45:07   3       So Device Implemented Network.
04:45:09   4   Q.  And this presentation was created when again?
04:45:12   5   A.  Well, it looks like I presented it on October 23rd, so
04:45:17   6   maybe a day or two before that.
04:45:20   7   Q.  Okay.  Now, I wanted to clarify that what you described
04:45:23   8   as the ah-ha moment --
04:45:25   9   A.  Yes.
04:45:25  10   Q.  -- in late September 2008, is that when all of the
04:45:30  11   patented inventions at issue in this case were conceived?
04:45:33  12   A.  No.  No, that's just when the notion of putting these
04:45:39  13   traditionally network-implemented technologies into a
04:45:46  14   device-implemented technology, which involves an entirely
04:45:49  15   different approach.  And like I said, there's all sorts of
04:45:52  16   challenges.
04:45:53  17       One of the first challenges was security, but it's
04:45:56  18   moving it from the network to the device.  And then after
04:45:58  19   that, as I just testified to the judge, there's a series
04:46:02  20   of, oh, wow, now I can do this.  Okay.  This is another
04:46:04  21   thing I can do on the device.  And, oh, I have to solve
04:46:07  22   this problem, and I have to solve that problem.  And
04:46:09  23   there's this creative process where you continually update
04:46:12  24   your material, your thinking, your inventions.
04:46:18  25       And then in the case of these patents, that went
```

166

```
04:46:19   1   on -- it wasn't all in the first provisional.  We came
04:46:24   2   across these ideas, concepts that we reduced to practice,
04:46:30   3   said, hey, we need to know if the user's interacting
04:46:33   4   because when a user is not benefiting from, say, for
04:46:36   5   example, listening to music, watching a video, typing
04:46:39   6   something on the screen, what have you, when the user is
04:46:45   7   not interacting, the device, power consumption, the network
04:46:45   8   resources, et cetera, are not valuable.  You can then stop
04:46:48   9   the application from communicating, and it doesn't harm the
04:46:52  10   user experience at all.  The user doesn't know the
04:46:55  11   difference.
04:46:55  12       And so that's something we came up with in the
04:46:58  13   '022.  But it all stemmed from this first idea that, hey, I
04:47:02  14   can do this on a device instead of the network.
04:47:05  15   Q.  And did any of these Best Buy presentations that we've
04:47:08  16   seen discuss this user interaction feature that you're
04:47:11  17   describing --
04:47:12  18   A.  No, no.
04:47:12  19   Q.  -- I think we saw from the patents?
04:47:14  20   A.  No, not even -- no, not even the final presentation I
04:47:18  21   gave Best Buy, and not even in the '354 application.
04:47:21  22   Q.  And what provisional application are those in, if any?
04:47:25  23   A.  '022.
04:47:27  24   Q.  And what was the date of that?
04:47:29  25   A.  May 25, 2010.
```

167

```
04:47:33   1   Q.  Okay.  Now, did any of the -- sort of the ah-ha moment
04:47:40   2   that you had that kicked things off or anything related to
04:47:44   3   the claimed inventions and this user interaction feature,
04:47:47   4   did any of that occur prior to you leaving Qualcomm?
04:47:50   5   A.  No, none of this.  Yeah, I did not have the idea of
04:47:54   6   moving these features, functions, you know, embodiments
04:47:59   7   onto the device.
04:48:00   8   Q.  All right.  I believe Mr. Kodish also talked to you
04:48:04   9   about Headwater's infringement assertions being directed to
04:48:07  10   operating system technology; is that right?
04:48:08  11   A.  I'm sorry, what's the question?
04:48:10  12   Q.  Mr. Kodish talked to you about Headwater's infringement
04:48:14  13   assertions being directed to operating system technology.
04:48:17  14   Do you recall that?
04:48:18  15   A.  He said something to that effect, yes.
04:48:20  16   Q.  Is there any claim of the asserted patents that cover
04:48:23  17   all operating system technology?
04:48:25  18   A.  No, that's the point I was trying to get across.  This
04:48:28  19   is such a broad -- you could never write a patent that
04:48:32  20   says, you know, manage applications in an operating system.
04:48:35  21   There's probably hundreds of thousands of patents that do
04:48:38  22   something like that.
04:48:43  23   Q.  Are any of the claimed inventions at issue here a new
04:48:47  24   MVNO service?
04:48:48  25   A.  No.
```

168

```
04:48:48   1   Q.  All right.  And I wanted to clarify, as well, Samsung
04:48:57   2   has never asserted incorrect inventorship; is that right?
04:49:01   3   A.  No.
04:49:02   4   Q.  Okay.  And the inventors on the asserted patents here,
04:49:09   5   is that just you, or did you have co-inventors?
04:49:09   6   A.  The other two co-inventors, James Lavine and Ali
04:49:14   7   Raissinia, were -- you know, we worked hand-in-hand to make
04:49:16   8   the '022 and the eventual patents that flowed from '022.
04:49:22   9   Q.  All right.  Thank you, Dr. Raleigh.
04:49:26  10       THE COURT:  Mr. Davis, do you have documents on
04:49:34  11   your privilege log that are of the sort that Dr. Raleigh
04:49:44  12   referred to as his correspondence with his attorneys about
04:49:52  13   his ongoing ideas?
04:49:53  14       MR. KRIS DAVIS:  Yes, Your Honor, I believe we do.
04:49:55  15       THE COURT:  And what is the date of the earliest
04:50:00  16   of those that you have logged?
04:50:01  17       MR. KRIS DAVIS:  I believe the earliest date is
04:50:07  18   December 7th, 2008.  That's what we were able to find just
04:50:11  19   now looking.  I can say for certain there are no such
04:50:18  20   documents while Dr. Raleigh was at Qualcomm.
04:50:22  21       THE COURT:  Well, what I've heard is that this
04:50:28  22   document, the October 23, 2008 presentation, was after he
04:50:37  23   had had that idea.
04:50:38  24       And what I'm interested in is whether that is
04:50:43  25   documented in some way.  And I'm thinking about directing
```

170

```
04:50:49   1   the Plaintiff to submit for in camera review the documents
04:50:56   2   that would reflect that.
04:50:57   3        MR. KRIS DAVIS:  Understood, Your Honor.
04:51:01   4        You know, we -- I had a note, as well, to raise
04:51:04   5   that with Your Honor if that's -- to see if that was
04:51:08   6   something you were interested in.  I don't think I have the
04:51:10   7   ability right at this moment to say the client will commit
04:51:13   8   to do that, but I think we can confirm that in the next 24
04:51:17   9   hours.  And, of course, if it's ordered, then we will
04:51:22  10   comply, but if you're asking us to make the offer, I can --
04:51:26  11        THE COURT:  I'm not really asking you to offer it.
04:51:28  12        MR. KRIS DAVIS:  Okay.
04:51:30  13        THE COURT:  I'm considering ordering it.
04:51:32  14        And so I guess what I'm asking you is if you have
04:51:36  15   some argument against that, tell me about it.
04:51:38  16        MR. KRIS DAVIS:  Just so I understand, in camera
04:51:43  17   review meaning this would not go to the other side and
04:51:46  18   waive privilege?
04:51:48  19        THE COURT:  Not if I determined that it was
04:51:51  20   privileged, yeah.
04:51:52  21        MR. KRIS DAVIS:  Okay.  No objection to that, Your
04:51:56  22   Honor.
04:51:58  23        THE COURT:  Well, I'm going to consider that
04:52:00  24   further, and I'll put that in writing.
04:52:04  25        All right.  Mr. Kodish, I'll give you the last
```

171

```
04:53:51   1             I want to start with a little bit of impromptu,
04:53:56   2   which is the testimony seemed to come down to this ah-ha
04:54:01   3   moment of device-based.  And I want to point to evidence,
04:54:05   4   the word "device" appears very many times in the Tab 8
04:54:08   5   document.
04:54:08   6        Mr. Compton, if you could put Tab 8 on the screen.
04:54:13   7        If you searched for the word "devices," it
04:54:22   8   appears, you know, many, many times.  I did that search.
04:54:25   9   For example, on Slide 2 -- if we can see that, please --
04:54:34  10   it's in the first paragraph.  What is ItsOn?  It's a
04:54:39  11   developer with an end-to-end connected solution in CE --
04:54:43  12   that is, consumer electronics-type devices.
04:54:46  13        And then if you go to the more detailed slides
04:54:49  14   that Dr. Raleigh talked about -- for example, at Slide 6,
04:54:55  15   which is Bates ending in 618, you see device design in the
04:54:59  16   opening paragraph, and it's also the third yellow box on
04:55:04  17   the right.
04:55:05  18        So, you know -- and this -- this document was
04:55:12  19   created before he left Qualcomm.  And then the document
04:55:15  20   that they seem to like a lot that comes, you know, a month
04:55:18  21   later is just one month after he left Qualcomm.  And so the
04:55:22  22   question is if they overcome the -- you know, met their
04:55:26  23   burden of proving that he had that idea after he left
04:55:32  24   Qualcomm because the contract is clear, it creates that
04:55:34  25   burden, that presumption.
```

172

```
04:55:37   1             If we can now turn to my closing slides,
04:55:56   2   Mr. Compton.  Let's jump to Slide 15 first of the slide --
04:55:58   3   of the closing slides.  Yeah, there we go.
04:56:00   4        Your Honor, these are cases that we submitted in
04:56:02   5   response to the questions you asked me at the last hearing.
04:56:05   6   You asked me a couple of times if I had cases about whether
04:56:08   7   the conception requirement was the same for an ownership
04:56:11   8   dispute under a contract as it is for prior art in a patent
04:56:14   9   case.  And so these are cases that answer that question.
04:56:17  10        I won't spend a lot of time right now on them.  We
04:56:21  11   talk about them a little more in our supplemental authority
04:56:24  12   at Docket 367.  But they're a collection of cases,
04:56:28  13   including from the Federal Circuit.
04:56:29  14        The Preston case examines the question of whether
04:56:33  15   it's a federal law question or a state law question.  The
04:56:36  16   Federal Circuit says it's not sure.  But it gets to the
04:56:38  17   same result either way in saying that you need to have a
04:56:42  18   definite idea and corroborating evidence.
04:56:44  19        To the extent it is a state law question, this is
04:56:48  20   a -- you know, a California contract.  So we cited Gerloni,
04:56:48  21   which is a California case that applied the same standard
04:56:57  22   to a contract dispute.
04:56:58  23        And then we cite an Eastern District case in
04:57:01  24   Collins, which was an ownership case, actually under a
04:57:04  25   federal statute rather than a contract.  But it, again,
```

172

```
04:52:10   1   couple of minutes if you have a question that is burning.
04:52:14   2        MR. KODISH:  Thank you so much.  I defer to my
04:52:18   3   colleague, Mr. Thornburgh, just for some closing remarks.
04:52:23   4        THE COURT:  All right.  Thank you, Doctor.  You
04:52:24   5   can step down.
04:52:25   6        THE WITNESS:  Do I leave these here?
04:52:27   7        THE COURT:  You can leave them.  Thank you.
04:52:28   8        MR. KRIS DAVIS:  Oh, and, Your Honor, I just --
04:52:33   9   before I forget, we did have that additional testimony from
04:52:39  10   Mr. Raissinia.  We also -- it's about four minutes long.
04:52:42  11   We could play it.  We also have it in writing if you want
04:52:44  12   to just read it instead for time purposes.
04:52:47  13        THE COURT:  That's fine.  Why don't you offer it
04:52:49  14   in writing.  That would be actually more helpful to me to
04:52:55  15   have the record of it than to listen to it.
04:53:01  16        MR. KRIS DAVIS:  Understood.  Thank you, Your
04:53:02  17   Honor.
04:53:02  18        THE COURT:  All right.  Thank you.
04:53:08  19        Mr. Thornburgh?
04:53:11  20        MR. THORNBURGH:  May I approach, Your Honor, with
04:53:12  21   slides?
04:53:14  22        THE COURT:  Yes.
04:53:24  23        MR. THORNBURGH:  So, Your Honor, mindful of the
04:53:41  24   time, I will be brief.
04:53:42  25        Thank you, first, for convening this hearing.
```

173

```
04:57:08   1   applied the same standard for proving conception.
04:57:11   2           THE COURT:  Mr. Thornburgh, wouldn't corroborating
04:57:14   3   evidence be something you need to get an earlier date?  I
04:57:20   4   mean, surely there is no requirement that you can't have
04:57:23   5   conceived an idea if you don't have corroborating evidence.
04:57:26   6           MR. THORNBURGH:  So that's -- that's the real
04:57:28   7   purpose of these -- these cites, Your Honor, in that the
04:57:33   8   usual case where corroborating evidence comes up in patent
04:57:37   9   cases, you're trying to swear behind prior art, get the
04:57:40  10   earlier date.  But in these cases, because they're
04:57:45  11   employment cases, the issue is whether you have
04:57:45  12   corroborating evidence to prove you were outside the
04:57:48  13   contract.
04:57:48  14           And so -- and, you know, before and after are
04:57:52  15   really the same issue, just looked at from two different
04:57:56  16   perspectives, that, you know, if I did it before or if I
04:57:58  17   did it after, it's really the same issue of proving when I
04:58:02  18   had this -- this idea, which is a mental act.
04:58:05  19           The Dawson case tells us that.  And so the reason
04:58:12  20   for corroboration is the same, which is it's way too easy
04:58:13  21   to make self-serving statements about a mental act.  And so
04:58:16  22   that's why the law requires corroboration, whether it's an
04:58:19  23   employment dispute or a prior art dispute.
04:58:22  24           And I think what we're hearing from the other side
04:58:27  25   is that their ultimate proof of their conception date is
```

174

```
04:58:31   1   their patent application, that, you know, they're going to
04:58:39   2   say that they conceived in January 2009 with the '354 or
04:58:39   3   May 2010 with the '022, and that's a problem, because the
04:58:45   4   filing of the patent application is what triggers the
04:58:50   5   presumption under the contract.  The contract says if you
04:58:53   6   file one of these applications within a year, Qualcomm gets
04:58:56   7   the presumption.  And that -- the '354 was filed within a
04:59:01   8   year of Dr. Raleigh leaving, and the '022 was filed within
04:59:05   9   a year of Dr. Raissinia leaving.
04:59:07  10           So the existence of those applications is what
04:59:12  11   creates the presumption.  If the existence of those
04:59:15  12   applications simultaneously rebuts the presumption, then
04:59:18  13   the contract would be meaningless.  It can't be what the
04:59:22  14   contract means.  It means that you've got to come up with
04:59:25  15   some other evidence of -- when you conceived it and that it
04:59:28  16   was before you left the company, not just that you filed
04:59:32  17   the application within a year.
04:59:33  18           THE COURT:  I agree.  There's no doubt that it's
04:59:38  19   not just the application.  And what the Plaintiff is
04:59:43  20   offering is the testimony of Dr. Raleigh as their proof.
04:59:46  21           MR. THORNBURGH:  And under the law, the
04:59:49  22   self-interested testimony of an inventor is not enough.
04:59:53  23           THE COURT:  And that -- that's definitely true as
04:59:56  24   far as relating back to an earlier date.  It takes some
05:00:00  25   corroboration.
```

175

```
05:00:01   1           But you're saying that you -- that even to
05:00:07   2   establish that there was conception after employment, it
05:00:17   3   still must have some corroboration in addition to the
05:00:20   4   inventor's testimony?
05:00:21   5           MR. THORNBURGH:  That is what we're submitting,
05:00:23   6   and that's what I believe that the cases that are on Slide
05:00:25   7   15 stand for from our supplemental authority.  And,
05:00:30   8   otherwise, the contract again would be meaningless.  If all
05:00:33   9   the former employer has to do -- former employee has to do
05:00:38  10   to do to meet this -- this burden of proof is to say, hey,
05:00:41  11   I didn't do it --
05:00:41  12           THE COURT:  No, he has to be believed.
05:00:45  13           MR. THORNBURGH:  He has to be believed.
05:00:47  14           But -- and I agree, the testimony, if believed --
05:00:49  15   and we think that it's very contradictory and should not be
05:00:54  16   believed -- but if believed, it still has to be
05:00:56  17   corroborated under the law.
05:00:57  18           THE COURT:  All right.
05:00:59  19           MR. THORNBURGH:  And, you know, they -- I would
05:01:02  20   also want to add that I think I heard admissions here
05:01:07  21   today that Dr. Raleigh said, you know, quite openly that
05:01:11  22   various ideas, he agreed, were conceived in September of
05:01:15  23   2008.  And we know two-thirds of that month he was at
05:01:19  24   Qualcomm.
05:01:20  25           And, you know, they seem to take solace in the
```

176

```
05:01:22   1   fact that maybe they added a limitation later, although
05:01:25   2   that's the first we're ever hearing about that, Your Honor.
05:01:30   3   But even if they did, I would go back to the Film Tech case
05:01:33   4   and the Bio-Rad case that we talked about at the last
05:01:37   5   hearing, that if he had the ah-ha moment of this
05:01:41   6   device-based network, that's the essential idea.  Qualcomm
05:01:44   7   owns that idea.
05:01:46   8           And so at a minimum, Qualcomm, you know, owns that
05:01:49   9   idea.  They own the '354 provisional.  And that makes them
05:01:54  10   a co-owner of the final patents, even if -- if Dr. Raleigh
05:01:59  11   and Dr. Raissinia added something else.  And, you know, we
05:02:02  12   would submit that there's a presumption that whatever
05:02:07  13   Dr. Raissinia added, and they won't tell us what that is,
05:02:09  14   but whatever he added, Qualcomm owns that, too, because
05:02:12  15   they haven't done a thing to rebut, you know,
05:02:17  16   Dr. Raissinia's presumption.
05:02:18  17           They're going to submit this four minutes of
05:02:22  18   testimony, and I -- I'm sure I've read it where, you know,
05:02:25  19   he denies conceiving at Qualcomm, but there's not a whit of
05:02:30  20   evidence, not of corroborating evidence.  And, again, we
05:02:33  21   get back to these cases.
05:02:35  22           THE COURT:  You know, there is argument in the
05:02:40  23   motion for sanctions about the fact that some of these
05:02:45  24   emails were provided very recently.  And tell me about what
05:02:54  25   Samsung says it would have done if it had known of
```

177

```
05:03:00  1   Ms. Lombardi, for instance, earlier.
05:03:03  2        MR. THORNBURGH:  We would have been able to
05:03:05  3   subpoena her, for example.  These -- I can't say for sure
05:03:10  4   for Ms. Lombardi, but two of the other names that came up,
05:03:14  5   Greg (sic) Wise and Mr. Snyder, you know, we know they're
05:03:19  6   ex-Qualcomm employees.  We didn't know their name.  You
05:03:24  7   know, the -- ItsOn argues that we did know David Wise's
05:03:27  8   name as a potential investor.  So fair enough.
05:03:30  9        But there was nothing connecting him in the
05:03:32 10   previous production to the employment insinuation or
05:03:35 11   better -- better phrased, Qualcomm's assertion of
05:03:39 12   ownership.  And so we had no way of knowing these names of
05:03:41 13   people that would have known about that assertion of
05:03:44 14   ownership that we could have gone off and deposed.
05:03:47 15        THE COURT:  Did you make an effort to determine
05:03:50 16   that through Qualcomm?
05:03:52 17        MR. THORNBURGH:  Mr. Kodish dealt with Qualcomm.
05:03:54 18   If he may answer that one, Your Honor.
05:03:56 19        THE COURT:  All right.
05:03:57 20        MR. KODISH:  Sure.  Yes, Your Honor, we talked to
05:03:59 21   Qualcomm multiple times in pursuit of our subpoena, and
05:04:02 22   their response over and over again was:  Can you give me
05:04:05 23   the names of the people that -- whose files I should search
05:04:10 24   for the things in your subpoena?
05:04:11 25        And we couldn't and didn't.  And they said --
```

178

```
05:04:16  1        THE COURT:  What about the one name that you did
05:04:16  2   have?
05:04:18  3        MR. KODISH:  Well, as Mr. Thornburgh explained --
05:04:23  4   yeah, Mr. Wise, you know, was in an investment context that
05:04:27  5   we were interested in the insinuation context and had
05:04:32  6   nothing linking the two of them in that regard.
05:04:36  7        THE COURT:  Well, wasn't there an indication that
05:04:38  8   the reason the investment didn't go forward was related to
05:04:42  9   the insinuation?
05:04:43 10        MR. KODISH:  There was not.  The connection
05:04:47 11   between those two was in the documents robustly explaining
05:04:52 12   it that were produced between July 2nd and July 15th of
05:04:58 13   2024.
05:05:00 14        MR. THORNBURGH:  And, Your Honor, if I may pick up
05:05:01 15   with that thought.
05:05:03 16        If we can see Slide 2 from my closing slides.
05:05:06 17        So, Your Honor, this conveniently summarizes the
05:05:11 18   newly produced documents in Slides 2 through 6.  The slides
05:05:20 19   identify when the e-mails and other documents were first
05:05:23 20   produced and why they're important.
05:05:24 21        And so I -- you know, given the time, I'll be
05:05:25 22   brief.  But, for example, Slide 2, from Tab 38, is an April
05:05:36 23   2009 email from Qualcomm.  It's the one that seeks
05:05:39 24   resolution of the IP ownership, including a 20 percent
05:05:42 25   stake in ItsOn.  So this very much links, you know, the
```

179

```
05:05:46  1   ownership and the investment.
05:05:47  2        But we had no idea of this in any document that
05:05:51  3   they had produced before July.
05:05:52  4        The next slide Your Honor already saw during the
05:05:58  5   cross, so I'll skip over it, but it's the same kind of
05:06:00  6   thing.
05:06:03  7        Slide 4 is the additional 5 percent to resolve
05:06:07  8   IP owner -- IP ownership.  Again, we had not had any whiff
05:06:09  9   of that before -- you know, July, which was after the last
05:06:15 10   hearing.
05:06:15 11        Then, you know, we think that the release that we
05:06:19 12   first saw in July, which is Slide 5, is huge.  That, you
05:06:26 13   know, this is when -- you know, Dr. Raleigh is saying he
05:06:29 14   doesn't -- you know, he didn't take this seriously.  He
05:06:30 15   thought it was nonsense.  But yet it was so much not
05:06:34 16   nonsense that he had a lawyer draft up this release that
05:06:37 17   was going to exchange ownership in ItsOn for Qualcomm
05:06:40 18   releasing its claims.
05:06:43 19        And, you know, Dr. Raleigh argued today that the
05:06:47 20   statute of limitations has run for Qualcomm now, that these
05:06:51 21   are all back from 2009.
05:06:52 22        THE COURT:  Well, to be fair, this release was
05:06:56 23   going to be part of a transaction.  There was going to be
05:07:00 24   consideration, and the record doesn't reveal what that
05:07:03 25   might have been.  But it wasn't an exchange of ownership
```

180

```
05:07:10  1   for the release.
05:07:11  2        MR. THORNBURGH:  Well, Your Honor, the way the
05:07:15  3   document seems to be written, if you look at Tab -- the Tab
05:07:18  4   35 release at Page 71, the recital on the first page of the
05:07:24  5   release -- can we actually switch to that, Mr. Compton, so
05:07:29  6   we can see the whole document?
05:07:30  7        So the consideration, Your Honor, is recited in
05:07:41  8   the "now therefore" clause in the background.
05:07:44  9        Can we highlight that?  Well, actually just go
05:07:48 10   ahead and highlight B -- A, B, C, and now therefore.  And I
05:07:52 11   really meant blow it up so it's easy to read.
05:07:55 12        So the consideration appears to be the reference
05:08:04 13   equity purchase agreements for the release.  So, Your
05:08:06 14   Honor, I think that -- you're the trier of fact on this,
05:08:09 15   but that's what -- how we interpret it.
05:08:11 16        THE COURT:  All right.
05:08:17 17        MR. THORNBURGH:  And, you know, this is all from
05:08:18 18   2009.  We think it's very relevant to Qualcomm's state of
05:08:22 19   mind back in 2009, that they believed that there was a
05:08:25 20   serious ownership problem and that Dr. Raleigh believed
05:08:28 21   that there was a serious ownership problem.
05:08:30 22        And so, you know, did the companies further
05:08:35 23   consider doing business over the years?  The record
05:08:37 24   suggests yes.  And did the statute of limitations run as
05:08:43 25   Dr. Raleigh said?  You know, probably.
```

181

```
05:08:44   1          But I would also say that ItsOn and Headwater's
05:08:50   2   statute of limitations also ran.  If they had wanted to
05:08:52   3   clear this contract dispute up, they also had a statute of
05:08:55   4   limitations.
05:08:56   5          And if they had -- and having waived that, they
05:08:59   6   still could have cleared it up as -- with reference to
05:09:03   7   standing by including Qualcomm as a party to this case.  If
05:09:07   8   they were really worried about standing, and Dr. Raleigh
05:09:10   9   said they weren't, but the word "legal standing" is in
05:09:14  10   their -- is in Dr. Raleigh's slides from March 2010 that we
05:09:16  11   saw, he was worried about legal standing.
05:09:18  12          And if they had wanted to clear that up, they
05:09:20  13   would have included Qualcomm as a party here.  That
05:09:23  14   probably would have meant they had to file the case in
05:09:25  15   San Diego, which they probably didn't want to do, but
05:09:28  16   nonetheless they could have cleared the air, and they chose
05:09:31  17   not to do it.
05:09:32  18          And they have the burden now of -- they really
05:09:34  19   have a triple burden.  They have the burden of proving
05:09:39  20   standing under federal law.  They have the burden under the
05:09:42  21   contract of overcoming the presumption.  And, you know, I
05:09:50  22   think I knew there was a third thing, and I've forgotten
05:09:53  23   what it was, Your Honor, I apologize.  But --
05:09:53  24          MR. KODISH:  Corroboration.
05:09:53  25          MR. THORNBURGH:  What's that?
```

182

```
05:09:55   1          MR. KODISH:  Corroboration.
05:09:55   2          MR. THORNBURGH:  Corroboration is the third thing.
05:09:56   3   Mr. Kodish reminded me that they have a burden of
05:10:00   4   corroborating conception.
05:10:02   5          So, you know, we don't think they've done any of
05:10:07   6   those things, and they can't blame Qualcomm for any of
05:10:10   7   that.  You know, Qualcomm could have chosen to file a
05:10:12   8   contract suit.  They didn't.  But Headwater is the
05:10:14   9   Plaintiff.  They have the burden of proving standing and
05:10:16  10   proving ownership.
05:10:17  11          THE COURT:  All right.  Thank you, Mr. Thornburgh.
05:10:21  12          MR. THORNBURGH:  Thank you, Your Honor.
05:10:23  13          THE COURT:  Mr. Davis, the -- it looks to me like
05:10:30  14   what Dr. Raleigh has identified as the moment of conception
05:10:35  15   of the idea was on or about the -- September 25th at the
05:10:42  16   end of the Best Buy meetings, which is barely a week after
05:10:51  17   his last day at Qualcomm.
05:10:53  18          MR. KRIS DAVIS:  Your Honor, I think what
05:10:56  19   Dr. Raleigh testified was that this was the ah-ha moment,
05:10:58  20   the spark that made him think, you know, this is not going
05:11:04  21   to work with the network-side focus.  Instead, let's do
05:11:08  22   something different and focus on the device-side
05:11:12  23   technologies.
05:11:12  24          Now, at that moment, I think Dr. Raleigh
05:11:14  25   testified, did he have an invention then?  No, he didn't
```

183

```
05:11:18   1   have a solution yet.  He thought of a new direction to
05:11:21   2   explore and started going down that direction.  That
05:11:25   3   eventually led to the claimed inventions, of course.
05:11:29   4          And I'll just point out again that the claimed
05:11:32   5   inventions here all require limitations not unlike the
05:11:37   6   user interaction limitation that Dr. Raleigh described as
05:11:41   7   being something that was part of conception with his
05:11:45   8   co-inventors and in the '022 provisional application dated
05:11:49   9   May 2010.
05:11:49  10          THE COURT:  And what is the effect of the statute
05:11:55  11   of limitations as you understand it?  How does that enter
05:11:57  12   into this argument?
05:11:59  13          MR. KRIS DAVIS:  So I think what that shows, Your
05:12:01  14   Honor, at minimum, is that Qualcomm did not act, as
05:12:05  15   Dr. Raleigh testified, like an owner.  Instead, they
05:12:08  16   specifically let the statute of limitations expire.  They
05:12:12  17   told him as much when they reengaged in 2017 after, you
05:12:17  18   know, years of not negotiating.  And Dr. Raleigh said:  I
05:12:22  19   need assurances that we're not going to have this
05:12:25  20   insinuation issue come up that came up before.
05:12:28  21          And they said:  We knowingly let the statute of
05:12:34  22   limitations expire.  We can't claim ownership.  So don't
05:12:37  23   worry, let's go ahead with the diligence and see if we can
05:12:41  24   make a deal.
05:12:41  25          THE COURT:  And what is your answer to the
```

184

```
05:12:43   1   argument that the authority that Samsung has offered
05:12:48   2   requires corroborating evidence to support the testimony of
05:12:53   3   Dr. Raleigh?
05:12:54   4          MR. KRIS DAVIS:  Your Honor, that's not -- well,
05:12:58   5   for starters, we have corroborating evidence.  We have
05:13:01   6   evidence in the form of the provisional apps themselves.
05:13:04   7   We have the testimony of Dr. Raleigh and Mr. Raissinia.  We
05:13:09   8   have presentations like the 2008 -- I'm sorry, October 2008
05:13:16   9   Best Buy presentation where we start to see the new
05:13:19  10   direction that Dr. Raleigh is heading where it says, as he
05:13:27  11   read:  New, colon, device-implemented network.
05:13:27  12          The prior slide, Your Honor, says:  Old, colon,
05:13:32  13   MVNO.
05:13:32  14          This is showing that -- exactly as Dr. Raleigh
05:13:35  15   testified, he came to Best Buy and was learning for those
05:13:39  16   couple of days.  He was seeing pitches about MVNO services,
05:13:43  17   and he figured out that's not the right approach.  This
05:13:46  18   network focus is not the right approach.  He thought about
05:13:49  19   it.  He came up with a new direction, and then he comes
05:13:52  20   back to Best Buy a month later and is saying, you know, I'm
05:13:56  21   thinking about this new approach, device-focused.  And
05:13:59  22   that's what we see exactly reflected in black and white.
05:14:02  23          THE COURT:  All right.
05:14:09  24          MR. KRIS DAVIS:  You know, the other issue, Your
05:14:10  25   Honor, that you raised was the case law, I believe, for
```

185

```
05:14:11   1   corroboration.  I wanted to talk -- I'll just grab my
05:14:16   2   laptop -- just briefly about one of those cases.  I think
05:14:18   3   it's the one that Mr. Thornburgh talked about most.  That
05:14:22   4   was the Preston case.
05:14:23   5          I think, as Your Honor referenced, this typically
05:14:25   6   comes up in the sense of swearing behind where, you know,
05:14:29   7   we can't rely on an inventor's just bare testimony to swear
05:14:38   8   behind the dates of the provisionals.  That's not what
05:14:39   9   we're doing.  We're not asking someone to --
05:14:42  10          THE COURT:  I agree it's different.  The
05:14:45  11   representation I'm hearing is that these cases indicate
05:14:47  12   that the same analysis applies in the employment situation
05:14:52  13   where the need is to establish a later conception.
05:14:56  14          MR. KRIS DAVIS:  Well, that's not true, Your
05:14:58  15   Honor.
05:14:58  16          So what happened in the Preston case, as one
05:15:00  17   example, so the inventor alleged, without any proof at all,
05:15:05  18   that he came up with the invention before he came to work
05:15:09  19   at the company that he was working for, such that it
05:15:12  20   belonged to him and not the company.
05:15:14  21          So there was lots of evidence that he came up with
05:15:17  22   the invention while at the company, and there was zero
05:15:21  23   evidence to the contrary supporting the swear behind, so to
05:15:25  24   speak.
05:15:25  25          He also didn't disclose it as a preemployment
```

186

```
05:15:28   1   invention.  As Your Honor may be familiar, and as we saw in
05:15:32   2   the Qualcomm agreement, it's common for new employees to
05:15:36   3   have to list any preemployment inventions.  He didn't do
05:15:41   4   that.
05:15:41   5          THE COURT:  Well, I will read these cases with the
05:15:44   6   distinction in mind and try and develop that.
05:15:47   7          I'm also considering ordering the production in
05:15:52   8   camera that was discussed earlier.  And I'll put that in
05:15:56   9   writing if I decide to do that.
05:15:59  10          And I may order additional briefing on a couple of
05:16:07  11   issues, but I'll give some further thought to that.
05:16:13  12          MR. KRIS DAVIS:  Your Honor, did you want me to
05:16:15  13   address just briefly the documents' issue, the
05:16:19  14   production -- recent production of emails issue?
05:16:22  15          THE COURT:  I think you -- your response, which
05:16:26  16   was filed yesterday, I guess, to the motion for sanctions,
05:16:28  17   I assume that laid out the position that you would recount
05:16:33  18   now?
05:16:34  19          MR. KRIS DAVIS:  Yes, I think that's right, Your
05:16:35  20   Honor.
05:16:35  21          THE COURT:  Well, I've read it, and I understand
05:16:39  22   what the issues are.  I don't know that that goes to
05:16:44  23   trying to prove that there was no bad faith involved.
05:16:51  24          MR. KRIS DAVIS:  The only thing I wanted to add,
05:16:54  25   Your Honor, because I'm not sure this is fleshed out so
```

187

```
05:16:56   1   much and focused in that response brief, is that the
05:17:01   2   presentation that we looked at -- and I'm sorry, which tab
05:17:07   3   this was in our binder -- but the ItsOn presentation
05:17:13   4   Dr. Raleigh testified about -- it's Tab 9 in the
05:17:16   5   Plaintiff's binder -- this was dated March 2010, and it was
05:17:21   6   produced, I think as Dr. Raleigh noted, to Samsung over a
05:17:25   7   year ago.  It turns out that that was produced in May 2023, and
05:17:28   8   that's the presentation we talked about with those bullets
05:17:31   9   of option.  Both sides talked about it.  Very clear from
05:17:34  10   that document there's this former employment insinuation,
05:17:38  11   that there were conversations with Qualcomm about this.
05:17:42  12          THE COURT:  And certainly from what I've heard,
05:17:48  13   Samsung was pursuing Qualcomm for information on that, but
05:17:52  14   without names, they say they were unable to get any
05:17:59  15   satisfactory response.
05:18:00  16          MR. KRIS DAVIS:  That's right, Your Honor.
05:18:01  17          I'll add that we did produce emails with Mr. Wise
05:18:06  18   from those 2009 discussions where it's apparent that the
05:18:12  19   2009 discussions, when you look at that presentation,
05:18:14  20   that's the context that this employment insinuation came up
05:18:18  21   in.
05:18:20  22          THE COURT:  All right.  Well, I will consider that
05:18:24  23   as well.
05:18:24  24          MR. KRIS DAVIS:  All right.  Thank you, Your
05:18:25  25   Honor.
```

188

```
05:18:25   1          THE COURT:  All right.  Thank you.
05:18:26   2          And I appreciate the presentations.  They've been
05:18:33   3   helpful.  And I'll try to get a ruling out promptly.
05:18:38   4          MR. KRIS DAVIS:  Your Honor, can I ask one more
05:18:40   5   just very housekeeping question?
05:18:42   6          We did not move in our exhibits as we went.  I
05:18:45   7   think you may have copies of all of these by this point
05:18:49   8   already, but would you like us to file them electronically
05:18:52   9   as a set or anything like that?
05:18:55  10          THE COURT:  In order to have them in the record
05:18:58  11   properly, I think probably both sides should file them
05:19:04  12   electronically.  And I didn't hear any basis to exclude any
05:19:12  13   of the offerings by either side.
05:19:17  14          If there is a specific objection, I'll hear about
05:19:26  15   it.  But I don't see any reason why any of this stuff would
05:19:26  16   not be admissible for the purposes of this hearing.
05:19:31  17          MR. KRIS DAVIS:  We agree with that, Your Honor.
05:19:32  18          THE COURT:  And I'm seeing nodding heads around.
05:19:36  19   All right.  Then --
05:19:40  20          MR. KODISH:  Yeah, we'll drop our objection.
05:19:48  21          THE COURT:  All right.  Well, then you can file
05:19:49  22   those electronically into the record as exhibits of this
05:19:53  23   hearing.
05:19:54  24          MR. KRIS DAVIS:  Thank you, Your Honor.
05:19:55  25          THE COURT:  All right.  Thank you.
```

190



```
05:19:56   1          And we are adjourned.
05:20:00   2          COURT SECURITY OFFICER:  All rise.
           3          (Hearing concluded at 5:20 p.m.)
           4
           5
           6
           7
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```



```
 1                      CERTIFICATION
 2
 3          I HEREBY CERTIFY that the foregoing is a true and
 4     correct transcript from the stenographic notes of the
 5     proceedings in the above-entitled matter to the best of my
 6     ability.
 7
 8
 9      /S/ Shelly Holmes                    7/29/2024
       SHELLY HOLMES, CSR, TCRR             Date
10     CERTIFIED SHORTHAND REPORTER
       State of Texas No.: 7804
11     Expiration Date: 10/31/2025
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```