FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

HEADWATER RESEARCH, LLC.,        (   CAUSE NO. 2:23-CV-103-JRG
                                 )
          Plaintiff,             (
                                 )
vs.                              (
                                 )
SAMSUNG ELECTRONICS CO., LTD.,   (
et al.,                          )   MARSHALL, TEXAS
                                 (   APRIL 25, 2025
          Defendants.            )   8:00 A.M.
_____


VOLUME 5

_____


TRIAL ON THE MERITS


BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

```
 1                      A P P E A R A N C E S

 2         FOR THE PLAINTIFF:    RUSS AUGUST & KABAT -
                                 LOS ANGELES
 3                               12424 WILSHIRE BOULEVARD
                                 12TH FLOOR
 4                               LOS ANGELES, CA 90025
                                 (310) 826-7474
 5                               BY: MR. MARC FENSTER
                                     MR. REZA MIRZAIE
 6                                   MR. BRIAN LEDAHL
                                     MR. PAUL KROEGER
 7                                   MR. ADAM HOFFMAN

 8                               MILLER FAIR HENRY, PLLC
                                 1507 BILL OWENS PARKWAY
 9                               LONGVIEW, TEXAS  75604
                                 (903) 757-6400
10                               BY:  MS. ANDREA FAIR

11         FOR THE DEFENDANTS:   FISH & RICHARDSON PC - ATLANTA
                                 1180 PEACHTREE STREET NE
12                               21ST Floor
                                 ATLANTA, GEORGIA  30309
13                               (404) 724-2792
                                 BY:  MR. THAD KODISH
14
                                 FISH & RICHARDSON, PC -
15                               WASHINGTON, DC
                                 1000 MAINE AVE., SW
16                               SUITE 1000
                                 WASHINGTON, DC 20024
17                               (202) 783-5070
                                 BY:  MR. MICHAEL McKEON
18
                                 FISH & RICHARDSON, P.C. -
19                               DALLAS
                                 1717 MAIN STREET, SUITE 5000
20                               DALLAS, TEXAS  75201
                                 (214) 292-4084
21                               BY:  MR. THOMAS REGER

22

23

24

25
```

```
 1                                   FISH & RICHARDSON PC - ATLANTA
                                     1180 PEACHTREE STREET NE
 2                                   21ST FLOOR
                                     ATLANTA, GEORGIA  30309
 3                                   (404) 724-2844
                                     BY:  MR. BENJAMIN THOMPSON
 4                                        MS. SARA FISH
                                          MR. NICHOLAS GALLO
 5                                        MR. NOAH GRAUBART
                                          MR. JONATHAN BRIGHT
 6
                                     QUINN EMANUEL URQUHART &
 7                                   SULLIVAN, LLP - LA
                                     865 S. FIGUEROA STREET
 8                                   10TH FLOOR
                                     LOS ANGELES, CALIFORNIA  90017
 9                                   (213) 443-3000
                                     BY:  MR. LANCE YANG
10
                                     GILLAM & SMITH, LLP
11                                   303 SOUTH WASHINGTON AVENUE
                                     MARSHALL, TEXAS  75670
12                                   (903) 934-8450
                                     BY:  MS. MELISSA SMITH
13
        OFFICIAL REPORTER:   SHAWN M. McROBERTS, RMR, CRR
14                                   100 E. HOUSTON STREET
                                     MARSHALL, TEXAS  75670
15                                   (903) 923-8546
16
17
18
19
20
21
22
23
24
25
```

1           THE COURT:  Be seated, please.

07:58    2           Yesterday after the close of the evidence, the Court

3    heard from the parties regarding motions offered for relief

4    under Rule 50(a) of the Federal Rules of Civil Procedure.

5           After having heard any and all motions either party cared

6    to offer under Rule 50(a) and ruling on the same, the Court an

7    informal charge conference in chambers with multiple counsel

8    present for all the parties.

07:58    9           We reviewed the then most current version of the final

10    jury instructions and verdict form, we discussed those areas

11    where the parties were not in agreement.  The Court also

12    raised questions about other areas that were not necessarily

13    disagreed but the Court wanted input on.  The Court provided

14    an opportunity for the parties through counsel to ask any

15    questions or explore any areas of these documents that they

16    thought would be helpful.

07:59    17           After an open and fulsome review of the final jury

18    instructions and verdict form, the Court concluded the

19    informal charge conference and then over the ensuing several

20    hours took into account the input from counsel, made various

21    adjustments and generated overnight what it believes to be the

22    appropriate and proper final jury instructions and verdict

23    form for use in this trial before this jury.

07:59    24           Approximately an hour ago the Court furnished hard copies

25    of those documents to counsel for both parties with an

1  opportunity to review and refresh their understanding of the

2  various documents and their contents, and the Court is now

3  prepared to hold a formal charge conference on the record

4  where either party may raise such objections that they think

5  are proper and in the interest of their clients.

08:00  6       As counsel are probably aware, my typical practice in

7  this regard is to ask each side to put forward a single

8  spokesperson, those two individuals to stay together at the

9  podium and be prepared to speak for their respective sides.

10  We'll then begin with the final jury instructions and I will

11  go through them on a page-by-page basis.

12       If at any point in that process when we get to a

13  particular page there is a matter listed there that you

08:01  14  believe supports and necessitates an objection, then you may

15  make that objection.  If you believe there is an omission at

16  that point that requires an objection, you may make it.  I'll

17  hear your objections, rule on them, and then we'll continue

18  the process again beginning with the final jury instructions

19  and then on the same page-by-page basis reviewing the verdict

20  form.

21       So whoever is going to speak for Plaintiff, please go to

22  the podium.  Whoever's going to speak for Defendants, please

08:01  23  go to the podium.  And we'll begin the process.

24            MR. GRAUBART:  Your Honor, Noah Graubart for

25  Samsung.

1       I know you asked for a single spokesman.  Would you mind

2   if Mr. McLaughlin subbed in for me on the verdict form when we

3   get there?

4           THE COURT:  I ask you to both be at the podium to

5   save time of walking back and forth.  If Mr. McLaughlin wants

6   to tag-team in as you step away, that's perfectly fine.

7           MR. GRAUBART:  Thank you, Your Honor.

08:01   8           THE COURT:  It's just for efficiency.

9           MR. GRAUBART:  Yes, sir.

10           THE COURT:  Let's begin with the final jury

11   instructions.  Let me just for completeness get both of you to

12   identify yourselves on the record.

13           MR. GRAUBART:  Noah Graubart for Samsung, Your

14   Honor.

15           MR. KROEGER:  Paul Kroeger for Headwater, Your

16   Honor.

17           THE COURT:  All right.  Turning to the final jury

18   instructions beginning with the cover page or page one, are

19   there objections here from either Plaintiff or Defendants?

20           MR. KROEGER:  No, Your Honor, not from Plaintiff;

21           MR. GRAUBART:  None for Defendants.

22           THE COURT:  Turning to page 2 of the final jury

23   instructions, are there any objections here from either party?

24           MR. KROEGER:  None for Plaintiff.

08:02   25           MR. GRAUBART:  None for Defendants.

```
 1              THE COURT:  Turning to page 3, are there any
 2   objections here?
 3              MR. KROEGER:  None for Plaintiff.
 4              MR. GRAUBART:  None for defendants.
 5              THE COURT:  Turning to page 4, are there any
 6   objections here?
 7              MR. KROEGER:  None from Plaintiff.
 8              MR. GRAUBART:  None for the Defendants.
 9              THE COURT:  Next is page 5.  Are there any
10   objections here?
11              MR. KROEGER:  Your Honor, in terms of the
12   stipulations of fact, Samsung has stipulated that they're not
13   presenting evidence of non-infringing alternatives.  Plaintiff
14   would object and suggest that that's a good place for the
15   inclusion after the paragraph about Firebase Cloud Messaging.
16              THE COURT:  All right.  I consciously did not list
17   that in there.  Stipulating about what you're not presenting
18   is not in my view what the jury needs to be instructed on.
19   They need to be instructed on what you are presenting and
20   contesting with the other side.  I consciously omitted that
21   there, and I'll overrule your objection.
22          Anything else on page 5, gentlemen?
23              MR. KROEGER:  Not for Plaintiff.
24              MR. GRAUBART:  Not for Defendants.
25              THE COURT:  Then we'll turn to page 6 of the final
```

08:02  (line 15)
08:03  (line 23)

 1    jury instructions.  Any objections here?

 2              MR. KROEGER:  Not from Plaintiff.

 3              MR. GRAUBART:  Not for Defendants.

 4              THE COURT:  Next is page 7.  Any objections here?

 5              MR. KROEGER:  Not for Plaintiff.

 6              MR. GRAUBART:  Not for Defendants.

 7              THE COURT:  Turning then to page 8, are there any

 8    objections here?

 9              MR. KROEGER:  Not for Plaintiff.

10              MR. GRAUBART:  Not for Defendants.

11              THE COURT:  Next is page 9.  Are there any

12    objections here?

13              MR. KROEGER:  Not for Plaintiff.

14              MR. GRAUBART:  Not for Defendant.

08:03  15              THE COURT:  Next is page 10.  Are there any

16    objections here?

17              MR. KROEGER:  Not for Plaintiff.

18              MR. GRAUBART:  Not for Defendants.

19              THE COURT:  Turning to page 11, are there objections

20    here?

21              MR. GRAUBART:  Your Honor, for Defendants we just

22    note our objection with respect to the constructions to the

23    extent the claim constructions were ones that Samsung opposed

24    at the time of the claim construction order, and we maintain

25    our positions on claim construction as they were presented

```
 1    during the claim construction process.

 2              THE COURT:  All right.  You're just going to have to

 3    speak up so I can hear you and the court reporter can hear

 4    you.

 5              MR. GRAUBART:  Sure.  Sorry, Your Honor.

 6         Samsung just objects to the final constructions of the

 7    disputed claim terms to the extent that they are contrary to

 8    the positions that Samsung urged during the claim construction

 9    process and preserves its position.

10              THE COURT:  I understand you're not waiving any

11    positions and you're maintaining your earlier positions, but

12    other than that, you don't object to what's included here.

13              MR. GRAUBART:  That's correct, Your Honor.

14              THE COURT:  All right.  Anything from Plaintiff on

15    page 11?

16              MR. KROEGER:  Headwater objects to the lack of the

17    inclusion of the actual claim constructions, Your Honor.  We

18    believe those should be read directly to the jury.

19              THE COURT:  All right.  That objection is overruled.

20         Turning to page 12, if you will, are there any objections

21    here, counsel?

22              MR. KROEGER:  None for Defendant.

23              MR. GRAUBART:  None for Defendants, Your Honor.

24              THE COURT:  Turning then to page 13, any objections

25    here?
```

The times "08:04" appear in the left margin next to lines 3 and 17.

1            MR. KROEGER:  Not for Plaintiff.

2            MR. GRAUBART:  Not for Defendants.

3            THE COURT:  Next is page 14.  Any objections here?

4            MR. KROEGER:  Plaintiff objects to the last sentence

08:05    5    of the last full paragraph that starts with, the use of the

6    claimed system.  We believe this goes to Defendants'

7    extraterritoriality defense about which there has been no

8    evidence, and we also believe it to be redundant and

9    unnecessary because use is defined three sentences above.

10            THE COURT:  All right.  That objection is overruled.

11    Anything else on page 14?

12            MR. KROEGER:  Not for Plaintiff.

13            MR. GRAUBART:  For Defendants, Your Honor, we object

14    to the omission at the end of that same paragraph of an

08:05   15    additional instruction on extraterritoriality explaining that

16    activities outside the United States cannot constitute

17    infringement.

18            THE COURT:  That's overruled.  As I told you both in

19    chambers yesterday, this was the middle ground I was going to

20    pursue and I was sure it would offend both of you and you made

21    that clear on the record.

22        Okay.  Let's turn to page 15.  Any objections here,

23    counsel?

24            MR. KROEGER:  Not for Plaintiff.

25            MR. GRAUBART:  Not for Defendants, Your Honor.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | THE COURT:  Turning then to page 16, any objections          |
|       | 2  | here?                                                         |
|       | 3  | MR. KROEGER:  Not for Plaintiff.                             |
|       | 4  | MR. GRAUBART:  Your Honor, Defendants object to the          |
| 08:06 | 5  | instruction in the first full paragraph, and particularly in |
|       | 6  | the final sentence that the instruction that absence or      |
|       | 7  | presence of pre-suit notice is not a factor in damages       |
|       | 8  | because, with respect to the indirect infringement theories, |
|       | 9  | the damages window will differ based on the absence of notice. |
|       | 10 | It also that the omission of the fact that this              |
|       | 11 | instruction doesn't notify the jury that this topic can be   |
| 08:06 | 12 | considered for purposes of credibility.                      |
|       | 13 | THE COURT:  All right.  I'm going to make the                |
|       | 14 | following modification.  In that last sentence, it currently |
|       | 15 | reads, "Accordingly, the presence or absence of any pre-suit |
|       | 16 | notice is not a factor to consider regarding a determination |
|       | 17 | of direct infringement or an award of damages."             |
| 08:07 | 18 | I'm going to change that sentence, and it will hereafter     |
|       | 19 | read, "Accordingly, the presence or absence of any pre-suit  |
|       | 20 | notice is not a factor to consider regarding a determination |
|       | 21 | of direct infringement or a related award of damages."      |
|       | 22 | Otherwise, your objection's overruled.  Anything further,    |
|       | 23 | counsel, on page 16?                                          |
|       | 24 | MR. GRAUBART:  Not for Defendants.                           |
|       | 25 | MR. KROEGER:  Not for Plaintiff.                             |

08:07

1    THE COURT:  Turning then to page 17, any objections

2    here, counsel?

3          MR. KROEGER:  Not for Plaintiff.

4          MR. GRAUBART:  Not for Defendants.

5          THE COURT:  Next is page 18.  Any objections here?

6          MR. KROEGER:  Not for Plaintiff.

7          MR. GRAUBART:  Not for Defendants.

8          THE COURT:  Next is page 19.  Any objections here?

9          MR. KROEGER:  Not for Plaintiff.

10         MR. GRAUBART:  Not for Defendants.

11         THE COURT:  Next is page 20.  Any objections here?

12         MR. KROEGER:  Not for Plaintiff.

13         MR. GRAUBART:  Not for Defendants.

14         THE COURT:  Next is page 21.  Any objections here?

15         MR. KROEGER:  Plaintiff objects to the paragraph --

16    the second -- the first full paragraph that starts, Samsung

08:08

17    can show through the patent claim invalid.  This goes to

18    Defendants' defense on anticipation under 102(g)(2).  We don't

19    believe there's been any of evidence of this shown and no

20    prior inventor has been shown; therefore, it should not be

21    given.

22         THE COURT:  Am I correct, counsel, there's been no

23    objection raised to this during the informal charge

24    conference, has there?

25         MR. KROEGER:  We mentioned that we were just, while

1    we agreed to the language, we were objecting to it.  We are

2    preserving our objections to it being given.

3                THE COURT:  All right.  Objection's overruled.

08:09    4    Anything further on page 21 from either party?

5                MR. KROEGER:  Not for Plaintiff.

6                MR. GRAUBART:  For Defendants, Your Honor, Samsung

7    objects to the omission at the end of the paragraph that

8    begins on page 20 and continues on to page 21, that we'd

9    requested an additional instruction under the *01 Communique*

10   *versus Citrix* case, explaining to the jury that to the extent

11   they find infringement of the accused product that under broad

12   application the claim, that the same -- for the same reasons

08:09   13   the claim can be found invalid with respect to comparison to

14   the prior art.

15               THE COURT:  All right.  That's overruled.

16          Let's turn to page 22 unless there's something further,

17   and I'll ask if there are any objections with regard to page

18   22 or anything therein.

19               MR. KROEGER:  Any further out or just page 22?

20               THE COURT:  I'm sorry?

21               MR. KROEGER:  Any other page beyond 22 or just page

22   22?

23               THE COURT:  Just page 22.

24               MR. KROEGER:  Not for Plaintiff.

25               MR. GRAUBART:  Not for Defendants.

08:10

```
 1              THE COURT:  We're going to do it one at a time.

 2     Turning then to page 23, are there any objections here from

 3     either party?

 4              MR. KROEGER:  Not for Plaintiff.

 5              MR. GRAUBART:  Not for Defendants.

 6              THE COURT:  Turning to page 24, any objections here?

 7              MR. KROEGER:  Not for Plaintiff.

 8              MR. GRAUBART:  Not for Defendants.

 9              THE COURT:  Next is page 25.  Any objections here?

10              MR. KROEGER:  Not for Plaintiff.

11              MR. GRAUBART:  Not for Defendants.

12              THE COURT:  Next is page 26.  Any objections here?

13              MR. KROEGER:  Not for Plaintiff.

14              MR. GRAUBART:  Not for Defendants.

15              THE COURT:  Next is page 27.  Any objections here?

16              MR. KROEGER:  Not for Plaintiff.

17              MR. GRAUBART:  Not for Defendants.

18              THE COURT:  Next is page 28.  Any objections here?

19              MR. KROEGER:  Not for Plaintiff.

20              MR. GRAUBART:  Not for Defendants.

21              THE COURT:  Next is page 29.  Any objections here?

22              MR. KROEGER:  Not for Plaintiff.

23              MR. GRAUBART:  Not for Defendants.

24              THE COURT:  Next is page 30.  Any objection here?

25              MR. KROEGER:  Not for Plaintiff.
```

1    MR. GRAUBART:  Your Honor, Defendants object to the

2    first full paragraph beginning a reasonable royalty to

3    the omission of language that the parties had jointly

4    proposed --

5    THE COURT:  Just a minute.  I can't hear you, you're

08:10  6    mumbling.  I mean, please, if you want the record clear as I

7    want the record clear, make sure I can hear you clearly and

8    slow down, please.

9    MR. GRAUBART:  Yes, Your Honor.  Thank you.

10    THE COURT:  Thank you.

11    MR. GRAUBART:  Defendants object with respect to the

12    first full paragraph that begins a reasonable royalty to the

13    omission of an instruction that was jointly proposed by the

14    parties that read, "Headwater's evidence must be reliable and

15    tangible; it can't be speculative."

16    THE COURT:  And I've omitted that as being

08:11  17    redundant.  I think it's otherwise clearly covered in here,

18    and I'm going to overrule your objection.

19    MR. GRAUBART:  Thank you, Your Honor.

20    THE COURT:  Anything further on page 30, counsel?

21    MR. KROEGER:  Not for Plaintiff.

22    MR. GRAUBART:  Not for Defendants.

23    THE COURT:  You'll note, counsel, at the bottom of

24    page 30 and taking all of page 31 and going on to the very top

25    of page 32 are the 15 *Georgia-Pacific* factors.  I'll ask if

1     there are any objections here, and I'll also ask you to

2     confirm on the record that both parties believe it's proper

3     and appropriate for the Court to charge this jury in this case

4     with all 15 of the factors.

08:11    5         MR. KROEGER:  No objections, Your Honor.  And, yes,

6     Plaintiff confirms that all 15 factors should be read.

7              MR. GRAUBART:  And no objection from Defendants, and

8     Defendants likewise agree that all 15 factors should be read

9     to the jury.

10              THE COURT:  All right.  Then let's turn to the

11     remainder of page 32 after the conclusion of the 15th

12     *Georgia-Pacific* factor, and I'll ask with regard to that if

13     you have any objections.

14              MR. KROEGER:  Not for Plaintiff, Your Honor.

15              MR. GRAUBART:  Not for Defendants.

16              THE COURT:  All right.  Turning then to --

17              MR. FENSTER:  Excuse me, Your Honor.  I'm sorry.

08:12    18              THE COURT:  Yes, sir.

19              MR. FENSTER:  Plaintiffs object at the lack of an

20     inclusion of any reference at all in the instructions to

21     non-infringing alternative based on the -- based -- there were

22     specific rulings before this case that led to this becoming a

23     serious issue, and we had reason to believe that there would

24     be a stipulation or that the Court would instruct that the

08:12    25     parties -- that Samsung has not offered into evidence any

1    evidence of a non-infringing alternative.  We've referred to

2    it throughout.

3        The absence here now suggests to the jury that we were

4    pointing to something irrelevant.  And I've confirmed with Mr.

5    McKeon that he's going to argue in his closing arguments that

08:13    6    what we've been talking about all week with non-infringing

7    alternatives and the fact that they haven't met their burden

8    of proof on that is not mentioned anywhere --

9        THE COURT:  All right, Mr. Fenster.  I know where

10    you're coming from.  I made a conscious decision here.  It's

11    undisputed that the Defendants have not raised non-infringing

12    alternatives as a manner in which to address the damages

13    issue.  I don't think the jury needs to be instructed on what

14    the parties haven't raised, what's not in dispute.

08:14    15    And I have been concerned, as I expressed in the informal

16    charge conference yesterday, which you were not present in

17    because you were preparing to present closings, which was

18    perfectly proper, but I expressed in the formal charge

19    conference yesterday that the issue of non-infringing

20    alternatives I viewed as a stealth infringement argument from

21    the Plaintiff in fact telling the jury the Defendants haven't

08:14    22    presented any way in which they could do this without

23    infringing so therefore they must infringe.

24        And the issue of non-infringing alternatives in the

25    Court's view has not been used in this trial in any relation

to the damages issue to which it solely relates but has been

an implied issue relating to the infringement question, which

is improper.  And that's why I took it out of the final

instructions.

If you want to argue that there's no dispute in this case

08:14    that the Defendants did not offer any non-infringing

alternative, there's no problem with you arguing that, but I

do not feel it's appropriate for the Court to instruct the

jury on the issue.

I made a conscious decision to take it out of here.  You

may object to that and I'll overrule your objection, but this

was not accidental.

MR. FENSTER:  I understand that, Your Honor, but we

have not -- we have not --

THE COURT:  I'm not going to argue with you and I'm

not going to change the charge.

MR. FENSTER:  Your Honor, I understand.  I just want

08:15    the Court to know that we have not argued at all with respect

to infringement.

THE COURT:  I didn't say you had overtly argued it.

I said it was a stealth, an implied non-infringement argument.

I've watched the trial, I've seen how it's been used, I've

seen where and when it was raised.  I do not want this jury to

make a decision on infringement based on some implication

that's improper.

08:15

            1        There are other matters that were presented by the

            2   Defendants that I thought were equally improper, and I've

            3   taken those out as well for the same kind of stealth argument.

            4   There were instructions that the Defendants argued or

            5   presented about the long delay in this case, and I view that

            6   as a stealth non-infringement argument; that if the Plaintiff

            7   has delayed and delayed and delayed, they must not have

            8   anything here that is really being infringed on and I've

08:16       9   addressed that in a way that I think's appropriate here.

           10        But I am convinced that the non-infringing alternatives

           11   issue, there is a high risk that it will be improperly

           12   considered and applied by the jury if I instruct on it.  I'm

           13   not trying to curtail what your argument will be or what Mr.

           14   McKeon's argument will be, and there is no dispute in this

           15   case that Samsung has not offered a non-infringing alternative

           16   theory.

           17        So with that, that's my ruling.

           18             MR. FENSTER:  Your Honor, I just want --

08:17      19             THE COURT:  You can make the record clear, but

           20   that's where we are.

           21             MR. FENSTER:  Okay.  Your Honor, I want you -- I

           22   want the Court to understand, one, I believe that the

           23   instructions as stated are incomplete and legally not right

           24   because the proper measure of damages, reasonable royalty

           25   damages, are the extent -- the benefits relative to the next

08:17   1   available alternative.  That's the proper measure of damages,

        2   and that is not recited in the current instructions.

        3       I was going to -- the way this has been presented

        4   throughout trial, it came in through the technical

        5   arguments --

        6           THE COURT:  Mr. Fenster, I know how it's come in

        7   through trial.  I've heard all the evidence.  I am persuaded

        8   after careful review that this affirmative defense that

        9   Defendants could have raised to mitigate the damages issue has

08:17  10   not been presented to the jury.  Just like enablement, it has

       11   not been presented to the jury, and I'm not going to instruct

       12   that there's been no enablement in this case or no theory of a

       13   lack of enablement.  And I'm not going to instruct that there

       14   have been no non-infringing alternatives.

       15           MR. FENSTER:  I'm not asking -- I apologize for

       16   interrupting.

08:18  17       I'm not asking the Court to instruct that they have

       18   not --

       19           THE COURT:  State your objection succinctly and then

       20   we need to move on.  You and I are not going to have a

       21   back-and-forth dialogue of 15 or 20 minutes here.

       22           MR. FENSTER:  Your Honor, to be clear, I'm not

       23   asking the Court to instruct them, instruct the jury

       24   that there hasn't been a non-infringing alternative.  All I'm

       25   asking for is that the measure of damages be clear that it is

08:18

1    the benefit to the infringer relative to any available

2    technology -- commercially-available technology, and that's

3    just -- it's -- that is required to be a proper statement of

4    damages.

5         And I promised the Court that I was going to make this

6    crystal clear that this has absolutely nothing to do with

7    infringement and it's damages only.  It's a measure of the

8    benefits.  And it goes exactly to the two bar charts where we

9    show the damages here and Dr. Foster showed the benefits of

10   the prior art.

11        THE COURT:  Okay.  Okay, Mr. Fenster.  I've heard

12   enough.  You argue it the way you want to argue it.  I'm

08:19

13   overruling your objection about the omission of the

14   non-infringing alternative instruction that you asked for.

15        MR. FENSTER:  Can I ask for guidance?  I think it's

16   wholly improper for Mr. McKeon to argue that the --

17        THE COURT:  Let me finish the formal charge

18   conference.  You've injected yourself into it even though Mr.

19   Kroeger's here to speak for your side.  I've heard you, I've

20   ruled.

21        If you and Mr. McKeon want some guidance from the Court

22   on closing arguments, I'll be glad to speak to you after I

23   complete the final charge conference.

24        MR. FENSTER:  Yes.

08:20

25        THE COURT:  All right, gentlemen.  Let's return to

1    the formal charge conference, and we're at page 33 by my count

2    in the final jury instructions.  I'll ask if either party has

3    any objection to anything here.

4            MR. KROEGER:  Yes, Your Honor.  This is just

5    preservation for the record, and I think the Court's already

6    made its ruling pretty clear on this, but we would request

7    that our non-infringing alternatives instruction be read here.

8            THE COURT:  Understood.  And that objection's

9    overruled.  Anything further?

10            MR. KROEGER:  No, Your Honor.

11            MR. GRAUBART:  Not from Defendants, Your Honor.

08:20    12            THE COURT:  All right.  Let's turn then to page 34

13    of the final jury instructions.  Are there any objections here

14    from either party?

15            MR. KROEGER:  No, Your Honor, from plaintiffs.

16            MR. GRAUBART:  Not for Defendants.

17            THE COURT:  Next is page 35.  Any objections here?

18            MR. KROEGER:  Not from Plaintiff.

19            MR. GRAUBART:  Not for Defendants.

20            THE COURT:  Next is page 36.  Any objections here?

21            MR. KROEGER:  Not from Plaintiff.

22            MR. GRAUBART:  Not for Defendants.

23            THE COURT:  All right.  That completes the formal

24    charge conference with regard to the final jury instructions.

08:20    25        Let's turn to the verdict form.  This has been generated

1    in the same way with the same opportunity to review it, and

2    we'll go through it in the same manner beginning with the

3    cover page or page 1.  Are there any objections here from

4    either party?

5              MR. KROEGER:  Not from Plaintiff.

6              MR. McLAUGHLIN:  Brendan McLaughlin on behalf of

7    Defendants.  Not for Defendants.

8              THE COURT:  All right.  Let's turn to page 2 of the

9    verdict form.  Any objections here?

10             MR. KROEGER:  Not from Plaintiff.

11             MR. McLAUGHLIN:  Not from Defendants.

12             THE COURT:  Next is page 3.  Any objections here?

13             MR. KROEGER:  Not from Plaintiff.

14             MR. McLAUGHLIN:  Not for Defendants.

15             THE COURT:  Next is page 4 where Questions 1A and 1B

16   are situated.  Any objections here?

17             MR. KROEGER:  Not from plaintiff.

18             MR. McLAUGHLIN:  Yes, Your Honor.  Defendants object

19   that the infringement question should be separated by accused

20   product and should also be separated by indirect versus direct

21   infringement.

22             THE COURT:  That objection's overruled.

23       Let's turn to page 5.  Any objections here, counsel?

24             MR. KROEGER:  Not from Plaintiff.

25             MR. McLAUGHLIN:  Not from Defendants.

1173

```
 1              THE COURT:  Turning then to page 6 where Questions
 2    2A and 2B are situated, any objections here?
 3              MR. KROEGER:  Not from Plaintiff.
 4              MR. McLAUGHLIN:  Not for Defendants.
 5              THE COURT:  Turning then to page 7, any objections
 6    here?
 7              MR. KROEGER:  Not from Plaintiff.
 8              MR. McLAUGHLIN:  Not for Defendants.
 9              THE COURT:  All right.  Turning then to page 8 where
10    Question 3, the final question, is found, any objections here?
11              MR. KROEGER:  Not from Plaintiff.
12              MR. McLAUGHLIN:  Yes, Your Honor.  And apologies for
13    not raising this yesterday during the informal charge
14    conference, but Defendants object that this damages question
15    is not separated on a patent-by-patent basis.
16              THE COURT:  All right.  That objection is overruled.
17        Turning to page 9, any objections here?
18              MR. KROEGER:  Not from Plaintiff.
19              MR. McLAUGHLIN:  Not for Defendants.
20              THE COURT:  Page 9 is the final page of the verdict
21    form.  That completes the formal charge conference both with
22    regard to the verdict form in particular and both the verdict
23    form and the final jury instructions collectively.
24        All right.  I will need a little bit of time to make the
25    one correction to the final jury instruction and then print
```

08:22  13

08:22  23

1    eight copies for each member of the jury to have their own.

2        While that's going on, if Mr. McKeon and Mr. Fenster

3    would like to meet me in chambers to discuss something about

4    their intended closings, I'm happy to be available to them.

08:23    5    Otherwise, we stand in recess.

6                          (Brief recess.)

08:29    7        THE COURT:  Be seated, please.

08:43    8        All right, ladies and gentlemen.  I'm about to bring in

9    the jury and give them the Court's final instructions on the

10    law followed by closing arguments from counsel for the

11    parties.  Before I do that, out of a desire for completeness

12    in the record, let me ask, were there any exhibits used during

13    yesterday's portion of the trial that had not been used

08:43    14    previously and need to be read into the record?

15        MS. SMITH:  Yes, Your Honor.

16        THE COURT:  All right.  Let's do that.

17        MS. FAIR:  For the Plaintiff, Your Honor, DTX 4.

18        MS. SMITH:  There's no objection for Samsung DTX 3,

19    DTX 21, DTX 22, and DTX 23.

20        THE COURT:  Any objection from Plaintiff?

21        MS. FAIR:  No, Your Honor.

22        THE COURT:  All right.  Thank you, ladies.

23        MS. SMITH:  Thank you.

24        THE COURT:  All right.  As I was saying, I'm about

25    to bring in the jury and present my final instructions to them

1       followed by counsels' closing arguments.

08:44   2           Let me say this as clearly as I can.  I consider this

3       portion of the trial process to be the most serious part of an

4       inherently serious proceeding.  Consequently, I don't want any

5       disruptions, I don't want any distractions.  I do not want

6       anything that could interfere with the jury's ability to

7       concentrate on both my instructions to them and counsels'

8       arguments to them.

08:44   9           If you have any kind of electronic device that's capable

10      of emitting a sound, either take it out of the room now or

11      make darn sure it will not make noise during this process.  If

12      you need to bring in a box of documents, if you need to shift

13      papers, if you need to move around the room, do it now before

14      I bring the jury in.  Because once I bring the jury in, I

15      expect everyone both in the gallery and inside the Bar to be

08:45   16      still, quiet, and respectful throughout the process.  I hope

17      that's clear and understood.

18          All right.  Counsel, let me ask one more time, is there

19      anything I need to hear from either party on before I bring in

20      the jury and present my final instructions to them?

21              MR. FENSTER:  Not from Plaintiff, Your Honor.

22              MR. McKEON:  Nothing from Samsung, Your Honor.

23              THE COURT:  All right.  Let's bring in the jury,

24      please.

25              (Whereupon, the jury entered the courtroom.)

08:46  1          THE COURT:  Good morning, ladies and gentlemen.

2    Welcome back.  Please have a seat.

3          Ladies and gentlemen of the jury, you've now heard all

4    the evidence in this case, and I'll now instruct you on the

08:46  5    law that you must apply.

6          I'm going to provide each one of you with your own

7    printed copy of these final jury instructions that I'm about

8    to give you orally.  I do that so that you will have no

9    compelling need to take notes right now so that you can focus

10   and listen on my oral presentation to you, understanding

11   you'll have a hard copy of your own to look at once you retire

12   to the jury room.

08:46  13         It's your duty to follow the law as I give it to you, but

14   on the other hand, and as I've said, you, the jury, are the

15   sole judges of the facts in this case.  Do not consider any

16   statement that I have made over the course of the trial or

17   that I may make in these instructions as an indication to you

18   that I have any opinion about the facts in this case.

19         Now, you're about to hear closing arguments from the

20   attorneys for the competing parties.  Statements and arguments

08:47  21   of the attorneys, ladies and gentlemen, are not evidence, and

22   they are not instructions on the law.  They are intended only

23   to assist you, the jury, in understanding the evidence and the

24   parties' competing contentions.

25         A verdict form has been prepared for you, and you'll take

08:47

1    this verdict form with you to the jury room.  And when you

2    have reached a unanimous agreement as to how to answer the

3    questions in the verdict form, you will have your foreperson

4    fill in those questions reflecting your unanimous answers.

5    Then your foreperson will date and sign the verdict form on

6    the last page, and then you should advise the Court Security

7    Officer that you have reached a verdict.

8         Answer the questions in the verdict form from the facts

9    as you find them to be.  Do not decide who you think should

10   win this case, ladies and gentlemen, and then answer the

11   questions to reach that result.  Again, your answers to the

08:48 12  questions in the verdict form must be unanimous.

13        Now, in determining whether any fact has been proven in

14   this case, you may, unless otherwise instructed, consider the

15   testimony of all the witnesses, regardless of who may have

16   called those witnesses.  You may consider any stipulations of

17   the parties, and you may consider all the exhibits that have

18   been received and admitted into evidence and shown to you over

08:48 19  the course of the trial, regardless of who may have introduced

20   and presented those exhibits.

21        You, the jury, are the sole judges of the credibility and

22   believability of all the witnesses and what weight and effect,

23   if any, to give to all the evidence.  Now, in deciding the

24   facts in this case, you may have to decide which testimony to

25   believe and which testimony not to believe.  You alone are to

1    determine the questions of credibility and truthfulness of the

2    witnesses.

08:49    3        In weighing the testimony of the witnesses, you may

4    consider a witness' manner and demeanor on the witness stand,

5    any feelings or interest that witness may have in the case or

6    about the case, any prejudice or bias about the case that

7    witness may have, and you may consider the consistency or

8    inconsistency of that witness' testimony, considered in the

9    light of the circumstances.  Has the witness been contradicted

08:49    10    by other evidence?  Has he or she made statements at other

11    places and at other times contrary to what they said on the

12    witness stand?

13        You, ladies and gentlemen, must give the testimony of

14    each witness the amount of credibility and weight that you

15    think it deserves.

16        You must also keep in mind that a simple mistake does not

17    mean that a witness is not telling the truth.  You must

18    consider whether any misstatement was an intentional falsehood

08:50    19    or whether it was a simple lapse in memory and what

20    significance should be attached to that testimony.

21        Now, as I've previously told you, the attorneys in this

22    case are advocates for their competing parties, their

23    competing clients, and they have a duty to object when they

24    believe evidence is offered that should not be admitted under

25    the rules of the Court.

08:50

1       When the Court sustained an objection to a question

2   addressed to a witness, you must disregard that question

3   entirely and you may draw no inference from its wording or

4   guess or speculate about what the witness would have said if I

5   had allowed them to answer the question.  However, if the

6   objection was overruled, then you may treat the answer to the

7   question just as you would treat any other question as if no

8   objection had been made.

9       Now, by allowing the testimony or other evidence to be

10  introduced over the objection of an attorney, the Court in so

08:51   11  doing did not indicate any opinion about the weight or the

12  effect of that evidence.

13      Now, at various times during the trial, it's been

14  necessary for the Court to talk with the attorneys outside of

15  your hearing either here at the bench or by calling a recess

16  and talking to them while you were outside of the courtroom.

17  This happens because there are things that arise during trials

18  that do not involve the jury.  You should not speculate,

19  ladies and gentlemen, about what was said during any of those

08:51   20  discussions that took place outside of your presence.

21      Now, there are two types of evidence that you may

22  consider in properly finding the truth as to the facts in this

23  case.  One is direct evidence, such as the testimony of an

24  eyewitness.  The other is indirect or circumstantial

25  evidence--that is, the proof of a chain of circumstances that

08:52

1    indicates the existence or non-existence of certain other

2    facts.

3         You should know that as a general rule, the law makes no

4    distinction between direct evidence or circumstantial

5    evidence, but simply requires that you find the facts based on

6    the evidence presented, both direct and circumstantial.

7         Now, the parties in this case have stipulated or agreed

8    to some facts in this case, and when the parties through their

9    counsel stipulate as to the existence of a fact, then you

10   must, unless otherwise instructed, accept that agreement and

08:52
11   stipulation as evidence and regard that fact as proven.

12        Here Headwater and Samsung have agreed that all the

13   accused products that previously were able to operate with the

14   Samsung Push Platform operated with the Samsung Push Platform

15   in substantially the same way for purposes of technical

16   operations at issue in this case.

17        Headwater and Samsung have also agreed that all the

08:53
18   accused products operate with the Firebase Cloud Messaging in

19   substantially the same way for the purposes of technical

20   operations at issue in this case.

21        Now, certain testimony has been presented to you through

22   the trial in the form of a deposition.  A deposition is the

23   sworn, recorded answers to questions asked to a witness in

24   advance of the trial.  If a witness cannot be present to

08:53
25   testify in person, or if the Rules of Civil Procedure allow

1181

1   the witness to be presented both by live testimony and by

2   deposition testimony, which you've seen in this case, then the

3   witness' testimony can be presented in the form of a

4   deposition.

5       Before the trial began, the attorneys representing the

6   parties questioned these deposition witnesses under oath.  At

7   that time, a court reporter was present and recorded their

08:54   8   sworn testimony.  Deposition testimony, ladies and gentlemen,

9   is entitled to the same consideration by you as testimony

10   given by a person from the witness stand in open court.  And

11   you should judge, to the best of your ability, the credibility

12   and importance of deposition testimony just as if the witness

13   had testified in person in open court.

14       Now, while you should consider only the evidence in this

08:54   15   case, you are permitted to draw such reasonable inferences

16   from the testimony and exhibits as you feel are justified in

17   the light of common experience.  Said another way, you may

18   make deductions and reach conclusions that reason and common

19   sense lead you to draw from the facts that have been

20   established by the testimony and the evidence in this case.

21       However, you should not base your decision on any

22   evidence not presented by the parties during this case,

08:55   23   including your own personal experiences with any of the

24   parties, the products, or the services that might be at issue.

25       Now, unless I instruct you otherwise, you may properly

1    determine that the testimony of a single witness may be

2    sufficient to prove any fact, even if a greater number of

3    witnesses might have testified to the contrary, if after

4    considering all the evidence you believe that single witness.

08:55    5    Also, ladies and gentlemen, when knowledge of a technical

6    subject might be helpful to you, the jury, a person who has

7    special training and experience in that technical

8    field--they're called an expert witness--is permitted to state

9    his or her opinions on those technical matters.  However, you

10    are not required to accept any of the opinions of an expert

11    witness or any witness for that matter.  It is solely up to

12    you to decide whether to rely on those opinions that are given

08:56    13    by expert witnesses.

14    Also, certain exhibits have been shown to you during the

15    trial that were illustrations.  We call these types of

16    exhibits demonstrative exhibits.  They're sometimes simply

17    called demonstratives for short.  Demonstrative exhibits are a

18    party's depiction, picture, or model to describe something

19    involved in the trial.  If your recollection of the evidence

20    differs from the demonstratives, you should rely on your

21    recollection of the evidence.

08:56    22    Demonstrative exhibits are sometimes called jury aids.

23    And these demonstrative exhibits are not evidence, but a

24    witness' testimony given while using a demonstrative is

25    evidence.  Let me be clear--demonstrative exhibits are not

1    going to be available for you to review or consider during

2    your deliberations in the jury room.

3          Now, in any legal action, the facts must be proven by a

08:57    4    required amount of evidence known as the burden of proof.  The

5    burden of proof in this case is on the Plaintiff Headwater for

6    some issues and on the Defendants Samsung for other issues.

7    And there are two burdens of proof that you will apply in this

8    case.  As I've told you, these are the preponderance of the

9    evidence and clear and convincing evidence.

10         The Plaintiff Headwater Research, LLC, which you heard

11    referred to throughout the trial simply as Headwater or as the

12    Plaintiff, it has the burden of proving patent infringement by

08:58    13    a preponderance of the evidence.  Headwater also has the

14    burden of proving damages for any patent infringement by a

15    preponderance of the evidence.

16         A preponderance of the evidence means evidence that

17    persuades you that a claim is more probably true than not

18    true.  Sometimes this is talked about as being the greater

19    weight and degree of credible testimony.

20         Now, the Defendants in this case are Samsung Electronics

08:58    21    Company, Limited, and Samsung Electronics America, Inc., which

22    you've heard referred to consistently throughout the trial as

23    Samsung or as the Defendants.  And when you've heard the term

24    Samsung, that refers to both of these Defendants.

25         Now, the Defendants Samsung has the burden of proving

08:58

1    invalidity of any of Headwater's presented patent claims by

2    clear and convincing evidence.  Clear and convincing evidence

3    means evidence that produces in your mind an abiding

4    conviction that the truth of the party's factual contentions

5    are highly probable.

6        Now, although proof to an absolute certainty is not

7    required to satisfy the clear and convincing evidence

8    standard, the clear and convincing evidence standard requires

9    a greater degree of persuasion than is necessary for the

10   preponderance of the evidence standard.  If proof establishes

11   in your mind, ladies and gentlemen, an abiding conviction in

08:59

12   the truth of the matter, then the clear and convincing

13   evidence standard has been met.

14       Now, as I've previously told you, these two burdens of

15   proof are not to be confused with a third burden of proof

16   known as beyond a reasonable doubt, which, as I've told you,

17   is the burden of proof applied in a criminal case and which

18   has no application in a civil case like this.  Beyond a

19   reasonable doubt is a higher standard than both the

20   preponderance of the evidence standard and the clear and

08:59

21   convincing evidence standard.

22       Now, as I did at the beginning of the case, I'll give you

23   a summary of each side's contentions and I'll then provide you

24   with detailed instructions on what each side must prove in

25   order to win on its contentions.  As you know and as I've

previously told you, this is an action for patent

infringement.

The Plaintiff Headwater contends that the Samsung Defendants infringe certain claims of Headwater's patents-in-suit.  Remember, there are two patents-in-suit in this case.  They are U.S. Patent No. 9,198,117, which you've heard referred to consistently throughout the trial as the '117 Patent, as well as United States Patent No. 8,406,733, which you've heard referred to consistently throughout the trial as the '733 Patent.

Headwater contends that Samsung infringes the following claims of the patents-in-suit.  They are claims 1, 12, and 16 of the '117 Patent, and they are claims 1, 7, and 19 of the '733 Patent.  And you've heard these referred to during the trial as the asserted claims.  You've heard the two patents referred to as the asserted patents.  You've also heard them called the patents-in-suit.

Now, Headwater contends that it's entitled to money damages in the form of a reasonable royalty for Samsung's infringement by making, using, importing, selling, or offering for sale in the United States certain products which I will refer to and which you've heard referred to as the accused products.  The accused products, ladies and gentlemen, include Samsung mobile phones and tablets, and push messaging servers used by such devices.  Headwater seeks damages for Samsung's

1    infringement of the asserted claims.

2        Samsung denies that it infringes any of the asserted

3    claims.  Specifically, Samsung denies that it makes, uses,

4    offers for sale, sells, or imports for sale in the United

5    States any accused product that infringes any of the asserted

6    claims.  Samsung also denies that it owes Headwater any money

7    damages.

09:02    8        Samsung further contends that the asserted claims are

9    invalid because they are anticipated or obvious in view of the

10    prior art, and because they fail to satisfy the written

11    description requirement.  Invalidity is a defense to

12    infringement, and Headwater denies that any of the asserted

13    claims are invalid.

14        Invalidity and infringement are separate and distinct

09:02    15    issues, and your job is to decide whether Samsung has

16    infringed any of the asserted claims and whether those claims

17    are invalid.  If you decide that any of the asserted claims

18    has been infringed and is not invalid, then you'll need to

19    decide what amount of money damages, if any, should be awarded

20    to Headwater to compensate it for the infringement that you

21    have found.

22        Now, before you can decide many of the issues in this

09:03    23    case, you'll need to understand the role of the patent claims.

24    The patent claims are the numbered sentences at the end of

25    each patent.  The claims are important, ladies and gentlemen,

because it is the words of the claims that define what a
patent covers.

        The figures and the text in the rest of the patent
provide a description and/or examples of the invention and
they provide a context for the claims, but it is the claims
themselves that define the breadth of the patent's coverage.
Each claim is effectively treated as if it were a separate
patent, and each claim may cover more or may cover less than
another claim.  As a result, what a patent covers depends, in
turn, upon what each of its claims covers.

        Now, you'll first need to understand what each claim
covers in order to decide whether or not there is infringement
of the claim and to decide whether or not the claim is
invalid.

        Now, the law says that it's my role to define the terms
of the claims and it's your role to apply my definitions to
the issues that you're asked to decide in this case.
Therefore, as I explained at the beginning of the case, I've
already determined the meanings of certain claim language and
I've provided those definitions to you regarding that claim
language, and those definitions are included in your juror
notebooks.  You must accept these definitions of these claim
terms that I have given you as being correct.  And it's your
job to take these definitions and apply them to the issues
that you are deciding, including the issues of infringement

1        and invalidity.

2            Now, you should disregard any evidence presented at the

3        trial that contradicts or is inconsistent with these

4        constructions or definitions which the Court has given you.

5            Now, for claim limitations or claim language that I have

09:05   6        not expressly construed--that is, I haven't interpreted or

7        defined it for you--you are to use and apply the plain and

8        ordinary meaning of that language as understood by one of

9        ordinary skill in the art, which is to say, the field of the

10       technology of the patent at the time of the alleged invention.

11           The meaning of the words of the patent claims must be the

12       same when deciding both infringement and when deciding

13       invalidity.  You've been provided with copies of the two

09:05   14       patents-in-suit which are in your juror notebooks, and you may

15       refer to them throughout your deliberations.  You may refer to

16       everything included in your juror notebooks during your

17       deliberations.

18           Now, several times in these instructions I have referred

19       to or I will refer to a person of ordinary skill in the field

20       of the invention, or a person of ordinary skill in the art,

21       which is sometimes referred to as a POSITA, P-O-S-I-T-A, a

09:06   22       person of ordinary skill in the art.

23           In deciding the level of ordinary skill in the field, you

24       should consider all the evidence introduced at trial,

25       including but not limited to, the levels of education and

1  experience of persons actively working in the field of the

2  patents-in-suit, the types of problems encountered in the

3  field, the previous solutions to those problems, the rapidity

09:06  4  with which innovations are made, and the sophistication of the

5  technology in the field of the patents-in-suit.

6      The claims, ladies and gentlemen, are intended to define

7  in words the boundaries of the inventor's rights.  Only the

8  claims of a patent can be infringed.  Neither the written

9  description or any of the figures or drawings can be

10  infringed.  And each claim must be considered individually.

11      I'll now explain to you how a claim defines what it

09:07  12  covers.

13      A claim sets forth in words a set of requirements.  Each

14  claim sets forth its requirements in a single sentence.  If a

15  product satisfies each of these requirements, then it is

16  covered by that claim.  There can be several claims in a

17  patent, and each claim may be narrower or broader than another

18  claim by setting forth more or fewer requirements.

19      The coverage of a patent is assessed on a claim-by-claim

09:08  20  basis, and in patent law the requirements of a claim are

21  also -- are often, rather, referred to as the claim elements

22  or the claim limitations.  And when a product meets all the

23  requirements of a claim, the claim is said to cover that

24  product, and that product is said to fall within the scope of

25  that claim.

09:08

1    In other words, a claim covers a product so long as each
2    of the claim elements or limitations are present in that
3    product.  If a product is missing even one limitation or
4    element, the product is not covered by the claim.  And if the
5    product is not covered by the claim, it does not infringe the
6    claim.

7    Now, if a product is covered by a claim, that product
8    infringes the claim.  If the product is not covered by a
9    claim, as I said, the product does not infringe the claim.

10   Now, the beginning portion or preamble of a claim often

09:08

11   uses the word 'comprising'.  The word 'comprising' when used
12   in the preamble of a claim means including but not limited to
13   or containing but not limited to.  When comprising is used in
14   the preamble, if you decide that an accused product includes
15   all of the requirements of that claim, that claim is infringed
16   and that is true even if the accused product contains
17   additional elements.

18   For example, a claim to a table comprising a tabletop,

09:09

19   legs, and glue would be infringed by any table that includes a
20   tabletop, legs, and glue, even if a table also contains other
21   features or structures, such as leaves that might expand the
22   size of the tabletop or wheels that might go on the ends of
23   the legs.

24   Now, this case, ladies and gentlemen, involves two types
25   of patent claims--independent claims and dependent claims.  In

09:09    1    this case, claim 1 of the '117 Patent and claim 1 of the '733

2    Patent are independent claims.  Claims 12 and 16 of the '117

3    Patent and claims 7 and 19 of the '733 Patent are dependent

4    claims.

5        An independent claim sets forth all the requirements that

6    must be met in order for the product to be covered by that

7    claim.  It is not necessary to look at any other claim to

09:10    8    determine what an independent claim covers--it is independent.

9        However, a dependent claim does not itself recite all the

10    requirements of the claim, but refers to another claim for

11    some of its requirements.  In this way, the claim refers to or

12    depends from another claim.  A dependent claim incorporates

13    all the requirements of the claim or claims to which it

14    refers, or from which it depends, as well as its own

09:10    15    additional requirements.

16        So to determine what a dependent claim covers, it's

17    necessary to look at both the dependent claim itself and any

18    other claim or claims to which it refers.  Now, a product that

19    meets all the requirements of both the dependent claim and the

20    claim to which it refers or from which it depends is covered

21    by that dependent claim.

22        Now, because a dependent claim incorporates all the

09:11    23    features of the independent claim to which it refers, if you

24    find that a claim is not infringed, then the claims that

25    depend on that claim are not infringed.  If you find that the

1192

1    independent claim on which the dependent claim depends is not

2    infringed, then the dependent claim is not infringed, to say

3    it another way.

4         Now, I'll instruct you on how to determine whether or not

5    Headwater has proven that Samsung has infringed any of the

09:11   6    asserted claims regarding the asserted patents.

7         If a person or a corporation makes, uses, sells, or

8    offers to sell within the United States, or imports into the

9    United States what is covered by a patent claim without the

10   patent owner's permission, that person or corporation is said

11   to infringe the patent claim.

12        A party makes a claimed invention when it combines all

13   the elements of the claim.  A party uses a claimed system when

09:12   14   it controls the system and obtains benefit from it.  A party

15   obtains a benefit from a system if it obtains a benefit from

16   each and every element of the claimed system.

17        A party does not have to exercise physical control or

18   direct control over each individual element of the system in

19   order to use the claimed system.  The use of a claimed system

09:12   20   occurs where the system as a whole is put into service, that

21   is, a place where control of the system is exercised and

22   beneficial use of the system is obtained.

23        In reaching your decision on infringement, keep in mind,

24   ladies and gentlemen, that only the claims of a patent can be

25   infringed.  You must compare the asserted claims to the

accused products and determine whether or not there is

infringement.  This is the only correct comparison.

09:13     You should not compare the accused products to any

specific examples set out in the patents-in-suit or to the

prior art in reaching your decision on infringement.

You must determine whether or not there is infringement

separately for each asserted claim.  However, if you find that

an independent claim is not infringed, then there cannot be

infringement of any dependent claim that refers to or depends

09:13   from that independent claim, as I've told you.  But on the

other hand, if you find that an independent claim has been

infringed, you must still separately decide whether the

accused products meet the additional requirements of any

claims that depend from that independent claim.  That is, the

dependent claims.  And you must separately decide whether any

dependent claims that refer to an independent claim have been

infringed.

09:14     Now, you must reach your decision as to each assertion of

infringement based on my instructions to you about the meaning

and scope of the claims, the legal requirements for

infringement, and the evidence presented to you by both of the

parties over the course of the trial.

I'll now instruct you on the specific rules you must

follow to determine whether Headwater, the Plaintiff, has

proven that Samsung, the Defendants, have directly infringed

09:14

one or more of the asserted claims involved in this case.

An asserted claim can be directly infringed even if the alleged direct infringer did not have knowledge of the patent and without the direct infringer knowing that what it did was infringing the claim.  An asserted claim may also be directly infringed even though the accused direct infringer believed in good faith that what it did was not infringing the patent.

09:15

Now, you have heard in this case that Headwater did not communicate with Samsung about its position on infringement and damages prior to the filing of this lawsuit.  The presence or absence of pre-suit notice is not a factor to consider in determining whether or not the asserted claims have been directly infringed.

Likewise, damages in a patent case are based solely on the reasonable royalty that would have resulted from a hypothetical negotiation between the parties at the time the alleged infringement first began.  Accordingly, the presence or absence of any pre-suit notice is not a factor to consider regarding a determination of direct infringement or a related award of damages.

09:16

Now, you must determine separately for each asserted claim whether or not there is infringement.  In order to provide direct infringement of a patent claim, Headwater -- actually I think it's better said in order to prove direct infringement of a patent claim, Headwater must

1    show by a preponderance of the evidence that an accused

2    product includes each and every limitation of an asserted

3    claim.

4        An accused product infringes a claim if it is configured

5    to satisfy each and every claim element, even though it may

6    also be capable of non-infringing modes of operation.  If a

09:17   7    single limitation of an asserted claim is not met by a

8    preponderance of the evidence by the accused product, then you

9    must find no infringement.

10       A required claim is present if it exists in an accused

11   product as it is described in the claim language, as it would

12   be understood by its plain and ordinary meaning to one of

13   ordinary skill in the art.  A single feature of an accused

09:17   14   product may satisfy more than one element of a patent claim.

15   A product may infringe even if the product contains additional

16   features or elements not required by the claims.  However, if

17   an accused product omits any element recited in a claim, then

18   you must find that the product in question does not infringe

19   that claim.

20       In this case, Headwater has also accused Samsung of

09:17   21   indirect infringement by actively inducing the users of the

22   accused products to directly infringe various asserted claims.

23   As with direct infringement, you must determine whether there

24   has been active inducement on a claim-by-claim basis.

25       Samsung is liable for induced infringement of an asserted

claim only if Headwater proves by a preponderance of the

evidence that:

     1.  Acts have been carried out by users of the accused

09:18  products that directly infringe that claim;

     2.  Samsung has taken action during the time the asserted

patent was in force, intending to cause the infringing act by

users of the accused products; and

     3.  Samsung has been aware of the asserted patent and has

known that the acts of the users of the accused products

constitute infringement of the asserted patents or was

willfully blind to that infringement.

09:18       Willful blindness, ladies and gentlemen, is established

if Samsung believed there was a high probability that the

acts, if taken, would constitute infringement of the asserted

claims, but deliberately avoided confirming that belief.

       Now, to establish induced infringement, it is not

sufficient that someone else directly infringes a claim, nor

is it sufficient that the company accused of inducing

09:19  another's direct infringement merely had knowledge or notice

of an asserted patent or had been aware of the acts by another

that allegedly constitute direct infringement.

       The mere fact that the company accused of inducing

another's direct infringement had known or should have known

that there was a substantial risk that someone else's acts

would infringe is not sufficient.  Rather, in order to find

09:19

1    inducement, you must find that Samsung specifically intended

2    or was willfully blind to that infringement by the users of

3    the accused products.

4        I'll now instruct you on the rules that you must follow

5    in deciding whether or not Samsung has proven that any

6    asserted claim from the asserted patents are invalid.

7        Patent invalidity, ladies and gentlemen, is a defense to

8    patent infringement.  The fact that the Patent Office, the

9    PTO, grants a patent does not necessarily mean that any

09:20    10   invention claimed in the patent, in fact, deserves the

11   protection of a patent.

12       In this case you have the ultimate responsibility for

13   deciding whether the asserted claims are valid or invalid.  To

14   prove that any of the asserted claims are invalid, Samsung

15   must persuade you by clear and convincing evidence--that is,

16   you must conclude that it is highly probable that a claim is

17   invalid.

09:20    18       An issued United States patent is accorded a presumption

19   of validity based on the presumption that the United States

20   Patent and Trademark Office, which you've heard referred to

21   during the trial as either the Patent Office, or the PTO,

22   acted correctly in issuing the patent.  This presumption of

23   validity extends to all issued United States patents.

24       However, that presumption of validity can be overcome if

09:21    25   clear and convincing evidence is presented in court that the

1       patent is invalid.  If one claim of a patent is invalid, this

2       does not mean that any other claim is necessarily invalid.

3              Now, Samsung alleges that the accused -- excuse me, the

4       asserted claims of the asserted patents are invalid for three

5       different reasons.  They are anticipation, obviousness, and

6       lack of adequate written description.

09:21   7              Like infringement, invalidity is determined on a

8       claim-by-claim basis.  You must determine separately for each

9       claim whether that claim is invalid.

10             Claims are construed in the same way for determining

11      infringement as for determining invalidity.  And you must

12      apply the claim language consistently and in the same manner

13      for the issues of infringement as well as for the issues of

14      invalidity.  In making your determination as to invalidity,

09:22   15      you should consider each claim separately.

16             Now, as I explained earlier, a previous device, system,

17      method, publication, or patent that predates the claimed

18      invention is generally called prior art, and may include items

19      that were publicly known or that had been used or offered for

20      sale, or references such as publications or patents that

21      disclose the claimed invention or elements of the claimed

22      invention.

09:22   23             To qualify as prior art, a device, system, publication,

24      or patent must have been publicly known or used, publicly

25      accessible or published before the priority date of the

1    asserted patent.  An invention is known when the information

2    about it was reasonably accessible to the public on that date.

3    The priority date, ladies and gentlemen, for the asserted

4    patents in this case is January the 28th, 2009.

09:23    5    I'll now instruct you on how to determine whether any of

6    the accused claims from any of the asserted patents are

7    invalid as being anticipated.  In order for someone to be

8    entitled to a patent, the invention must actually be new.  In

9    general, inventions are not new when the identical product,

10    method, or process has been made or used or disclosed before.

11    Samsung contends that all of the asserted claims of the

09:23    12    asserted patents are invalid because the claimed inventions

13    were not new.  In other words, Samsung contends that the

14    asserted claims are anticipated by the prior art.

15    Anticipation requires that all the requirements of a

16    patent claim be disclosed in a single prior art reference or

17    system.  Also, the single prior art reference or system must

18    disclose all elements of the claim arranged or combined in the

09:24    19    same way as in the claim.

20    Anticipation must be determined on a claim-by-claim

21    basis, and Samsung must prove by clear and convincing evidence

22    that an asserted claim is anticipated by the prior art

23    reference or system.

24    To anticipate the invention, the prior art does not have

25    to use the same words as the claim, but all the requirements

09:24

1    of the claim must have been disclosed, either as stated

2    expressly or implied, to a person having ordinary still in the

3    art in the technology of the invention, so that looking at

4    that one reference, that person could make and use the claimed

5    invention.  Keep in mind that the Defendants may not establish

6    anticipation by arguing that the accused products practice the

7    prior art, or by comparing the accused products to a prior art

8    reference.

09:25

9        Now, Samsung can show that an asserted claim was not new

10   if the invention described in such claim was first made or

11   invented by someone else in the United States before January

12   the 28th, 2009, and that other person had not abandoned the

13   invention or kept it secret.  If the invention of a patent

14   claim was first made or invented by someone else, you must

15   find that the patent claim is invalid.

09:25

16       Samsung also contends that the asserted claims of the

17   asserted patents are invalid as being obvious.  Even though an

18   invention may not have been identically disclosed or described

19   in a single prior art reference or system before it was made

20   by an inventor, in order to be patentable, the invention must

21   also not have been obvious to a person of ordinary skill in

22   the field of the technology of the patent at the time the

09:26

23   invention was made.

24       To establish that a claim is obvious, Samsung must prove

25   by clear and convincing evidence that the claimed invention

1    would have been obvious to persons having ordinary skill in

2    the art at the time the invention was made in the field of the

3    technology of the patent.

4        In determining whether a claimed invention is obvious,

5    you must consider the level of ordinary skill in the field

09:26   6    that someone would have had as of the priority date, which

7    I've explained to you earlier, the scope and content of the

8    prior art, and any differences between the prior art and the

9    claimed invention.

10       Keep in mind, ladies and gentlemen, that the existence of

11   each and every element of the claimed invention in separate

12   prior art does not necessarily prove obviousness.  Most, if

13   not all, inventions rely on the building blocks of elements

14   that were already known in the prior art.

09:27   15       Now, in considering whether the claimed invention was

16   obvious, you must first determine the scope and content of the

17   prior art.  The scope and content of the prior art for

18   deciding whether the invention was obvious includes at least

19   prior art in the same field in the claimed invention.  It also

20   includes prior art from different fields that a person of

21   ordinary skill in the art would have considered when trying to

09:27   22   solve the problem that is addressed by the invention.

23       Further, the teachings, suggestions, and motivations may

24   also be found within the knowledge of a person of ordinary

25   skill in the art, including inferences and creative steps

1    including logic, judgment, and common sense that a person of

2    ordinary skill in the art would employ.

3         A person of ordinary skill may be able to fit the

4    teachings of multiple pieces of prior art together like pieces

09:28    5    of a puzzle.  The person of ordinary skill in the art would

6    have the capability of understanding the scientific and

7    engineering principles applicable to the pertinent art.

8         In considering whether a claimed invention is obvious,

9    you may, but are not required, to find obviousness, if you

10   find by clear and convincing evidence that as of the priority

11   date there was a reason that would have prompted a person

09:28    12   having ordinary skill in the field to combine the known

13   elements in a way that the claimed invention does, taking into

14   account the following factors:

15        1.  Whether the claimed invention was merely the

16   predictable result of using prior art elements according to

17   their known function;

18        2.  Whether the claimed invention provides an obvious

19   solution to a known problem in the relevant field;

20        3.  Whether the prior art teaches or suggests the

09:29    21   desirability of combining elements in the claimed inventions;

22        4.  Whether the prior art teaches away from combining

23   elements in the claimed invention;

24        5.  Whether it would have been obvious to try the

25   combination of elements, such as when there is a design need

1    or market pressure to solve a problem, and there are a finite

2    number of identified predictable solutions; and

09:29    3        6.  Whether the change resulted more from design

4    incentives or other market forces.

5        If you find that a reason existed at the time of the

6    invention to combine the elements of the prior art to arrive

7    at the claimed invention, and there would have been a

8    reasonable expectation of success for doing so, this evidence

9    would make it more likely that the claimed invention was

10    obvious.

11        Now, prior art is not limited to the patents and

12    published materials, but includes the general knowledge of a

09:30    13    person of skill in the art in the field of the invention.

14    Also, Samsung does not need to show that one of ordinary skill

15    would actually have combined the physical structures of the

16    references.  A person of ordinary skill in the art need only

17    be motivated to combine the teachings, but that motivation

18    must be shown.

19        In determining whether the claimed invention was obvious,

20    consider each claim separately.  Do not use hindsight, ladies

09:31    21    and gentlemen; consider only what was known at the time of the

22    invention.  In other words, you should not consider what a

23    person of ordinary skill in the art would know now or what has

24    been learned from the teachings of the asserted patents.

25        In making these assessments, you should take into account

09:31

any objective evidence, sometimes called secondary

considerations, that may have existed at the time of the

invention, and afterwards, that may shed light on the

obviousness or not of the claimed invention.

Now, the following are possible secondary considerations,

but it's up to you, ladies and gentlemen, to determine whether

secondary considerations of non-obviousness exist at all.

These are:

1.  Whether the invention was commercially successful as

the result of the merits of the claimed inventions, rather

than the result of design needs or market pressure,

09:31

advertising, or similar activities;

2.  Whether the invention satisfied a long-felt need;

3.  Whether the inventor proceeded contrary to accepted

wisdom in the field;

4.  Whether others tried, but failed, to solve the

problem solved by the claimed invention;

5.  Whether others invented the invention at roughly the

same time;

6.  Whether others copied the claimed invention;

09:32

7.  Whether the claimed invention achieved unexpected

results;

8.  Whether others in the field praised the claimed

invention;

9.  Whether there were changes or related technologies or

market needs contemporaneous with the invention;

    10.  Whether persons having ordinary skill in the art of the invention expressed a surprise or disbelief regarding the claimed invention; and

    11.  Whether others accepted licenses under the asserted patents because of the merits of the claimed invention.

    These factors are relevant if there is a connection or a nexus between the factors and what differentiates the invention from the prior art.  Headwater has the burden of establishing this connection or nexus.  Moreover, even if you conclude that some of the above indicators have been established, those factors should be considered along with all of the other evidence in the case in determining whether Samsung has proven that the invention would have been obvious.

    Now, Samsung also contends that the asserted claims of the patents-in-suit are invalid for failure to satisfy the written description requirement.  As I previously explained, to obtain a patent, one must first file an application with the PTO, the United States Patent and Trademark Office.  The process of obtaining a patent is called patent prosecution.  And the application submitted to the PTO contains within it what is called a specification.

    The specification is required to contain a written description of the claimed invention telling what the invention is, how it works, how to make it, and how to use it.

09:34

1    The written description requirement is designed to ensure that

2    the inventor was in possession of the full scope of the

3    claimed invention on the patent's priority date.

4        To succeed on its claims of a lack of an adequate written

5    description as to the patents-in-suit, Samsung must show by

6    clear and convincing evidence that a person having ordinary

7    skill in the field reading the patent specification as of the

8    priority date of the patent would not have understood that the

9    specification describes the full scope of the invention as it

09:34

10   is claimed in the claims of the patent.  If a patent claim

11   lacks adequate written description, it is invalid.

12       In deciding whether the patents-in-suit satisfy this

13   written description requirement, you must consider the

14   description from the viewpoint of a person having ordinary

15   skill in the field of the technology of the patent as of the

16   filing date of the patents-in-suit.  The specification must

17   describe the full scope of the claimed invention, including

09:35

18   each element thereof, either expressly or inherently.

19       A claimed invention -- excuse me.  A claimed element is

20   disclosed inherently if a person having ordinary skill in the

21   field as of the priority date would have understood that

22   element is necessarily present in what the specification

23   discloses.

24       The written description does not have to be in the exact

09:35

25   words of the claim.  The requirement may be satisfied by any

combination of words, structures, figures, diagrams, formulas,
et cetera, contained in the patent specification.  Adequate
written description does not require either examples or an
actual reduction to practice of the claimed invention.

Now, in evaluating whether the specification has provided
an adequate written description, you may consider such factors
as:

09:36    1.  The nature and scope of the patent claims;

2.  The complexity, predictability, and maturity of the
technology at issue;

3.  The existing knowledge in the relevant field; and

4.  The scope and content of the prior art.

The issue of written description is decided on a
claim-by-claim basis, not as to the entire patent or group of
claims.

09:37    Now, oral testimony alone, ladies and gentlemen, is
insufficient to prove prior invention or that something is
prior art.  A party seeking to prove prior invention or that
something is prior art must provide evidence that supports and
corroborates a witness' oral testimony.

I'll now instruct you about the measure of damages.  By
09:37    instructing you on damages, however, I am not suggesting which
party should win this case on any issue.  If you find that
Samsung has infringed any of the asserted claims, and that
those claims are not invalid, then you must consider what

1       amount of damages to award to Headwater.

2           Headwater has the burden to establish the amount of its

3       damages by a preponderance of the evidence.  In other words,

09:37   4   you should award only those damages that Headwater establishes

5       that it more likely than not suffered as a result of Samsung's

6       infringement.  Now, while Headwater is not required to prove

7       the amount of its damages with mathematical precision, it must

8       prove them with reasonable certainty.  Headwater is not

9       entitled to damages that are remote or that are only

10      speculative.

11          The damages that you award, if any, must be adequate to

09:38   12  compensate Headwater for any infringement that you may have

13      found, but in no event may the amount be less than a

14      reasonable royalty for the use made of the invention by

15      Samsung.  You must not award Headwater more damages than are

16      adequate to compensate it for any infringement.  And you also

17      must not include any additional amount in any damage award for

18      the purposes of punishing Samsung or for the purpose of

19      setting an example.

09:38   20          The purpose of a damages award is to put the plaintiff in

21      the same position it would have been in if the defendant would

22      have taken a license at the time of the first alleged

23      infringement.

24          I'll now instruct you on how to calculate reasonable

25      royalty damages, if you find damages are appropriate to award

1        in this case.

2             Headwater seeks damages in the form of a reasonable

09:39   3        royalty.  A royalty is a payment made to a patent owner in

4        exchange for the right to make, use, sell -- or sell the

5        claimed invention.  A reasonable royalty is the amount of

6        money that Headwater and Samsung would have agreed to in a

7        hypothetical license negotiation taking place at a time just

8        prior to when the infringement first began, which in this case

9        the parties agree is February or March of 2013.

09:39   10            In considering this hypothetical negotiation, you should

11       focus on what the expectations of the patent owner and the

12       alleged infringer would have been had they entered into an

13       agreement at that time, and had they acted reasonably in their

14       negotiations.

15            In determining this, you must assume that both parties

16       believed the asserted patents were valid and infringed and

17       that both parties were willing to enter into an agreement.

09:40   18       The reasonable royalty you determine must be a royalty that

19       would have resulted from the hypothetical negotiation and not

20       simply a royalty that either party would have preferred.

21            Evidence of things that happened after the infringement

22       first began can be considered in evaluating a reasonable

23       royalty only to the extent that the evidence aids in assessing

24       what royalty would have resulted from a hypothetical

25       negotiation.

09:40  1    The law requires, ladies and gentlemen, that any royalty

2    awarded to Headwater correspond to the value of the patented

3    invention within the accused product, as distinct from other

4    unpatented features.  This is particularly true where the

5    accused products have multiple features and multiple

6    components not covered by the patent or where the accused

7    products work in conjunction with other non-patented items.

09:41  8    The amount you find as damages must be based on the value

9    attributable to the patented invention, as distinct from the

10   unpatented features of the accused products or other factors

11   such as marketing or advertising or size or market position.

12   A royalty compensating Headwater for damages must reflect

13   the value attributable to the infringing features of the

14   accused products and nothing more.  The process of separating

09:41  15   the value of the allegedly infringing features from the value

16   of all other features is called apportionment.

17   When the accused infringing products have both patented

18   and unpatented features, your award must be apportioned so

19   that it is based only on the value of the patented features.

20   You may not award damages based on Samsung's revenue from

21   products that you do not find have infringed.

09:42  22   A reasonable royalty is the amount of royalty payment

23   that a patent owner and the alleged infringer would have

24   agreed to in a hypothetical negotiation taking place at a time

25   immediately prior to when the first infringement began.

1       If you find that Headwater is entitled to damages, both

2   Headwater and Samsung contend that the parties would have

3   agreed to a fully paid-up lump-sum royalty at the time of the

09:42   4   hypothetical negotiation.  A lump-sum royalty is when the

5   infringer pays a single price for a license to use a patent

6   throughout the life of the patent.  As such, a lump-sum

7   royalty compensates the patent holder for damages both for

8   past infringement and for future infringement throughout the

9   life of the patent.  In this case, ladies and gentlemen, the

10   asserted patents expire on March the 2nd, 2029.

09:43   11       In determining a reasonable royalty, you should consider

12   all the facts known and available to the parties at the time

13   of this hypothetical negotiation.  Some of the kinds of

14   factors that you may consider in determining the reasonable

15   royalty are:

16       1.  The royalties received by the patentee for the

17   licensing of the patents-in-suit, proving or tending to prove

18   an established royalty;

19       2.  The rates paid by the licensee for the use of other

09:43   20   patents comparable to the patents-in-suit.  Comparable license

21   agreements include those covering the use of the claimed

22   invention or similar technology;

23       3.  The nature and scope of the license, as exclusive or

24   non-exclusive, or as restricted or non-restricted in terms of

25   territory or with respect to whom the manufactured product may

be sold;

09:44

4.   The licensor's established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

25.   The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business;

6.   The effect of selling the patented specialty in
09:44
promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sale;

7.   The duration of the patent and the term of the license;

8.   The established profitability of the product made under the patents, its commercial success, and its current popularity;

09:45
9.   The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10.   The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefit to those who have used the invention;

11.   The extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

09:46

12.   The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13.   The portion of the realizable profits that should be credited to the invention as distinct from non-patented elements, the manufacturing process, business risks, or

09:46

significant features or improvements added by the infringer;

14.   The testimony and opinions of qualified experts; and

15.   The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed to -- or would have agreed upon (at the time the infringement began) if both had been trying reasonably and voluntarily to reach an agreement; that is, the amount which a prudent

09:46

licensee who desired as a business proposition to obtain a license to the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

You may have heard these factors referred to, ladies and gentlemen, as the *Georgia-Pacific* factors.  No one of these

09:47

factors is dispositive, and you can and should consider all

1    the evidence that's been presented to you in this case on each

2    of these factors.

3        And you may also consider any other factors which, in

4    your mind, would have increased or decreased the royalty the

5    alleged infringer would have been willing to pay and the

6    patent holder would have been willing to accept, acting as

7    normally prudent business people.

8        As I explained with respect to the *Georgia-Pacific*

09:47    9    factors, when determining a reasonable royalty, comparable

10    license agreements are one factor that may inform your

11    decision as to the proper amount and form of a reasonable

12    royalty award, similar to the way in which the value of a

13    house is determined relative to comparable houses sold in the

14    same neighborhood.

15        Now, whether a license agreement is comparable to the

16    license under the hypothetical license scenario depends on

17    many factors, such as whether they involve comparable

09:48    18    technologies, comparable economic circumstances, comparable

19    structure, and comparable scope.  If there are differences

20    between a license agreement and the hypothetical

21    negotiation -- excuse me, the hypothetical license between

22    Headwater and Samsung, you must take those into account when

23    you make your reasonable royalty determination.

24        Now, with these instructions, ladies and gentlemen, we're

25    ready to hear closing arguments from the attorneys in the

1    case.

09:49    2    Plaintiff may present its first closing argument to the

3    jury at this time.  Would you like warning on your time, Mr.

4    Fenster?

5    MR. FENSTER:  No.  I'll keep my own time, Your

6    Honor.

7    THE COURT:  All right.  You may present your first

8    closing argument.

9    MR. FENSTER:  And, Your Honor, may I have leave to

10    set up a couple of boards?

11    THE COURT:  You may use the easel and the boards as

09:49    12    you wish.

09:49    13    MR. FENSTER:  Thank you.

14    THE COURT:  Please proceed.

15    MR. FENSTER:  Thank you, Your Honor.

16    Good morning, ladies and gentlemen of the jury, and may

17    it please the Court.

09:50    18    On behalf of Headwater and Dr. Raleigh, I want to thank

19    you.  Personally I want to tell you that I am humbled and

20    deeply grateful for your attention in this matter.  You honor

21    our judicial process.

22    My job in closing is to help synthesize all of the

23    evidence that you've heard throughout this trial.  You must

24    feel like you've been drinking from a fire hydrant.  There's

25    been a lot of new stuff that's thrown at you, and I'm going to

09:51

1  try to help synthesize that and put it together for you so

2  that you can answer -- to help you answer the three questions

3  that you have on the jury form.

4      As you've seen in this process, enforcing your

5  constitutional property rights against a company like Samsung

6  is a hard process.  Dr. Raleigh told you about his invention

7  and his belief in the patent system, and that's why he's here.

09:51

8  You've seen just a little of the gauntlet that Samsung has put

9  us through to enforce these patent rights.  You heard about

10 Dr. Raleigh sitting through 35 hours of deposition, but he

11 remains here because of his belief in the jury system and the

12 patent system.

13     The reason that patent cases are tried to juries is

09:52

14 because you are the best mechanism that we have for

15 determining credibility, and patent trials like all trials are

16 about credibility--credibility of the witnesses and

17 credibility of the parties.

18     One of the best tools that you have for determining the

19 credibility of the witnesses is cross examination.  Ladies and

20 gentlemen, anyone can tell a good scripted story on direct,

09:52

21 but it's how they hold up on cross examination that gives you

22 the best ability to determine were they being credible, were

23 they telling you the truth, the full truth, and were they

24 being consistent with the pre-litigation documents that

25 existed before.

1      I'll submit to you that Headwater's witnesses, Dr.

2  Raleigh, Mr. de la Inglesia, Dr. Groehn, Mr. Dell, were solid.

09:53  3  And I'll submit to you, ladies and gentlemen, that Headwater's

4  witnesses on cross examination revealed something a little bit

5  different.

6      Ms. Fair's cross examination of Ms. Roberts revealed

7  that, while she told you, we have full-day battery life and

8  battery life is not important, her position was inconsistent

9  with Samsung's own documents.

09:53  10     Mr. Mirzaie's cross examination of Google's engineer, Mr.

11  Hansen, who came to tell you that the Google GtalkService was

12  the same revealed that there were key differences between the

13  accused system and the prior art system.

14     And I submit to you that Dr. Foster's story just fell

15  apart on cross examination.  He came to tell you that the

16  patent was invalid, then admitted it was.  He had new

09:54  17  non-infringement arguments that he abandoned in the middle.

18  He was impeached repeatedly.

19     We have been laser-focused on meeting our burden of proof

20  and bringing you the evidence that you need to answer the

21  three questions on the verdict form.

22     Samsung, for its part, talked to you about billing, which

23  is not in the claims, they talked to you about ItsOn, which

09:54  24  is -- everyone admitted was not relative to infringement, they

25  talked to you about InterDigital and the fact that it took a

1218

1     while -- that we didn't bring suit earlier.  The Court's

2     instructions make clear that all of those are irrelevant.

3          After Samsung spent hours talking about InterDigital in

4     their opening statement, with Dr. Raleigh, with Mr. Dell, with

09:55   5     Dr. Perryman, hours and hours on InterDigital, this

6     non-binding letter of intent that never led anywhere, what did

7     Dr. Perryman admit?

8          Slide 5, please.

9          He was asked, "So InterDigital was not part of your

10    damages conclusions in terms of the range of royalties that

11    should be owed, nor was it part of Mr. Dell's, either.

12    Correct?"

13         Answer:  "It was not part of mine.  I wouldn't think it

14    would be for anyone."

09:56   15         Dr. Perryman admitted that on the fourth day of trial in

16    cross examination after they spent hours.

17         You can take that down.

18         And Samsung told you that the accused products were

19    materially different in opening statement, materially

20    different than the accused products -- than Headwater's

09:56   21    patents.  But their only real argument, this server argument,

22    is flatly contradicted by their own internal confidential

23    technical documents describing their system.

24         So let's go infringement on the '117 Patent.  The truth

09:56   25    of this trial, ladies and gentlemen, is that Headwater's

1  system -- strike that.  Sorry.

2       The truth of this system, ladies and gentlemen -- the

3  truth of this trial is that Samsung is infringing Headwater's

4  invention.  Dr. Raleigh came up with a new system that

5  securely and specifically allowed the delivery of push

09:57  6  messages from multiple different app servers to individual

7  applications on the phone.  Dr. Foster admitted that their

8  system does everything in this claim, and their only dispute,

9  their only dispute, came down to whether it's one server or

09:58  10  two.

11       So let's take a look to what the evidence showed.  First

12  of all, on infringement, you've heard from two witnesses--Mr.

13  de la Inglesia and Dr. Foster.  Your determination of

14  infringement really comes down to your weighing the

15  credibility of Mr. de la Inglesia's testimony versus that of

09:58  16  Dr. Foster.

17       Slide 9.

18       There are two accused systems in this case--the Samsung

19  push system and Google's FCM or Firecloud [sic] Messaging

20  System.  Both experts agree that the architectures are the

21  same.  If one infringes, they both infringe.  If Samsung,

22  Samsung's push system infringes, FCM infringes.  That is

09:58  23  undisputed among the experts in this case.

24       Slide 72.

25       Mr. de la Inglesia explained that just like the patented

09:59

09:59

10:00

10:01

10:01

1    system, the Samsung push system and the FCM both have a push

2    server, it receives requests from a plurality of application

3    servers on the left.  That request indicates both the

4    application and the device.  It's used by the server to

5    generate a message.  That message is transmitted to a device

6    messaging agent.  That device messaging agent maps that app

7    identifier to a specific app and delivers it safely and

8    securely via a secure interprocess communication.

9        JX 58, please, or -- actually slide 11.

10        This is from JX 58.  You'll have this with you.  And this

11   is Samsung's internal confidential document pre-litigation

12   where they describe their push notification server is

13   everything between the yellow lines.  And you heard Dr. Foster

14   admit that what's described as their push notification server,

15   meets every element of the claim that's required for the

16   push -- for the network messaging server.  He admitted that.

17        So what is the dispute?  The dispute is whether it's a

18   server or two servers.

19        Let's look at what the evidence shows, Samsung's own

20   evidence.  First, there's JX 58.  JX 58 shows that they

21   describe it as a push notification server.  But, ladies and

22   gentlemen, that's not the only document.  And I want to show

23   you the most important document in this case, and it is PTX

24   311.

25        PTX 311 is Samsung's internal architectural design

1221

            1    specification for this system.  Samsung is one of the most

            2    sophisticated, technical companies in the world, and this is

            3    their technical document where they specify the architectural

            4    design of the accused system.

10:01       5        Let's go to -- and this was produced in 2013, before this

            6    litigation.

            7        If we can go to slide 13, please.

            8        In PTX 311, I encourage you to ask for it in the jury

            9    deliberations, the first part is architecture overview.  They

10:02      10    describe their system as a push notification server, and then

           11    they go to 1.2 and they describe the system architecture--how

           12    does Samsung describe their system architecture?  They

           13    describe it as a push server.

           14        Then let's go to slide -- I think it's 14.

10:02      15        At page 7 of PTX 311, they describe the physical

           16    architecture of their system.  And how do they describe it?

           17    They describe the push notification server, a single server,

           18    and they describe it as a push server.  Samsung did not bring

10:03      19    a single engineer to talk to you about their own technical

           20    specification.  They never disputed this; only the lawyers did

           21    and Dr. Foster.

           22        And what did Dr. Foster say?  He disputed that Samsung

           23    calls this the push notification server.  Dr. Foster doesn't

           24    know who wrote this.  He wasn't there in 2013 when they did

           25    this, and he didn't cite you testimony from a single engineer

1222

| | |
|---|---|
| | 1 |
| 10:03 | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| 10:04 | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| 10:05 | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

from Samsung disputing this.

Ladies and gentlemen, this entire case comes down to word games and lawyer games about a network server, and they're trying to suggest that because the push notification server includes -- has what they call a divided architecture, that it has connection managers and request managers, that somehow that means they don't infringe. Their own document shows this divided architecture. You had -- heard some witnesses describe that divided architecture. It is a server architecture that their technical documents describe as a server.

You heard from Mr. Hansen that the -- that there are different architectural --

Slide 15, please.

There are multiple ways to organize a server. He said, but a divided architecture or distributed architecture is still a server architecture nonetheless, and he said sure. And Samsung did not present a single witness to dispute that.

These are not the only documents that describe the system that way. JX 64 --

Slide 16, please.

At JX 64 at page 3, this is another Samsung document, pre-litigation, describing their system as a push server. And we saw that it's consistent with the specification.

Slide 18.

10:05    1         This is the way the patent describes it.  It will be

2    apparent to those of skill in the art that the server names

3    and functional breakouts do not imply that each name is an

4    individual server.  And you've seen that portion at column 22

5    that a server can be a server farm.  And Dr. Raleigh, at slide

6    20, you heard him describe his understanding of a server the

7    exact same way.

10:06    8         And we heard at slide 21 that both Samsung and Google

9    describe the FCM system, which we heard has the identical

10    architecture, the same way.  This is Samsung's document at JX

11    63 describing the Android FCM as the FCM server.  And at slide

12    22, you heard Mr. Hansen testify about his famous YouTube

10:06    13    video that he rehearsed 10 times and described it as an FCM

14    server.

15         The preponderance of the evidence, ladies and gentlemen,

16    is that Samsung's system and the FCM system use a network

17    message server that meets every one of those elements and that

18    we've proven our case for infringement.  There is no

19    dispute--common sense--there is no dispute that those systems

10:07    20    do exactly what Dr. Raleigh's invention was meant to do.  All

21    they're doing is trying to play word games, and those word

22    games are inconsistent with the record evidence and their own

23    internal technical specifications.

24         Their only other argument with respect to '117 Patent was

25    the app identifier being used to map in claim 1[h].  Samsung

10:08    1    didn't even mention that argument in opening.  Dr. Foster

2    admitted that he never even included that argument in his

3    expert report where he had to disclose all of his opinions.

4    And the evidence was undisputed that that app identifier does

5    uniquely identify the application and is used to route that

6    message to the specific application.

7        Mr. de la Inglesia showed infringement of every element

10:08    8    of claim 1 and dependent claims 12 and 16.  It's undisputed in

9    this case, it's agreed among the experts that if you find that

10    we've met our burden of preponderance of the evidence that

11    each of the elements of claim 1 is met, then you should find

12    infringement of claim 1, 12, and 16.

10:08    13        Let's talk a little bit about the '733.  Actually on the

14    '117 Patent, we have to show that Samsung used the system in

15    the United States.  You heard Mr. de la Inglesia, you heard

16    Ms. Roberts, you heard our evidence throughout the case, that

17    Samsung uses those systems from the United States to send push

10:09    18    messages to their devices in the United States.  We've met our

19    burden of proving that.

20        Let's talk about the '733.  They had two arguments.  With

21    the '733, they talked about the service control link.  The

22    service control link was the only argument that they started

23    with in opening statement.  Mr. -- Dr. Foster admitted that he

10:09    24    read it wrong.  He assumed that the control link was dedicated

25    to control-plane communications even though the claim clearly

says that the control link has to carry both control plane and

agent messages.

     And then remember I showed him column -- claim 7, which

says that the agent message is an advertisement or a service

10:10  offer, and then he admitted cleanly that at slide 33.  "So do

you dispute that the service control link has to be configured

to support both control-plane communications and agent

messages, which are data"?

     And he agreed.  He admitted that that's his entire

argument, which was premised on the control link being limited

to control communications, was false.

10:11       And then with respect to agent identifier, their only

argument with -- on 1[h], Mr. de la Inglesia at slide 31, he

explained that the agent -- device agent identifier does map

to the specific device agent.  And Dr. Foster admitted at

10:11  slide 35 that that agent identifier was mapped to that same

package name.  Correct?  And he said, "And that agent

identifier is used to deliver the message content to that

particular device agent.  Correct?"  Answer, Yes.

     Ladies and gentlemen, I submit to you that we have met

our burden of proof by preponderance of the evidence that

every one of these elements is met and that their

10:11  non-infringement arguments did not hold up.  Dr. Foster

crumbled on each of them, and they were thin distinctions to

begin with.

1    And if you find that claim 1 was infringed, it's

2    undisputed that you should find that both -- that the

3    dependent claims are infringed as well.

4    And, Ms. Brunson, may I have --

5    And so the first question that you're going to be asked

10:12    6    is infringement, and you're going to be asked whether we met

7    our burden of proof for each of those elements, and we ask you

8    to find yes on Question 1 for each of the claims because we

9    submit that the evidence showed that we did meet our burden of

10    proof.

11    Now, what do they say in response?  For validity -- slide

12    7.

10:12    13    They say if we infringed FCM, if FCM infringed, then it

14    must be invalid because the prior art Gtalk was the same.

15    Right?  They said that there was no difference between the

16    prior art GtalkService and FCM, and, therefore, if the later

17    one infringes, the earlier invalidates.  That's fine if

18    they're the same, but the evidence showed that there are key

19    differences.

10:13    20    Dr. Raleigh's solution was a secure solution that could

21    support requests and messages from multiple application

22    servers.  That's that secure interprocess communication.

23    So if we can go to slide 38.

10:13    24    The evidence showed at PTX 335 that the early system

25    which had an implicit intent was insecure and that it was so

1    insecure that Google had to pull it from the market and limit

2    it only to one application server, only to Google.

3        They couldn't open it up to third-party app developers.

4    Why?  Because they did not have the secure interprocess

10:14    5    communication.  The evidence is undisputed that that's what

6    happened in this case.

7        Slide 37, please.

8        So the key differences are that the prior art

9    GtalkService was implicit use.  Implicit is insecure,

10    Dr. Foster admitted.  So the prior art GtalkService, because

11    it doesn't secure the interprocess communication service,

10:14    12    doesn't disclose this element.  He said, "I agree with you."

13        On the other hand, the accused systems have an explicit

14    intent that is secure, and Dr. Foster admitted.

15        And with respect to element 1[h], "Is it correct that

16    today you did not offer any opinion disputing that the accused

17    products meet the secure interprocess communication service?"

18        Answer, "That's correct."

10:15    19    Samsung's entire premise, Ms. Smith told you, Mr. McKeon

20    told you, Samsung has told you repeatedly, they had -- Mr.

21    Hansen say this, that GtalkService did not change, it went

22    straight from GtalkService, the same technology, all the way

23    to FCM.  But the evidence showed that the GtalkService prior

24    art was implicit and that the later one was explicit.  And

10:15    25    Dr. Foster admitted that one is secure and one is not.  That's

1228

1       the difference.

2             If we can go to slide 79.

3             Okay.  The documents show that implicit and explicit are

4       specifically different mechanisms altogether.  Implicit intent

10:16   5       is a security hazard because you can't be certain what service

6       will respond to that intent.  Many can respond to it.

7       Explicit intent, on the other hand, this allows the intent to

8       be interpreted only by a specific component.

9             The evidence is undisputed that explicit intents did not

10      exist before the priority date in 2009.

10:17   11            The -- so Samsung has the burden of proving invalidity by

12      clear and convincing evidence.  Dr. Foster admitted, though,

13      that these claims are not invalid.

14            Slide 39.

15            "You did not offer any opinion today that the

16      GtalkService prior art, the priority art GtalkService

10:17   17      invalidates either of the claims under the proper

18      interpretation of the claims.  Correct?

19            "Yes.

20            "And you agree that under the proper interpretation, the

21      '733 is not invalidated by the prior art.  Correct?"

22            And he answered, "That's correct."

23            They admitted it's not invalidating.  The only theory

24      that they have is that it's invalidating if they were the

10:17   25      same, which we know they're not.

1       So then they go to obviousness and --

2       You can take that down.

3       They say they could have, it would have been obvious to

4   combine the GtalkService with the WAP service and that

5   Kalibjian service.  He agrees that he didn't show any

6   motivation to combine.

7       Do any of you have an abiding conviction that one of

10:18   8   ordinary skill in the art would have combined GtalkService

9   with either of those references?  Do you have any idea what

10  that combination would look like?  Did he show you that?

11      And the fact is, it didn't happen in the real world.

12  When Google had to fix its system, it took two years to come

13  up with a solution to make it work with multiple app servers.

14  And when it did, it wasn't by combining it with either WAP or

15  Kalibjian.

10:18   16      With written description, he didn't follow the rules.

17  The Court instructed you that -- he told you that he just did

18  a word search.  And the Court instructed you that you don't

19  have to use the exact same words.  He used the wrong standard

20  and he relied on Samsung to tell him the standard.

21      So, ladies and gentlemen, when you get to Question 2 of

10:19   22  the jury form, Question 2 is whether Samsung has shown by

23  clear and convincing evidence any of the following claims are

24  invalid, I respectfully submit to you that they have not met

25  their burden of proof and request that you answer no to each

1       of those questions.

2               Let me talk to you briefly about damages.

3               Slide 42, please.

10:19   4               The statute and the law require that damages be made

5       based on the over -- based on the use made of the invention by

6       the infringer.  They spent the entire trial trying to tell you

7       that these patents were about billing and that they don't

8       mention battery savings once.  But what did Dr. Foster finally

9       admit on cross examination?

10              Slide 3, please.

10:20   11              He admitted that the overarching goal of the asserted

12      patents is improving the battery life of consumer mobile

13      devices by optimizing certain software functionality and

14      preventing needless battery consumption.

15              So that's what we measured.

16              Slide 46.

17              Mr. de la Inglesia measured the device -- the battery

18      savings from each of those unnecessary communications that

10:20   19      were saved.  He used Google's own documents.  If they had

20      different evidence to show you, they would have brought it.

21      They didn't.

22              Slide -- DDX 1.43, please.

23              So he showed you that for 2 to 4 apps, the battery

24      savings was 2 to 7 percent.  And that for 8 to 10 apps, it was

25      8 to 16 percent.

Slide 43.

10:21    Dr. Groehn did an analysis survey and conjoint evaluating

the value of those battery savings.  Samsung criticized this,

but they didn't bring any different data.  This is Samsung.

These guys know what they're doing, they know what it's worth,

and if they had different data that contradicted this, do you

think they would have brought it?

10:21    Slide 48, please.  Let's go to slide 44.

Mr. Dell then took those inputs and determined the

reasonable royalty using the Court's instructions.  First, it

has to be based on the extent of use.  He is the only expert

in this case that considered the extent of use, and that

number is undisputed.

10:22    Now, the royalty rate is up to you.  When you go back and

deliberate, we submit that the evidence shows that the

reasonable royalty that the parties would have agreed to at

that hypothetical negotiation is $5 a unit.  But it's up to

you to determine that.  If you determine it's a different

number, use that number.  The royalty base is undisputed, but

we think this is what it shows.

Now, this number gets discounted back because it was paid

10:22    as a lump sum -- if it would have been paid as a lump sum way

back in 2013 -- 2017, I think.  So that discount rate is 57

percent.  So if you do determine a different lump sum, take a

discount of 57 percent and that's your damage number.

         1          Ladies and gentlemen, I'll have a brief opportunity to

         2    visit with you again.  I thank you for your attention.

10:23    3          THE COURT:  Mr. Fenster, you need to take down your

         4    boards, please.  Thank you.

         5      We'll now hear closing arguments from counsel for the

         6    Defendants.

         7      Mr. McKeon, would you like a warning of any kind on your

         8    time?

         9          MR. McKEON:  Yes, Your Honor.  Six minutes and two

        10    minutes.

        11          THE COURT:  I'll warn you when you have six minutes

10:24   12    and two minutes remaining.

        13          MR. McKEON:  Can we approach first, please?

        14          THE COURT:  Approach the bench.

        15          (The following was had outside the hearing of the

        16          jury.)

        17          MR. McKEON:  So, Your Honor, the key document that

10:24   18    Mr. Fenster described as a key document in the case, the

        19    supporting document in the case where you have that single

        20    server issue, it's a Samsung document.  And he said, in

        21    connection with describing that document, that Samsung did not

        22    bring a witness to counter the description in the document

        23    that it was a single server.  That's what he said.  And that's

        24    an empty chair.  That's violation of MIL 24.

        25          And then I would let it go if it was anything else, but

10:24  1    he described it as the key document in the case.  And that

2    figure has gotten a lot of attention in this case.  And, you

3    know, I'm sitting here now I've got -- he said I didn't have a

4    witness describing it.

5           MR. FENSTER:  Your Honor, this is not -- this is not

6    an empty chair argument.  There were lots of expert -- there

7    were lots of Samsung witnesses, but none of them

8    disclosed -- discussed that testimony.  So the point isn't

9    that it was an empty chair.  It's that they didn't have any of

10:25  10   the Samsung witnesses in this case discuss that document.

11          THE COURT:  What are you suggesting, Mr. McKeon?

12          MR. McKEON:  I think the best remedy, Your Honor, is

13   deduction of time in the second close.

14          MR. FENSTER:  Your Honor, I was not making reference

15   to anyone who was unavailable.  They have Samsung witnesses.

10:25  16   We heard from Kwak and Jwa and others that --

17          THE COURT:  So this was not -- this document was not

18   addressed by any witness in your mind, either a Samsung

19   witness or the Google witness?

20          MR. McKEON:  This particular document, no one came

21   to court to address that document in court.  We didn't bring a

22   witness.  And that's the harm.  I'm faced now with a key issue

23   in the case is that single server issue, and the document

10:26  24   says, if you recall, Your Honor, is the one with a single

25   server on the top of it.  Anyway, it's a singular and, you

1    know, he pointed out we didn't bring anybody to counter that.

2         MR. FENSTER:  Your Honor, Mr. --

3         THE COURT:  Just a minute.  Mr. Fenster has seven

4    minutes and 22 seconds left.  I do think it's a violation of

5    the empty chair MIL, which is standing MIL No. 25.  I'm not

10:26   6    persuaded that it warrants a huge penalty.  I'm going to round

7    Mr. Fenster up to seven minutes from 7:22.  I'll take away the

8    last 22 seconds.

9         You have seven minutes for your second closing.

10        MR. McKEON:  Thank you, Your Honor.

11        MR. FENSTER:  Thank you, Your Honor.

12        (The following was had in the presence and hearing

13        of the jury.)

10:27   14        THE COURT:  Mr. McKeon, you may proceed with closing

15   argument when you're ready.

16        MR. McKEON:  Thank you, Your Honor.

17        Well, good morning, ladies and gentlemen.  As you hear,

18   I've kind of lost some of my voice, so be patient with me and

19   stick with me.  I appreciate that.

20        Well, you heard all the evidence, you made it through the

21   week, and we certainly appreciate your dedication to this

10:27   22   process.  We know there were long days, and we know some of

23   you are driving long distances to come back and forth to

24   court.  And, of course, there's been a lot being thrown at you

25   in terms of the evidence.  So we really, really appreciate

         1    your dedication.

         2         Now, in a little bit the Court's going to ask you to go

         3    through those doors and go deliberate and render a verdict.

         4    And I want to ask you to do one thing when you do that.  Don't

10:28    5    check your common sense at the door.  Use your common sense as

         6    you go through the evidence and discuss it with each other.

         7         As the Court said in the preliminary -- or the

         8    instructions you just heard, as the Court noted, use your

         9    common sense.  Your common sense is a guide for you.  And we

        10    submit, ladies and gentlemen, when you use your common sense

        11    to what are the witnesses saying, what do the documents show,

        12    when you use your common sense, ladies and gentlemen, we

10:29   13    believe the just and the right verdict in this case is that

        14    Samsung does not infringe these patents.

        15         Now, I'm going to take my time this morning to walk you

        16    through that.

        17         If I can have my slides, please.

        18         Now, as you've heard in the evidence, ladies and

        19    gentlemen, what we've established by the evidence is that the

10:29   20    Google and Samsung messaging systems have a different

        21    architecture, and they have a different message delivery

        22    system.

        23         The architecture you see here on the slide, that's the

        24    high-level architecture that we've been using throughout the

        25    trial so you're familiar with it.  And because of these

1    differences, ladies and gentlemen, what the evidence shows is

2    that the elements of the claim that are required we show here

3    on the slide are not found in the accused products.  I'm going

4    to walk you through that.

5    And remember when we met on Monday, one of the first

6    things I said to you was that Headwater's infringement case is

7    impossible.  Now, why did I say that?  I said that, ladies and

8    gentlemen, because if something's infringing today but it came

9    before the patents, well, then the patents can't be valid.

10    And we brought to you and presented in court Mr. Hansen

11    who's Google's engineer.  Mr. Hansen was there from the

12    beginning.  He was one of the key designers of the Google push

13    messaging service and system, and he pulled out his G1

14    T-Mobile phone and showed it to you.

15    That phone had the Google apps on it and that phone used

16    the Google push messaging system to push messages.  That was

17    in 2008 before.  Before the Headwater patents in 2009, the

18    system was being used, ladies and gentlemen, in the United

19    States.

20    What else did you learn?  You learned, too, ladies and

21    gentlemen, the evidence that ItsOn itself was using Google's

22    push messaging service back when ItsOn was a viable company.

23    You see here on the slide, you see the -- on the left the

24    application servers and on the right the software that was on

25    the phones.  And Dr. Raleigh explained that, how they would

10:30 (line 5)
10:30 (line 11)
10:30 (line 18)

10:31    1    push messages.  And what system did they use?  Google system.

2    Google system, ladies and gentlemen.

3         And this is all happening at the same time that

4    Samsung -- Samsung was using the Google push messaging system.

5    So ItsOn and Dr. Raleigh and Headwater, they knew about these

6    systems this whole time.  They knew about it and they were

7    using them.

8         But yet the position that they take in this case, ladies

10:31    9    and gentlemen, is that ItsOn didn't practice the patents, is

10    what they say.  ItsOn didn't practice these two patents.  So

11    when ItsOn uses Google's push messaging to push messages from

12    their servers to their software on the phones in the Sprint

13    network, when ItsOn does it, the patents aren't practiced.

14    When Samsung does it, well, there's infringement and the

15    patents are practiced.  It's -- something's not making sense

10:32    16    here, ladies and gentlemen.

17         And you also heard from Dr. Raleigh that ItsOn, the

18    company, the lawyers and the team evaluated all the patents.

19    They went through one by one by one, and you see here on the

20    slide the notice page that's posted on the internet.  And the

21    notice page identifies all the patents that are practiced by

22    ItsOn, all of them.

23         And you know what's missing, ladies and gentlemen?  The

24    two patents in this case.  They did a thorough analysis, as

10:33    25    you heard from the testimony, and they concluded they weren't

1    practicing.

2          MR. FENSTER:  Objection, Your Honor.  This is an

3    improper non-infringement argument.  I'm sorry for the

4    interruption.

5          THE COURT:  Overruled.  Let's continue.

6          MR. McKEON:  Thank you, Your Honor.

7    Ladies and gentlemen, this -- in the opening I presented

8    this slide to you about the timeline, about the timeline and

9    the history of parties here.

10   Now, as you heard, in the United States you don't have to

10:33  11  give somebody notice.  You can sue them without calling them.

12   That's the law.  Maybe you don't like that, but that's the

13   law.  And you can wait and sue them out of nowhere.

14   But, ladies and gentlemen, it's about credibility.  They

15   come into this court and say their patents are worth $700

16   million nearly, and they say that Samsung's infringement over

17   all these years, they were watching it, they saw it, they knew

18   it.  ItsOn itself was using push messaging, and they knew it.

10:33  19  And all these years go by, day after day after day, year

20   after year after year, and they said nothing to Samsung?

21   Ladies and gentlemen, if someone's walking over your most

22   valuable property you have and they keep doing it, wouldn't

23   you say something?  Hey, you know what?  You're infringing my

24   patents.  You got to pay me for that.  You think you would

25   call.  They just didn't do that, ladies and gentlemen.  It

 1    goes to the credibility of the parties, ladies and gentlemen.

10:34  2        And you also heard, ladies and gentlemen, the damage

 3    period here goes back to six years, to 2017, and the reason it

 4    only goes back six years is because the statute of limitations

 5    expired.  They can't go any further; they waited so long.  And

 6    that's what happened here, ladies and gentlemen.  They waited.

 7        Now, you heard testimony from Dr. Raleigh and others, oh,

 8    well, you know what?  They didn't know.  They didn't know what

 9    Samsung was doing.  And now in this trial they got all the

10:34 10   discovery and now they know.

11        Well, ladies and gentlemen, that was true on March 10th,

12    2023, they didn't know, if that's what they're saying because

13    when you file a lawsuit, you get discovery.  But they didn't

14    have discovery on March 10th, 2023.  They didn't have

15    discovery on March 10th, 2020, 2016, 2015.  It's the same

16    position.  They just waited and didn't -- it's a credibility

10:35 17   issue, ladies and gentlemen.  Credibility issue.

18        Now let's talk about the Headwater patents, ladies and

19    gentlemen.  Now, I showed you this in opening, and it's

20    interesting to look to me at the state of affairs, and I know

21    many of you remember this.  Right?

22        Back in the day when the smartphones were just coming out

23    and the technology was evolving and the networks really

24    weren't ready for that, so what was going on then?  They were

10:35 25   charging.  They were charging for text messages.  That was

1    part of what was happening.  And the network was evolving.

2        And Dr. Raleigh recognized something.  He recognized

3    something.  He said, you know what?  This is going to affect

4    network profits.  So his invention was based on

5    application-based billing.  When you use your application,

6    we're going to charge for it.  That's what Dr. Raleigh -- that

7    was the essence of his invention, and we're going to talk more

8    in detail about that.

10:36   9        But, ladies and gentlemen, the industry moved in a

10   different direction.  They spent billions and billions of

11   dollars building out the infrastructure to handle the traffic

12   and the congestion.  So it never went in the direction of

13   billing for specific use of applications.  That's not the

14   direction it went in.  Now you have unlimited data plans.  The

15   network can now handle that congestion.

16       Dr. Raleigh, these patents, you know what?  They're great

10:37   17   ideas.  But, frankly, Dr. Raleigh bet on the wrong horse.  You

18   know, the industry didn't go in that direction.  That's what

19   happened.

20       And you heard, of course, Dr. Raleigh tell you that, you

21   know, he built a company and sold it to Cisco and built a

22   company and sold it to Qualcomm and has done very well and God

23   bless him.  He's a smart guy, obviously.  Right?  But you know

24   what?  On this one, this project, he bet on the wrong horse.

10:37   25   It didn't work out because the industry didn't go in that

1241

1    direction, didn't adopt his technology.  And that's what the

2    evidence shows, ladies and gentlemen.

3        And here, ladies and gentlemen, what you see in this

4    slide is figure 16 in the patent.  And what Dr. Raleigh

5    described, if you recall, the aha moment in November of 2008,

6    and he indicates that this figure reflects the claimed

7    inventions, is what he says.  And you see that service control

10:37    8    link?  We're going to talk about that.  That service control

9    link was the essence of his aha moment that he had.  And this

10   was -- of course, became figure 16 of the patent.

11       And as you've heard in this trial, the specification of

12   the patents are important because the claims are considered in

13   the context of the specification.  And Mr. Fenster asked Mr.

14   Foster this question, and rightfully the specification is

10:38   15   important to consider as you review the evidence in this case

16   and look at the patent.

17       And what you see here in the slide, ladies and gentlemen,

18   specifically Dr. Raleigh recognized the profits.  Right?

19   Because the expanding usage, and he specifically talks about

20   application-based billing.  And what is the solution?

21   Solution was to monitor, classify, and control deeper aspects,

22   deeper aspects of the application.

10:38   23       You see this here.  You have to have as part of that

24   process the control so you can throttle, so you can block, so

25   you control the application usage.  That's part of the

                invention, ladies and gentlemen.

                    And you see here an example, the testimony you heard
        yesterday by deposition from Mr. Fitzgerald, who was at ItsOn.
        And you see here an example of what they were working
        on--Facebook.  And they were going to have a data plan for
10:39   Facebook.  This is the type of thing they were working on at
        ItsOn.  And you see examples here on the slide.

                    Now, what you see here on this slide, ladies and
        gentlemen, the key to the patents in this case is this control
        and track the usage to bill for it.  And you see control and
        billing mentioned in the patents all over the place.

                    But you see these other terms that they come into this
        court and they tell you aggregated push, push messaging
10:39   server, battery.  They say this is battery savings, these are
        key, and they want $700 million for battery savings, but the
        patents don't mention it.  They say nothing about it; nothing.

                    And, you know, Dr. Raleigh was here on direct, and he
        walked you through his idea of aggregated push and battery
        savings.  You know what?  He didn't open his patent up and
        walk you through the patent.  He didn't do that.  And that's
        unusual for the inventor not to walk you through the patent.
10:40               The reason is, ladies and gentlemen, because they don't
        talk about aggregated push.  They don't talk about billing
        [sic].  And, ladies and gentlemen, the Court has put this in
        your binder for the reason; not just the claims but the whole

1    specification.

2        Don't take my word for it, don't take Mr. Fenster's word

3    for it about what this patent's about.  Convince yourself the

4    patents are the same specification.  You only got to go

5    through one.  Just flip through it.  Don't read in detail, but

6    flip, get an idea.

7        What do you see?  Do you walk away, oh, this is about

10:40    8    aggregated push messaging and battery savings?  You're not

9    going to walk away with that because that's not what the

10    patent talks about.

11        Now, Dr. Raleigh says, Well, we have -- not these

12    patents, but I have other patents that relate to billing, is

13    what he said.

14        And then I asked him a question, if you remember on cross

15    examination.  I go, Well, you believe your patents are about

16    aggregated message channel, the subject of patents.  And he

17    said, yeah.

10:41    18        Well, then later in the testimony on cross examination,

19    he goes, well, he didn't invent aggregated push messaging,

20    that wasn't his invention, ladies and gentlemen.  And as you

21    recall, you see here, you know, in the deposition you saw

22    yesterday, the video, you know, he didn't know what push was

23    during discovery in this case a few months ago before trial.

24        He came to court, he knew a lot about it on Monday.  But

25    frankly, you know, he didn't know in discovery what push was.

1244

10:41    1    And, ladies and gentlemen, as you heard, the lawyers pick the

2    patents to sue Samsung on in this case.

3    And what you're seeing, ladies and gentlemen, is that the

4    lawyers have twisted and turned his patent into something

5    that's different than Dr. Raleigh's idea that's in the

6    patents.  And they did it so much that in the video yesterday,

7    Dr. Raleigh -- he didn't recognize what his lawyers have

8    turned his patent into.  He didn't know what push was in his

9    deposition, ladies and gentlemen.

10:42    10    And you see this from column 14 of -- column 127 in the

11    '733 Patent.  It equates service usage through push messaging

12    or poll.  It says you can use push or poll.  It doesn't say

13    don't use poll, it's more battery.  It says you can use either

14    one, is what the patent says right in the disclosure of the

15    patent.

10:42    16    Now, let's walk to the non-infringement points, and I

17    want to start with service control link.  And I want to start

18    with the language.  It's not a link.  If they show you a link,

19    that's not good enough.  It's not a control link.  If they

20    show you a control link, it's not good enough.  It's a service

21    control link.

22    Did you hear any testimony from Headwater's expert, did

10:43    23    you hear any describing what service in the Samsung accused

24    system and the Google system, what service is being

25    controlled?  Did you hear any evidence of that?  And you also

1    need a service control device link agent on the phone.  What

2    service is being controlled, ladies and gentlemen?

3         They -- we're in closing arguments, and they've never

4    answered that question.  They haven't provided you with an

5    answer to that.  And when we tell you, ladies and gentlemen, I

6    told you in the opening argument this patent is about this

10:44    7    control link service usage, and you see that in the claim.

8    You see it in the claim.

9         This is Dr. Raleigh's aha moment, this figure, and you

10   see service control link, service control.  That's what's got

11   to be controlled.  You don't have that in the accused product

12   and, in fact, you know, the specification calls this link,

10:44    13   consistent with the aha moment, calls it unique, calls it

14   unique.

15        And what they're pointing to, ladies and gentlemen, it's

16   a standard data link.  It's a standard TCP data link.  That's

17   what they're pointing to.  It's not a unique service control

18   link.

19        And as you've heard from the witnesses, there is no

20   ability to control applications in these systems.  It's just

21   not there because, again, the industry, ladies and gentlemen,

10:44    22   it went in a different direction.  They didn't go in that

23   direction.  There's just no infringement.

24        And you see on the left, you know, what you've got in

25   your push messages and on the right is what they envisioned

1    with controlling, watching your -- watching the applications

2    and your usage and being able to lock down through the service

3    control link.

4        Now let's talk about the issue of the network server.

5    Now you heard a lot, of course, discussion on this.  What is

10:45    6    not disputed, ladies and gentlemen, it's got to be one server,

7    a single server.

8        This is Headwater's expert.  He admits that.  And, of

9    course, the claim language.  Right?  A network server, the

10    network server to receive, generate, transmit.  It's got to be

11    a single server.  It's admitted, ladies and gentlemen, by

12    Headwater's expert as he had to.  And, in fact, Headwater's

10:45    13    expert calls this the key, key is a centralized server, key to

14    the patent.  That's his words--key to the patent.

15        Now, you've heard the testimony with how the systems are

16    architectured.  It's a divided architecture.  You have in

17    these servers the connection servers to the phones, 5,000 of

18    them, and in the Google system and in the backend the servers

19    that communicate with the application servers, the DMBE is

20    4,000 of them.  It's a massive system.

10:46    21        And what you heard from Mr. Hansen, the software is

22    totally different in the different servers because they're

23    doing different roles.  They do different roles in the system,

24    so the software is different.  They're doing different things

25    and they're communicating with different things.

1247

10:46

1  And you see here the architecture on this slide and the

2  roles and the functions, the request servers and the

3  connection servers.  Right?  And the roles and the functions,

4  the request servers talked to the application servers.  They

5  don't talk to the phones.  And then the connection servers,

6  they talk to the phones.  They have different roles in the

7  system.  And this is important, ladies and gentlemen, because

8  it gives you scalability.

9  When you have a network that's servicing billions of

10  phones, you've got to scale.  Having this divided architecture

11  allows you to scale and put the service communicating with

12  phones, highly populated areas.  Put the application server

10:47  13  communicating with application servers in areas where you have

14  farms or have applications.  They scale based on this and also

15  reliability you have a shorter connection.  You heard the

16  testimony from the witness, Mr. Hansen, on this.

17  Now, what does Headwater's expert do?  He does what he

18  has to do.  He's got to draw a big box.  And you heard a lot

19  about this in this trial.  And, you know, he and I went back

20  and forth on this and, you know, you have here on the right,

10:47  21  the version of the -- the Samsung document.  He does the same

22  thing, puts the big box around it.

23  And I asked him this question, you see, well, anyone in

24  their right mind think all these servers in these different

25  divided servers are one server?

1    And he says, Anyone doing an infringement analysis would

2    say one server.  Anyone counting the number of physical boxes

3    would count the number of physical boxes.

4    Ladies and gentlemen, infringement analysis is on

5    physical systems.  You got to look at what the systems are

10:48    6    doing.  It's not a box-drawing exercise where you just, oh,

7    put a box here, infringement.

8    And, frankly, ladies and gentlemen, you know, Mr. de la

9    Inglesia, he's an expert, and he's done well doing that.  He's

10    got 14 active cases now.  In the last four years, all he has

11    worked with is the law firms.  He's done very well.  He made

12    $800,000 in 2022.  Good for him; it's his occupation.  I'm

13    glad he's doing that.

10:48    14    But at some point you cross the line; you become an

15    advocate instead of an independent expert.  And I know, ladies

16    and gentlemen, I'll leave that up to you whether that's

17    happened here, but I think it has.  You know, when you answer

18    a question like, well, when I'm doing my infringement

19    analysis, I can just draw boxes and ignore the physical world.

20    And, of course, you know, the hypotheticals, you know.

21    And this is the hypothetical, well, what about if you had one

22    of the servers, the connection server, request server in

23    Dallas, and you had the other server in Marshall?  Well, that

24    is one server.

10:49    25    And then, you know, hypotheticals is how you test the

1249

1  proposition of someone's argument, what if one's on earth and

2  one's on Mars?  Well, I would do that.  Now, he says it

3  doesn't -- you know, it matters to physics, but it doesn't

4  matter to my opinion.

5       Ladies and gentlemen, we're dealing with physical systems

6  that are in the physical world.  How they're configured and

7  how they operate does make a difference.

8       And one more thing about this document.  You remember we

9  had a long discussion on it.  And he says in the middle, oh,

10:49

10  it says push notification server, it's singular.  And

11  then -- and that gives him justification for drawing a big

12  box.  But then on the left, you have push client, and on the

13  right, ladies and gentlemen, you have app server.  You see

14  that?  Those are singular, too, but the claims require

15  multiple, a plurality of those.

16       So when it comes to infringement and this document, he's

10:50

17  okay with saying, oh, it's not one application server and one

18  phone.  You know, he says, oh, there, we'll ignore that, this

19  singular.  We're just going to -- we'll just -- who cares

20  about that?

21       You know, it's talking out both sides of your mouth,

22  ladies and gentlemen.  That's not the way this is supposed to

23  be done.

24       Now, you were referred to this column 16, line 20 to 26

25  in the specification.  And, ladies and gentlemen, this is

10:50    1    perfectly -- the claim requires a single server.  That's what

2    the claim says and the claim governs.  But this is consistent

3    with that.  What the green says here is that you can divide

4    the functions of a server across different servers, but with

5    the claim, you have to take all of the functions.  And you can

6    have a system, of course, where you have many, many network

7    servers, like is shown here in the figure.

8        That's all that patent's is saying is you can divide the

10:51    9    functions, but you've got to divide them -- all the functions

10    have to be in the same server as required by the claim.  And

11    you can have many, and that's what's going on here in the

12    specification.

13        Now let's go to the last argument, ladies and gentlemen.

14    It's very specific.  It's very specific what's required.  You

15    have to deliver -- this is the delivery message.  The message

16    has to go to a particular device agent.  This is claim 1, '723

10:51    17    [sic].  It doesn't say go to an application.  It says

18    particular device agent.  Claim 1 is '117.  It goes to a

19    software process.  It doesn't say go to an application.

20        And what Headwater's expert says is infringement, he says

21    the package name, the package name, ladies and gentlemen, is

22    the application and the function is setPackage.  So you set

23    the application as your destination and that's what the

10:52    24    developer guide says right here.

25        And, you know, yesterday Headwater's expert was asked a

1    question, do you know if the Android apps have multiple

2    components?  And he says, no, they don't.  But then he was

3    confronted on cross examination, the developer guide itself

4    tells you, ladies and gentlemen, different components in your

5    application to run in separate processes.  So every

6    application has separate processes that run in different

7    components.

10:52    8        And this is an example of that, ladies and gentlemen.

9    It's a phone app, and your phone app that you have in your

10    phone has different processes.  You can make a call, you can

11    save a number to contacts, you can send a text.  These are all

12    different processes within the same application.

13        So you see a delivery, an example of a delivery, what you

14    see, ladies and gentlemen, is that the package

15    name -- remember, the package name is the application name.

10:53    16    You send it over to the app.  The Google push messaging system

17    will send it over to the app.  And it hits the app.  But then

18    it's the app that delivers it to the process internally; not

19    the push messaging system.  It drops it off at the front door.

20        Every witness in this case that has testified on this

21    subject agrees.  We drop it off at the application.  And the

22    analogy, ladies and gentlemen, is exactly what's on this

10:53    23    slide.  When FedEx comes to your house, they drop it off at

24    the front door.  They don't go in your house and go into your

25    kitchen or your living room.  Right?  They drop it off at the

```
 1    front door.  In the accused systems, the messages are dropped

 2    off at the front door.  The application and the application

 3    decides what to do with it.

 4        You see this testimony is very important from Headwater's

 5    expert at the top here.  He acknowledges device agent is not

 6    an application.  It's part of the application but it's

 7    something different.  And you see here also the components

 8    consist of processing, processing the message.  You see that

 9    there during his testimony.

10        And what -- the testimony you heard from Dr. Foster,

11    ladies and gentlemen, is that there's no infringement because

12    the delivery only happens to the app, it's undisputed in this

13    case, everybody agrees.  You don't go to the particular agent,

14    you don't go to the software process.  You go to the app, the

15    front door.  These are claim requirements.

16        Now, yesterday Headwater's counsel asked Headwater's

17    expert, Well, is the testimony you heard about the agent

18    identifier and application identifier which are the

19    identifiers they point to, that setPackage, the package, does

20    that give you any concern?

21        He said, not at all; it doesn't give me any concern.

22        Well, the reason it doesn't give him concern, ladies and

23    gentlemen, is because what I show on the slide is what he

24    needs to do.  He needs to cross out software process and write

25    application.  But the claim itself talks about application.
```

10:54 (line 6)
10:54 (line 13)
10:55 (line 19)

10:55

1    They didn't use the word 'application'.  It said drop off at

2    the software process, deliver it to the process.  This is

3    internal to the app.  It's not the front door.  And that's

4    what the claim requires.

5        Now, we heard from my colleague on the other side

6    reference this testimony.  Dr. Foster adamantly disputed

7    what's in yellow:  Forward the application data in the message

8    to the software process.  That was highly disputed.  You heard

9    him say that.

10       He never disputed the mapping part of the claim, and what

10:56

11   he says here on cross examination is exactly that.  I didn't

12   dispute the mapping.  But he definitely disputes this

13   forwarding to the application because if you only forward to

14   the application, you can't infringe these claims.  And that's

15   exactly what's going on in the accused system.

16       Now, I want to turn to the prior art issue.  The prior

17   art issue, ladies and gentlemen.  What you've heard is that

18   these systems, these systems over the years, ladies and

10:56

19   gentlemen--right?--remain the same.  All versions.  Right?

20   Remain the same.  And, of course, there was improvements.  Of

21   course, there's changes obviously.  Right?

22       But the core architecture that's at issue in this case

23   and the delivery processes that are at issue in this case,

24   that hasn't changed.  And you see this from testimony of Mr.

25   Hansen, who's the engineer and designer of the entire system.

1254

10:57

1    And, you know, he says, no, it hasn't changed.  The core

2    architecture is the same.  This is testimony he gave on the

3    witness stand, ladies and gentlemen.  He was never

4    cross-examined on the point or was disputed.  The system

5    didn't change or the core architecture.

6        Now, what do they say here in court?  What are the

7    differences?  Well, it boils down to this, ladies and

8    gentlemen.  They don't say, oh, there's no aggregated push

9    message.  They don't say anything about that.  There is one.

10   There's an aggregated channel.  Right?  They don't say

11   anything about that.

12       What they say is that these two things are different

13   between what was in the prior art and what's accused.  And it

14   boils down, ladies and gentlemen, to the setPackage, this

15   package, because what would happen in the prior art is exactly

16   the same.  You had a package in this system Gtalk, and the

17   package went to the front door.  They say, oh, there was no

18   package in the prior art system is what they say.

19       But I'm going to show you that there was a package.  And,

20   again, this is the argument they have.  This is what they're

21   presenting.  This is what they're down to, is the only

22   difference between the prior GtalkService and what's accused

23   is this package issue.

24       And you see here, Mr. Hansen, what he tells you.  He

25   tells you that the app, it went to the app.  And that was true

10:58

     1    in 2008.  And you could use the package name.  He tells you

     2    this is what was done, action name would be the package name.

     3    It would be the name of the application, just like what

     4    happens today in the package--you deliver it to the

     5    application, FedEx delivers it to your front door.  It happens

     6    today in the accused systems and it happened back in 2008.

     7         Now, Headwater's expert, Headwater's expert actually

     8    said, well, I don't agree with Mr. Hansen, I know more about

     9    this than him, I just disagree with him.  I leave it up to

    10    you, ladies and gentlemen, to decide whether the designer of

    11    the system, the person with the architecture back in 2008, has

    12    been involved in this system intimately all the way through to

10:59

    13    today, I'll let you decide whether Headwater's expert knows

    14    more about it than he.

    15         But what we did know yesterday on cross examination, he

    16    recognized that there's no -- he said, oh, I didn't see any

    17    evidence of the package name.  I didn't see any evidence of

    18    that in the Google prior system, the GtalkService.  That's

    19    what he says here on cross examination.

    20         So then he was confronted with the evidence.  And what

10:59

    21    you see, ladies and gentlemen, this is a document that was

    22    dated 2007, and this document tells you right here in Android

    23    application-specific actions, you use a vendor's package name.

    24    The package name was being used back then, ladies and

    25    gentlemen, in the GtalkService.  You deliver it to the front

         1    door of the house.  You do it today, you did it back in 2008.
11:00    2    This document tells you that, ladies and gentlemen.

         3        So the systems are the same.  And keep in mind, ladies
         4    and gentlemen, this is the only difference that they say is
         5    existing, this issue of the package.  Because that's what they
         6    say is no ID and it's not secure.  But if it goes to the front
         7    door of the house, under the current system, they say it
         8    satisfies the claim and it's secure.

         9        Now, as I said earlier, we don't think that's true.  We
        10    think you need to go into the house because it's talking about
11:00   11    delivery to a software process, it's talking about delivery to
        12    a device agent.  But if they're going to say it's infringement
        13    to deliver it to the front door of the house, well, then the
        14    prior art deliver to the front door of the house with the
        15    package name.  Both things can't be true with the evidence.
        16    There can't be infringement and have a valid patent.

        17        What the result is, ladies and gentlemen, there is no
        18    infringement because these things don't practice that, going
        19    into the house.  It just is not practiced.
11:01   20        Finally, I want to, ladies and gentlemen, address the
        21    issue of damages.

        22            THE COURT:  Six minutes remaining, counsel.

        23            MR. McKEON:  Thank you, Your Honor.

        24        Now, you heard a lot about damages.  And, of course, as
        25    you know, ladies and gentlemen, I got to address damages.

1    Right?  Of course.  We don't think there's infringement.

2    Right?  So we think that the damages, as we show here, are

3    zero because there's no infringement.  And if there's

11:01  4    infringement, which we absolutely don't believe the evidence

5    shows, well, then the patents must be invalid.  The damage

6    question is beside the point.

7         But I need to present on damages and what we have here,

8    you heard about this hypothetical negotiation.  You-all

9    remember that?  It's an interesting legal construct in patent

10   damage law where we go back in time because, remember, in this

11   case we never had a real negotiation.  So we do a

12   hypothetical.

11:02  13        And what Headwater proposes is that they're going to go

14   into a room and demand $696 million from Samsung, and this is

15   what their theory is, and Samsung's going to shake their hand

16   and do the deal in the hypothetical negotiation.  That's their

17   position.

18        But what we know is that Samsung knows all these things

19   that they're going to say.  We just went through the package

20   name.  So if package name is the only difference that they say

11:02  21   between the prior system and today's system, that's the only

22   difference they've identified, well, you want me to pay almost

23   $700 million for package name?

24        Don't get into this, oh, it's push technology, because

25   the difference between the systems today and the prior art,

1    it's not push technology.  They were both using it and they

2    acknowledge that.  The only argument they have is package

3    name.  That's the only argument they have.

4        So Samsung's not going to pay $700 million, that's all

11:03  5    you got is package name, is that what we're paying for?  And,

6    of course, everybody knows in this courtroom that Dr. Raleigh,

7    he admitted he didn't invent push -- aggregated push

8    messaging.  Samsung would know this in the hypothetical

9    negotiation.  It would be in their heads, and this is what

10   they would say to the other side:  Headwater agreed to sell

11   400 patents for $60 million to InterDigital.  And remember

12   there was made by Dr. Raleigh, well, I had warrants, I had

11:04  13   warrants.

14       So Dr. Perryman did the calculation and said, well, if

15   you sold those warrants at the highest point they'd ever be

16   worth, it would be $48 million, giving him all the benefit

17   that Dr. Raleigh's a really, really good investor and made the

18   right decision at the right time.  So that would be $108

19   million.

20       But whether you use 60 million or you give him the

21   benefit of the doubt and used 100 million, the point is it's

11:04  22   for all 400 patents.  Headwater agreed to this.  This happened

23   in the real world.  They shook hands with InterDigital, a very

24   sophisticated patent company.  They shook hands and said,

25   We're going to sell you all of our patents for a $60 million

|    |    |
|----|----|
|          | 1 | closing payment.  You want to use the $108 million, okay.  But |
|          | 2 | they agreed to sell all of it for that--sell them.  In this |
| 11:04    | 3 | case, they want almost $700 million for -- it's a license. |
|          | 4 | We're not buying them.  $700 million for two patents. |
|          | 5 | And you know what happened?  InterDigital looked into it |
|          | 6 | and didn't want them.  InterDigital could have got them for |
|          | 7 | $60 million, and this sophisticated patent company walked |
|          | 8 | away.  You know why they did it, ladies and gentlemen? |
|          | 9 | Because they read the patents.  They looked through the |
|          | 10 | patents.  They knew, you know what--the industry actually is |
| 11:05    | 11 | not in that direction.  These patents have been bet on the |
|          | 12 | wrong horse, and InterDigital walked away.  That company makes |
|          | 13 | a living out of investing and buying assets, and they walked |
|          | 14 | away from that deal.  And now in this Court -- |
|          | 15 | THE COURT:  Two minutes remaining. |
|          | 16 | MR. McKEON:  -- that're worth $700 million, ladies |
|          | 17 | and gentlemen?  And here's the deal.  It's JX 36, ladies and |
|          | 18 | gentlemen.  That's the exhibit number if you're interested. |
| 11:05    | 19 | Now, Samsung has other licenses, and Dr. Perryman walked |
|          | 20 | you through this, ladies and gentlemen, these other deals that |
|          | 21 | Samsung did in an arm's length transaction.  Samsung shook |
|          | 22 | hands with these parties for similar technology areas.  These |
|          | 23 | are the calculations that Dr. Perryman presented, and he |
|          | 24 | adjusted the InterDigital deal because there's only two |
|          | 25 | patents in this case, not -- not 400.  You've got to adjust |

1    that.

2         So these deals were adjusted, the Seven deal, totally

11:06    3    different than 700 million.  Remember, Samsung would know

4    this, Samsung would tell Headwater, in the hypothetical

5    negotiation about this, and the parties would negotiate.

6    That's what happens in the hypothetical negotiation.

7         And you see these other things here.  No one else has

8    ever paid a license for the technology.  Samsung would say

9    that.  Samsung pays $5.71 for the phone itself [sic], and they

10   want $5 a unit.  It's almost a full price of the phone.  That

11   doesn't make sense, ladies and gentlemen.  But what we do know

11:06    12   is that Samsung would say that in the hypothetical

13   negotiation.

14        And Headwater made less than a million dollars in

15   royalties from its own company, ItsOn.

16        And then, of course, Dr. Groehn's survey, ladies and

17   gentlemen, was flawed.  You heard him admit he dusted off a

18   survey from another case, another case with different patents.

19   Another case with different issues, not related to this case,

20   he dusted it off and reused it.

21        And they want -- and, of course, that's a major input for

11:07    22   Mr. Dell is the dusted-off survey used by Dr. Groehn, is a

23   major input to Mr. Dell.  Something's wrong there, ladies and

24   gentlemen.  The analysis is flawed.

25        The damages, ladies and gentlemen, in this case should be

 1    zero, should be zero.

 2             THE COURT:  Mr. McKeon, your time has expired.

 3             MR. McKEON:  Ladies and gentlemen, thank you for

 4    your time this week.  Thank you for your time this morning,

 5    and thank you for putting up with my raspy voice.  I really

 6    appreciate it.  Thank you.

11:07  7             THE COURT:  All right.  Plaintiff may present its

 8    final closing argument.

 9        You have seven minutes remaining, Mr. Fenster.  Would you

10    like any warning from the Court on your time?

11             MR. FENSTER:  Two minutes, please.

12             THE COURT:  All right.

13             MR. FENSTER:  Two minutes remaining.

14             THE COURT:  I'll warn you with two minutes

11:08 15    remaining.  Proceed when you're ready.

16             MR. FENSTER:  Good morning, ladies and gentlemen.

17        What you heard from Samsung's lawyer was a lot of

18    improper argument--billing, ItsOn, everything that the Court

11:08 19    has instructed is irrelevant to infringement.  The one thing

20    that he did say about infringement control link with respect

21    to the '733 is completely contrary to the actual evidence.

22        896 at 8 -- lines 8 to 13, please.

23        Dr. Foster admitted that the specification describes that

24    the service control link is being described as a standard TCP

11:09 25    connection.  Correct?  And he answered, "I believe that's

1    right."

2         If you go down to 13, please.

3         "And you understand that a standard TCP connection is

4    known to carry both data and control.  Correct?

5         "Well, a TCP connection can be used for various

6    purposes."  And he agrees that it's both.

7         Dr. -- Samsung's argument here is completely contrary to

8    the evidence.

9         Then with respect to server, he said, "Would anyone in

11:09    10    their right mind describe that architecture as a server."

11         You know who did?  Samsung did.  PTX 311, when they sat

12    down and wrote down their architectural design specification.

13    He showed you a quote from Dr. -- Mr. de la Inglesia about

14    centralized server.

15         If we can go to 317 in the trial transcript at 15 to 25,

16    he takes this quote out of context, but here's what Mr. de la

11:10    17    Inglesia exactly said:  Yesterday you heard -- you have

18    referred to the network server as centralized.  In what sense

19    is the network message server a centralized server?

20         Well, it's centralized because all of the apps, all of

21    the app servers think of this as a single service.  It's the

22    push service, and that's how they address it and all of the

23    devices connect to it because it's their notification service.

24         Don't be confused that centralized server means a single

25    server.

11:10    1    They argued about ItsOn.  Even their expert, Dr. Foster,

2    did not talk about ItsOn.  Why?  Because ItsOn is completely

3    irrelevant to infringement.  It's just an improper argument.

4    The Court has instructed you that the only proper

5    consideration, the only proper comparison for infringement is

6    to the claims, the accused products to the claims.  It's an

7    absolutely improper argument.

11:11    8    Now, let's talk about validity just very briefly.  The

9    difference is not whether they use package name.

10    If you could bring up slide 37.

11    The difference is the mechanism of delivery.  The old

12    system was implicit which everyone admits is not secure

13    because multiple apps can subscribe to it.  I doesn't matter

11:11   14    if they use package name.  If multiple apps can subscribe to

15    it, it's not secure.  It is just a different mechanism of

16    delivery altogether, whereas explicit intent is not.  And the

17    evidence in this case was undisputed.  You heard from

18    Dr. Hansen that setPackage and explicit intent were not

19    available prior to 2009.

20    Now, how do we know that this is true?  Because we know

11:12   21    from that PTX 335 --

22    If you could pull up slide 38.

23    -- that Google pulled the GtalkService from the market,

24    made it -- kept it only to Google wouldn't let third-party app

25    developers can do it.  Why?  Because it wasn't secure.  If it

         1    was so easy to fix, do you think they would have pulled it

         2    from the market and not reintroduced it until two years later?

11:12    3    That just does not make sense.

         4        And they have the burden of corroboration.  The Court has

         5    instructed you that to prove up their prior art by clear and

         6    convincing evidence, they need corroboration.  They showed you

         7    zero documents, zero architectural diagrams, zero evidence

         8    that anyone did use package or explicit intent or that it

         9    could have been secure.  They have not proven up their

11:13   10    invalidity case.  And, in fact, Dr. Hansen -- Dr. Foster

        11    specifically admitted that GtalkService does not perform any

        12    mechanism to secure the interprocess communication.

        13        Now, let's talk a little bit about damages.  The Court

        14    has instructed you that the way you determine reasonable

        15    royalty damages is by looking at the extent of use by the

        16    infringer.

11:13   17            THE COURT:  Two minutes remaining.

        18            MR. FENSTER:  Only we presented that.  We showed you

        19    the battery savings and --

        20        If you pull up slide 48, please.

        21        -- you know from Ms. Roberts' cross examination, which

        22    Samsung didn't show you, that battery savings at the time of

        23    the hypothetical negotiation was critical.

11:14   24        Go to slide 142.  I'm sorry, DDX 3.142.  142.

        25        So Samsung argues that you have to compare the benefits

1    of the patented invention which are all the way out to here,

2    these are the benefits, to the already existing technology.

3    Well, that's only true if they can prove that they had the

11:14    4    ability to do it another way.  But we saw from Google's

5    documents that they don't have another way to do it because it

6    wasn't secure.

7    And at slide 70, Dr. Foster admitted that they presented

8    no evidence of a non-infringing alternative.  They had no

9    other way to do push technology except by using the accused

10    products, and that's how you know that the benefit is the

11:15    11    entire battery savings.  They had no other way to do it.

12    It's also how you know that this was a valuable

13    invention.  If there was another way to do push other than the

14    accused products, they would have shown you that there was a

15    suitable non-infringing alternative other than the accused

16    products, and they have not.

17    THE COURT:  Your time's expired, counsel.

18    MR. FENSTER:  Ladies and gentlemen of the jury, I

19    thank you for your attention.  We await your just verdict.

11:15    20    Follow the evidence and follow the Court's instructions.  We

21    look forward to hearing from you.

22    Thank you.

23    THE COURT:  All right.  Ladies and gentlemen of the

24    jury, I'd like to now provide you with a few final

25    instructions before you begin your deliberations.

1    You must perform your duty as jurors without any bias or

2    prejudice as to any party.  The law does not permit you to be

11:16    3    controlled by sympathy, prejudice, or public opinion.  All

4    parties expect that you will carefully and impartially

5    consider all the evidence, follow the law as I have given it

6    to you, and reach a just verdict regardless of the

7    consequences.

8    Answer each question in the verdict form based on the

9    facts as you find them to be, following the Court's

11:16    10    instructions regarding the law.  Do not decide -- again, do

11    not decide who you think should win this case and then answer

12    the questions to reach that result.  And one more time, I'll

13    remind you that your answers to the questions in the verdict

14    form must be unanimous.

15    You should consider and decide this case as a dispute

16    between persons of equal standing in the community, of equal

17    worth, and holding the same or similar stations in life.  This

18    is true in patent cases between corporations, partnerships,

11:17    19    other business organizations, and individuals.

20    A patent owner is entitled to bring suit in a United

21    States District Court for damages for infringement if it

22    believes its patents have been infringed.  And by the same

23    token, an accused infringer is entitled to vigorously defend

24    itself against assertions of infringement, including by

25    arguing that it does not infringe the asserted claims and that

1   the asserted claims are invalid.

11:17   2       The law recognizes no distinction between types of

3   parties and all corporations, partnerships, other

4   organizations, and individuals stand equal before the law,

5   regardless of who owns them and regardless of where they're

6   located, and they are to be treated as equals.

7       Now, when you retire to the jury room in just a few

8   minutes, as I've told each, you'll each have your own printed

9   copy of these final jury instruction with you, and you can and

11:18   10  may well want to review them during your deliberations.

11  You'll also have the materials in your juror notebooks which

12  you may refer to during your deliberations.  If, however, you

13  desire to review any of the exhibits which the Court has

14  admitted into evidence and have been shown to you over the

15  course of the trial, then you should advise me by written note

16  delivered to the Court Security Officer signed by your

17  foreperson identifying any exhibit or exhibits that you wish

11:18   18  to see.  And I will then send that exhibit or exhibits to you.

19      Once you retire, you should select your foreperson and

20  then conduct your deliberations.  If you recess during your

21  deliberations, continue to follow all the instructions the

22  Court has given you about your conduct as jurors during the

23  trial.

24      After you have reached a verdict, your foreperson is to

25  fill in your unanimous answers to the questions in the verdict

1268

1    form, sign and date the verdict form on behalf of the jury,

11:19    2    and advise the Court Security Officer that you've reached a

3    verdict.  Do not reveal your answers until such time as you

4    are discharged, unless otherwise directed by me, and you must

5    never disclose to anyone, not even to me, your numerical

6    division on any unanswered question.

7        Any notes that you've taken over the course of the trial

8    are aids to your memory only.  If your memory should differ

9    from your notes, then rely on your memory and not your notes.

11:19    10    The notes are not evidence, ladies and gentlemen, and a juror

11    who has not taken notes or who has taken very few notes still

12    must rely on his or her own independent recollection of the

13    evidence and should not be unduly influenced by the notes of

14    other jurors.  Notes are not entitled to any greater weight

15    than the recollection or impression about the evidence by each

16    juror.

17        If you want to communicate with me at any time during

18    your deliberations, you should give a written message or a

11:20    19    question signed and dated by your foreperson to the Court

20    Security Officer, who will then bring it to me, and I will

21    respond as promptly as possible either by responding in

22    writing or by having you brought back into the courtroom where

23    I can address you orally.  And I will always first disclose to

24    the attorneys in the case any question and my intended

25    response before I answer or respond to any question.

1       Now, after you have reached a verdict and I have accepted

2   your verdict and discharged you as jurors, I want you to

11:21  3   understand you are not required to speak with anybody about

4   your experience as jurors in this case.  However, at that time

5   and after I have discharged you, you will be perfectly free to

6   discuss your experience as jurors with anyone of your

7   choosing.  The choice is yours at that point, ladies and

8   gentlemen--100 percent up to you.

9       I'm now going to hand eight printed copies of these final

10  jury instructions and one clean copy of the verdict form to

11:21  11  the Court Security Officer to deliver to you in the jury room.

12      Ladies and gentlemen of the jury, you may now retire to

13  the jury room to deliberate on your verdict.  We await your

14  response.

15          (Whereupon, the jury left the courtroom.)

11:22  16          THE COURT:  Be seated, please.

17      I want to know whose cell phone sounded during final

18  instructions and closing arguments.  All right.  You need to

19  give your cell phone to the Court Security Officer.

20      Mr. Caban, if you'll take possession of that device, the

21  Court will determine when and if to return it to you.

11:22  22      Also, counsel, you're welcome to wait here in the

23  courtroom for the jury's verdict.  You're also free to wait

24  off premises, but if you do, stay close by where we can get

25  you back promptly if we have a question from the jury or upon

1    the return of their verdict.

2         Awaiting either a note from the jury or the return of

3    their verdict, Court stands in recess.

4                         (Jury deliberates.)

11:23    5         THE COURT:  Be seated, please.

02:56    6         Counsel, I've received the following message from the

7    jury.  It states as follows:  "We have a verdict."  Signed by

8    Mr. Espinosa, who is Juror No. 5, as the foreperson of the

9    jury, and it bears today's date.

10        I'm going to hand the original note to the Courtroom

11   Deputy at this time.

12        And I'm about to bring in the jury.  Is there anything I

02:56   13   need to hear from anybody on before I do that?

14             MR. FENSTER:  Not for Plaintiff Your Honor.

15             MR. McKEON:  Nothing for Samsung, Your Honor.

16             THE COURT:  Let's bring in the jury, please.

17             (Whereupon, the jury entered the courtroom.)

02:57   18             THE COURT:  Please be seated, ladies and gentlemen.

19        Mr. Espinosa, I understand you're the foreperson of the

20   jury.  Is that correct?

21             THE PRESIDING OFFICER:  Yes, Your Honor.

22             THE COURT:  Has the jury reached a verdict?

23             THE PRESIDING OFFICER:  Yes, Your Honor.  We've

24   reached a verdict.

25             THE COURT:  Would you hand the completed verdict

1    form to the Court Security Officer who will bring it to me?

2            THE PRESIDING OFFICER:  Yes, sir.

3            THE COURT:  Thank you.

02:58    4        Ladies and gentlemen of the jury, I'm about to read the

5    verdict into the record.  I'd like you to listen very

6    carefully and closely as I do that, because after I've

7    announced the verdict into the record I'm going to poll the

8    members of the jury to ensure and confirm that this is, in

9    fact, the unanimous verdict of all eight members of our jury.

10        Turning to the verdict form and beginning on page 4 where

02:58   11    Questions 1A and 1B are found, Question 1A, "Did Headwater

12    prove by a preponderance of the evidence that Samsung

13    infringed any of the following claims of the '733 Patent?"

14        Claim 1 of the '733 Patent, the jury's answer is "Yes."

15        Claim 7 of the '733 Patent, the jury's answer is "Yes."

16        And claim 19 of the '733 Patent, the jury's answer is

02:59   17    "Yes."

18        Turning next the Question 1B, "Did Headwater prove by a

19    preponderance of the evidence that Samsung infringed any of

20    the following claims of the '117 Patent?"

21        As to claim 1 of the '117 Patent, the jury's answer is

22    "Yes."

23        As to claim 12 of the '117 Patent, the jury's answer is

24    "Yes."

25        And as to claim 16 of the '117 Patent, the jury's answer

03:00

1    is "Yes."

2        Turning, then, to page 6 of the verdict form where

3    Questions 2A and 2B are found, Question 2A, "Did Samsung prove

4    by clear and convincing evidence that any of the following

5    claims of the '733 Patent are invalid?"

6        As to claim 1, the jury's answer is "No."

7        As to claim 7, the jury's answer is "No."

03:00

8        As to claim 19, the jury's answer is "No."

9        Question 2B, "Did Samsung prove by clear and convincing

10   evidence that any of the following claims of the '117 Patent

11   are invalid?"

12       As to claim 1 of the '117 Patent, the jury's answer is

13   "No."

14       As to claim 12 of the '117 Patent, the jury's answer is

15   "No."

16       And as to claim 16 of the '117 Patent, the jury's answer

17   is "No."

03:01

18       Turning next to page 8 of the verdict form where Question

19   3 is found, "What sum of money, if paid now in cash as a lump

20   sum, has Headwater proven by a preponderance of the evidence

21   would compensate it for its damages as to any and all

22   infringement that you have found?"

03:01

23       The jury's answer is "$278,791,460."  I'll say that

24   again--$278,791,460.

25       Turning next to page 9, which is the final page of the

verdict form, I find it is dated with today's date, April the

25th, 2025, and it's signed by Mr. Espinosa as foreperson of

the jury.

03:01    Ladies and gentlemen of the jury, let me poll you to

confirm on the record that this is, in fact, the unanimous

verdict of all eight members of our jury.  If this is your

verdict as I have read it, would you please stand up.  Thank

you, ladies and gentlemen.  Be seated, please.

    Let the record reflect that all eight members of the jury

immediately rose and stood in response to the Court's question

to poll the jury.  I find that this is the unanimous verdict

03:02    of all eight members of the jury, the Court accepts the jury's

verdict, and I'll deliver the original verdict form to the

Courtroom Deputy.

    Ladies and gentlemen, this now completes the trial of

this case.  From the very beginning from jury selection

forward I have given you many, many instructions about how you

must conduct yourself, what you can do, what you can't do.

Having accepted the verdict, completed this trial, confirmed

03:02    its unanimity, I am releasing you as jurors.  I am discharging

you as jurors and I am releasing you from all the instructions

I've given you about your conduct heretofore.  That means,

ladies and gentlemen, if you want to talk with somebody about

this case, you're free to; if you want to talk among

yourselves about this case, you're free to; if you want to

1274

03:03

1    talk to anyone about this case, you're free to; but it also

2    means, by the same token, you're not required to talk to

3    anybody about this case in any shape, form, or fashion.

4    Whether you do or you don't, it is strictly up to you.

5        I will tell you, ladies and gentlemen, so you'll be

6    aware, that there's been a custom and practice in this

7    courthouse for many years, because I've seen it and I have

8    participated in it, and that is as follows:  the lawyers in

9    this case, no matter which side they're on, are very

10   interested to know what you thought about this trial and how

03:03

11   they conducted themselves, but they are not permitted to

12   initiate the conversation with you.  But if you want to

13   initiate a conversation with them, you're perfectly free to.

14       The way that works out in a practical sense is, as you

15   all understand from having been here all week, there is one

16   way in and there's one way out of this courthouse and that's

17   up and down those front steps.  Do not be surprised when you

03:04

18   go down those front steps if there are not a group of lawyers

19   conveniently standing on the sidewalk making it easy and

20   convenient for you to stop and talk to them.  They will not

21   initiate a conversation with you, they will not get in your

22   way, they will not impede your progress, but if you choose to

23   stop and initiate a conversation with them, I can assure you

24   they will be interested in talking to you.  It's up to you;

25   it's not up to them.  But don't be surprised when you walk

03:04    1    down the front steps of the building if the sidewalk's not

         2    populated with lawyers who participated in this case.  That's

         3    the way it's been for as long as I can remember, and I've been

         4    around here a long time.  So expect that when you leave the

         5    building.

         6        Also, ladies and gentlemen, I'd like to ask a personal

         7    favor of you.  Now that the trial's complete, now that I've

         8    accepted your verdict and discharged you as jurors, for the

         9    first time I can talk to you.  And as you leave the courtroom

03:05   10    in just a minute, I'd like to ask you as a personal favor to

        11    me to go back in the jury room, let me come in, because I'd

        12    like to shake each hand individually, I'd like to look each

        13    juror in the eye and tell them thank you face-to-face for the

        14    service and the sacrifice that each of you have made to serve

        15    on this jury.  I know full well it's Friday afternoon and I'm

        16    not going to keep anybody, but if you would give me the

        17    privilege of thanking you personally before you leave, I would

03:05   18    appreciate it and consider it an honor.

        19        I have no doubt in my mind that each of you have made a

        20    very real and personal sacrifice, each and every one of you

        21    have, in so doing, rendered very valuable and important public

        22    service not only to the Court, not only to our country, but to

        23    your Constitution and the rule of law, and before you leave I

        24    think that warrants a personal word of thanks from me to you.

        25    And if you'd let me have that privilege, I would certainly

1276

1    consider it an honor.

03:06    2        With that, ladies and gentlemen, that completes the trial

3    of this case.  As I said, I discharged you as jurors.  If

4    you'll do me that honor, I'll meet you in the jury room.

5        Counsel, you are excused.

6            (The proceedings were concluded at 3:06 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              I HEREBY CERTIFY THAT THE FOREGOING IS A

2              CORRECT TRANSCRIPT FROM THE RECORD OF

3              PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4              I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5              FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6              COURT AND THE JUDICIAL CONFERENCE OF THE

7              UNITED STATES.

8

9              S/Shawn McRoberts          04/25/2025

10            _____DATE_____
                SHAWN McROBERTS, RMR, CRR

11            FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25