1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF TEXAS
2                          MARSHALL DIVISION

3    HEADWATER RESEARCH, LLC.,      (  CAUSE NO. 2:23-CV-103-JRG
                                    )
4            Plaintiff,             (
                                    )
5    vs.                            (
                                    )
6    SAMSUNG ELECTRONICS CO., LTD., (
     et al.,                        )  MARSHALL, TEXAS
7                                   (  APRIL 24, 2025
             Defendants.           )  8:30 A.M.
8    _____

9

                              VOLUME 4
10

11   _____

                         TRIAL ON THE MERITS
12

13              BEFORE THE HONORABLE RODNEY GILSTRAP
               UNITED STATES CHIEF DISTRICT JUDGE
14                         and a jury
     _____
15

16

17

18

19

20

21

22                    SHAWN McROBERTS, RMR, CRR
23                     100 E. HOUSTON STREET
                      MARSHALL, TEXAS  75670
24                        (903) 923-8546
                 shawn_mcroberts@txed.uscourts.gov
25

1                        A P P E A R A N C E S

2          FOR THE PLAINTIFF:    RUSS AUGUST & KABAT -
                                 LOS ANGELES
3                                12424 WILSHIRE BOULEVARD
                                 12TH FLOOR
4                                LOS ANGELES, CA 90025
                                 (310) 826-7474
5                                BY: MR. MARC FENSTER
                                     MR. REZA MIRZAIE
6                                    MR. BRIAN LEDAHL
                                     MR. PAUL KROEGER
7                                    MR. ADAM HOFFMAN

8                                MILLER FAIR HENRY, PLLC
                                 1507 BILL OWENS PARKWAY
9                                LONGVIEW, TEXAS  75604
                                 (903) 757-6400
10                               BY:  MS. ANDREA FAIR

11         FOR THE DEFENDANTS:   FISH & RICHARDSON PC - ATLANTA
                                 1180 PEACHTREE STREET NE
12                               21ST Floor
                                 ATLANTA, GEORGIA  30309
13                               (404) 724-2792
                                 BY:  MR. THAD KODISH
14
                                 FISH & RICHARDSON, PC -
15                               WASHINGTON, DC
                                 1000 MAINE AVE., SW
16                               SUITE 1000
                                 WASHINGTON, DC 20024
17                               (202) 783-5070
                                 BY:  MR. MICHAEL McKEON
18
                                 FISH & RICHARDSON, P.C. -
19                               DALLAS
                                 1717 MAIN STREET, SUITE 5000
20                               DALLAS, TEXAS  75201
                                 (214) 292-4084
21                               BY:  MR. THOMAS REGER

22

23

24

25

```
1                                  FISH & RICHARDSON PC - ATLANTA
                                   1180 PEACHTREE STREET NE
2                                  21ST FLOOR
                                   ATLANTA, GEORGIA  30309
3                                  (404) 724-2844
                                   BY:  MR. BENJAMIN THOMPSON
4                                       MS. SARA FISH
                                        MR. NICHOLAS GALLO
5                                       MR. NOAH GRAUBART
                                        MR. JONATHAN BRIGHT
6
                                   QUINN EMANUEL URQUHART &
7                                  SULLIVAN, LLP - LA
                                   865 S. FIGUEROA STREET
8                                  10TH FLOOR
                                   LOS ANGELES, CALIFORNIA  90017
9                                  (213) 443-3000
                                   BY:  MR. LANCE YANG
10
                                   GILLAM & SMITH, LLP
11                                 303 SOUTH WASHINGTON AVENUE
                                   MARSHALL, TEXAS  75670
12                                 (903) 934-8450
                                   BY:  MS. MELISSA SMITH
13
        OFFICIAL REPORTER:         SHAWN M. McROBERTS, RMR, CRR
14                                 100 E. HOUSTON STREET
                                   MARSHALL, TEXAS  75670
15                                 (903) 923-8546
16
17
18
19
20
21
22
23
24
25
```

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| RAY PERRYMAN, PH.D. | |
| Direct By MR. REGER | 982 |
| Cross By MR. MIRZAIE | 1007 |
| Redirect By MR. REGER | 1050 |
| JAMES FRANCIS FITZGERALD | |
| Direct By BY VIDEO DEPOSITION | 1054 |
| GREG RALEIGH, PH.D. | |
| BY VIDEO DEPOSITION | 1058 |
| ERIK DE LA INGLESIA | |
| Direct By MR. FENSTER | 1067 |
| Cross By MR. YANG | 1085 |
| Redirect By MR. FENSTER | 1104 |

981

| | |
|---|---|
| | 1    THE COURT:  Be seated, please. |
| 08:26 | 2    Mr. Reger, are you prepared to continue with your direct |
| | 3    examination of Dr. Perryman? |
| | 4    MR. REGER:  Good morning, Your Honor.  Yes, we are. |
| | 5    THE COURT:  Dr. Perryman, if you'll return to the |
| | 6    witness stand.  I'll remind you, you are still under oath. |
| | 7    And let me ask if there are items from the list of |
| | 8    pre-admitted exhibits used during yesterday's portion of the |
| | 9    trial that need to be read into the record. |
| | 10    MS. FAIR:  Yes, Your Honor.  For the Plaintiff -- |
| | 11    THE COURT:  Please do so. |
| | 12    MS. FAIR:  Sorry, Your Honor.  For the Plaintiff, |
| 08:27 | 13    it's JX 30 and 68. |
| | 14    THE COURT:  All right.  Any objection from |
| | 15    Defendants? |
| | 16    MS. SMITH:  No, Your Honor. |
| | 17    THE COURT:  Do Defendants have a similar rendition |
| | 18    to offer? |
| | 19    MS. SMITH:  We do, Your Honor.  DTX 2, DTX 12, DTX |
| | 20    24, JX 9, and JX 51. |
| | 21    THE COURT:  All right.  Any objection from |
| | 22    Plaintiff? |
| | 23    MS. FAIR:  No, Your Honor. |
| | 24    THE COURT:  Thank you. |
| | 25    All right.  Is there anything I need to hear from the |

982

          1    parties on before I bring in the jury?

          2             MR. FENSTER:  Not from Plaintiff, Your Honor.

08:27     3             MR. McKEON:  Nothing from Samsung, Your Honor.

          4    Thank you.

          5             THE COURT:  Let's bring in the jury, please, Mr.

          6    Estes.

          7             (Whereupon, the jury entered the courtroom.)

          8             THE COURT:  Good morning, ladies and gentlemen.

          9    It's good to see you.  Please have a seat.

08:28    10        We'll pick up this morning with where we left off

         11    yesterday.  The Defendants are putting on their direct

         12    examination of Dr. Ray Perryman, and we'll proceed with that

         13    at this time.

         14        Mr. Reger, you may continue.

         15             MR. REGER:  Thank you, Your Honor.

         16                    RAY PERRYMAN, Ph.D.,

         17    having been previously duly sworn, testified further under

         18    oath as follows:

         19                  DIRECT EXAMINATION continued

         20    BY MR. REGER:

         21    Q.   Good morning, Dr. Perryman.

         22    A.   Good morning.

         23    Q.   So to quickly orient ourselves to where we were when we

         24    stopped for the evening, we were talking about the

         25    InterDigital deal, and you had mentioned there was a $60

1    million closing payment and some options or stock warrants.

2    Do you remember that, sir?

08:29    3    A.    Yes, sir, that's correct.

4    Q.    Now, so what was the total possible value to Headwater if

5    it had actually closed the deal with InterDigital?

6    A.    Well, if they had closed the deal and exercised the

7    options at a very good time, they would have received a total

8    of $108 million.  That would have been the $60 million closing

9    payment when they transferred the patents and then the $48

10    million that they potentially could have earned from the

11    warrants.

08:29    12    Q.    And was that $108 million for just the two patents in

13    this case?

14    A.    No, sir.  That would be to own all 400 patents that

15    Headwater owned at the time.

16    Q.    Did you calculate the value of these two patents from

17    that $108 million value?

18    A.    Yes, sir.  I did an estimate of that.

19    Q.    And how did you do that, sir?

20    A.    Well, Headwater has highlighted in documents that had

21    been publicly available 21 of their patents as ones that they

08:29    22    were focusing on, so I -- to be conservative, I assumed the

23    other 400 patents had -- most of the other 400 patents had no

24    value at all, and I just looked at those 21 patents.

25         And two of those would be the patents we're talking about

today.  And so just doing that math, you come up with a little

over $10 million, $10.29 million.

Q.   And what did the fact that the deal did not go through

for $108 million maximum value, what does that tell you about

08:30   the market interest in these two patents, sir?

A.   Well, it says that a very sophisticated technology

company took a good look at these patents and decided it was

not worth purchasing them for that price.

Q.   Now, how does the number you calculated compare to what

Mr. Dell offered to the jury?

A.   Well, my number is about 69 times lower than his number,

and my number would have been to buy and own the patents,

08:31   whereas Mr. Dell's number would simply be to have a license

where you could use the patents.

Q.   What does that tell you as an economist about Mr. Dell's

damages?

A.   Well, it tells me that it's very much out of line with

some real-world evidence that we have.

Q.   Now, was Headwater ever able to even license its patents?

A.   It did have one license.

Q.   And who was that to, sir?

08:31   A.   It was to ItsOn, an affiliated company.

Q.   Why do you say it's an affiliated company?

A.   Well, it had the same president -- or CEO.  I'm not sure

what the formal titles were the same CEO, the same chief

financial officer, and one was basically started to implement

the technology of the other so they were closely related.

Q.    Well, let's look at those official titles.  Who signed

08:31    that license between Headwater and ItsOn?

A.    Well, Dr. Raleigh signed it for both parties.  It's the

similar signature on both sides.

Q.    And what was his title for Headwater and his title for

ItsOn?

A.    Chief executive officer.

Q.    Would you call this an arm's length transaction, sir?

A.    No, sir.  An arm's length transaction is where you have

independent parties that come together and discuss something

and try to reach an agreement.

08:32    Q.    What does that mean when an agreement is not arm's

length?

A.    Well, it means it's not going to be informative of how

the market might react to this because the interests are

not separate interests between two independent parties.

Q.    Is it basically Dr. Raleigh negotiating with himself?

A.    It really is, yes, sir.

Q.    Okay.  Well, how much did Headwater supposedly --

supposed to earn from this deal between Dr. Raleigh and Dr.

Raleigh?

08:33    A.    Well, over the entire period that they had agreements in

effect, the total royalties that were due were about $2.267

million.

Q.   And did ItsOn, that sister company, did it pay everything it owed?

A.   No, it did not.

Q.   How much did ItsOn actually pay Headwater for patent licensing royalties?

A.   $937,000,674.  So a little less than a million dollars.

08:33   Q.   Just to be clear, was it 937 million or 937 thousand --

A.   My apologies.  It's early.  $937,674.

Q.   Now, we see a spreadsheet here, and next to it is DTX-3. What is that, sir?

A.   That's a confidential document that we received from Headwater that outlined the royalty history.

Q.   And is DTX 3 something the jury could ask for if they were interested in these royalties?

A.   Yes, absolutely.

08:33   Q.   Now, apart from the $937,000 that ItsOn paid Headwater for patent royalties, did Headwater ever make any other patent royalties ever?

A.   No, sir, they did not.

Q.   Did ItsOn actually pay anywhere close to the rate Mr. Dell was asking for?

A.   No, sir, obviously not.

Q.   Now, so what does that tell you about the value of these two patents in this case?

08:34   1    A.   Well, again, it tells me that no one in the market chose

2    to take a license to these patents other than an affiliated

3    company and it only paid a very small amount in royalties.  So

4    it tells me that basically the market was not interested in

5    these patents.

6    Q.   And did Headwater license its patents to anyone else?

7    A.   No, it did not.

8    Q.   Would Headwater be able to hide the fact that only Dr.

9    Raleigh's other company licensed the patents and that

08:34   10   Headwater only made $937,000 in patent royalties?  Could

11   Headwater hide that from Samsung?

12   A.   No, they couldn't.  That's one of the things we talked

13   about yesterday.  At the hypothetical negotiation, everybody

14   has access to all the information.

15   Q.   So we're sitting at that hypothetical negotiation table,

16   Samsung would learn this information from Headwater.  Would

17   Samsung tell Headwater about licenses that Samsung had?

18   A.   Yes, it would.

19   Q.   And actually let me go back.  Just to be clear, did ItsOn

08:35   20   practice, did they use the two patents in this case?

21   A.   No, they did not.

22   Q.   And how do you know that, sir?

23   A.   It was admitted in some of the court filings here that

24   ItsOn did not use these patents.

25   Q.   And Samsung would know that at the hypothetical

1    negotiation table as well.  Right?

2    A.   Absolutely, yes, sir.

3    Q.   Now, why would the parties in real negotiations or the

4    hypothetical negotiation, why would they look at Samsung's

5    licenses?

08:35   6    A.   Well, one way you can get an idea of what something's

7    worth is to look at something similar and see what it's worth.

8    You know, for example, on the demonstrative I have up here, if

9    you were thinking about renting a house, you would probably

10   look at houses in the same neighborhood about the same size

11   and that sort of thing to determine and see how much rent

12   they're paying to help you figure out how much rent you should

13   pay.

14   Q.   And how many Samsung licenses did you review as part of

08:36   15   your work?

16   A.   Oh, I think there were about 15 that I was able to

17   review.

18   Q.   And how did you go about determining which of the 15 are

19   more relevant to the hypothetical negotiation?

20   A.   Well, I want to try to find the ones that are most

21   similar.  We're not going to find anything that's exactly like

22   the hypothetical negotiation.  Obviously the hypothetical

23   negotiation didn't really happen.  But you want to find those.

24        So the first thing I did was ask Dr. Foster to help me

25   understand which ones were technically comparable; that is,

08:36  1    had similar technology in them by looking at the patents.

2    Q.    And how many Samsung licenses did you and Dr. Foster

3    determine were comparable to the hypothetical license?

4    A.    There were several, but I focused on four of them in

5    particular.

6    Q.    Okay.  And are they the four agreements we see here, sir?

7    A.    Yes, sir, they are.

8    Q.    Now, are these licenses, are they the result of

9    real-world negotiations or hypothetical negotiations?

08:37  10   A.    No.  These are actual licenses that were negotiated in

11   the marketplace and between a licensor and a licensee and an

12   agreement was reached.

13   Q.    Why does that matter, sir?

14   A.    Well, again, it gives us evidence of what the market is

15   saying and paying what Samsung would anticipate it would pay

16   for similar technology.

17   Q.    And did the Seven agreement include similar technology?

18   A.    Yes, they did, and that was -- I had Dr. Foster help me

19   with that.

08:37  20   Q.    Now, you've been here in court.  Did you ever hear Mr. de

21   la Inglesia say that the Seven Networks patent license did not

22   include similar technology?

23   A.    No, sir.  He did not dispute that at all.

24   Q.    Was the Seven license agreement limited to just phones?

25   A.    No.  It covered all of Samsung's products and services.

```
            1   It was comprehensive.
08:38       2   Q.   And how much money did Seven agree to for a license to
            3   all of its patents?
            4   A.   ███████████.
            5   Q.   Now, from an economist's standpoint, were there any
            6   economic differences between this agreement and the
            7   hypothetical license?
            8   A.   There were.  And we have to adjust for those things, much
            9   like if you were looking at houses and you saw one that was
           10   pretty similar but it had an extra bedroom or an extra
           11   bathroom, you would make an adjustment for that sort of thing.
08:38      12   Q.   And did you adjust -- did you make any adjustments to the
           13   Seven license agreements to match the hypothetical license?
           14   A.   I did, yes, sir.
           15   Q.   What adjustments, sir?
           16   A.   Well, basically this agreement covered a lot of patents,
           17   about 500 patents, and so I had to make an adjustment because
           18   the hypothetical license would only be for two patents.  And
           19   so I had to make an adjustment to account for that.
           20   Q.   And what adjustment did you make?
08:39      21   A.   Well, basically, although there were 500 patents here,
           22   that they highlighted nine of those -- of different patent
           23   families where we had one patent family, the two patents here,
           24   and so I made an adjustment to say basically, according to
           25   those patent families, assuming those are the only patents
```

991

1    that had any value, that I'm sure others may have well had

2    value, but I assume they didn't.  And that gave me a value of

3    $6.94 million.

4    Q.   Now, to be clear, did you consider all of the provisions

08:40   5    of the Seven agreement?

6    A.   Yes, sir, I did.

7    Q.   Now, we heard very briefly about this provision from Mr.

8    Dell at the end.  Can you remind us what this provision, what

9    it says?

10   A.   Yes, sir.  In summary, basically what it says is this was

11   not a hypothetical negotiation in -- of the type that we're

12   talking about here.

13   Q.   Now, with all of your experience reviewing patent

08:40   14   licenses and valuing patents, do you agree with Mr. Dell that

15   it means this agreement cannot be used in a hypothetical

16   negotiation?

17   A.   Oh, absolutely not.  I mean, every agreement we get to

18   look at is a real world agreement.  There's no such thing as a

19   hypothetical real-world agreement much like it would be like

20   having a fast slow car.  I mean, they're the opposite of each

21   other.  And so we always have to take real-world licenses and

22   then properly adjust them to be more like what we would see in

08:40   23   the hypothetical negotiation.

24   Q.   And were there any provisions that were actually more

25   favorable to Headwater that allowed you to consider this?

```
  1   A.   Oh, absolutely, yes, sir.
  2   Q.   And what is the second agreement we're going to look at,
  3   sir?
  4   A.   This is an agreement with MTEL, Mobile Telecommunications
  5   Company.
  6   Q.   Okay.  And, Dr. Perryman, could you briefly summarize the
  7   economics of this MTEL agreement?
  8   A.   Yes, sir.  It was 19 patents, they were across several
  9   patent families, and then -- and it was a real-world license
 10   for all of the products all over the world for every patent
 11   that MTEL owned for ███████████.
 12   Q.   And, again, from an economic standpoint, did you consider
 13   the MTEL agreement to be a comp?
 14   A.   Oh, I did.  In fact, when he looked at it, Dr. Foster
 15   told me this one was substantially technically comparable,
 16   meaning it was even more similar in technology than some of
 17   the others that, as he talked about yesterday, were in the
 18   same technology field.
 19   Q.   Dr. Perryman, did you adjust this one down?
 20   A.   I did not.  I could have because it was more patents, but
 21   it wasn't like 500 patents or something like the other one, so
 22   to be conservative, I did not adjust it.  I certainly could
 23   have.  It was -- you know, you're comparing only U.S. patents
 24   to worldwide patents, you're comparing only a few products to
 25   all the products and services, so I certainly could have but I
```

08:41   8

08:41   15

08:42   23

1    chose not to.

2    Q.   And did this MTEL agreement include language that was

3    similar to Seven?

4    A.   Yes, it did.

5    Q.   Okay.  And did that affect your analysis in any way?

6    A.   Oh, it really didn't.  Again, that type of language we

7    see in a lot of agreements these days.  And -- but in essence

08:42    8    we're taking a real-world situation where two companies that

9    both are trying to get the best deal they can, in fact have

10    obligations to shareholders or investors to get the best deal

11    they can in the marketplace are coming together and reaching

12    an agreement.

13    Q.   Dr. Perryman, can you briefly identify the final two

14    agreements you looked at?

15    A.   Sure.  The other two are Bell Northern Research and R2,

08:43    16    and those are two others that, again, Dr. Foster looked at and

17    told me were economically comparable.  In fact, he said the R2

18    was substantially -- or, I'm sorry, technically comparable, I

19    misspoke there, and so those were a couple of others that I

20    looked at.

21    Q.   And if the ladies and gentlemen of the jury wanted to

22    look at these agreements themselves, what numbers would they

23    ask for?

24    A.   DTX -- these two are DTX 21 and 23.  The first two I

25    talked about are 20 and 22.

08:43    1    Q.    Okay.  So the two you walked through originally was Seven

2    DTX 20 and MTEL DTX 22.  Is that right?

3    A.    Yes, sir.

4    Q.    All right.  Did you adjust the BNR agreement?

5    A.    Yes, I did.  On the Bell Northern agreement, it was close

6    to a hundred patents and six different patent families were

7    actually asserted in that one.  And so I did make an

8    adjustment similar to what I did with the Seven Networks

9    agreement.

08:44   10    Q.    And what number did you end up with after you adjusted

11    this to make it comparable?

12    A.    ███████████████.

13    Q.    And what -- tell us about that last license, please, sir.

14    A.    Well, the R2 license was a large number of patents.  Some

15    of them were quite comparable to -- as Dr. Foster would say,

16    substantially technically comparable to these others.

17    And -- but it was a large number of patents for a relatively

18    small amount of money, so I did not make any additional

08:44   19    adjustments to that one.

20    Q.    So based on your analysis of these real Samsung licenses,

21    what was your final conclusion about the reasonable royalty

22    for the two Headwater patents here?

23    A.    Well, my basic conclusion was that it would -- the MTEL

24    license, because of its technical similarity and relatively

25    smaller number of patents was probably the best we had.  So I

08:45

1    would say ████████ with an upper bound being the Seven

2    Networks at ████████.

3    Q.   And did Mr. Dell use these Samsung licenses to come up

4    with his hypothetical license?

5    A.   No, sir, he did not.

6    Q.   Do you think that's appropriate, sir?

7    A.   No, sir.  It's absolutely not appropriate.  You never

8    ignore what the real world is telling you.  It would be like

9    going out and trying to rent an apartment or buy a house

10   and -- or rent a house and have no idea what other people were

11   paying for similar things.

08:45

12   Q.   Now, without getting into the details -- I know we've

13   just talked about him ignoring real world evidence.

14   A.   Yes, sir.

15   Q.   What other high level reasons did you have for thinking

16   Mr. Dell's number is unreliable?

17   A.   Well, in addition to that one that we just talked about,

18   he also relies on this survey which is--we'll talk about in a

19   few minutes--not really related to the facts of the case.  He

20   didn't really use a proper measure of the benefits of the

21   patents, and he didn't properly account for all the things

08:46

22   that Samsung brings to the table.

23   Q.   So instead of really looking at that real-world evidence

24   that you analyzed, what did Mr. Dell rely on instead?

25   A.   Well, he looked at the purported battery life benefits of

08:46
1    the patents that he received from Mr. de la Inglesia, which

2    we'll talk about in a moment and Dr. Foster's already talked

3    about.  And then he took that and the survey evidence, the

4    conjoint analysis from Dr. Groehn, and basically put those two

5    things together.

6    Q.    With all your experience as an economist, would the

7    parties at the hypothetical negotiation or the real-world

8    negotiation favor Mr. Dell's calculations or the real-world

9    evidence?

10   A.    Well, I think anyone would prefer to have evidence of

11   what other people are actually paying.  What evidence is that

08:47
12   this technology is worth in the marketplace would always be

13   better evidence than trying to do a calculation of this

14   nature.  And, of course, both parties would also understand

15   the issues associated with this calculation.

16   Q.    Now, this input No. 2 is Dr. Groehn and his survey.

17   A.    Yes, sir.

18   Q.    Is that right?

19   A.    That's correct.

20   Q.    Were you here when Mr. Dell said that he was unaware of

21   anyone claiming that Dr. Groehn's survey was flawed?

22   A.    I believe he did say that, yes.

08:47
23   Q.    Do you believe Dr. Groehn's survey is flawed?

24   A.    Oh, it's very seriously flawed, yes, sir.

25   Q.    What happens to Mr. Dell's numbers if the jury agrees

1    that Dr. Groehn's survey is flawed?

2    A.    Well, Dr. Groehn's survey was a key piece of the things

3    that Mr. Dell put together to multiply and come up with his

4    royalty rate, so if that's wrong, then the entire thing is

5    unreliable.

6    Q.    Well, and to orient ourselves, was Dr. Groehn's survey,

7    was it done in this case or for an earlier project?

8    A.    He did this for an earlier project.

08:48   9    Q.    What are some of the problems that you identified with

10    Dr. Groehn's survey?

11    A.    Well, one we just briefly mentioned, of course, he did

12    not really have any knowledge of this case when he was doing

13    it.  And so he just worked from another project, and it's

14    difficult to do that.

15          And then the second one is, as we've heard since we got

08:48   16    here, this technology is all about push notifications.  Dr.

17    Groehn's survey, if you recall, he said he was going to pick

18    seven various parts of a phone he was going to analyze.  Push

19    notifications wasn't one of them.  So he didn't even rank that

20    as being something important.

21          And then the most important one is just he simply didn't

22    define the battery life which was what he was actually trying

23    to measure and what Mr. Dell used.  He didn't really define

24    that for the survey participants.

08:49   25    Q.    So I want to make sure I understand.  So Headwater in

1    court has been claiming that push notifications are valuable

2    and -- but Dr. Groehn didn't ask his survey participants that

3    question?

4    A.    No, sir.  It was not anywhere in his survey.

5    Q.    Was push notifications like just push notifications

6    mentioned anywhere?

7    A.    No, not at all.

8    Q.    Well, your last point says battery life is subjective.

08:50   9    Can you briefly explain to the jury what Dr. Groehn actually

10    tested?

11    A.    Sure.  What he did was -- and, I mean, I've taught

12    conjoint analysis, I've helped the government design these

13    things.  I mean, if you took a course in conjoint analysis,

14    the first thing they would tell you in the first hour is you

15    have to define the things that people are going to be asked to

16    rank.  They have to understand what it is they are being asked

17    to do.

08:50   18        And here he just said standard battery life.  And then

19    his alternatives were standard plus 5 percent and standard

20    plus 10 percent.  Well, standard to my grandkids who play

21    video games on their phones all day and standard to me are two

22    very different things and I suspect most of us in the room

23    would have a different definition of standard if we were asked

24    that.  So he starts out not adequately defining what it is

25    that he's trying to measure.

999

08:50

         1    Q.    Well, Dr. Perryman, if I took a survey and someone asked

         2    me about standard battery life, I would have my understanding

         3    of what that is.  And so I would appreciate what plus five

         4    percent may mean to me.

         5    A.    Correct.

         6    Q.    So why is that a problem here?

         7    A.    Well, the problem is if we take a simple example here, if

         8    you took the survey and what he does is, if you recall, he

         9    told you he gives you a couple of phones with different

        10    characteristics and a different price and says pick one.  And

        11    then he asks if you -- if you would really actually buy that

        12    phone.

        13          Well, all you would see in the survey, and he put one of

08:51   14    these up on his slides, was if we take, say, a Samsung Galaxy

        15    S24 and an iPhone 15, you just see standard here and maybe

        16    standard plus five percent here.  Well, if you didn't know

        17    better, you would think, well, wow, that means I get more

        18    battery life here than I get here.  But that in reality might

        19    not be the case.

        20    Q.    Well, as a survey participant, if I wanted more battery

08:51   21    life and I picked the Apple iPhone 15 because it's standard

        22    plus five percent, would I be getting more battery life?

        23    A.    No.  You'd actually be getting substantially less because

        24    the advertised battery life for the Samsung is higher than the

        25    average life for the Apple, even if you add 5 percent or 10

1    percent for that matter.

2         And so basically, as you looked at the survey, you would

3    think, hey, more battery life with the Apple 15 or, I'm sorry,

4    Apple -- yeah, the iPhone 15, but in reality you would get

08:52    5    much more battery life with the Galaxy S24.

6    Q.    So I want to make sure I understand.  So to me standard

7    battery life is all day battery life.

8    A.    Right.

9    Q.    And if I wanted to pick a phone shown on the screen here

10    that had more battery life, which one would I pick:  standard

11    or standard plus five percent?

12    A.    Well, in this is all you knew, you would probably pick

13    standard plus 5 percent.  But if you really wanted more

14    battery life, you should pick this one.  And that gets back to

08:52    15    that Conjoint Analysis 101--you have to define the terms where

16    people understand them.  If you don't do that, whatever else

17    you do is not going to be valid.

18    Q.    With all your years of experience, sir, what is your

19    ultimate opinion of Dr. Groehn's survey and regression?

20    A.    Well, basically there was some technical issues, but we

21    don't even have to go into those.  I mean, literally what Dr.

22    Groehn was trying to do was ask these people how much they

08:53    23    would pay for battery life without telling them what battery

24    life was.  You can't ask somebody how much they would pay for

25    something if they don't know what it is and expect to get a

1  reliable answer.  It's really that simple.

2  Q.   So if someone picked the Apple phone here, they're

3  getting less battery life.  But how would that impact Dr.

4  Groehn's numbers?

5  A.   Well, again, they would be getting less battery life, but

08:53  6  in Dr. Groehn's numbers, that would come off as someone who

7  said, yes, I want more battery life.

8  Q.   And he would value the Apple phone even though it had

9  less battery life?

10  A.   That's correct.  And, again, when you do that, you simply

11  cannot measure -- you can't ask people and -- you do a whole

12  lot of fancy regression modeling, the kind of that keeps me

13  and probably him up at night sometimes.  But at the end of the

14  day, it doesn't matter what you do with that.  If you start

15  out not telling people what it is, you can't measure how much

16  they're going to pay for it.

08:54  17  Q.   So Mr. Dell relied on two experts.

18  A.   Correct.

19  Q.   He relied on Dr. Groehn and Mr. de la Inglesia.

20  A.   Yes, sir.

21  Q.   Were there problems from an economic

22  standpoint -- from -- as part of your analysis with Mr. de la

23  Inglesia's work here?

24  A.   Yes, there was.

25  Q.   And what was that, sir?

08:54    1    A.    Well, as -- as Dr. Foster explained yesterday, a lot of

2    this technology already existed.  And what you have to do when

3    you're doing -- looking at a hypothetical negotiation trying

4    to figure out the value of a patent, you need to know the

5    incremental amount of technology that is contributed by the

6    new invention.

7          And in this case Dr. Inglesia based his analysis on

8    comparing the entire centralized push notification system to

08:55    9    the old polling system.  What he should have done was look at

10    how much new and improved situation you had with these -- when

11    you added these two patents.

12    Q.    So to be clear, is there a *Georgia-Pacific* factor that

13    asks you to look at the incremental benefit of the patent?

14    A.    Yes, sir.  That's a part of *Georgia-Pacific* factor No. 9

15    and this is just a diagram that Dr. Foster used yesterday I

08:55    16    think shows it very well.  A lot of technology already

17    existed.  The patents perhaps added some.  I know that's a

18    matter of dispute.  But for me I assume it added some and I

19    need to value what it adds, not what was already there.

20    Q.    So the *Georgia-Pacific* factors that governed your

21    analysis and were supposed to govern Mr. Dell's analysis, what

22    should be measured under *Georgia-Pacific* factor 9?

23    A.    Well, *Georgia-Pacific* factor No. 9 tells us we want to

08:56    24    measure the incremental.  That is the extra benefit you get

25    from these patents over and above what was already there.

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | Q.    Now, did Dr. Foster identify any prior art that could          |
|       | 2  | have been used to measure the benefits under *Georgia-Pacific*       |
|       | 3  | factor No. 9?                                                        |
|       | 4  | A.    Yes, he did.  He showed us two different prior arts, one       |
|       | 5  | by Lee and one by Herzog, and explained those.                      |
| 08:56 | 6  | Q.    Did Mr. de la Inglesia measure the alleged benefit of         |
|       | 7  | these two patents over Lee and Herzog?                              |
|       | 8  | A.    No, he did not.  He measured it of all the entire push        |
|       | 9  | notification system relative to the old polling system.            |
|       | 10 | Q.    And why is that a problem for Mr. Dell?                       |
|       | 11 | A.    Well, it's a problem for Mr. Dell because he has -- he        |
|       | 12 | has -- now has as an input something that's not the                |
|       | 13 | incremental contribution of these two patents, it's the entire     |
| 08:57 | 14 | push notification system, much of which has been talked about      |
|       | 15 | a lot here, has been in place for quite some time.                 |
|       | 16 | Q.    What did Mr. de la Inglesia do instead?                      |
|       | 17 | A.    Well, he found a -- Mr. de la Inglesia found a -- and        |
|       | 18 | we've looked at this before, he found a Google presentation        |
| 08:57 | 19 | that talked about potential battery savings relative to -- for     |
|       | 20 | push relative to everything polling.  And, again, it was a         |
|       | 21 | comparison of push notification and polling, not the little        |
|       | 22 | new contribution potentially of these patents to push             |
|       | 23 | notification.                                                       |
|       | 24 | Q.    Did Dr. Foster do anything to illustrate this issue?         |
|       | 25 | A.    He did, yes, sir.  He also found a later study that          |

08:58

1    was -- that's been peer-reviewed, meaning other scientists

2    looked at it, that did essentially the same thing later in

3    time because this technology evolves and found a much lower

4    number.  But even that number which was much lower than this

5    one, about 25 times lower, even that number was still

6    measuring push versus polling.  It still wasn't getting down

7    to the incremental value of these patents.

8    Q.   Now, do we know how much the average cost is of a battery

9    in Samsung's phones?

08:58   10   A.   Yes, sir, we do.  One of the documents that Samsung

11   produced showed us what they pay for their batteries, and the

12   average was about ████.

13   Q.   From your review of Mr. Dell's work, did he consider the

14   average cost of the battery at his hypothetical negotiation?

15   A.   It doesn't appear that he did, no, sir.

16   Q.   And so ████ for the entire battery, yet Mr. Dell is

17   asking for $5 a phone for just a couple of percentage points.

18   Is that right?

08:59   19   A.   That's correct, yes, sir.

20   Q.   Now, were you able to use -- use the average cost of the

21   battery life in Dr. Foster's numbers?

22   A.   Yes, sir.  I did a calculation here just to illustrate --

23   this still -- we're still not getting down to the incremental

24   contribution of these patents, but just to illustrate this,

25   basically the study Dr. Foster talked about yesterday talked

08:59    1    about an improvement of roughly about half a percent.

2         To get half -- assuming that adding a half a percent

3    would be just be proportional in the cost, which is probably

4    conservative because you already have the battery in place,

5    but anyway, making that assumption, that would mean that you

6    could add that much battery life for about a little less than

7    3 cents.

8         And then I adjusted that for the things -- the opt-in

09:00    9    rate and the benefit share, a couple of things that Mr. Dell

10    did, which were also incorrect, but for this purpose I used

11    his numbers, and then I took that difference and I multiplied

12    it, you know, the ratio of that by the $5 to all of his damage

13    number.  And when you do that, you come up with, using this

14    alternative thing which still doesn't get to this incremental

15    value of these patents, you end up with almost $3.7 million

16    instead of $969 million.

09:00    17   Q.   Okay.  I'd like to move on to the next one.  Is it your

18    understanding that Mr. Dell offers opinions that Headwater is

19    entitled to a large part of Samsung's profits?

20   A.   Yes, sir.

21   Q.   Does the evidence support that, sir?

22   A.   No, it does not.

23   Q.   So let's cut to the chase.

24   A.   Sure.

25   Q.   Mr. Dell is asking the ladies and gentlemen of the jury

09:01    1    to believe that $5 per phone is a reasonable royalty.  Do you

         2    believe with all your experience that is reasonable?

         3    A.    No, it's not.  All the evidence I've looked at and all my

         4    experience would tell me that's not reasonable.

         5    Q.    And if -- once again, if the jury finds the patents are

         6    not infringed or are invalid, what is the most appropriate

         7    damages award in this case?

         8    A.    Well, obviously, if there's no infringement or the

         9    patents are found to be not valid, then the appropriate number

        10    would be zero and you wouldn't even get to the work that Mr.

        11    Dell and I did.

09:02   12    Q.    And finally, sir, can you remind the ladies and gentlemen

        13    of the jury who has the burden of proof on damages?

        14    A.    For damages, Headwater in this case, the Plaintiff, would

        15    have the burden of proof.

        16    Q.    Thank you, Dr. Perryman.

        17              MR. REGER:  Pass the witness.

        18              THE COURT:  All right.  Cross examination by the

        19    Plaintiff.

        20              MR. MIRZAIE:  Thank you, Your Honor.  I just need

        21    one moment to set up, and may we pass out binders?

        22              THE COURT:  You may distribute witness binders,

        23    counsel.

09:02   24              MR. MIRZAIE:  Thank you.

09:03   25              THE COURT:  You may proceed, counsel.

|  |  |  |
|--|--|--|
| | 1 | MR. MIRZAIE:  Thank you. |
| | 2 | Good morning, everybody. |
| | 3 | CROSS EXAMINATION |
| | 4 | BY MR. MIRZAIE: |
| | 5 | Q.   Good morning, Dr. Perryman. |
| | 6 | A.   Good morning.  How are you? |
| | 7 | Q.   Good, good.  We haven't had the pleasure of meeting yet. |
| | 8 | Right? |
| | 9 | A.   That's right.  Looked forward to it. |
| | 10 | Q.   Other than saying hi and bye, you know -- |
| | 11 | A.   That's right. |
| | 12 | Q.   -- in the hallway. |
| | 13 | A.   Yeah. |
| 09:03 | 14 | THE COURT:  One at a time, gentlemen; please. |
| | 15 | Q.   (BY MR. MIRZAIE)  Now, you're Samsung's only damages |
| | 16 | expert testifying before the jury this week.  Correct? |
| | 17 | A.   That's my understanding, yes, sir. |
| | 18 | Q.   And it would be accurate to say you've never provided |
| | 19 | opinions in any case for any party that was opposite to |
| | 20 | Samsung.  Correct? |
| | 21 | A.   I don't recall -- I've been doing this a long time.  I |
| | 22 | don't recall being in a party opposite to Samsung. |
| 09:03 | 23 | Q.   And I think you testified on your direct exam, but you've |
| | 24 | been hired by Samsung before.  Correct? |
| | 25 | A.   Yes, sir, I have. |

1   Q.    At least six times.  Correct?

2   A.    I believe that's right, over about 25 years, yes, sir.

3   Q.    And those were fairly significant and important cases.

4   Right?

5   A.    I'm not sure how you define that.  Some of them lasted a

6   long time and some of them didn't.

7   Q.    And this is your seventh case--right?--working with them?

8   A.    I'm not sure if this is sixth or seventh honestly, but --

09:04  9   Q.    But in any event they are a repeat client?

10   A.    Yes.  I've had the privilege of working with Samsung

11   several times.

12   Q.    And your billing rate today is $900 an hour.  Is that

13   right?

14   A.    Yes, sir, that's correct.  That's what my firm bills for

15   my time.

16   Q.    Right.  And your firm bills around 300 to $500 for other

17   people for their time working on the case.  Correct?

18   A.    I believe that's correct, yes, sir.

19   Q.    And so over the years, you've been paid at least $500,000

20   by Samsung for your work on patent cases.  Correct?

09:04  21   A.    Oh, I would think so, yes, sir.

22   Q.    At least a million dollars.  Correct?

23   A.    I would think so.  Several of the cases lasted for quite

24   a while.

25   Q.    At any rate, based on that past experience, Samsung and

09:05

09:05

09:06

```
  1   you have some familiarity with each other, they're familiar
  2   with your work.  Correct?
  3   A.   I presume so.  I'm also very familiar with some of their
  4   technology plants in Texas and that sort of thing as well.
  5   Q.   And so when they faced the allegations in this case, they
  6   turned to you and hired you to be the expert in this case.
  7   Correct?
  8   A.   Now, I don't know the conversations that took place
  9   around that, but I was hired to work in this case.
 10   Q.   And you did work in this case and provided an expert
 11   report containing all your damages opinions.  Right?
 12   A.   Yes, sir.  We had to supplement a couple of times when
 13   Mr. Dell had to make some changes to his report, but yes, sir,
 14   we did.
 15   Q.   And as you testified on your direct examination, your
 16   damages conclusions are based on the comparable license
 17   approach.  Right?
 18   A.   Well, we looked at all of the evidence, but ultimately
 19   that was the best evidence that we had.
 20   Q.   Now, Mr. Dell uses what's known as the income or
 21   analytical approach.  Correct?
 22   A.   I suppose you could call it that.  It's -- it's -- what
 23   he did is -- I suppose you could call it that broadly.
 24   Q.   And you've heard of that approach before?  That's an
 25   approach that's used in patent cases.  Correct?
```

```
 1   A.   Oh, if you do it properly, absolutely you can use it.

 2   Q.   In fact, you've used it before several times.  Correct?

 3   A.   I feel sure that I have.  We always kind of start with a

 4   blank piece of paper and see what evidence we have and then

 5   begin working to find the best evidence.

 6   Q.   And --

 7        THE COURT:  Mr. Mirzaie, slow down a little bit,

 8   please.

 9        MR. MIRZAIE:  Sorry, Your Honor.

10        THE COURT:  Go ahead.

11   Q.   (BY MR. MIRZAIE)  Were you finished, Dr. Perryman?

12   A.   Oh, yes, sir, I was.

13   Q.   And so you'll agree, sir, that you'll also agree that the

14   comparable license approach is not an approach that you can

15   use in every case.  Correct?

16   A.   Oh, I've certainly been in situations where they were not

17   comparable licenses, yes, sir, that's correct.

18   Q.   In many cases there are not any comparable licenses.

19   Right?

20   A.   Probably.  I mean, I don't have a real sense of how many

21   there are and how many there are not.  Usually there seem to

22   me like there's usually something we can use or at least

23   evaluate, but I'm not sure how many have them and how many

24   don't.

25   Q.   But the evidence of the case has to support the use of
```

09:06  at line 13
09:07  at line 23

                1    them.  Correct?

                2    A.    Oh, absolutely.  You always look for the best evidence.

                3    Q.    And in other cases where you've used that approach,

                4    you've based your analysis on licenses that were not

                5    settlements to litigation.  Correct?

                6    A.    Well, again, we try to use the best evidence we have.  If

                7    there are other licenses out there that are not settlements

    09:07       8    that are sufficiently comparable economically and

                9    technologically, we would certainly use them, yes, sir.

               10    Q.    Now, sir, the jury's heard about the hypothetical

               11    negotiation, both during Mr. Dell's opinions before the jury

               12    and during your direct examination.  Right?

               13    A.    Yes, sir.

               14    Q.    And the licenses you rely on, I believe you called them

               15    real-world licenses.  Right?

               16    A.    Correct, yes, sir.

               17    Q.    And to be clear, you refer to them as real-world licenses

    09:08      18    because they weren't hypothetical licenses under the rules of

               19    the hypothetical negotiation.  Correct?

               20    A.    Well, that and the fact that they were negotiated by

               21    parties that have an obligation and a desire to get the best

               22    outcome they can.

               23    Q.    Now, but the rules of the hypothetical negotiation that

               24    apply to the jury's damages decision this week are pretty

               25    specific.  Correct?

09:08    1    A.    I don't want to give any legal opinions, but I think
         2    they're spelled out fairly well, yes, sir.
         3    Q.    And the parties both have to assume the patents are
         4    infringed and valid and that all cards are up on the table,
         5    all information is disclosed between the parties when they
         6    reach a deal.  Fair?
         7    A.    Yes, sir, absolutely.
         8    Q.    And the real world doesn't have to play by those rules.
         9    Right?
        10    A.    No.  There are situations where our technical name we
09:09   11    give it is asymmetric information because we have to have a
        12    long name for everything.  But there are certainly situations
        13    where one party maybe knows something another party does not.
        14    Q.    And there are situations where -- strike that.
        15          And the more closely a license resembles the hypothetical
        16    negotiation, the more information it should be -- the more
        17    informative, rather, it should be in determining a proper
        18    reasonable royalty.  Correct?
        19    A.    Well, certainly you always try to find the most
09:10   20    comparable market evidence that you can find, and licenses are
        21    often an important part of that.
        22    Q.    And if the jury believes that any of the agreements is
        23    either not technically comparable or economically comparable,
        24    they are free to ignore the agreement.  That's their choice.
        25    Fair?

A.   Well, again, I don't want to give any legal opinions, but it's my understanding that the jury weighs all of the evidence in the case, and then makes the determination of how they want to balance and evaluate that evidence.  So I would think that would be the case.

Q.   And there's two -- to be clear there's two requirements for comparability.  There's both a technical comparability requirement and an economic comparability requirement and you got to meet both.  Right?

A.   Yes, sir, that is correct.

Q.   And the hypothetical negotiation, to be clear, is not a negotiation for settlement of a pending litigation.  Fair?

A.   That's my understanding, yes, sir.  It's to take place prior to any alleged infringement.

Q.   Now, sir, each and every single license agreement you relied on for your royalty range is a Samsung settlement agreement for different patents.  Right?

A.   Yes, sir.  The four that we used are settlement agreements.  That's correct.

Q.   They're both settlement agreements and settlement agreements to patents from another party, not Dr. Raleigh's patents.  Right, to be clear?

A.   Oh, yes, sir, from patents that Dr. Foster said were technically comparable to these patents.

Q.   But because they're patents from someone else, that's why

1    they're -- you can't consider them under *Georgia-Pacific*

2    factor 1.  You consider them instead under *Georgia-Pacific*

3    factor 2.  Correct?

4    A.    That's correct.  Sometimes we have a situation in

5    *Georgia-Pacific* factor 1 where the other party's been able to

6    license their technology to other people, and when that

7    happens, obviously you have that evidence of exactly what

8    other people are paying for these very patents.  We didn't

09:11    9    have that in this case because the only license was the ItsOn

10    license.

11    Q.    And so the jury has not seen a single non-settlement

12    agreement where Samsung approached a patent owner and said,

13    you know what?  I'd like to take a license to use your

14    patents.  Correct?

15    A.    I don't know the history and the back and forth on all of

16    those agreements and to that level of detail, but they were

17    all settlements of litigation.

18    Q.    The jury hasn't seen one non-settlement agreement signed

09:12    19    by Samsung.  Right?

20    A.    That's correct, yes, sir.

21    Q.    And in each settlement agreement, there was a pending

22    litigation where Samsung disputed even whether they use the

23    patent.  Correct?

24    A.    Again, I don't know all the contentions and all the

25    litigation.  Normally there is a disagreement about those

1    types of things if you are involved in litigation.

2    Q.    There's a -- they disputed whether the patents were even

3    valid.  Right?

09:12    4    A.    Again, I don't know if that was the case in all of these

5    agreements or not, but that's not uncommon that's one of the

6    issues at issue in this case.

7    Q.    And this week has been filled with analogies.  I think

8    you used a real estate analogy in your direct examination.  Do

9    you recall that?

10    A.    Yes, sir, I do.

11    Q.    Where the infringer is looking for the right price of

12    rent to pay, I think is what you said.

13    A.    I used that analogy, yes, sir.

14    Q.    And, again, in all of the agreements that you're relying

15    on, Samsung was disputing whether they even used the patent or

09:13    16    whether the patent was valid.  Right?

17    A.    There was obviously some level of disagreement at some

18    point in the process because they were in litigation, yes,

19    sir.

20    Q.    So Samsung claimed it didn't need to pay for rent in the

21    first place because it wasn't on the property in the first

22    place.  True?

23    A.    Again, I don't know all the back and forth of all the

24    litigations, but Samsung obviously had a position that was

25    different from the position of the other party.

09:13    1    Q.    To use your analogy again, sir, Samsung claimed the

         2    property deed was invalid as well.  Right?

         3    A.    Assuming that that was one of the issues in the case,

         4    that is an analogy they potentially could have used, I

         5    suppose.

         6    Q.    Now, the Court will instruct the jury on the damages

         7    instructions later, but you'd agree that if there are

         8    differences between a license agreement and the hypothetical

         9    license, you must take those into account in determining your

        10    reasonable royalty.  Correct?

09:14   11    A.    Oh, you certainly need to make adjustments when they're

        12    appropriate as we did, yes, sir.

        13    Q.    And there could be many differences between the two--the

        14    hypothetical negotiation on the one hand and settlement

        15    agreements or licenses that you review on the other hand.

        16    Right?

        17    A.    Oh, there certainly could be.  And, again, that's why you

        18    have to make appropriate adjustments.

        19    Q.    And to settle your claim before trial, that means you

        20    wouldn't have to go through this whole process this week.

        21    Right?

        22    A.    Yes, sir.  That's correct.

        23    Q.    And we agree it's an expensive process costs millions of

09:14   24    dollars.  Fair?

        25    A.    I would assume so, yes, sir.

1    Q.   And some patent owners settle because they rather not go

2    through the process and subject themselves to this scrutiny.

3    Right?

4    A.   Yeah, I would assume some patent owners pay a premium in

5    order not to go through this process, yes, sir.

6    Q.   Yeah.  And Dr. Raleigh, he sat for cross examination this

7    week.  Right?

8    A.   Yes, sir, he did.

9    Q.   And in the transcripts that you cite in your report, he

09:15    10    sat for over 35 hours of deposition.  Do you recall that?

11    A.   I didn't count the hours.  There were a lot of

12    depositions.  I have no reason to doubt that.

13    Q.   Thank you.  And not everyone wants to go through that.

14    Right?

15    A.   Probably not.

16    Q.   Some patent owners may not believe in the strength of

17    their case.  Fair?

18    A.   There may be patent owners who don't think their patents

19    are valid or don't think they're infringed.  I suppose that's

20    possible.

21    Q.   They'd just rather settle their claim and dispute

22    instead.  Right?

23    A.   I would think if they didn't think their patents were

09:15    24    valid and they didn't think their patents were infringed, they

25    probably wouldn't want to go through this process.  I think

that's correct.

Q.    Dr. Raleigh did want to go through this process.  Fair?

A.    Well, I'm not sure if he wanted to or not.  He's certainly in the middle of it right now.

Q.    Now, sir, one of the differences the jury can absolutely consider is whether the settlement agreement and the fact that there was litigation impacted the amount of the license.  Right?

A.    Certainly you can -- again, as I understand it, and I'm not giving a legal opinion, but as I understand it, the jury can weigh all of the facts that are out here in the case.

Q.    And you provided an expert report in this case.  Correct?

A.    I did, yes, sir.

Q.    It included all of your opinions.  Right?

A.    Well, again, we had to supplement it when -- as Mr. Dell made some corrections, but I tried to put all our opinions in the reports.

Q.    And based on those opinions in the supplement, you reached a conclusion that there is no evidence that any of the cases settled or settlement amounts were influenced due to litigation.  Correct?

A.    Yes, sir.  They were all -- in the sense that they were all arm's length transactions with firms that have an incentive to maximize their benefit.

Q.    That's not really true, is it, sir?

A.    In a marketplace that's pretty much how things work.  I'm not sure what you're saying.

09:17  Q.    The fact that you've concluded in your expert report that there's no evidence that any of the cases settled or that the settlement amounts were influenced by litigation, that's not quite right, is it?

A.    I'm not aware of any evidence of that.  I'd be happy to look at anything.

Q.    Let's look at some then.  If you could look at your screen?

A.    Yes, sir.

MR. MIRZAIE:  If I could have slide 1.

Q.    (BY MR. MIRZAIE)  This is the Seven/Samsung settlement
09:17  agreement that you discussed on your direct examination, and in fact this is your slide from your direct examination.  Correct?

A.    Yes, sir, absolutely.

Q.    We did add some highlights, though, I should note.

A.    I see that, yes, sir.

Q.    Now, you see in the highlights here that it says that the licensor believes the amount is, quote, substantially less than the amount that licensor, the patent owner, contends would constitute a reasonable royalty.  Do you see that?

A.    Yes, I do.

09:18  Q.    And the licensor was agreeing because, quote, the release

          1    and license prior to trial in the litigations and IPRs and

          2    there are significant unknowns and uncertainties with respect

          3    to the resolution of this matter.  Do you see that?

          4    A.   Yes, sir, I do.

          5    Q.   And further down, the parties agree that the payment does

          6    not reflect a calculation based on applying a reasonable

          7    royalty.  Right?

          8    A.   Yes, sir, I see that.

          9    Q.   And the Seven agreement was the first agreement you

         10    showed the jury, wasn't it?

09:18    11    A.   Yes, sir, absolutely.  This page in fact.

         12    Q.   And the jury's free to determine whether this was

         13    influenced based on the fact that it settled litigation or

         14    not.  Fair?

         15    A.   Again, my understanding is certainly the jury's entitled

         16    to weigh all of the evidence in making an appropriate

         17    determination.

         18    Q.   And you'd agree, sir, that under the rules of the

         19    hypothetical negotiation, what's highlighted here absolutely

         20    wouldn't be true of the rules of the hypothetical negotiation.

         21    Correct?

09:19    22    A.   This is a very common clause you see in a lot of

         23    agreements these days.  But, again, the hypothetical

         24    negotiation is trying to -- factor 2 is trying to use

         25    available licenses for comparable technology to try to

1    determine what parties would pay, and these two are parties

2    that were -- had obligations and expectations to do what they

3    thought was best for their organizations in reaching this

4    agreement.

09:19  5    Q.   And despite providing a report basing your conclusions on

6    analysis that there's no evidence that the fact that there was

7    litigation risk impacted the amount of the license agreement.

8    The jury sees right here on the screen that the licensor

9    believes the amount is, quote, substantially less than the

10   amount that licensor contends would constitute a reasonable

11   royalty.  Right?

09:20  12   A.   Yes, sir.  This is the language I showed them earlier,

13   yes, sir.

14   Q.   Now, in another agreement that you show the jury, I think

15   the only other agreement was the MTEL/Samsung agreement.

16   Correct?

17   A.   Yes, sir, that is correct.

18   Q.   And you have it here, this is your slide from your direct

19   examination, entitled MTEL/Samsung agreement clause, a

20   real-world negotiation.  Do you see that?

21   A.   I'm sorry.  Just one second.

22   Q.   This is your slide --

23   A.   Oh, yes, sir.  Oh, you mean the title.  Yes, sir, I see

24   that.

09:20  25   Q.   Yeah.

1    A.    I was looking at the text.

2    Q.    In this settlement agreement, the second of two that you

3    show the jury, the settlement of the dispute was, quote,

4    acknowledged and agreed that it had been, quote, entered into

5    solely for the purpose of settling and compromising the

6    litigation and to avoid the expense and uncertainty of

7    continued litigation.  Do you see that?

8    A.    Yes, sir, very much so.

09:21    9    Q.    But your opinions today and yesterday are based on the

10    assumption that no agreement has any clause impacting the

11    price based on the uncertainties of litigation.  Correct?

12    A.    Oh, I don't think I gave the opinion that this clause was

13    not there.  In fact, I put it on the screen in at least one of

14    the two cases, and -- but, again, made the adjustments that

15    were appropriate for the different circumstances and

09:21    16    recognized that in both instances, and the others I looked at

17    you were talking about a situation where you have two parties

18    sitting down at a table and coming up with an agreement

19    that -- where both have an obligation to do what's best for

20    their organizations.

21    Q.    Sir, the Seven and MTEL agreements are the only two

22    agreements you showed the jury today.  Correct?

23    A.    In detail, that's correct, yes, sir.

24    Q.    Okay.  And in your opinions and based on your reliance on

09:22    25    Dr. Foster, those were your most comparable.  Correct?

        1    A.   Well, the -- from the technological perspective,

        2    the -- it was the MTEL and the R2.  When I added the economic

        3    analysis to it, really the MTEL was the better of the two, but

        4    I felt like the Seven Networks was also informative.

        5    Q.   Okay.  So MTEL was the better of the two.  Right?

        6    A.   I thought so, yes, sir.

        7    Q.   And that's the MTEL that's shown right here on the

        8    screen.  Correct?

        9    A.   That's correct, yes, sir.

09:22  10    Q.   The one that was entered into, quote, solely for the

       11    purpose of settling and compromising the litigation and to

       12    avoid the expense and uncertainty of continued litigation.

       13    Correct?

       14    A.   That clause is in the agreement, as I stated earlier,

       15    yes, sir.

       16    Q.   And if the jury finds this not comparable, they're free

       17    to ignore it.  Fair?

       18    A.   Again, my understanding, not as a lawyer, but my

       19    understanding is that the jury is in charge of balancing all

       20    the facts and all the evidence they hear and make an

09:23  21    appropriate determinations.

       22    Q.   And because you testified that the other agreements were

       23    less comparable, they're free to ignore those as well.

       24    Correct?

       25    A.   They were all in the same general range, but certainly my

1024

1    understanding is the jury is free to evaluate the evidence as

2    they see fit.

3    Q.    Sir, there are other differences between the hypothetical

4    negotiation and your analysis of the Samsung settlement

5    agreements in this case as well.  Fair?

09:23    6    A.    Oh, they absolutely were not identical.  That's certainly

7    true.  That's -- you're not going to find a real-world license

8    for related different technologies identical to a hypothetical

9    negotiation.

10   Q.    And, sir, I'd like you to focus on my question.  My next

11   question is another difference the jury can take into account

12   is the relative size or resources of the settling parties to

13   Samsung.  Correct?  You don't deny that.  Right?

09:24    14   A.    Oh, I would think, again, factor 15 of the 15

15   *Georgia-Pacific* factors talks about the relative bargaining

16   position of the two parties in the negotiation, and so that

17   would certainly be something that you would take into account.

18   Q.    And in your analysis, you don't really talk about the

19   relative size or resources of the settling parties to Samsung,

20   do you?

21   A.    I don't recall all the words in the report.  I know

22   factor 15 did discuss the relative bargaining positions of the

09:24    23   two.  I don't remember precisely what we said about it.

24   Q.    Well, do you have your deposition transcript in front of

25   you, sir?

|        |    |                                                                   |
|--------|----|-------------------------------------------------------------------|
|        | 1  | A.   I think so, yes, sir.                                        |
|        | 2  | Q.   And if you could turn to page 89.                            |
|        | 3  | A.   Yes, sir.                                                    |
|        | 4  | THE COURT:  This is the October 24 --                             |
|        | 5  | MR. MIRZAIE:  Yes, it is.                                         |
|        | 6  | THE COURT:  -- deposition?                                        |
|        | 7  | THE WITNESS:  Page 89?                                            |
| 09:25  | 8  | Q.   (BY MR. MIRZAIE)  Yes, sir.                                  |
|        | 9  | A.   Yes, sir.                                                    |
|        | 10 | Q.   Do you see a question and answer that goes from line 17      |
|        | 11 | to 24, sir?  Do you see the question and answer there?            |
|        | 12 | A.   Yes, sir, I do.                                              |
|        | 13 | Q.   Okay.  And so I'll ask you again, you don't believe that    |
|        | 14 | in your report you really talk about the relative size or        |
| 09:25  | 15 | resources of the settling parties to Samsung.  Correct?          |
|        | 16 | A.   Well, what I said here was that I didn't believe so, that   |
|        | 17 | in the early part of the report I talked about Samsung as a      |
|        | 18 | company.  We really weren't talking about -- it doesn't appear   |
|        | 19 | as if we were talking about the relative bargaining strength     |
|        | 20 | in this particular question, but, yeah, I may or may not have    |
|        | 21 | used those exact words in factor 15.  I don't recall.            |
|        | 22 | MR. MIRZAIE:  Your Honor, may I have permission to               |
|        | 23 | publish?                                                          |
| 09:26  | 24 | THE COURT:  I don't think his answer is inconsistent            |
|        | 25 | with his deposition, so no.                                       |

```
 1              MR. MIRZAIE:  Okay.
 2     Q.   (BY MR. MIRZAIE)  Sir, for a license to be comparable,
 3     the licenses in each case must be examined for the differences
 4     between the technological and economic circumstances.
 5     Correct?
 6     A.   Yes, sir.
 7     Q.   And you'd agree that a few of the factors involve the use
 8     and contribution of the licensed technology to the products at
 9     issue.  Right?
10     A.   That's my understanding, yes, sir.
11     Q.   And it also includes an analysis of the relative
12     importance of the specific patents-at-issue.  Right?
13     A.   I believe so, yes, sir.
14     Q.   After all, not all patents are equal in value.  Fair?
15     A.   Oh, absolutely.  I took account of that in my analysis,
16     yes, sir.
17     Q.   Some are infringed, some are not.  Right?
18     A.   I would presume so.
19     Q.   Some patents in the world are valid; some patents are
20     invalid.  Right?
21     A.   That's been my experience, yes, sir.
22     Q.   Even two push messaging patents don't necessarily have
23     equal value.  Fair?
24     A.   They can have different relative contributions, yes, sir.
25     Q.   Now, you relied on Dr. Foster for all your technical
```

09:26 — line 11
09:27 — line 22

1    comparability opinions, didn't you?

2    A.    For technical comparability, absolutely, yes, sir.

3    Q.    But he didn't perform an explicit analysis of the

4    importance of the technology being licensed in the license

5    that you show the jury today.  Correct?

6    A.    Well, I will let Dr. Foster speak to specifically what he

09:27  7    did.  He -- I asked him to analyze a series of licenses, about

8    15 of them, and tell me the ones that had technically

9    comparable technology, and then he relayed that information to

10    me.

11    Q.    Sir, you're not aware of any relative metric or anything

12    like that between the importance of the technology to Samsung

13    here and the importance of the different accused technology in

14    those cases in the settlement agreements you showed the jury.

15    Right?

09:28  16    A.    All I can -- Dr. Foster could answer that I'm sure better

17    than I could.  All I can say is he looked at a number of

18    agreements and a couple of ones I used he said were

19    substantially technically comparable and others were

20    technically comparable to the extent it would be appropriate

21    to rely on them.

22    Q.    And you also reviewed the deposition testimony of Mr.

23    Kwak.  Right?

24    A.    Yes, I did.

25    Q.    And he's Samsung's corporate representative on licensing.

1    Correct?

2    A.    Yes.

09:28   3    Q.    And for Seven Networks, I show this here on the screen,

4    we played Mr. Kwak's testimony by deposition in our case in

5    chief this week.  Do you recall that?

6    A.    Yes, sir, I heard that.

7    Q.    You didn't mention this testimony on your direct

8    examination.  Right?

9    A.    No.  I didn't need to, no, sir.

10   Q.    You're saying you didn't need to, but it's true that what

11   this testimony shows is that at the time of the settlement,

12   Mr. Kwak didn't know whether Seven Networks provided

09:29   13   any -- was -- received any sales data from Samsung in the

14   litigation.  Correct?

15   A.    Right.  I don't think he was aware of the details of the

16   litigation.  That's correct.

17   Q.    And he was also asked, Did Samsung use any of the

18   technology that was licensed to it under the Seven Networks

19   agreement.  He said, I don't know.  Right?

20   A.    Again, my understanding is -- and I also talked to Mr.

21   Kwak.  My understanding is that he did not -- he was not aware

22   of the details of this.

23   Q.    He also wasn't aware whether Samsung even planned to use

09:29   24   the technology licensed in that case.  Right?

25   A.    Again, that's my understanding.  He was not aware of a

1       lot of the details of this license.

2       Q.    Now, the rules of the hypothetical negotiation that we

3       all have to play by this week, those rules are different.  You

4       have to assume use and assume validity of the patents.  Right?

5       A.    Yes, sir.

6       Q.    Mr. Kwak also testified this week on the MTEL agreement.

7       Right?

8       A.    He did, yes.

9       Q.    And you didn't discuss that with the jury, either.

10      Correct?

09:30   11      A.    No.  I think you played that testimony, but I'm aware of

12      it.  Again, I've spoke with Mr. Kwak.

13      Q.    And he also testified on MTEL which I believe

14      it -- strike that.

15          He also testified, as shown on this screen, that he

16      doesn't know exactly whether Samsung provided any sales data

17      to MTEL before that settlement.  Correct?

18      A.    That's correct.  Again, he was not aware of a lot of the

09:30   19      details on some of these very specific agreements.

20      Q.    And we don't have to go through the ones that you didn't

21      show the jury, but the same is true for the R2 and BNR

22      agreements.  We can agree on that.  Right?

23      A.    Generally I think it's accurate that Mr. Kwak was not

24      aware of all the details of these agreements.

25      Q.    Okay.  So -- and, sir, you've been here all week, and you

1    know that Samsung has not provided any evidence of a

2    non-infringing alternative, either.  Correct?

09:31    3    A.    That gets into technical issues, but I don't recall

4    anything of that nature.

5    Q.    And so all settlements -- strike that.

6        So to summarize, all of the agreements that you discussed

7    during your direct examination, all the Samsung agreements --

8    A.    Yes, sir.

9    Q.    -- those are settlement agreements.  Right?

10    A.    They were, absolutely.

11    Q.    Samsung never admitted infringement or use.  Correct?

12    A.    Oh, in the agreements?  No.  They wouldn't write in there

09:32    13    that there was infringement or admitted validity, I would

14    think.  No, sir.

15    Q.    Samsung never admitted validity.  Right?

16    A.    I wouldn't think so, no, sir.

17    Q.    According to Mr. Kwak, there's no evidence of extent of

18    use or sales data exchanged.  Correct?

19    A.    I'm not aware of any.  Sales data is available from

20    public sources, but I'm not aware of anything.

21    Q.    You have no evidence of a measurement of benefits,

22    including battery benefits or any other benefit, that was

23    exchanged in those cases.  Right?

09:32    24    A.    I'm not aware one way or the other, that's correct.

25    Q.    No admission from any of those -- in any of those

1    licenses that there are no non-infringing alternatives.

2    Correct?

3    A.    I don't recall that being in a license agreement, no,

4    sir.

5    Q.    Okay.  And the jury's entitled to review the jury

6    instructions and look at these facts and decide these

7    settlement agreements are just not comparable; we shouldn't

09:33    8    use those low numbers.  Fair?

9    A.    Again, as I've said several times, it's my understanding

10   that the jury weighs all of the facts and all of the evidence

11   and makes the determinations they feel are appropriate.

12   Q.    Now, sir, you also talked about at length another

13   agreement.  That's the InterDigital purchase agreement.

14   Strike that.

15        You also talked about the InterDigital non-binding letter

16   of intent.  Do you recall that?

17   A.    Yes, I do.

09:33    18   Q.    And, again, that was a non-binding letter.  Right?

19   A.    It did not -- my understanding of it is that InterDigital

20   had the right to walk away from it, but that Headwater did

21   not, is my understanding.

22            MR. MIRZAIE:  Your Honor, I move to strike.  I just

23   asked him if it was a non-binding agreement.

24            THE COURT:  And he responded as he thought it to be.

25   His response is responsive.

1    Q.    (BY MR. MIRZAIE)  It was not a final agreement.  Correct,

2    sir?

3    A.    It was not a final agreement.  That's correct.

09:33    4    Q.    And it certainly wasn't a letter of intent for a patent

5    license agreement for use of the patent.  Right?

6    A.    No.  InterDigital was actually contemplating purchasing

7    all of the patents and owning the patents which conveys more

8    rights.

9    Q.    It's not an agreement that tends to prove an established

10    royalty for using a patent by an accused infringer.  Correct?

11    A.    That's correct.  I saw no evidence of an established

12    royalty for these patents.

09:34    13    Q.    And the damages we're discussing this week, on the other

14    hand, are for Samsung's use of the invention by sales of

15    smartphones.  Correct?

16    A.    Yes.  As I understand the way Mr. Dell framed his

17    analysis, it has to do with the -- with Samsung's use of --

18    the alleged use of the technology in these products.

19    Q.    And InterDigital didn't make cell phones or any other

20    products as far as you're aware.  Correct?

09:35    21    A.    I'm not aware that InterDigital makes phones, no.

22    Q.    And there was a lot of suggestions yesterday and today

23    that -- about the reasons the deal didn't happen.  Do you

24    recall that testimony, sir?

25    A.    Yes, sir.

1033

Q.   Now, I want to be clear, you don't know the actual reason
that the non-binding letter of intent didn't materialize into
an agreement.  Right?

A.   The only thing I'm aware of is that InterDigital did some
due diligence and then the deal did not happen.  As far as
other details, I'm not really aware of those.

Q.   And you provided no opinions in your report or yesterday
or today that Dr. Raleigh even knew of the extent of Samsung's
infringement at the time that deal -- that non-binding letter
of intent was signed.  Right?

A.   Could you repeat that?

Q.   Sure.  You provided no testimony that Dr. Raleigh knew
about the extent of Samsung's use in this case at the time he
signed that non-binding letter.  Correct?

A.   Oh, I did not address that issue as far as Dr. Raleigh's
knowledge at all, no, sir.

Q.   There's no evidence that Dr. Raleigh knew that we'd be
here this week where he's presenting a 600-plus million dollar
damages claim.  Correct?

A.   I certainly didn't see anything like that in the
InterDigital agreement, no, sir.

Q.   No evidence that when that agreement was -- or that
letter of intent, rather, was signed that he hired experts.
Correct?

A.   There's nothing in the letter that indicates that

1    Mr. -- Dr. Raleigh hired experts.  I can't think why he would,

2    but no, I -- no, sir.

3    Q.    And no evidence that you're aware of that InterDigital

4    understood the extent of Samsung's infringement or whether

5    Samsung even infringed these two patents on that date.  Fair?

09:36    6    A.    The agreement doesn't address that.  In fact, it doesn't

7    call out these two specific patents at all, but it just simply

8    says that InterDigital will go into a rigorous patent

9    evaluation process.

10    Q.    And you provided no evidence that InterDigital knew about

11    any infringement of these two patents or Samsung's

12    confidential sales information.  Correct?

13    A.    Oh, I don't think InterDigital would have access to

14    Samsung's confidential sales information, no, sir.  And to my

09:37    15    knowledge, these patents weren't highlighted at all as being

16    anything particularly important in the group.

17    Q.    And neither Dr. Raleigh nor InterDigital had the

18    testimony of any of the experts or any of the confidential

19    documents this week.  Correct?

20    A.    I'm not sure what all Headwater was obligated to provide

21    an extensive amount of documentation to InterDigital.  I don't

22    know if some of that overlaps with what was produced here or

09:37    23    not, but certainly not the expert opinions and that sort of

24    thing.

25    Q.    Thank you.

            1          And you didn't speak with anyone at InterDigital to get

            2    that evidence.  Correct?

            3    A.   Oh, no, sir, not at all.

            4    Q.   And I want to be very clear here so we can avoid

            5    confusion.  When it comes to patents, the acquisition price is

            6    not a legal cap on damages.  Correct?

            7    A.   That sounds like a purely legal opinion.  It makes sense

            8    to me, but I would not be the person to ask.  I'm not

            9    disputing it in any way.

09:38      10    Q.   It makes sense to you as a damages expert.  It's not a

           11    cap at all.  Right?

           12    A.   Again, I can think of economic reasons why it wouldn't be

           13    is the most I can say about that.

           14    Q.   And in any event you recall the deal had an upfront

           15    payment and a back-end payment as well.  Right?

           16    A.   Correct.  Well, it had some warrants that potentially

           17    could turn into a payment.  Correct.

           18    Q.   And it would sound reasonable to you that Dr. Raleigh

           19    would have thought that, had the agreement gone through, it

09:38      20    would have been worth hundreds of millions of dollars.  Fair?

           21    A.   Well, he testified that he thought that.  I have no

           22    reason to doubt his honesty.

           23    Q.   And to be clear, sir, your conclusions that you presented

           24    to the jury were a range of royalties based on Samsung's

           25    settlement agreements today.  Correct?

| | |
|---|---|
| 1 | A.   Correct.  That was the best evidence we had, yes, sir. |
| 2 | Q.   InterDigital was not part of that range.  Correct? |
| 09:39  3 | A.   Oh, no, sir.  They were not a -- it was not a patent |
| 4 | license.  It was a potential patent purchase agreement. |
| 5 | Q.   Yeah.  So InterDigital was not part of your damages |
| 6 | conclusions in terms of the range of royalties that should be |
| 7 | owed, nor was it part of Mr. Dell's, either.  Correct? |
| 8 | A.   It was not a part of mine.  I wouldn't think it would be |
| 9 | for anyone. |
| 10 | Q.   And the jury's entitled to take all of that into account |
| 11 | to decide whether they rely on it or not.  Fair? |
| 09:39  12 | A.   Again, my understanding is that the jury -- and I |
| 13 | listened to the Court's reading at the beginning of the case |
| 14 | and I've heard similar ones before.  My understanding is the |
| 15 | jury is the sole arbiter of the facts that -- in the case and |
| 16 | weighing those facts, yes, sir. |
| 17 | Q.   That's right.  Now, you also talked about the ItsOn |
| 18 | license.  Do you recall that? |
| 19 | A.   Yes, sir. |
| 20 | Q.   And you -- that's in DTX 4.  And that actually is a |
| 09:40  21 | *Georgia-Pacific* factor 1 license.  Agree? |
| 22 | A.   I guess technically it could be because it granted a |
| 23 | license to all of Headwater's patents to ItsOn and it was |
| 24 | entered into initially before these patents were issued, but |
| 25 | the license did say it also included future patents.  So I |

09:40

1    guess technically you could regard that as a license.  It

2    certainly wouldn't meet the other criteria to be a comparable

3    license, but it would be a license to the patented technology.

4    Q.    Now, I wanted to just briefly touch on that.  You showed

5    the spread -- a snapshot of the spreadsheet in DTX 3.  Do you

6    recall that?

7    A.    Yes, sir.

8    Q.    But -- and I believe you said that it was informative of

9    your damages opinions.  Correct?

10   A.    Informative, yes, sir, in that it helped me to understand

09:41

11   whether or not there was an established royalty for the use of

12   these patents.

13   Q.    And the total royalties due were 2.3 million or so.  Do

14   you recall that, sir?

15   A.    Yes, sir.

16   Q.    And ItsOn didn't sell ███████ phones.  Correct?

17   A.    No, I don't believe so.  I don't think they were able to

18   sell a lot of products at all.

19   Q.    Did they sell any phones?

20   A.    Phones?  No, I don't think so.

21   Q.    Thank you.

22         Now, those numbers you showed the jury were based on

23   royalty rates.  Right?

09:42

24   A.    As set forth in the agreement, that's correct.

25   Q.    You didn't show the jury those rates, did you?

1    A.    No, sir, I did not.  Again, that agreement was not

2    comparable for a reasonable royalty here.

3    Q.    But it was informative, I think you just testified.

4    Correct?

5    A.    Well, it was informative in the sense it helped me

6    understand that there was not an established royalty for these

7    patents.  I mean, it was not an arm's length transaction.  I

8    mean -- and I talked about that there was many issues.

09:42  9    Q.    But just to be complete, the royalty rates in those

10    agreements were between 3 percent and 7 percent, as shown in

11    the spreadsheet at DTX 3.  Agree?

12    A.    I believe that's correct, yes, sir.

13    Q.    And even 3 percent of the average sales price here would

14    be $13 per unit, wouldn't it?

15    A.    Well, that's the math, but it's not remotely comparable.

16    As you said, there were no phones involved.

17    Q.    Now, in your direct examination, you provided your

09:42  18    opinions on the adjustments you made for the agreements you

19    relied on.  Right?

20    A.    Yes, sir.

21    Q.    At no part did you provide evidence on the exact sales

22    unit or the extent of use by Samsung in those other cases.

23    Right?  In the other cases that were settled as part of the

24    settlement agreements.  Right?

25    A.    No, sir.  We talked about that before.  That's correct.

           1    Q.    Correct.  You didn't make any adjustment for the use in

           2    those cases.  Right?

09:43      3    A.    Well, again, it was -- they were licenses agreed upon by

           4    independent parties, both parties having obligations to try to

           5    get and desire to get the best outcome they could get.  But

           6    beyond that, I didn't go in and evaluate any technical usage

           7    of the patents or anything like that.

           8    Q.    Now, again, we all have to play by the rules in this

           9    court.  Right, sir?

          10    A.    Yes, sir, we do.

          11    Q.    And you're familiar with the statute on patent damages

09:43     12    that's 35 U.S.C. §284, aren't you?

          13    A.    Oh, yes, sir.  Again, I'm not an attorney.  I've seen

          14    this many times.

          15    Q.    Many times.  And what it says here that the reasonable

          16    royalty shall in no event be less than -- strike that.

          17    Apologies.

          18          "Upon finding for the claimant, the Court shall award the

          19    claimant damages adequate to compensate for the infringement,

          20    but in no event less than a reasonable royalty for the use

09:44     21    made of the invention by the infringer."

          22          Did I read that correctly?

          23    A.    You did, yes, sir.

          24    Q.    Now, Mr. Dell's model, that's a per-unit model.  Right?

          25    A.    He comes up with a lump sum, but the calculation process

1    he uses does involve his past sales and his projections of

2    future sales.

3    Q.    Right.  And it's $5 a unit.  Do you recall that?

4    A.    I do indeed recall that, yes, sir.

5    Q.    More units Samsung sells, the more they use it, the

09:45  6    higher the total amount due.  Right?

7    A.    Well, he ultimately came up with a lump-sum amount that

8    would reflect all of that, but before -- the step before he

9    makes that calculation, the number would be higher if more

10   phones were sold that were infringing.

11   Q.    Now, your number doesn't change one bit based on the

12   sales data because you didn't have the sales data in those

13   other cases.  Correct?

09:45  14   A.    No.  Again, both parties came together with -- and made

15   the deal that they thought was best for their interests.

16   Q.    Now, you -- sir, you had a lot of disagreements with Mr.

17   Dell, but I wanted to highlight a few that -- a few of the

18   items that you might agree on.  Is that okay?

19   A.    Sure.

20   Q.    You agree that he's an expert, by the way.  Fair?

21   A.    He's been designated by the Court as an expert, yes, sir.

22   Q.    And you'd agree that for the damages period in this case,

09:45  23   the damages period that's agreed on in this case, it is

24   irrelevant whether Headwater gave notice of infringement of

25   its patent claims to Samsung.  Right?

1    A.    That sounds like a legal conclusion.  I have no reason to

2    doubt what you're saying.

3    Q.    The damages in this case can't be based on how many

4    employees Headwater had or how many employees ItsOn had.

5    Right?

09:46   6    A.    That's not the criteria we use for evaluating the value

7    of a patent, no, sir.

8    Q.    You can't use the number of patents that Samsung has.

9    Right?

10    A.    That's indicative of -- basically can impact the

11    bargaining position, can impact the contribution they've made.

12    It doesn't go to anything about these specific patents.

13    Q.    And -- thank you.

14          And Mr. Dell, you two agree on the hypothetical

15    negotiation date.  Right?

16    A.    At this point we do, yes, sir.

09:46   17    Q.    Agree on the damages period relevant to this case.

18    Correct?

19    A.    Yes, sir, I believe so.

20    Q.    He calculated the accused number of units correctly.  No

21    dispute there.  Right?

22    A.    As far as past units are concerned.  He had some issues I

23    think were talked about in terms of his projections for the

24    future, but past units I did not see anything to disagree with

25    there.

09:47

09:47

09:48

```
 1   Q.   He calculated the gross profit margin on the products
 2   correctly.  Right?  No dispute there?
 3   A.   I didn't see anything abnormal about that.
 4   Q.   And no dispute that Samsung had no evidence of any
 5   commercially-acceptable non-infringing alternatives.  Right?
 6   A.   Well, there again, I've been in court all week, and I
 7   didn't hear any evidence of that, no, sir.
 8   Q.   Now, you also talked a bit about battery.  Do you recall
 9   that on your direct examination?
10   A.   Yes, sir.
11   Q.   You spoke about the replacement costs or the costs of the
12   battery.  Right?
13   A.   Yes, sir.
14   Q.   Now, again, I want to be very clear.  You have no
15   opinions in this case that the patent damages rules place a
16   cap on reasonable royalty based on the cost of that battery
17   unit.  Right?
18   A.   Oh, as far as I know, there's -- again, you keep asking
19   me legal things.  As far as I know, there's nothing like that
20   that places a cap on it.  I think, you know, there are some
21   common sense things that might weigh on people's opinions
22   about things, but there's certainly -- I'm not aware of
23   anything that sets a cap.
24   Q.   And you were here for Ms. Roberts' testimony yesterday,
25   weren't you?
```

```
 1   A.   Oh, I certainly was, yes, sir.

 2   Q.   So you were here when she made clear you can't just take

 3   a phone and pop in a bigger battery.  Do you recall that

 4   testimony?

 5   A.   I'm very much aware of that, yes, sir, and I do recall

 6   the testimony.

 7   Q.   So it's not even an option to buy a bigger battery to get

 8   more battery life for any given phone.  Right?

 9   A.   Well, I don't know.  When you're talking about very small

10   increments of battery of improvement in battery, that may or

11   may not be an option.  I just don't know.  I know you

12   certainly can't put in a battery twice as big as the one you

13   have now.  I mean, I know, as someone said yesterday, it's

14   really tightly packed inside those things.

15   Q.   Right.  And as Headwater's contended this week, the

16   accused features add 2 to 7 percent battery life for any given

17   specific battery in a phone.  Right?

18   A.   Are you saying that's what Headwater concluded?

19   Q.   Contended.  Correct?

20   A.   Yeah, Mr. de la Inglesia?  Oh, I'm aware that's what he

21   concluded based on comparing to polling, yes, sir.

22   Q.   So taking the same battery which is actually possible in

23   the real world and improving it by 2 to 7 percent.  Right?

24   A.   That wasn't a measure of the incremental benefit of the

25   patents, but I understand you're saying that you could improve
```

09:48 (line 10)
09:49 (line 19)

1    the efficiency of a battery.  There's a number of things that

2    Samsung and other companies do to try to do that.

09:49    3    Q.    And no doubt in this case this week that battery life is

4    important.  Right?

5    A.    Battery life is one of the features that people tend to

6    pay attention to.  It's becoming different now because they

7    last so long that I think everybody's pretty well

8    accommodated.  But, yes, people like to have battery life.

9    Q.    Now, you talked also, sir, about conjoint studies during

10    your direct examination.  Recall that?

11    A.    Yes, sir, I do.

09:50    12    Q.    And -- strike that.  The jury heard from Dr. Groehn this

13    week.  You were here for that, weren't you?

14    A.    I was, yes, sir.

15    Q.    And people in your industry rely on conjoints.  Right?

16    A.    For some purposes.  When it's a proper tool, yes, sir.

17    Q.    Now, unlike Dr. Groehn, you have never conducted or

18    designed a full conjoint on your own.  Right?

19    A.    I don't think I've ever designed the full thing.  I mean,

20    I think he has other people conduct for him.  I think most

21    people do that these days.

22        But I've helped -- again, the ones they use to estimate

23    the consumer price index, the ones they use to estimate the

09:51    24    unemployment rate at the Department of Labor.  I've helped

25    design those.  I don't think I've ever designed it from start

          1    to finish.  I've advised a lot of people about it and --

          2            THE COURT:  Dr. Perryman, slow down a little bit

          3    please, sir.

          4            THE WITNESS:  Yes, sir.

          5            THE COURT:  Thank you.

          6            THE WITNESS:  Yes, sir.

          7            THE COURT:  Go ahead and finish your answer if you

          8    weren't complete.

          9            THE WITNESS:  I think that's fine.

         10            THE COURT:  All right.  Let's go to next question,

         11    counsel.

         12    Q.   (BY MR. MIRZAIE)  Now, you also mentioned some other

         13    experts on one of your slides that Samsung hired this week.

         14    Do you recall that?

         15    A.   I do, yes, sir.

09:51    16    Q.   And they provided no rebuttal to Dr. Conjoint [sic]

         17    survey this week.  Correct?

         18    A.   I don't believe so.  And it had some very basic fallacies

         19    that I pointed out.

         20    Q.   And Samsung itself has conducted conjoints for

         21    smartphones internally.  You saw that.  Right?

         22    A.   Oh, absolutely.  They're very useful when done for the

         23    right purpose in the right way, yes, sir.

09:51    24    Q.   And Samsung didn't present any conjoint to contradict Dr.

         25    Groehn this week, either, did they?

           1   A.   I wouldn't think Samsung would have ever done a conjoint

           2   study like this one because it's not what you're supposed to

           3   use a conjoint study for.  So no, sir.

           4   Q.   So neither Samsung nor you have done any conjoint study

           5   to rebut Dr. Groehn's.  Right?

           6   A.   Well, I don't think a conjoint survey is the appropriate

           7   thing that should have been done here so obviously I didn't do

           8   one.  Yes, sir, that's correct.

09:52      9   Q.   But you have no doubt that the jury's entitled to weigh

          10   the evidence and conclude that if Samsung could do one, they

          11   would have presented one this week.  Correct?

          12   A.   Oh, if Samsung wanted to do something that that like that,

          13   which again is not the right thing to do, but I suppose they

          14   could have done one.

          15   Q.   Now, sir, you also heard evidence this week that there's

          16   no plans to discontinue use of the accused technology.  Right?

09:52     17   A.   My understanding is that notifications are likely to be

          18   with us for a while.  Again, I know there's dispute over

          19   whether or not that actually uses the accused technology and

          20   that's outside my area, but I understand that notifications

          21   are going to continue to be part of what we live with with our

          22   phones.

          23   Q.   So -- and, sir, you'd agree actions speak louder than

          24   words.  We can agree on that.  Right?

09:53     25   A.   It's an old adage that I've generally found to be fairly

1  true.

2  Q.   So if Samsung actually believed that the accused

3  technology was valueless, they could stop using if they wanted

4  to.  Correct?

5  A.   Well, I think Samsung obviously as an entity, part of the

6  reason we're here is Samsung has opinions about whether or not

7  they use the technology at all at this point in time.  But

8  Samsung certainly has the opportunity to evaluate what they

09:54  9  think is in their best interest of meeting the needs of their

10  customers and competing in this -- in this highly competitive

11  market.

12  Q.   Sir, you've also reviewed agreements between Google and

13  Samsung, haven't you?

14  A.   Yes, sir, I have.

15  Q.   And that includes a royalty sharing agreement at -- which

16  is Exhibit PTX 102.  Correct?

17  A.   I don't recall the exhibit number, but I have seen it,

18  yes, sir.

09:54  19  Q.   Okay.  And we don't have to get into the details of that.

20  I don't want to seal the courtroom.  But if the jury wanted to

21  get into the details, they could see the royalty rates at page

22  25 of that agreement.  Right?

23  A.   Yes, sir.  I presume -- I don't know what page it's on,

24  but I know there's royalty rates in there for the -- the

25  agreement that allows Samsung to load certain Google apps into

1    its phones and that sort of thing.

2    Q.    Okay.  You talked about a reference called Lee and a

09:54   3    reference called Herzog.  Do you remember that testimony, sir?

4    A.    Yes, sir.  Those were discussed by Dr. Foster yesterday.

5    Q.    Again, those are not acceptable non-infringing

6    alternatives that Samsung could have turned to.  Agree?

7    A.    My understanding -- and, again, I'm not giving a

8    technical opinion here.  But my understanding is they are

9    prior art for a large part of the technology that Mr. de la

10   Inglesia applied to these patents when he did his analysis.

09:55  11   Q.    No contention that that was a non-infringing alternative

12   this week.  Right?

13   A.    Again, I haven't heard any discussion of non-infringing

14   alternatives.

15   Q.    No contention that Samsung actually considered in the

16   real world to use those.  Right?

17   A.    I'm not aware one way or the other.  I mean, if they're

18   prior art, they're probably -- parts of it are probably

19   embodied in what they use now, but that's way beyond what I

20   would know.

09:56  21   Q.    Sir, in terms of apportionment, again you and Mr. Dell

22   agree that the average gross profit -- you agree on that

23   number.  Correct?

24   A.    I believe so, yes, sir.

25   Q.    And based on that number, as you see on your screen here

in slide 20, Samsung would still be left with all profit

contributed to their contributions.  Correct?

A.   Oh, I would disagree with that completely.  The way that

09:56    contribution was done bore no relation whatsoever to the

reality of how these things are determined.

Q.   If you were to apply Mr. Dell's $5 rate, they'd still be

left with almost $65.  Correct?

A.   I mean, I agree that if you take $69 and subtract $5, you

get $64.  But I disagree that for something this small, in

terms of overall contribution, that you would end up giving

09:56    six or seven percent of your gross profit for that, makes no

sense at all.

Q.   Now, if we were to take the high end of your estimated

royalty range and divide it by the number of units, would it

surprise you that it would be 2 cents a unit, sir?

A.   I haven't done the math, but that would sound very

reasonable to me, yes, sir.

Q.   And the jury's entitled to consider that Headwater and

Samsung at the hypothetical negotiation would have all of the

evidence we've seen this week, understand that there's no

09:57    non-infringing alternative for Samsung, and conclude that

that's an unreasonable number that Dr. Raleigh would have

never agreed to.  Correct?

A.   Well, they would certainly -- the jury would certainly

have access to all the information we've heard this week, and

1    then they could -- they could look at it and evaluate all of

2    that information and then make a determination as to what they

3    think is appropriate, yes, sir.

4             MR. MIRZAIE:  Pass the witness, Your Honor.

5             THE COURT:  Redirect by the Defendants?

6             MR. REGER:  Yes, Your Honor.

7             THE COURT:  Proceed with redirect, please.

8                    REDIRECT EXAMINATION

9    BY MR. REGER:

09:58  10    Q.    Hello, Dr. Perryman.

11    A.    Hello, Mr. Reger.

12    Q.    Now, at the end, Headwater's lawyer asked you what's the

13    maximum per phone rate that Samsung was paying under your --

14    he said like 2 cents a phone.  Does that sound about right?

15    A.    That's what he said, yes, sir.  I haven't verified that

16    math.

09:58  17    Q.    So I want to talk about the ItsOn agreement, the patent

18    license between Headwater and ItsOn.  All right?

19    A.    Yes, sir.

20    Q.    What I heard was Dr. Raleigh agreed to pay Dr. Raleigh 3

21    to 7 percent.  Did I hear that right?

22    A.    You did, yes, sir.

23    Q.    Did ItsOn ever pay anywhere near that to Headwater?

24    A.    I don't believe so, no, sir.  It was -- the total payment

25    was less than a million dollars.

| | | |
|---|---|---|
| | 1 | Q.   How much per unit did -- does Mr. Dell agree that ItsOn |
| 09:58 | 2 | paid Headwater out of that $937,000?  What does that come out |
| | 3 | to?  Do you remember, sir? |
| | 4 | A.   I don't recall that number.  I think it's a fraction of a |
| | 5 | penny. |
| | 6 | Q.   It's a fraction of a penny that ItsOn paid for the |
| | 7 | licensed technology to license the patents to Headwater? |
| | 8 | A.   That's my understanding, yes, sir. |
| | 9 | Q.   And under your analysis, Samsung would pay 2 cents per |
| | 10 | unit under the Seven agreement.  Is that right? |
| | 11 | A.   Based on the market evidence, I've seen, yes, sir. |
| 09:59 | 12 | Q.   Now, you were asked did Samsung present any survey that |
| | 13 | contradicts Dr. Groehn's conjoint survey.  Do you remember |
| | 14 | that? |
| | 15 | A.   Yes, sir, I do. |
| | 16 | Q.   Sir, if Samsung came to you and said, Dr. Perryman, we |
| | 17 | really want you to do a conjoint survey to rebut Dr. Groehn's |
| | 18 | flawed survey, what would you tell them? |
| | 19 | A.   I would tell them that they shouldn't do that because -- |
| | 20 | in fact, I have told clients that before, that they shouldn't |
| | 21 | do that because it's not the appropriate technique for this |
| | 22 | type of analysis. |
| 09:59 | 23 | Q.   And does that hold true for this case? |
| | 24 | A.   Oh, absolutely, absolutely. |
| | 25 | Q.   Now, counsel asked you some questions about the Seven |

1   agreement.

2   A.   Yes, sir.

3        MR. REGER:  If I could have DTX 20, page 9, please.

4   Q.   (BY MR. REGER)  Now, you had indicated to Headwater's

10:00   5   counsel that this was a real agreement negotiated with folks

6   who were trying to maximize their value.  Is that a fair

7   summary, sir?

8   A.   Yes, sir, it is.

9        MR. REGER:  If I could go to section 4.3, please.

10  Q.   (BY MR. REGER)  This is of the Seven agreement that

11  Headwater's counsel presented to you.  Right?

12  A.   Yes, sir.

13  Q.   Did they show the jury this section?

14  A.   They did not, no, sir.

15  Q.   Does this section support Headwater's view of this

16  agreement or your view, sir?

17  A.   This section supports my view.  It talks about

10:01  18  sophisticated parties at all relevant times, they all had

19  legal counsel, they determined through independent

20  investigation and robust arm's length negotiation that the

21  terms of this agreement would govern the agreement.

22  Q.   Is that the same approach that the parties would take at

23  the hypothetical negotiation?

24  A.   Yes, sir, absolutely.

25  Q.   Do you know if Mr. Dell has ever relied on settlement

1053

10:01    1    agreements in conducting valuations before?

2    A.    I'm not sure one way or the other.  I know he's been

3    involved in a lot of cases, and you tend to see a lot of them

4    these days, but I don't know.

5    Q.    Have you relied on settlement agreements in other cases?

6    A.    I have, yes, sir.

7    Q.    Now, a couple of more questions, sir.

8    A.    Yes, sir.

9    Q.    Headwater's lawyer mentioned the InterDigital deal.  Do

10    you remember that?

11    A.    Yes, sir.

10:01    12    Q.    Do you recall what year that agreement was signed?

13    A.    2020.

14    Q.    Now, in 2020 was Samsung well-known for being one of the

15    largest smartphone makers in the world?

16    A.    Oh, absolutely.  In fact, I think they had the largest

17    market share in the world at that time.

18    Q.    Now, earlier in the trial did you hear that Dr. Raleigh

19    and his team knew how Google's push messaging system worked?

20    A.    Yes, sir, I recall that.

21    Q.    Did he know that before 2020, sir?

10:02    22    A.    I believe so, yes, sir.  That's my recollection.

23    Q.    So Dr. Raleigh and his team knew how Google's push

24    messaging system worked when they signed the deal with

25    InterDigital.  Isn't that right?

```
 1              MR. MIRZAIE:  Objection; speculation.

 2              THE COURT:  This witness has no way of knowing what

 3    Dr. Raleigh knew.  I'll sustain that.

 4              MR. REGER:  Thank you, Your Honor.

 5         Pass the witness.

 6              THE COURT:  All right.  Additional cross

 7    examination?

 8              MR. MIRZAIE:  No, Your Honor.

 9              THE COURT:  Then you may step down, Dr. Perryman.

10              THE WITNESS:  Thank you, Your Honor.

11              THE COURT:  You're quite welcome.

12         Defendants, call your next witness.

13              MR. McKEON:  Good morning, ladies and gentlemen of

14    the jury.

15         Your Honor, Samsung will now play the video testimony of

16    James Fitzgerald.  James Fitzgerald is a former ItsOn software

17    engineer.  His video runs 2 minutes and 26 seconds for

18    Defendants, and zero for Plaintiff.

19              THE COURT:  All right.  Proceed with this witness by

20    deposition.

21                   JAMES FRANCIS FITZGERALD,

22                   BY VIDEO DEPOSITION

23    Q.   Would you start by just stating your full name for the

24    record?

25    A.   James Francis Fitzgerald.
```

10:02 (line 11)
10:03 (line 20)

1    Q.    And you were previously employed at ItsOn.  Correct?

2    A.    Correct.

3    Q.    And is it correct that you were a software engineer at

4    varying levels throughout your employment at ItsOn?

5    A.    Correct.

10:03  6    Q.    And I recognize that your specific responsibilities

7    likely evolved over time, but can you tell me at a high level

8    what you were responsible for as a software engineer at ItsOn?

9    A.    Yeah.  Essentially I started with the company with only a

10    handful of people and kind of started as an individual

11    contributor and rose to manage the Android development team by

12    the end.

10:04  13    Q.    Was most of the software engineering you did during your

14    time at ItsOn software engineering with the Android OS?

15    A.    Android OS and the application, yeah.

16    Q.    Okay.  And if I'm looking at your Linked-in experience

17    profile, there's a sentence that says, "Part of small team

18    which built a mobile policy enforcement and billing engine

10:04  19    from the ground up using the Android OS."

20          Do you see that?

21    A.    Yes.

22    Q.    Can you give me an understanding as to what's meant by

23    mobile policy enforcement and billing engine?

24    A.    Yeah.  Essentially what we did was we had various hooks

25    throughout the Android operating system, so like I said,

1    related to voice text and data.  Any time a user would access

2    data, send a text message, send or receive a phone call, we

3    could classify that traffic and enforce it and then, you know,

4    bill accordingly.

10:05    5       So the example I used to give was like you could have a

6    Facebook-only data plan, for example, because we could tell

7    exactly which traffic was coming from the Facebook

8    application.  Things like that.

9    Q.    What's your understanding of Headwater as a company at a

10    high level?

11    A.    I believe it was just an IP holding company.

12    Q.    Do you have any understanding as to why Headwater was

13    formed?

10:05    14    A.    Just to hold the patents for ItsOn, I believe.

15            THE COURT:  Does that complete this witness by

16    deposition?

17            MR. McKEON:  Yes, it does, Your Honor.

18            THE COURT:  All right.  Ladies and gentlemen of the

19    jury, we're going to take a short recess before we have the

20    next Defense witness.  If you'll simply leave your notebooks

21    in your chairs, follow all my instructions, and we'll be back

22    shortly to continue.  We'll try to keep this to 10 or 12

23    minutes.

24        The jury's excused for recess.

10:06    25            (Whereupon, the jury left the courtroom.)

```
          1              MR. McKEON:  Your Honor, can I ask just one thing?

          2              THE COURT:  Go ahead.

          3              MR. McKEON:  Can we have Dr. Perryman excused?

          4              THE COURT:  Dr. Perryman's excused.

          5         Court stands in recess.

          6                        (Brief recess.)

          7              THE COURT:  Be seated, please.

10:17     8         All right.  Let's bring in the jury, please.

          9              (Whereupon, the jury entered the courtroom.)

10:18    10              THE COURT:  Please be seated, ladies and gentlemen.

         11         Defendants, call your next witness.

         12              MR. McKEON:  Your Honor, Samsung will now play the

         13    video testimony of Dr. Greg Raleigh, of course, who's the

         14    founder and CEO of Headwater, founder and CEO of ItsOn, and

         15    the inventor of the '117 and '723 Patents [sic].

10:18    16         This video runs 8 minutes and 55 seconds for Defendants

         17    and 1 minute and 45 seconds for Plaintiff.

         18              THE COURT:  All right.  Proceed with this by

         19    deposition.

         20         I do, before you play the deposition, want to tell the

         21    jury, under certain rules--in this case, it's Rule 32 of the

         22    Federal Rules of Civil Procedure--the Defendants' entitled to

         23    play the deposition of Dr. Raleigh even though he's here and

         24    in the courtroom and has testified live.

         25         You might think that's unusual, but the rules give them
```

10:18  1    that latitude and there's nothing wrong with them presenting

2    him by deposition when he's available in person under these

3    circumstances.  Okay?

4        All right.  Let's proceed with this witness by

5    deposition.

6                          GREG RALEIGH, Ph.D.,

7                          BY VIDEO DEPOSITION

8    Q.   Good morning, Dr. Raleigh.  Please state your full name

9    and address for the record.

10   A.   Gregory Raleigh, 878 Lakeshore Boulevard, Village,

11   Nevada.

10:19  12   Q.   Did you prepare for today's deposition?

13   A.   Not sure what you mean by that.

14   Q.   How long did you spend preparing for today's deposition?

15   A.   I'm not sure.

16   Q.   Did you confirm that what was stated in those complaints

17   or discovery responses was true and accurate?

18   A.   I wouldn't say it that way.

19   Q.   What way would you say it?

20   A.   Well, I reviewed them and had some privileged discussions

21   with counsel about them.

10:19  22   Q.   So you can't say one way or the other whether the

23   complaint is truthful?

24   A.   I think the complaint is generally truthful, yeah.

25   Q.   So I'll just take these one at a time.  Do you know who

1    runs Headwater Research?

2    A.    Runs.  So on a day-to-day basis, I generally run the

3    business.  And I work with Jennifer, the operations manager.

10:20   4    Q.    Did you play any role in selecting which patents to sue

5    Samsung on?

6    A.    So when it comes to patent selection, that's a hundred

7    percent with the attorneys.

8    Q.    Isn't Headwater Research just two employees?

9    A.    We have two employees at Headwater Research.

10    Q.    Do you currently own a home in Texas?

11    A.    No.

12    Q.    Have you ever owned a home in Texas?

13    A.    No.

14    Q.    How long has it been the case that Headwater Research has

10:20   15    only had two employees?

16    A.    Roughly I would say 18, 20 months, something like that.

17    Q.    Is Headwater's sole business location still in Tyler,

18    Texas?

19    A.    Yes.

20    Q.    How many days have you worked in the Tyler, Texas,

10:21   21    Headwater Research office in the past year?

22    A.    A few.

23    Q.    Less than ten?

24    A.    Yeah.  In the office?  Yes, less than ten.

25    Q.    Other than ItsOn, has any other entity paid Headwater

1  Research for products or services?

2  A.   I don't think so.  I'm not a hundred percent sure.  I'd

3  have to go back and look.  It's been a while and there's been

4  a variety of agreements and discussions, so I'd have to go

10:21  5  back and look.  I don't think so, though.

6  Q.   Since Headwater Research was founded, has it licensed any

7  patents or other technology to anyone but ItsOn?

8  A.   I don't believe so.

9  Q.   Do you have any other financial interests in Headwater?

10  A.   My salary.

11  Q.   And what is that?

12  A.   Roughly $200,000 a year.

13  Q.   Did ItsOn ultimately develop software for use on mobile

14  devices?

15  A.   Yes.

10:22  16  Q.   And was one aspect of that software, at a high level,

17  related to mobile services billing?

18  A.   It was -- okay.  There were features in the ItsOn

19  software that related to mobile services billing.

20  Q.   Is it your understanding that push notifications, as a

21  general concept, are being accused?

22  A.   No, that's not my understanding.

23  Q.   Why not?

10:22  24  A.   Because it's not a general concept.  It's very specific

25  inventions.

1061

1   Q.   And when you say push, what is push?

2   A.   That's a good question.  Again, you have to be very

3   careful when you use general terms like this.  I don't think

4   you'll see too many general terms like that in our claims, and

5   that's why I like to be very careful when people ask me to

6   characterize things generally in the context of an interview

7   like this.  So push can mean a lot of different things to a

8   lot of different people.

10:23   9   Q.   Do you see where it says network system and a service

10   control device link agent?

11   A.   Okay.  I see the terminology you're talking about.  And

12   what's the question?

13   Q.   How would one embody or create a network system that

14   practiced this?

15   A.   Well, a network system, for example, would be a wireless

16   network in this case.  I'm not sure what the question is.

17   It's pretty obvious in the claim term.  So what is it that you

10:24   18   don't understand?

19   Q.   I guess what do you mean by wireless network?  Are you

20   talking about base stations?  Are you talking about servers?

21   Are you talking about gateways?

22   A.   There are many ways to realize a network, a wireless

23   network system.  It's a network for communication between the

24   device and the broader network.  So it's a connection to the

10:24   25   device from the network to the device to allow the device to

          1    communicate.  I mean, this is such a basic term.  I'm not sure

          2    why you're asking about it.

          3    Q.   Did Headwater ever design or develop any software that

          4    implemented push notifications?

          5    A.   Well, that's a big -- I think you need to be more

          6    specific.  Push notifications could mean almost anything.

          7    Q.   Well, using the broadest definition, why don't we start

          8    with that.

10:24     9    A.   What would be your definition of the broadest definition

         10    of push?

         11    Q.   Well, you're the expert.  Why don't I ask you that

         12    question.  What in your mind is a push notification?

         13    A.   When you say 'push', it could mean anything.  You could

         14    email somebody something and that could be called a push in

         15    some people's minds.  So I think you have to be more specific.

         16    Q.   Would you agree that the asserted patents in this case

         17    don't claim to have invented push, broadly speaking, where it

         18    means sending a message from a server to a device without the

         19    device requesting the message?

10:25    20    A.   I'll say again that concept is so broad, I don't think

         21    anybody could own that concept.  It doesn't have enough meat

         22    on the bones to say anything about what the invention might

         23    be.

         24    Q.   All right.  I'm going to ask you some more questions

         25    about push, and to avoid having to say over and over again

        1    what I was saying earlier about a server sending a message

        2    without a device requesting it, can we agree for the purpose

        3    of the rest of this deposition that when I use the word push,

10:25   4    that's what I mean?

        5    A.    No.  You'll have to be more specific.

        6    Q.    All right.  Is there a word that I can use as a shorthand

        7    to express the concept that a server sends a message without a

        8    device requesting it?

        9    A.    If you're asking me to answer any detailed questions

        10   about technology, you'll have to explain the technology to me.

        11   Q.    I'm just trying to --

        12   A.    Push isn't a quick definition, as we've discussed.

        13   Q.    And there's no other word that I can use to describe that

        14   concept?

10:26   15   A.    I find that -- if ever --

        16   Q.    For today.

        17   A.    If ever there's a single word that describes an

        18   invention, it's exceedingly rare.  Maybe never.

        19   Q.    But I think -- we've -- you've already said that push is

        20   not your invention?

        21   A.    I'm not going to answer that question because what is

        22   'push'.

        23   Q.    Okay.  I'm not trying to come up with a word for your

        24   invention yet; I'm just trying to come up with a word for

10:26   25   sending a message from a server without a device requesting

```
 1   it.  But there's not a word that I can use for that?

 2   A.   I'll answer questions that I understand.

 3   Q.   In your view, does claim 1 of the '117 Patent require the

 4   use of push technology?

 5   A.   Okay.  What is 'push'?

 6   Q.   Using any definition that you've ever heard as a start,

 7   and I'm going to ask you what your definition was.

 8   A.   I'm not going to give you that.

 9   Q.   Well would -- using any reasonable definition of 'push'

10   in the industry, would anyone think that --

11   A.   I have no idea what you're asking me.

12   Q.   Well, many phones these days have push capabilities.

13   Right?

14   A.   There we go with 'push' again.  What do you mean by

15   'push'?

16   Q.   The ability to receive messages from a server without

17   requesting them.

18   A.   I don't know why you keep using that definition, but --

19   I'm just not even sure how to answer your question.

20   Q.   When did you first learn of C2DM?

21   A.   I mean, I'm vaguely aware of Android messaging, but not

22   in any detail at this stage.  I don't really know the details

23   of Android messaging, so -- but, you know, if that was a

24   precursor to Firebase, I probably heard the term tossed around

25   when it was being released in the market.
```

10:27 (line 11)
10:27 (line 21)

Q.   Is Firebase also sometimes called Firebase Cloud
Messaging?

A.   I think so.  I'm not sure.  These are just terms for the
Android product.

10:28   Q.   Have you heard it called FCM?

A.   Firebase Cloud Messaging, yeah.

Q.   When did you first become familiar with FCM?

A.   Again, I'm not very familiar with it to this day.  I've
never been familiar with any of these features of the Android.
I know roughly what they do.  I know that they're infringed,
but I don't know much more.  I don't study these things in any
10:28   real detail.  I'm not the infringement person.

Q.   So you're saying FCM you believe infringes the patents in
this case?

A.   I believe -- you know, you're asking me what we filed,
and I believe we filed infringement charts and infringement
contentions on FCM.

Q.   Do you believe that C2DM also practices any of the claims
of the asserted patents?

A.   So there's all these different versions, and I'm, you
10:29   know, sitting here without the complaint in front of me and
some of these things could be under the protective order.  So,
you know, you're throwing terms around that I'm not -- I would
need to see the complaint and that complaint would be modified
by whatever is in the protective order.

```
 1   Q.   So sitting here right now, you don't know?

 2   A.   I'm not privileged to the protective order information,

 3   and that's really where the rubber hits the road, so --

 4             THE COURT:  Does that complete this witness by

 5   deposition?

 6             MR. McKEON:  Yes, it does, Your Honor.

 7             THE COURT:  All right.  Defendants, call your next

 8   witness, please.

 9             MR. McKEON:  Your Honor, Defendant Samsung rests its

10   case.

11             THE COURT:  All right.  Both parties have rested

12   their case in chief.  Do both parties rest and close subject

13   to final jury instructions and closing arguments?

14             MR. FENSTER:  No, Your Honor.  We would like to put

15   on a rebuttal.

16             THE COURT:  Oh, all right.  Do you have a rebuttal

17   case to put on?

18             MR. FENSTER:  We do, Your Honor.

19             THE COURT:  Call your first rebuttal witness.

20             MR. FENSTER:  Your Honor, Headwater calls Mr. de la

21   Inglesia to the stand.

22             THE COURT:  All right.  Mr. de la Inglesia, please

23   return to the witness stand and you remain under oath, sir.

24             THE WITNESS:  Yes, Judge.

25             THE COURT:  And, counsel, approach the bench
```

10:29

10:30

10:30    1    briefly, please.

2                    (The following was had outside the hearing of the

3                    jury.)

4              THE COURT:  Just so you'll know, counsel, according

5    to my records the Plaintiff has 29 minutes and Defendant has

6    24 minutes.

7              MR. McKEON:  Okay.  Thank you, Your Honor.  It's

8    helpful.

9                    (The following was had in the presence and hearing

10                   of the jury.)

11             MR. FENSTER:  And, Your Honor, may I have leave to

12    use the boards?

10:31    13             THE COURT:  You may just as you have during the

14    trial.

10:32    15        All right.  Mr. Fenster, please proceed with direct

16    examination of the witness.

10:33    17             MR. FENSTER:  Thank you.

18        Good morning, ladies and gentlemen of the jury.

19                      <u>ERIK DE LA INGLESIA</u>,

20    having been previously duly sworn, testified further under

21    oath as follows:

22                      <u>DIRECT EXAMINATION</u>

23    BY MR. FENSTER:

24    Q.   Good morning, Mr. de la Inglesia.

25    A.   Good morning.

1  Q.    You have been -- so previously in this trial, you

2  testified to infringement and damages.  Correct?

3  A.    Yes.

4  Q.    And you have been here for the entirety of the trial?

5  A.    I have.

6  Q.    And were you here for the testimony of Samsung's rebuttal

10:33  7  expert, Dr. Foster, yesterday?

8  A.    Yes, I was.

9  Q.    And did anything that he said or anything that occurred

10  in that -- during his examination change your opinion that

11  Samsung infringes the '117 and '733 Patents?

12  A.    Not a thing.

13  Q.    Now, Dr. Foster originally started off testifying that

14  the patents are invalid.  Do you recall that?

10:33  15  A.    I recall he eventually agreed with me.

16  Q.    What was Dr. Foster's actual view in terms of whether the

17  GtalkService invalidates either of the accused products under

18  the proper construction?

19  A.    I understand Dr. Foster -- Dr. Foster's view on the stand

20  was that under proper analysis using proper terms the Gtalk

21  does not invalidate the patents.

10:34  22          MR. FENSTER:  And if we can pull up the trial

23  transcript at 900 at 18 to 22, please.

24  Q.    (BY MR. FENSTER)  And was this Dr. Foster's testimony

25  yesterday, that the accused -- that the GtalkService did not

1    invalidate under the proper construction?

2    A.   Yes, it was.

3    Q.   Now, we heard just at the end of Samsung's case, they

10:34   4    chose to end their case by calling Dr. Raleigh by deposition.

5    Did you -- you heard that?

6    A.   I saw that, yes.

7    Q.   Now, they asked him about is the number of employees they

8    have, whether he works in Texas, things like that.  Does that

9    have anything to do with infringement or validity in this

10   case?

11   A.   No, it does not.

12   Q.   They were asking him whether Dr. Raleigh had any opinion

13   about infringement.  Do you recall that?

14   A.   I recall that question, yes.

10:35   15   Q.   And did you hear him say that he did not have access to

16   the confidential information because of the protective order?

17   A.   That's right.  I have to be under protective order to

18   have access to that.

19   Q.   And did you have access under the protective order?

20   A.   Yes, I was granted that access.

21   Q.   So you had access to all of the source code for Samsung

22   and Google's products and all of their technical information

23   and even the depositions of their witnesses.  Correct?

24   A.   Yes.

25   Q.   And did Dr. Raleigh have access to any of that?

10:35   1    A.   No, he did not.

2    Q.   And is it Dr. Raleigh's job in this case to talk about

3    infringement or determine infringement?

4    A.   I understand that is strictly an expert discussion.

5    Q.   Now, you heard some questions about whether Dr. Raleigh

6    invented push technology.  Do you recall that?

7    A.   I saw those questions, yes.

8    Q.   What is the actual invention that's claimed and how is it

9    defined?

10   A.   This invention is defined by the claims.  It is described

10:36   11   implicitly what it does, how it does it, and it is the

12   technology that allows secure push at scale as is used in the

13   industry.

14   Q.   And does the claimed invention have to have all of the

15   elements of the claims?

16   A.   Yes.

17   Q.   And is it that combination of secure push that's

18   described with all of the elements that allows a

10:36   19   commercially-acceptable push -- secure push system to be used

20   at scale?

21   A.   Not just the combination.  The interaction that provides

22   that.

23   Q.   And you've been here throughout this case.  Has Samsung

24   presented any evidence that it had available to it any

25   commercially-acceptable alternative to the accused products

1    that practice the claimed invention?

2    A.    I have heard no non-infringing alternatives.

3    Q.    And what does that tell you about the value and

10:37    4    importance of the claimed invention?

5    A.    It says they are very important and provide significant

6    benefit.

7    Q.    If Samsung had available to it a commercially-acceptable

8    alternative, do you think they would have presented that to

9    the jury?

10   A.    I would hope so.

11   Q.    Now, Samsung -- let's talk about the validity case.

10:37    12   Samsung has the burden of proof by clear and convincing

13   evidence.  Is that right?

14   A.    Yes.

15   Q.    And in your view, did Dr. Foster meet Samsung's burden of

16   proving invalidity of every single element on the claims by

17   clear and convincing evidence?

18   A.    Not only did he not meet that burden; he stated they were

19   valid under proper interpretation.

20   Q.    Did Dr. Foster present any source code or technical

10:38    21   documentations to actually prove up every single element of

22   the accused products?

23   A.    Not with respect to the accused products, no.

24   Q.    Did Dr. Foster show any schematics or architecture

25   specifications of the GtalkService system?

|    |    |
|----|----|
| | 1 | A.    No, he did not, and in my previous answer Dr. Foster did |
| | 2 | not present any software with respect to the Gtalk. |
| 10:38 | 3 | Q.    And we also heard from the Google engineer, Mr. Hansen. |
| | 4 | A.    Yes. |
| | 5 | Q.    And did Mr. Hansen show the jury any code or any |
| | 6 | architecture documents describing the architecture of the |
| | 7 | prior art Gtalk system? |
| | 8 | A.    I did not see any. |
| | 9 | MR. FENSTER:  Ms. Brunson, if I could have the elmo |
| | 10 | for just one minute. |
| 10:39 | 11 | Q.    (BY MR. FENSTER)  Dr. Foster presented -- the only source |
| | 12 | code that Dr. Foster presented was something from API demos. |
| | 13 | Do you recall that? |
| | 14 | A.    Yes, the API demos, yes. |
| | 15 | Q.    And I'm just going to show -- this is Exhibit DX 72. |
| 10:39 | 16 | This is the API demos source code that Dr. Foster showed.  Is |
| | 17 | that correct? |
| | 18 | A.    Yes. |
| | 19 | Q.    This is the only code that he showed the ladies and |
| | 20 | gentlemen and he just showed a small snippet.  Is that |
| | 21 | correct? |
| | 22 | A.    That was my recollection. |
| | 23 | Q.    Now, was the API demos part of the G1 release that was |
| | 24 | actually commercially released in the G1 product or was it a |
| | 25 | different system? |

           1    A.    It's a different system.  It was not in the released

           2    product.

           3    Q.    And did Dr. Foster or Mr. Hansen show the jury any source

10:40      4    code at all that was actually in the G1 prior art system that

           5    they're relying on for invalidity?

           6    A.    No.

10:40      7    Q.    Okay.  We have at the board the '117 Patent, claim 1.

           8    And which elements did you find were missing from the

           9    GtalkService analysis -- Gtalk -- the prior art Gtalk

          10    system --

          11    A.    So I think I identified at least [d], [e], [f], and [h].

          12    Q.    So [d], [e], [f], and [h].  Okay.  So if we can start

10:41     13    with [d], [e], and [f], can you explain to the jury why the

          14    GtalkService was missing those elements of the -- of claim 1

          15    of the '117 Patent?

          16    A.    Well, Gtalk is chat.  So going down the list, there's no

          17    application server.  This is somebody is sending a chat and

          18    someone is receiving a chat.  Right?  An application server is

          19    Facebook.  It is not somebody's mobile device sending a chat.

10:41     20          There's no device identifier.  Gtalk does not know which

          21    device it's sending to.  It is using the JID, which is the

          22    identity of the person.  It does not know what device it's

          23    sending to.  It does not know how many devices are logged in.

          24    And there is no identifier, because the -- that is delivered.

          25    It all goes into the chat client.

10:42

                 And then, finally, within the chat client, when the chat
1

2        client receives the message, it has the ability to publish it

3        to the world using this insecure intent, the implicit intent.

4        And so anybody can look at it.  So it does not meet the

5        requirement for that reason as well.

6        Q.    Okay.  So you're just talking about the secure

7        interprocess communication intent.  That's in 1[h]?

8        A.    Yes.

9        Q.    And does the Gtalk prior art system, the GtalkServices

10       prior art system, did that have a secure interprocess

11       communication service?

12       A.    No.

10:42  13       Q.    Did Dr. Foster actually admit that the prior art

14       GtalkService did not have -- did not meet that element of a

15       secure interprocess service?

16       A.    He did.  I heard him yesterday.

17                 MR. FENSTER:  Can we pull up the trial transcript at

18       912, lines 1 through 5, please?

19       Q.    (BY MR. FENSTER)  And is this the testimony from

20       Dr. Foster that you were referring to where he was asked, And

10:43  21       so the prior art GtalkService, because it doesn't secure the

22       interprocess communication service, doesn't disclose this

23       element under your understanding of what the claim would

24       require.  Correct?

25                 And he said, "I agree with that."

1    Is that the testimony you're referring to?

2  A.    Yes.

10:43    3  Q.    Okay.  And with respect to the '733 Patent, which

4  elements did you find that Samsung did not prove by clear and

5  convincing evidence were met?

6  A.    Well, it's all the evidence that involved the agent

7  identifier.

8  Q.    And why doesn't the Samsung -- I'm sorry.  Excuse me.

9    Why doesn't the prior art GtalkService meet the agent

10:44    10  identifier limitation of the '733 Patent?

11  A.    Well, again, the endpoint -- the reception that's going

12  on in the mobile device is the chat manager.  It's the chat

13  application, it's receiving the message.  It can also then

14  publish that generally.  So there is no identification because

15  it's a chat service to begin with, and wherever that message

16  goes, if it is published generally for anyone to see it, does

17  not meet the requirements.

10:44    18  Q.    Okay.  And, Dr. Foster, do you recall that he admitted

19  that the GtalkService doesn't invalidate -- anticipate either

20  of the claims under the proper construction?

21  A.    That's my recollection of his testimony, yes.

22  Q.    Okay.  If I can turn now to some questions on

23  infringement.

10:45    24    One of the questions -- so do you recall that

25  Dr. Foster's primary argument with respect to the '117 Patent

```
 1   is that while it meets -- while it does all of the functions
 2   that are performed there, he disputes the network server
 3   limitation.  Right?
 4   A.   I understand that's a dispute, yes.
 5   Q.   Okay.  And we'll get to that in a second.
 6        And then yesterday do you recall that he admitted that in
 7   his -- he also raised a second argument with respect to
 8   mapping the application identifier to the message software
 9   process corresponding.  Do you recall that he offered that on
10   direct?
11   A.   I recall that, yes.
12   Q.   And do you recall that he admitted that in his report
13   where he had to disclose all of his non-infringement opinions
14   before the case, that he did not disclose that opinion?
15   A.   That was my recollection.
16   Q.   Okay.  So -- okay.  So what is it that you point to as
17   the app identifier for the '117 Patent?
18   A.   Well, the app identifier is the package name that is sent
19   down through the system.
20   Q.   And do you recall that the argument that Mr. Foster was
21   trying to make, I believe, is that there was a difference
22   between a package -- the device package identifier in the '733
23   and the app identifier in the '117?
24   A.   There is something to that effect.  But the package
25   uniquely identifies the application, the application runs in a
```

10:45 (line 8)
10:46 (line 16)
10:46 (line 18)
10:47 (line 25)

1077

          1    single process.  This is -- I don't think this is technically

          2    even disputed.

          3    Q.   Okay.  So what specific -- what specifically were you

          4    pointing to as both the application identifier and the agent

          5    identifier?

          6    A.   It is the package name.

          7    Q.   Okay.  And is it consistent to point to -- to use the

          8    package name as both the application identifier and the device

          9    identifier -- the device agent identifier?

10:47    10    A.   The device agent identifier, yes.

         11    Q.   And why is that?

         12    A.   Because in each case, the package name is what is used to

         13    identify how the action is performed.

         14    Q.   And is it the case -- what is the relationship between

         15    the components that run in an application and a software

         16    process?

         17    A.   In Android, an application runs as a process.

         18    Q.   Okay.  And so is it the case that all of the device

10:48    19    agents, all of the components all -- are all part of the same

         20    software process?

         21    A.   Yes.

         22    Q.   And is that why the package identifier identifies both

         23    the app and all of the device agents or components within that

         24    app?

         25    A.   Yes.  When you set a package, it knows exactly what the

1078

```
 1    application is and it knows using the same container the

 2    process.

 3    Q.    Okay.  So is there anything that happened with Dr. Foster

 4    about his distinction between an agent identifier and an

 5    application identifier that causes you any concern about

 6    whether Samsung is infringing both the '117 and '733 Patents?

 7    A.    No, no concern.

 8    Q.    Okay.  Let's go to the server architecture.

 9          So did you hear that Dr. Foster agreed that a server is

10    hardware and software that performs the functions of that

11    server?

12    A.    I saw that, yes.

13    Q.    And do you agree with that?

14    A.    I do.

15    Q.    Okay.  And the claim defines the functions of this

16    network server as supporting the network connections,

17    receiving, generating, and transmitting.  Is that right?

18    A.    The three actions that we've talked about, yes.

19    Q.    And did you find in the accused products hardware and

20    software that performs each of the functions recited for that

21    network server in the claim?

22    A.    Yes, I did.

23    Q.    Now, Dr. Foster and Mr. Hansen suggested that there is

24    a -- instead of having one network server, that they had a

25    divided server architecture.  Do you recall that?
```

10:49 (line 4)

10:49 (line 9)

10:50 (line 20)

10:50   1    A.   I remember them discussing that, yes.

        2         MR. FENSTER:  If we can pull up Mr. Hansen's

        3    deposition -- or trial transcript at 743, lines 18 to 22.

        4    Q.   (BY MR. FENSTER)  And do you recall Mr. Hansen saying --

        5    answering, "we can all agree that the distributed or divided

        6    server architecture is one type of server architecture?", and

10:50   7    he answered, "Yes, there are multiple ways to set up your

        8    infrastructure"?

        9    A.   I saw that and that's consistent.

        10        MR. FENSTER:  And then if we can pull up 743 at 23

        11   through 744, line 1.

        12   Q.   (BY MR. FENSTER)  And did Mr. Hansen confirm that a

        13   divided architecture or distributed architecture is still a

10:51   14   server architecture nonetheless?

        15   A.   He did and I agree.

        16   Q.   Now, was there anything in the specification -- does the

        17   specification support your interpretation that a divided

        18   architecture is supported by the specification in the claims?

        19   A.   Yes, and we went through those on direct.  It's at column

        20   16, about a third down, and column 22 I think towards the end.

10:51   21   Q.   You're referring to that portion at 16:22 that says you

        22   can perform over multiple servers and that it can be

        23   distributed over multiple servers, and column 22 referred to a

        24   server that could be a server farm?

        25   A.   Yes, that's right.  The last one was farm; the first one

1    was all the components and functions can spread.

2    Q.    And is that understanding that a server includes a

10:52    3    distributed or divided architecture consistent with how one

4    of skill in the art would understand it?

5    A.    It's consistent with a POSITA's understanding and it's

6    consistent with the inventor's explicit description.

7    Q.    And is it also consistent with how Samsung itself, before

8    it got into this case before the jury, described their system?

9    A.    Certainly in the pre-litigation documents, yes.

10          MR. FENSTER:  Can we pull up JX 58 at page 10,

11    please.

10:53    12    Q.    (BY MR. FENSTER)  And does -- is this a document from

13    Samsung where they're describing their entire system, this

14    distributed architecture as a push notification server?

15    A.    Yes.

16    Q.    And does everything within these lines perform all of the

17    elements, the functions that are recited in the claim for the

18    network message server?

10:53    19    A.    Yes.  All of the three actions are within the parts here,

20    which is the collection of hardware and software that performs

21    that.

22    Q.    And did you also hear Mr. Hansen -- his testimony about

23    that video where he described the same architecture, the same

24    FCM architecture as the FCM server?

25    A.    Yes.  That was the one-minute YouTube video that we

played.

10:53    Q.    That was the one -- do you recall how many takes he said

he took before confirming that that was right?

A.    I think -- well, it was a two-digit number, I don't

recall the exact one.

Q.    Ten?

A.    Sounds right.

10:54    Q.    So did you find -- do you have any hesitation whatsoever

that the accused systems, both the Samsung push system and the

FCM push notification system, both have a network message

server as required by the claims?

A.    No hesitation whatsoever.

Q.    Let me turn you to the benefits question.

        MR. FENSTER:    So if we can pull up PTX 91 at page 7.

10:54    Q.    (BY MR. FENSTER)    So on direct earlier you testified that

-- as to the battery savings that Samsung's phones enjoy as a

result of using the Headwater patents.    Is that right?

A.    That's right.

Q.    Okay.    And did you rely on this document, which was

a -- what did you rely on for the -- to measure how much

10:55    battery is used by each poll?

A.    I relied on the evidence, the evidence provided by

Google.

Q.    Okay.    And Dr. Foster, he said -- he disagreed on the

stand, but did he show any evidence that -- to contradict

1    this?

2    A.    I did not see any evidence presented by him or any

3    presentation of even one lower number.

10:55  4    Q.    Okay.  And with respect to -- okay.  We'll come back to

5    this.  Let me just get back to -- I forgot to --

6        So Samsung also -- Dr. Foster also asserted obviousness.

7    Right?

8    A.    Yes, he did.

9    Q.    Okay.  And did he --

10            MR. FENSTER:  You can take this down, Mr. Mahon.

11    Q.    (BY MR. FENSTER)  Did Dr. Foster show by clear and

10:56  12    convincing evidence any evidence of motivation to combine the

13    GtalkService with the other two references that he proposed

14    combining them with?

15    A.    No.  I didn't see anything.  That was the Lee reference

16    and the long, difficult to pronounce name that related to

17    encryption--no motivation to combine.

18    Q.    I think it was actually the WAP reference --

19    A.    It might have been the WAP reference.

20    Q.    And Kalibjian?

21    A.    Kalibjian.

22    Q.    Is that the one?

23    A.    I think so.

10:56  24    Q.    And did you find any evidence that would suggest that it

25    would have been obvious to a person of ordinary skill in the

1  art at the priority date to combine those references?

2  A.    I did not.

3  Q.    Now, with respect to written description, did you find

4  that -- do you agree that Samsung met their burden of proof to

5  show by clear and convincing evidence that the written

10:57  6  description requirement is not satisfied by Dr. Raleigh's

7  specification?

8  A.    They did not meet their burden of proof.  It's three

9  terms--I think app server, the control link, and the network

10  message server.

11  Q.    And do you recall that Dr. Foster admitted on the stand

12  that network message -- that a person of ordinary skill in the

13  art would understand that network message server would be

14  supported by all of the disclosure in the specification of the

15  control server?

10:57  16  A.    Yes.  I think he specifically mapped it to element 122 in

17  figure 16.

18  Q.    And did you personally find that the specification

19  supported the application servers?

20  A.    Yes, I did.  There is -- let's see.  It's like figure 16,

21  I think figure 64, as well as column 69, portions of it, are

22  relevant.

23  Q.    Okay.  And did you find that the other element that he

10:58  24  talked about was control link?  Do you recall that?

25  A.    Yes.  The control link is -- has a number on it in the

1  diagram on figure 16 and has description of exactly what that

2  numbered element is in the specification.  It's a TCP link,

3  and that's exactly how he understood it.

4  Q.   And does a TCP link carry both data and control playing

5  communications to a person of ordinary skill in the art?

6  A.   Yes.

10:58  7  Q.   So Mr. de la Inglesia, if we can go back to the benefits.

8       MR. FENSTER:  If we can pull up Mr. de la Inglesia's

9  demonstrative at 188.

10       THE COURT:  Mr. Fenster, so you'll know, you have

11  three minutes of designated trial time remaining.

12       MR. FENSTER:  Yes, Your Honor.

13       THE COURT:  Now, did you find that the -- so you

14  concluded that the battery savings was 2 to 7 percent for 2 to

15  4 apps.

16  A.   Yes.

10:59  17  Q.   And what was your conclusion with respect to 8 to 10

18  apps?

19       MR. FENSTER:  If we can pull up 186.

20       THE WITNESS:  That was in the 8- to 16-percent

21  range.

22  Q.   (BY MR. FENSTER)  And which do you think is actually more

23  realistic in the ordinary course?

24  A.   I mean, it's going to be more apps in a realistic place.

25  Q.   Okay.

                    1          MR. FENSTER:  Your Honor, I'll pass the witness.

                    2      Thank you, Mr. de la Inglesia.

                    3          THE COURT:  All right.  Cross examination by the

                    4   Defendants.

10:59       5      Mr. Yang, are you going to use these boards?

                    6          MR. YANG:  No, I'm not, Your Honor.

                    7          THE COURT:  Then you need to take them down and put

                    8   them away, Mr. Fenster, please.

11:00       9          MR. FENSTER:  Yes, Your Honor.

                   10          THE COURT:  All right.  Mr. Yang, you may proceed

                   11   with cross examination.

                   12          MR. YANG:  Thank you, Your Honor.

                   13          THE COURT:  You're welcome.

                   14                      CROSS EXAMINATION

                   15   BY MR. YANG:

                   16   Q.    Good morning, Mr. de la Inglesia.

                   17   A.    Good morning.  We haven't met.  Pleased to meet you.

                   18   Q.    Pleased to meet you as well.

11:00      19      Now, in Android, an Android app, you understand one app

                   20   can have multiple components and multiple processes.

                   21   A.    The app is launched under a process.  I think what you're

                   22   referring to is threads, which is something different.

                   23   Q.    No, I'm not referring to threads; I'm saying an app in

                   24   Android can have multiple components and multiple processes.

                   25   Correct?

```
 1   A.   The default is one process.

 2   Q.   Mr. de la Inglesia, I'm trying to do the courtesy of
11:01
 3   asking you a straightforward question.  I'd appreciate the

 4   same courtesy in your response.

 5        Now, just to be clear --

 6             THE COURT:  Mr. Yang, let me stop you there.  If you

 7   believe the witness is not responsive the your question, you

 8   need to raise that with me.  Don't instruct the witness or

 9   talk to him about whether he is or isn't responsive.  That's

10   part of why I'm here.

11             MR. YANG:  Apologies, Your Honor.

12   Q.   (BY MR. YANG)  So my question is, an app in Android can

13   have multiple components and multiple processes.  Correct?
11:01
14   A.   Not the Android apps in the infringing system.

15             MR. YANG:  Okay.  Let's pull up DDX 726.

16   Q.   (BY MR. YANG)  So what I'm showing you on this screen is

17   the Android developer website that explains what processes and

18   threads are.  Do you see this?
11:02
19   A.   Yes, I do.

20   Q.   Now, this document states you can arrange for different

21   components in your application to run in separate processes.

22   Do you see that?

23   A.   Yes, you can arrange for that to happen in -- if it's a

24   -- in software that has that setting, yes.

25   Q.   Thank you.
```

11:02    1        Now, you just testified that a package name uniquely

         2    identifies a component.  Correct?  Or a process.  Sorry.

         3    A.    Thank you.  A process.

         4    Q.    Okay.  Now, if I have -- let's say I have a

         5    household--two parents, two children, four people in the

         6    household.  Okay?  If I receive a package and it's addressed

         7    to residents, you would agree that that package does not

11:03    8    uniquely identify any one of those individual four people.

         9    Correct?

         10   A.    I mean, if it addresses the family it addresses the

         11   people; if it addresses residents, it addresses residents, and

         12   if it addresses the house, it's To Whom it May Concern.  I'm

         13   not sure I'm understanding the question.

         14   Q.    Oh, let me restate the question.  If a package is

11:03    15   addressed to residents, it does not uniquely identify any

         16   individual member of that four-member family.  Correct?

         17   A.    It addresses whatever is on the address label.  I think

         18   that's how I would think about it.

         19   Q.    And the address label does not uniquely identify any one

         20   of those four family members.  Correct?

11:04    21   A.    If they are the residents that uniquely identifies the

         22   family and it's the family that's living there, that's who the

         23   package would be destined for.

         24   Q.    Now, what you just said for the term 'uniquely', is that

         25   the same definition of 'uniquely' that you applied for

            1    infringement?

            2    A.    I'm sorry.  Can -- I'm going to need clarification on

            3    which infringement you're -- which infringement mapping of

            4    what element we're talking about.

11:04       5    Q.    We're talking about, as we have been for a little while

            6    now, package names and processes, and we're saying does a

            7    package name uniquely identify a process if an app has

            8    multiple processes.  Do you understand where we are?

            9    A.    Yes.

           10    Q.    Okay.  Now, like the house with multiple family members,

           11    if a message just has a package name, which is the application

11:05      12    name, does it tell you how many processes are in the app; just

           13    the package name?

           14    A.    The package name tells you everything about the app and

           15    that's through the manifest definition.

           16    Q.    Does it tell you how many processes are running in the

           17    app?

           18    A.    The app is the process.  I'm sorry if I'm not making that

           19    clear.

           20    Q.    That's okay.  We'll move on.  It's not clear for me

           21    either.

11:05      22          So moving on to invalidity.  Okay?

           23               MR. YANG:  Now let's put up the claims here.  Let's

           24    show DDX 7.1.

           25    Q.    (BY MR. YANG)  Now, the '117 Patent, there's a limitation

1    that requires a plurality of network application servers.

2    Correct?

3    A.    Yes, as part of the limitation.

11:06    4    Q.    Yes, as part of the limitation.  And I'm just focusing on

5    this part of the limitation.  Plurality means one or more.

6    Right?

7    A.    Plurality means I think more than one.

8    Q.    Sorry; more than one.  You're right--more than one.  So

9    this limitation just requires more than one application

10   server.  Correct?

11   A.    In the context of the larger claim, yes.

11:06    12   Q.    Yes.  And it doesn't say anything about it having to be

13   Google application servers or Samsung application servers or

14   anybody's particular application server; it just has to be two

15   or more application servers.  Correct?

16   A.    Two or more application servers that can both be -- have

17   requests that provide indications.  It has to meet the

18   entirety of the claim; it's not sufficient that the noun be

19   there.

20   Q.    Understood and agreed.  But it doesn't matter who owns

11:07    21   those servers.  Right?

22   A.    I don't think that's in the claim.

23   Q.    And the plurality of applications, it doesn't matter

24   whose application it is.  Right?  There just has to be two or

25   more applications.

```
          1   A.   As long as the applications meet the rest of the

          2   requirements, but ownership is not a claim element.  I

          3   haven't checked the dependent claims.

11:07     4   Q.   Fair enough.  We're just talking about claim 1.

          5             MR. YANG:  All right.  Now if we can go to slide 2,

          6   please.

          7   Q.   (BY MR. YANG)  You see 'plurality of device agents' in

          8   the '733 Patent.  Correct?

          9   A.   In that limitation, yes.

         10   Q.   And it doesn't -- you just need two or more device

         11   agents; it doesn't matter who owns the apps that are -- that

         12   correspond to those device agents.  Right?

11:08    13   A.   I don't think ownership is a claim element in any of the

         14   asserted claims.  I don't know whether it appears in any of

         15   the unasserted claims.

         16   Q.   Exactly.  So for the asserted claims, the claims don't

         17   care about whose app it is, who the app developer is, or who

         18   owns the app server.  Correct?

         19   A.   It only cares about what is in the claims.

11:08    20             MR. YANG:  Okay.  Now let's go to slide 33.

         21   Q.   (BY MR. YANG)  Okay.  So I want to talk about these

         22   application identifiers and application names.

         23        Now, for your infringement analysis, you have mapped

         24   these to the package name.  Correct?

         25   A.   I believe that's right.
```

11:09   1   Q.   Okay.  And you were here for Dr. Hansen's testimony

2   yesterday when he said that GtalkServices uses the action name

3   to route messages to the right application.  Correct?

4   A.   I think you'll have to show me Mr. Hansen's testimony.  I

5   don't have it memorized.

11:09   6        MR. YANG:  Can we pull up the sixth slide?

7   Q.   (BY MR. YANG)  This is Mr. Hansen's testimony.  He was

8   asked, "In GtalkService, could app developers use package

9   names inside the action name to help route the message to the

10   right app?"

11        Do you see that?

12   A.   I see that.

13   Q.   And he answers, "Yes.  As a matter of fact that's what we

14   recommended they use for the action name."

15        Correct?

11:10   16   A.   That's right he says--they could.

17   Q.   They could?

18   A.   He does not say they did.

19   Q.   Ahh.  But you understand that in order to satisfy the

20   limitation of an apparatus claims, you just need to have the

21   capability of doing something.  Correct?

22   A.   I think you need to have the -- depends on the claim

23   language.  If there's a 'configured', that's generally

24   correct.

25   Q.   Generally correct.  Okay.

11:10  1        Now, you're not disputing what Mr. Hansen testified to

2    here.  Correct?

3    A.    There is nothing in Gtalk that routed to the right app;

4    it routed to -- it routed to the chat manager, regardless of

5    what was in the action and the chat manager posted that

6    publicly.  Any app could then subscribe to that intent and

7    grab the message.  But the routing was not there in accordance

8    with the claim.

11:11  9    Q.    Well, you heard Mr. Hansen testify that describing it as

10   a bulletin board is incorrect.  You heard him testify to that.

11   Right?

12   A.    I heard that testimony.  I stand by my description.

13   Q.    Okay.  Now, let's be clear here, Mr. de la Inglesia.  You

14   understand the difference between a fact witness and an expert

15   witness.  Correct?

16   A.    Yes, I do.

17   Q.    Mr. Hansen was here to testify as a fact witness.

18   Correct?

19   A.    That's right.

11:11  20   Q.    Okay.  So that means he was only here to testify about

21   the facts.  Right?

22   A.    That's right; not the claims.

23   Q.    Not the claims.  Specifically, he was here to talk about

24   the facts of the GtalkService.  Correct?

25   A.    He was here to talk about whatever his direct testimony

1    was related to.

2    Q.    And that's because he spent 18 years working on Google's

3    cloud messaging system.  Correct?  He knows the facts.

11:12    4    A.    Mr. Hansen can speak to the facts he knows.  He can also

5    characterize things as however he wants.  On some things I

6    disagree with his characterizations.

7    Q.    Now, you're not here as a fact witness, are you?

8    A.    No, sir.

9    Q.    You're here as an expert witness.  Correct?

10    A.    That's correct.

11    Q.    So you're here to offer your opinions.  Correct?

12    A.    Yes.

13    Q.    Okay.  Because you don't actually have any first-hand

11:12    14    knowledge of the GtalkService and how it was developed in

15    2008.  Correct?

16    A.    Sir, I have the source code and I have the evidence that

17    is in this case.  That's what's relevant to understand what

18    GtalkService was doing in 2008.

19    Q.    You didn't create the GtalkService.

20    A.    I've never been employed at Google.

21    Q.    Exactly.

22    A.    Right.

23    Q.    All right.  So you're here to offer opinions.  Correct?

24    Expert opinions, but opinions nonetheless.

11:13    25    A.    I think that's correct, based on my investigation and

            based on the evidence.

1    Q.    Right.  And you're being paid by Headwater a lot of money

2    to offer those opinions.  Correct?

3

4    A.    My hourly rate is I think average for the industry, and I

5    am paid for the amount of time that I spend here.

6    Q.    $750 an hour.  Correct?

7    A.    Yes.

8    Q.    That's a lot of money.  Right?

9    A.    Yes.

11:13  10    Q.    Okay.  Now, you're not saying that package names didn't

11    exist in GtalkService, are you?

12    A.    I'm sorry.  A package name in which GtalkService are we

13    talking about?  The prior art or something else.

14    Q.    The only GtalkService--the prior art, yes.

15    A.    So I'm going to ask for clarification, because there's

11:14  16    the GtalkService that was running on T-Mobile --

17              THE COURT:  Just a minute, Mr. de la Inglesia.  If

18    you don't understand his question, just say, I don't

19    understand your question; don't throw back three or four

20    possibilities.  If you understand it, answer it; if you don't

21    understand it, say, I don't understand it.  All right?

22              THE WITNESS:  Yes, Your Honor.

23              THE COURT:  All right.  Let's proceed, Mr. Yang.

24              MR. YANG:  Thank you, Your Honor.

25    Q.    (BY MR. YANG)  You're not saying that GtalkService didn't

           1    have a package name.  Right?  Didn't use a package name.

11:14      2    A.    I didn't see any evidence of the use of package name in

           3    GtalkService.

           4    Q.    Well, you're not disputing that package names existed in

           5    Android during the GtalkService time, are you?

           6    A.    I think all packages -- all applications have to have --

           7    had to have a package manifest that -- and that includes a

           8    package name.  That's right.

           9    Q.    Exactly.  You're not disputing that, are you?

11:15     10    A.    No.  I think that's -- I think we all agree that

          11    applications are referred to by their package, but not that

          12    the GtalkService didn't use it.

          13    Q.    All right.  Now, the '733 doesn't have a requirement for

          14    secure IPC.  Correct?  That's something from the '117 Patent?

          15    A.    If I remember correctly, secure IPC is 1[h] of '117.  I

11:15     16    think '733 is just -- that's the delivery to the process, if

          17    memory serves.

          18    Q.    Right.  Delivery doesn't have to be over a secure

          19    IPC--correct?--in the '733?

          20    A.    It doesn't have to be; it could be.  I don't know if

          21    there's a dependent claim that addresses that.

          22    Q.    Right.  Now, in the '733, it has the requirement for a

          23    secure interprocess communication, and you say that's the

11:16     24    setPackage in the accused FCM products.  Right?

          25               MR. FENSTER:  Objection, Your Honor; misstates the

1    evidence in the patents.  I think he just misspoke.

2              MR. YANG:  Let me restate it, then.

3              THE COURT:  I'm going to overrule the objection.

4    Either call for an answer or restate your question or move on,

5    counsel.

6              MR. YANG:  Sure, Your Honor.  I'll restate my

7    question.

8    Q.   (BY MR. YANG)  The '117 Patent, secure interprocess

11:16    9    communication, you're mapping that to setPackage.  Correct?

10   A.   I am -- the interprocess communication is mapped to the

11   intent and the intent delivery.  The setPackage makes that

12   specific interprocess communication secure by making it an

13   explicit intent that is delivered in that interprocess

14   communication.

15   Q.   Thank you.  You said it better than I did.

11:17    16        So you heard Mr. Hansen testify that even using the

17   setPackage, there have been instances where people have been

18   able to hijack messages sent over FCM.  Correct?  You heard

19   him testify to that yesterday?

20   A.   I don't recall that testimony.  If you can show it to me,

21   I'd be happy to look at it.

22   Q.   Sure.

23             MR. YANG:  Why don't we put up slide 4.  Sorry.

11:17    24   Give me a second here.  Actually can we pull up the -- yeah.

25   Slide 8.  The next one.  Sorry.  I had the wrong note here.

11:18    1    It's trial transcript 790:6 to 14.

2    Q.    (BY MR. YANG)  Now, he testifies that even when they were

3    using setPackage, he's seen examples of apps using the package

4    name and sender ID of a different app and being installed via

5    side loading or other ways.  Do you see that?

11:19    6    A.    Side loading, I see where he's saying that.  Side loading

7    is jail breaking.  That's breaking the box.

8    Q.    Exactly.  So even using setPackage, it's not a hundred

9    percent secure.  Right?

10    A.    It's a secure IPC when it's setPackage, absolutely.

11    We're not talking about security from a hacker disassembling

12    the machine and installing their own operating system on it.

11:19    13    That's what side loading is.

14    Q.    Right.  And that's how computer security works.

15    Sometimes you do your best to be secure, someone else comes up

16    with a different way to hijack it or get around it, you fix

17    that problem, and that's generally how it works with computer

18    security.

19    A.    No, sir.  Security is based on a standard.  It's the

20    expectation of security that's delivered.

21         THE COURT:  Just a minute.  He asked you a question,

22    you didn't agree, you said no.  He didn't say, Well, then tell

11:19    23    me your version of it.  You're offering information not called

24    for.  Okay?  Limit your answers to the questions called for,

25    please.

1    Let's continue.

2        MR. YANG:  Thank you, Your Honor.

3   Q.   (BY MR. YANG)  Mr. Hansen testified that even using

4   setPackage he was still aware of people receives messages they

5   weren't supposed to get.  Correct?

6   A.   That sounded like what was on the slide.  It's not clear

7   that they could get those messages.

11:20  8   Q.   Now, you heard Mr. Hansen testify that for GtalkService,

9   he wasn't aware of anyone -- any phone receiving a

10  GtalkService message that they weren't supposed to get.  Did

11  you hear him testify to that?

12  A.   You'll have to remind me of his testimony.

13  Q.   Sure.

14       MR. YANG:  Let's put up the same transcript starting

15  2 to 5, the testimony right before that.

16  Q.   (BY MR. YANG)  He was asked, "Now, we talked about

11:20  17  setPackage"  -- Sorry.  "Now, in GtalkServices, are you aware

18  of any phone that actually hijacked a push message that was

19  sent over GtalkServices?

20       "I'm not aware of any apps that did that myself."

21       That is what he said.  Correct?

22  A.   That was his testimony.

23  Q.   And you have no reason to dispute that because you were

24  not working at Google at the time.  Correct?

25  A.   If he doesn't have a recollection, I don't dispute it.  I

1099

1       don't dispute his recollection.

2       Q.   Okay.  And you would agree that the claims don't require

3       100 percent security.  Right?

11:21   4       A.   The claim requires -- the claim requires a security for

5       the purpose -- to meet the purpose.

6               THE COURT:  Mr. Yang, I'll give you the same warning

7       I gave Mr. Fenster.  You have three minutes of designated

8       trial time left.

9               MR. YANG:  Thank you, Your Honor.

10      Q.   (BY MR. YANG)  Now, you've relied on this case on a 2010

11      presentation by Mr. Debojit Ghosh.  Correct?

12      A.   Yes.

11:22   13      Q.   And Debojit Ghosh -- Mr. Debojit Ghosh is a reliable

14      source when it comes to how Google's push messaging system

15      worked in 2010.  Correct?

16      A.   I think so.  He was on C2DM.

17      Q.   And you reviewed that entire presentation and considered

18      everything in that presentation before forming your

19      conclusions.  Correct?

20      A.   Yes.

21      Q.   Okay.  Now, that presentation was posted on YouTube, and

11:22   22      I'd like to play you part of that presentation that you didn't

23      show the jurors.

24              MR. YANG:  So Mr. Andryszak, if we could pull up

25      DDX 7.17 and let's see what Mr. Ghosh has to say.

1          MR. FENSTER:  Objection, Your Honor; hearsay.  I

2    don't think this is impeachment.

3          THE COURT:  What's the purpose of this, Mr. Yang?

4          MR. YANG:  Well, Your Honor, he relied on the

11:22  5    presentation for informing his opinions.  I want to show what

6    he did and did not include in what he presented to the jury.

7    I think it goes to the credibility of his opinions, and if

8    there's relevant information he should be able to -- the jury

9    should be able to see it.

10          THE COURT:  This is not a pre-admitted exhibit, is

11    it?

12          MR. YANG:  No, it's not a pre-admitted exhibit.

13          THE COURT:  All right.  I think Plaintiff is right.

14    This is hearsay.  It's not statements of this witness.  It's

11:23  15    not available for impeachment.  I don't see a basis to present

16    this at this point.

17          MR. YANG:  Well, Your Honor, he's already testified

18    that he reviewed the entire presentation, and so I'm just

19    showing him the documents he relied on in forming his expert

20    opinions.  I think I'm entitled to show the witness what he

21    relied on and what he did and did not show the jury in forming

22    his opinions from a document that he used in this trial.

23          THE COURT:  I'm trying to understand your position.

24    Is this some kind of attempt to refresh the recollection of

11:24  25    the witness?  Is this some kind of rule of completeness?  I

don't see where you're coming from, Mr. Yang.

MR. YANG:  Okay.  I can try to refresh his recollection first, if that works, Your Honor.

THE COURT:  Well, you have about 45 seconds before your time runs out.

MR. YANG:  Fair enough.  Fair enough.

Q.    (BY MR. YANG)  Let me just end with this, then.  Did you review the entire presentation by Debojit Ghosh?

A.    I reviewed the entire document.  That's the Google IO presentation.  I have it in PowerPoint format.

Q.    So you didn't review the actual video of what he said for that presentation, did you?

A.    If it's in my materials considered, I reviewed it, but this is the document that I cited here in court.

THE COURT:  Do you remember if you saw the video?

THE WITNESS:  I do not, sir.

THE COURT:  Then say so, if that's the question.

What else, Mr. Yang?

MR. YANG:  Well, I think the legal rule says that if someone -- I just got this now.  If someone shows part of a writing or says part of something in the court, the other side can ask for the rest of it to be shown, and that's what I'm trying to do, Your Honor.

THE COURT:  Well, typically the rule of completeness is if a portion is shown but not the entirety of it, then you

1102

```
 1   can show the unshown remainder.  He didn't show anything; he

 2   just talked about what he did or didn't see, and now you want

 3   to play the video of something.  He just said he didn't

 4   remember seeing the video.

 5            MR. YANG:  Thank you, Your Honor.

 6       Let me just pull up the slides, then.  How about if I

 7   just work off the slides that he used; that he used.

 8            THE COURT:  You're just -- you're out of time.

 9   We're not going to -- I understand you and I have had a little

10   back and forth here, but if you want in the next 20 seconds to

11   pull something up new, then unless it gets an objection we'll

12   go forward.  If it gets an objection, I'll take the objection

13   up.

14            MR. YANG:  Sure.  Thank you.

15            THE COURT:  Okay?

16            MR. YANG:  Could we pull up the slide presentation

17   from Mr. Ghosh, which is JX -- PTX 91.  We will flip through

18   this and we can go to the slide that introduces C2DM.

19            THE COURT:  Mr. Yang, your time's expired.  I'll

20   give you an extra 60 seconds.

21            MR. YANG:  Go back.  Go back.

22            THE COURT:  And I'll give Mr. Fenster an additional

23   60 seconds if he needs it.

24            MR. YANG:  Thank you, Your Honor.  I didn't mean to

25   interrupt; I was directing Mr. Andryszak.
```

11:25  7

11:25  17

11:26  25

```
            Can you go back.  Go back one more.
  1
  2    Q.   (BY MR. YANG)  All right.  So this is his presentation on
  3    Android Cloud to Device Messaging.
  4    A.   Yes.
  5    Q.   Okay.  And this is what he's announcing in 2010?
  6    A.   Yes.
  7    Q.   Okay.  And this is the version of GtalkService that came
  8    out after GtalkService was introduced in 2008.  Correct?
  9    A.   This is C2DM.  It's not GtalkService.
 10    Q.   Right.  It came after GtalkService.  Right?
 11    A.   Yes.
 12    Q.   Okay.  Now, this slide shows that Cloud to Device
 13    Messaging uses existing connection for Google services.
 14    Correct?
 15    A.   That's what it says.
 16    Q.   Okay.  That's the connection.  Now, did you look into
 17    what that connection is?
 18    A.   I don't -- it's not in the accused products.
 19    Q.   Well, you were here when Mr. Hansen testified that that
 20    is the exact same connection in C2DM as it is for
 21    GtalkServices.  Correct?
 22    A.   You'd have to show me his testimony.  It's not --
 23    Q.   Well, in any event, you didn't show this slide to the
 24    jurors and you did not rely on this slide for your validity
 25    opinions.  Correct?
```

11:27  11

11:27  20

         1    A.    I relied on the entire presentation.

         2            THE COURT:  Your time is expired, Mr. Yang.

         3            MR. YANG:  Thank you, Your Honor.

         4            THE COURT:  Is there any redirect?

         5            MR. FENSTER:  Yes, Your Honor.

         6            THE COURT:  Okay.  You have two minutes,

11:27    7    Mr. Fenster.  That's with the extra one minute.

         8            MR. FENSTER:  If we can pull up JX 30 or my opening

         9    at slide 9.

        10                    REDIRECT EXAMINATION

        11    BY MR. FENSTER:

        12    Q.    Did the accused products use an explicit intent?

        13    A.    No.  I'm sorry.  The accused products use the explicit

        14    intent; the prior art did not.

        15    Q.    And Dr. Foster -- did you hear Dr. Foster agree with you

        16    that that is a secure interprocess communication?

        17    A.    Yes.

11:28   18    Q.    Okay.  Now, did the prior art GtalkServices use an

        19    implicit intent?

        20    A.    Yes.

        21    Q.    And is an implicit intent a secure interprocess

        22    communication?

        23    A.    No.

        24    Q.    Would it be a secure interprocess communication even if

        25    the action name were populated with package?

1105

```
 1   A.   No, it is still insecure.

 2   Q.   Why?

 3   A.   Because it is still published to everyone.

 4   Q.   Does the implicit intent that the prior art system

 5   restrict the apps that can view that?

 6   A.   I'm sorry?

 7   Q.   Does the prior art -- does the implicit action intent

 8   that was used in the prior art restrict which apps can view

 9   that information?

10   A.   It does not and it cannot.

11   Q.   Why not?

12   A.   Because it simply publishes to everyone and has no

13   control over who receives the messages.

14   Q.   And was --

15        MR. FENSTER:  If we can pull up JX 50 and go to the

16   mitigation section.

17   Q.   (BY MR. FENSTER)  This is the Google document saying that

18   the way you avoid insecurity is make intents explicit by

19   calling setPackage.  Correct?

20   A.   SetPackage makes the intent secure--it's now explicit.

21   Q.   And did that setPackage explicit intent exist -- even

22   exist in the world prior to the priority date?

23   A.   It did not.

24   Q.   And so was it used in the prior art system?

25   A.   Absolutely not.
```

11:28 (line 5)

11:29 (line 17)

11:29     1          THE COURT:  Your time's expired, Mr. Fenster.

          2          MR. FENSTER:  Thank you, Your Honor.

          3      And thank you, Mr. de la Inglesia.

          4          THE COURT:  You may step down, Mr. de la Inglesia.

          5          THE WITNESS:  Thank you, Your Honor.

          6          THE COURT:  Mr. Fenster, does this complete the

          7      Plaintiff's rebuttal case?

          8          MR. FENSTER:  It does, Your Honor.

          9          THE COURT:  Now I'll ask again, subject to final

         10      instructions to the jury and closing arguments, do both sides

         11      rest and close?

         12          MR. FENSTER:  Plaintiff does, Your Honor.

         13          MR. McKEON:  Samsung does, Your Honor.  Thank you.

11:30    14          THE COURT:  All right.  Thank you, counsel.

         15      Ladies and gentlemen of the jury, that means you have now

         16      heard all the evidence in this case.  There are certain

         17      procedural steps I have to go through with the parties and

         18      their counsel that don't require your presence.  That's going

         19      to take some time.  It will probably take most of the rest of

         20      the day.  I'm not going to require you to be here for that

         21      because it doesn't involve you, so I'm about to release for

11:30    22      the remainder of today.  I do want you back promptly in the

         23      morning, and I'm going to ask you to be here at 8:30, as you

         24      have throughout the trial.

         25      Now, it is quite possible that I will have everything

1    ready so that I can give you my final instructions on the law

2    at 8:30.  I may need you to wait on me a few minutes.  It's

3    not a precise science here.  But if you'll be here at 8:30,

4    we'll start as promptly as we can either right then or as soon

5    thereafter as we can.

6         I'm going to ask you to take your notebooks to the jury

11:31   7    room when you leave and leave them there.  I'm told by the

8    Clerk's Office your lunch is available in the jury room.

9    You're welcome to stay and have it today.  You're not

10   obligated to since I'm releasing you for the day.  I don't

11   know what it is, but if you can take it with you, you can take

12   it with you; it's up to you.

13        Also ladies and gentlemen, we are very close to the end

14   of the process.  Let me remind you again of all my

15   instructions, including that you not communicate in any way in

11:31   16   the broadest sense of the term with anyone about anything

17   regarding this case, and that includes the eight of

18   yourselves.

19        Now, tomorrow morning when I give you my final

20   instructions on the law, that will be followed by closing

21   arguments for the competing parties through their counsel.

22   Once those closing arguments are completed, shortly thereafter

23   I will instruct you to retire to the jury room to deliberate

24   on your verdict.  I'll send a written verdict form with you to

25   the jury room.  At that point, as I've told you, you go from

11:32  1    being prohibited to discussing all the evidence in this case

2    to being required to discuss the evidence in this case among

3    yourselves as you work together collectively to answer the

4    questions in the verdict form.  And your answers to those

5    questions will need to be unanimous.  So please redouble your

6    efforts to continue to follow, as you have, the instructions

7    I've given you about your conduct.

11:32  8        Please enjoy the rest of the day.  Drive home safely and

9    drive back tomorrow morning safely, and we'll see you at 8:30.

10        The jury's excused for the remainder of today.

11            (Whereupon, the jury left the courtroom.)

11:33  12        THE COURT:  Be seated, please.

13        Counsel, there was no unused trial time.  There was a

14    little extra given to try and bring things to a conclusion.

15        It is 11:33 by my clock.  We're going to break for lunch,

11:33  16    and about 12:30 I'll be back on the bench.  At that time I'll

17    hear motions under Rule 50(a) as urged by either or both

18    parties.

19        After I've given you my rulings on any motions presented

20    to the Court under Rule 50(a) of the Federal Rules of Civil

21    Procedure, we will then have an informal charge conference in

22    chambers where we can collectively review, discuss, and have

23    an open and free-flowing discussion in regard to the most

24    current iteration of the proposed final jury instructions and

25    verdict form.

1109

11:34    1          After that we will see where we are.  I think it is

2    entirely likely that I will get you what I believe to be the

3    final charge and verdict form sometime early tomorrow morning

4    and probably will conduct the formal charge conference at 8:00

5    tomorrow morning.  I'll give you more detailed instructions on

6    that once we complete the informal charge conference.  That's

7    what I think things are shaping up to be.

8          As is this Court's usual practice, if you're involved in

11:34    9    closing arguments, you're not required to be here for the

10    motions under Rule 50(a) or the informal charge conference.

11          At this point, Mr. Fenster, can you tell me on behalf of

12    the Plaintiff who will be presenting closing arguments?

13                MR. FENSTER:  I drew the short straw, Your Honor; I

14    will.

15                THE COURT:  All right.  Mr. McKeon, can you give me

16    the same information from the Defendants' standpoint?

17                MR. McKEON:  Your Honor, I'm not a hundred percent

18    sure where we settle on who's doing what, but it won't be me;

11:35    19    I can tell you that.  I'll be back at the war room.

20          Oh, I'm sorry.  I thought you were talking about the JMOL

21    motions.  Sorry, Your Honor.  I was thinking about something

22    else.  I will be giving the closing argument tomorrow, Your

23    Honor.  I thought you were talking about JMOL.

24                THE COURT:  I'm glad you caught yourself.  I was

25    about to fall out of my chair.

1       All right.  So both lead counsel will be presenting

2   closings.  Correct?

3           MR. FENSTER:  Yes, sir.

4           THE COURT:  You gentlemen are not required to be

5   here this afternoon, although if you want to you're welcome,

11:36   6   but there are -- the one thing we have no shortage of in this

7   case is plenty of capable lawyers, so as long as each side is

8   fully staffed at 12:30, we'll proceed with the Rule 50(a)

9   motions then, and then move on to the informal charge

10  conference.

11      Is there anything I need to hear from either side on

12  before we break for lunch?

13          MR. FENSTER:  Not from Plaintiff, Your Honor, except

14  our thanks.

15          MR. McKEON:  Yes, Your Honor; not from Samsung.

16          THE COURT:  All right.  We stand in recess until

17  12:30.

11:36   18                  (Lunch recess.)

19          THE COURT:  Be seated, please.

12:49   20      All right, counsel.  At this time the Court's prepared to

21  hear from you with regard to requests for relief pursuant to

22  Rule 50(a) of the Federal Rules of Civil Procedure.

23      My typical practice and the way I'd like to proceed at

24  this juncture is to have a spokesperson for Plaintiff and a

12:49   25  spokesperson for Defendant identify for me one at a time the

       1    substantive or topical matters regarding which you're seeking

       2    relief under Rule 50.

       3         Then once I've identified the subject matter of your

       4    motions and determined whether there are any that are directly

       5    opposite of each other, I'll order the argument to be

       6    presented.  It is typically the case that many of these

12:49  7    motions are diametrically-opposed and a common round of

       8    argument sufficient to cover it from both directions, and I

       9    find that to be often a more efficient approach.  So that's

      10    what I'll try to achieve here if it's applicable.

      11         So with that, let me ask Plaintiff first, what matters as

      12    a matter of subject matter are you seeking relief on, if at

      13    all, under Rule 50(a)?

      14              MR. LEDAHL:  Yes, Your Honor.  Would you like me to

      15    use the lectern?

      16              THE COURT:  Yes, I would.

      17              MR. LEDAHL:  Thank you.

12:50 18         Your Honor, in terms of topic areas for the Plaintiff, we

      19    anticipate moving for relief under Rule 50(a) on the issue of

      20    infringement and on the issue of invalidity.  If you'd like me

      21    to specify more within that, I'm happy to.

      22              THE COURT:  Well, we have an allegation or you have

      23    brought an allegation of direct infringement, also you've

12:50 24    brought an allegation of induced infringement.  With regard to

      25    invalidity, you've raised theories under §102, §103, and §112.

1          Are you seeking relief under Rule 50(a) with regard to

2     all these various iterations or is it something less in either

3     category?

4               MR. LEDAHL:  It is all of those iterations, Your

5     Honor.  Thank you.

6               THE COURT:  Okay.  Then let me hear from Defendants

7     as to those matters on which they're seeking relief, if any,

8     under Rule 50(a).

9               MS. FISH:  Yes, Your Honor.

12:51  10          Unsurprisingly, Samsung will seek relief under 50(a) as

11     to no infringement, including direct and indirect

12     non-infringement; as to no -- as to invalidity under §102,

13     §103, and §112; and will seek 50(a) as to no damages.

14               THE COURT:  All right, Ms. Fish.  Thank you.

12:51  15          So with that, let's start with the competing issues of

16     infringement and non-infringement, both direct and indirect.

17     And let me hear argument beginning with the Plaintiff since

18     they bear the burden on those issues.

19               MR. KROEGER:  Thank you, Your Honor.  Paul Kroeger

12:52  20     for Plaintiff.

21               THE COURT:  Please go ahead, Mr. Kroeger.

22               MR. KROEGER:  Headwater moves under Rule 50(a) on

23     infringement of all asserted claims with respect to both

24     accused systems.  Headwater's technical expert Mr. de la

25     Inglesia walked the jury through the substantial evidence

1    demonstrating Samsung's infringement of all asserted claims by

2    the two accused push systems.  He pointed to source code,

3    technical documents, and testimony from Samsung Google

4    witnesses supporting his opinions.

12:52  5        The response from Samsung's expert, Dr. Foster, was

6    essentially two non-infringement arguments.  First, the jury

7    heard Dr. Foster assert that the systems had different

8    architecture from what is claimed and more specifically that

9    the multiple relevant servers underlying the systems could not

10   be considered collectively to be the claim server.

11        Headwater showed that the patent specification recognizes

12   a server can include multiple individual physical servers, and

12:53 13   Samsung/Google themselves refer to the SPP server and FCM --

14        THE COURT:  Let me stop you, counsel.  I know you're

15   reading to me.  Have you filed this in written form on the

16   docket?

17        MR. KROEGER:  No, Your Honor.

18        THE COURT:  Okay.  Are you going to file this on

19   the --

20        MR. KROEGER:  We understood you just wanted oral

21   argument, Your Honor.

22        THE COURT:  Okay.  If you'll let me finish my

23   question, then I'm happy to hear your response.  You're not

24   going to file this in written form on the docket.  Correct?

25        MR. KROEGER:  Correct.

12:53

1    THE COURT:  Okay.  Then I'm happy for you to present

2    it.  But if you're going to read it, it's awfully fast.  Try

3    to slow down.  Go ahead.

4    MR. KROEGER:  The jury saw that the diagrams

5    appearing in the technical documents showed that the servers

6    were referred to singular terms, and the jury heard Mr. Hansen

7    confirm that as well.

8    The jury heard Dr. Foster assert the accused systems use

9    a different secured delivery method from what is claimed, but

12:54    10    the evidence showed otherwise.  Mr. de la Inglesia explained

11    in detail the source code, technical documents, and witness

12    testimony establishing that all of the security-related

13    elements of the asserted claims are met by both accused

14    systems.

15    As for divided infringement and extraterritoriality for

16    the '733 Patent, there is no dispute that Samsung makes,

12:54    17    sells, and imports the accused products.  Samsung has not

18    presented any evidence supporting a divided infringement or

19    extraterritorialty defense for the '733 Patent.

20    As to the '117 Patent, the jury heard substantial

21    evidence that Samsung puts the accused systems into service

22    and greatly benefits from its infringing use.  For example,

12:55    23    the evidence showed that Samsung employees located in the U.S.

24    used the Samsung messaging platform to send billions of push

25    messages to users of Samsung devices in the United States.

12:55

1    Before 2020, those messages were sent via SPP, and since

2  then these messages have been sent via FCM.  And these

3  messages advertise Samsung products and provide customers with

4  important software updates providing direct benefit to

5  Samsung.

6    The jury also heard largely unrebutted evidence from Mr.

7  de la Inglesia regarding the battery savings benefits that

8  Samsung enjoys from its use of the claimed invention, which

9  Headwater's other experts translated into economic benefits to

10  Samsung.

12:56

11    With regard to Samsung's extraterritoriality defense, the

12  evidence shows that the accused FSC system and all aspects of

13  that system take place in the United States, and the jury

14  heard no evidence to the contrary.

15    Lastly, as to inducement, the jury heard substantial

16  evidence that, in addition to directly infringing the '117

17  Patent, Samsung also indirectly infringes the '117 Patent by

18  inducing others to infringe.  For example, Mr. de la Inglesia

12:57

19  explained how Samsung induces its customers to directly

20  infringe including by encouraging users to enable push

21  notifications for individual apps and opt in to push

22  notifications.

23    THE COURT:  Anything further, counsel?

24    MR. KROEGER:  Not on the 50(a) of infringement, Your

25  Honor.

 1              THE COURT:  All right.  Then let me hear from the

 2      Defendants on their motion for judgment as a matter of law

12:57  3      under Rule 50(a) regarding non-infringement.

 4              MR. GALLO:  Thank you, Your Honor.  Nicholas Gallo

 5      on behalf of Samsung.

 6          I'll let the Court know that I will be addressing the

 7      technical non-infringement aspects of Samsung's 50(a) motions,

 8      and my colleague Mr. Bright will follow me to address the

 9      issues of divided infringement, inducement, and contributory

10      infringement.

11              THE COURT:  All right.  Mr. Gallo, clear something

12:57 12      up for me before you go any further.  I've heard nothing in

13      this case about some kind of extraterritorialty defense, and

14      I'm not aware of any of the evidence regarding the asserted

15      damages that Defendants have said these occurred outside the

16      United States and, therefore, they're not appropriate.

17          All the damages evidence appears to me to have been

18      limited to domestic transactions in the United States.  Is

19      that your understanding or do you perceive this situation

20      differently?

12:58 21              MR. GALLO:  I think my colleague, Mr. Bright, could

22      better speak to that, Your Honor, if he might.

23              THE COURT:  That's fine.  Whoever is the most

24      knowledgeable.

25              MR. BRIGHT:  Good morning, Your Honor.  Jonathan

1    Bright on behalf of Samsung.

2        So as far as extraterritoriality is concerned, you know,

3    our position is that the case law under *Centillion* and its

4    progeny require identification of who was using the system.

5    And in this case, the only possible user could be the

6    application server, and Headwater's presented no evidence that

12:58    7    the application servers are actually located in the United

8    States.

9        And you're correct, Your Honor, that was not -- sort of

10   didn't get a lot of trial time because at the end of the day

11   it sort of depends on what application servers would be

12   presented at trial.

13       THE COURT:  Yeah.  I don't remember any trial time

14   on this.  That's what I'm trying to get you to clarify for me.

15       MR. BRIGHT:  Right.  Our position on that is that

16   Plaintiff has not met its burden.  It was -- the burden was

12:59   17   own them to demonstrate where -- Samsung is a Korean company,

18   where any of their application servers are located.

19       THE COURT:  Okay.  All right.  If you have part of

20   the argument on non-infringement, while you're at the podium

21   give it to me.  If not, we'll hand off to your colleague.

22       MR. BRIGHT:  Sure.  In that case I'm happy to

23   continue, and I'll be addressing what we call the sort of

24   infringing acts as opposed to the technical elements that are

25   not met.

12:59   1    So, first off, Your Honor, Samsung moves for judgment as

2    a matter of law that the accused products do not directly

3    infringe any of the asserted claims.

4    With respect to the '117 Patent, the first ground is that

5    Headwater's produced insufficient evidence to support a

6    finding that Samsung directly infringes the '117 Patent by

7    making, selling, offering for sale, or importing either the

8    FCM or SPP system.

9    You may recall, Your Honor, that the '117 Patent is

10   structured so that it's a say network system that consists of

01:00   11   a server and device messaging agents which are located on the

12   phones.  So it's a system; it's not an actual product.  And I

13   don't think there's any dispute that Samsung does not actually

14   sell that system.  They certainly -- with respect to FCM, they

15   do not sell Google servers, which is half of the system.

16   So -- and the same is true for SPP.  You know, it's not the

17   sort of thing that's sold.  It's also not imported.

18   Samsung doesn't have control over what Google does with

01:00   19   its servers.  And as far as the SPP servers, those are not

20   located in the United States and were under the damages period

21   for which when it was active.

22   Samsung also does not make the accused system.  One of

23   the dependent claims asserted for the '117 Patent, I think it

24   was claim 12, which requires initiating -- the device

01:01   25   messaging agents initiating a connection to the network

1    system, that is not -- that is how the products work in a

2    sense.  Right?  We are -- I think both parties are in

3    agreement that the only time that a system is established is

4    when the device initiates the connection to the system, and as

5    a result, the final assembler under Deep South Packaging would

6    be the user and not Samsung.  So if anybody would be making

7    the system, it's not Samsung.

8            THE COURT:  All right.

01:02   9            MR. BRIGHT:  Next, Your Honor, I want to address the

10   issue of extraterritorialty.  So this applies to the '117

11   Patent.  So the controlling law for who -- for determining

12   where use is accomplished is *Centillion.*  That case applies

13   here because we have a situation where half of the elements

14   are in the possession of one party and half of the elements

15   are in the possession of the another party.

01:02   16       Google servers are in Google's possession, phones are in

17   the possession of customers, so we think that's the right

18   rubric.  *Centillion,* as well as *NTP* as well, they both focus

19   on where does the use occur.  The use occurs where the system

20   as a whole is put into place.

21       And for push notification, sort of the very definition of

22   a push notification is that the server is the one that

23   controls the push, they determine the content of the push,

01:02   24   they determine the timing and the recipient of the push as

25   confirmed by Mr. de la Inglesia, for example, at pages 278,

1    375 through 376, and 376 to 377 of his testimony.

2         So our view -- Samsung's position is that if anybody

3    could be said to use the system, it's only an application

4    server.  It's not the device that receives those messages.

5         And so applying *NTP,* you have to look to where that use

01:03    6    occurs, and there's no evidence in the record -- Headwater

7    adduced no evidence in the record that those servers are

8    located in the United States.  I think there was very paltry

9    evidence of any specific Samsung servers.  Generally speaking,

10    as we heard at trial, there are millions of application

11    servers out there, and Samsung would have only made a fraction

12    of those.

13         The only one I think we heard any significant testimony

14    on was something called the Samsung Messaging Platform, not to

01:03    15    be confused with the Samsung Push Platform.  And there was no

16    evidence of where those Samsung Messaging Platform servers are

17    located.

18         A second reason that we believe there's been no

19    showing of --

20              THE COURT:  Let me ask you something, counsel.  It

01:04    21    seems to me that Mr. de la Inglesia testified at least to the

22    extent of saying, and I'm quoting from his testimony, "Well,

23    Samsung infringes directly because they're using the accused

24    system in the United States.  They're also benefiting from

25    that use."

1    With that in the record, does that not shift the burden

2    to Samsung to come forward and try to present evidence that

3    that use did not occur in the United States or waive its

01:05    4    extraterritorialty -- actually none of us can say that --

5    anyway, waive that defense?

6    MR. BRIGHT:  I personally read that statement as not

7    evidence; it's a legal conclusion -- I view it as sort of --

8    THE COURT:  It wasn't objected to.  It's from a live

9    witness under oath.

10    MR. BRIGHT:  Understood, Your Honor.

11    THE COURT:  That's how we define evidence is sworn

12    testimony from the witness stand.

13    MR. BRIGHT:  I understand your point, Your Honor.

14    Maybe another way to view it is that I think his analysis was

01:05    15    predicated on the wrong interpretation of what it means to

16    use.  I think the bulk of the testimony that both he provided

17    and everyone else provided in this case is about how many push

18    messages are received in the United States by users, and we

19    think that's the wrong rubric as a matter of law because it's

20    not the users who --

21    THE COURT:  So, in other words, strategically

22    Samsung decided to sit back, hide behind the log, and bet on

23    the fact that the Plaintiff wouldn't meet the technical

01:05    24    requirements to establish use within the United States and

25    then at 50(a) rise up and assert its extraterritorialty

1122

1    Defense.  Is that correct?

2            MR. BRIGHT:  Your Honor, I would like to say that

3    was certainly not our strategy.  Our view is that burden never

4    shifts.  The burden is always on them.

5            THE COURT:  My point is, yes, the burden's on them.

6    But you never offered anything on this topic.  Your position

01:06  7    is they failed, and if the burden did shift, you don't have

8    anything to come back with.  You just sat there and did not

9    address use, the situs of that use as within this country or

10    elsewhere.  Your argument is based solely on the finding that

11    Plaintiffs fell short of their burden here.  Correct?

12            MR. BRIGHT:  Yes, Your Honor.  We do think

13    Plaintiffs fell short here.  We proposed jury instructions on

14    this, and they were well aware of this.

01:06  15            THE COURT:  We'll talk about the jury instructions

16    later.

17            MR. BRIGHT:  Sure.

18            THE COURT:  This is 50(a).

19            MR. BRIGHT:  I'll point out one more aspect of this.

20    There's a bit of ambiguity throughout this case about what

21    exactly their theory was.  We didn't know precisely what

22    application servers they were going to come to trial and say

23    these are Samsung application servers.  It's a Korean company.

24    It does have application servers, and it's which ones are they

25    going to be relying on.

01:07

1       It was also a little unclear whether or not they were

2   going to be relying on application servers as the users or

3   devices of the users.  We did have interrogatory responses

4   where we did set this forth.  So that should probably clarify

5   my earlier comments on that where we did raise the issues of

6   extraterritoriality and we did put them on notice that we

7   viewed the application servers as the users.

8            THE COURT:  All right.  Let me hear the remainder of

9   your affirmative argument.

10           MR. BRIGHT:  Yes, Your Honor.

11      I should caveat on my previous statements in that the

12   sense that the application servers are the only potential

01:07

13   users of the system.  However, *Centillion* and *NTP* are not the

14   only case law that address this issue.  There's also another

15   case in the Federal Circuit, *Intellectual Ventures versus*

16   *Motorola Mobility,* which expanded upon *Centillion* and said

17   that to control and benefit -- to determine the use you have

18   to control and benefit for each claim component, not just the

19   whole system but -- and I can provide the quote if you like --

20   but it's not just the whole system; it's each component within

21   that system.

22           THE COURT:  All right.

01:08

23           MR. BRIGHT:  And the device messaging agent is not

24   something on the Samsung user devices, which customers do have

25   some control over that particular element as far as enabling

1    or disabling, when the phone is on, when the phone is off, and

2    whether or not push notifications, you know, can be received

3    in the first place.

4              THE COURT:  Anything further?

5              MR. BRIGHT:  Yes, Your Honor.  Just a few more

6    points if I may.

7         For the '733 Patent, we also think there is no use of

01:08  8    that patent because that's a device that's not in, you know,

9    once -- so the '733 Patent unlike the '117 Patent, it's about

10    an end-user device.  So that's sold to customers.  And once

11    it's sold to customers, it's out of Samsung's hands.

12    We don't -- Samsung as a matter of law does not use that

13    system.

14         And I don't believe we heard any evidence of Samsung

15    testing the phones in the United States, at least not testing

16    to support any kind of push notification.  So we think we're

17    entitled to judgment as a matter of law for that issue as

18    well.

01:09  19         Just a few more issues, if I may, Your Honor.

20         We also -- Samsung also moves for judgment as a matter of

21    law that the accused products do not indirectly infringe any

22    of the asserted claims.  Sort of the easiest off ramp for this

23    we see is that there's no pre-suit knowledge.  So it's

24    recognized in Judge Payne's Docket No. 373.  He granted

25    Samsung's motion for summary judgment of non-infringement as

01:09    1    to the '117 Patent when it comes to pre-suit infringement.

2    THE COURT:  I'm aware of that.

3    MR. BRIGHT:  Okay.  We think the same rationale

4    applies to the '733 Patent, so we think that's a bright line

5    of when potential indirect infringement can begin.

6    With respect to the Samsung Push Platform, I think

7    everyone agrees at this trial that that product was

8    discontinued in 2020.  So prior -- and there's no overlap

9    between the period at which Samsung was on notice of the

01:10   10    patents which was 2023 with the filing of this lawsuit and the

11    discontinuation of Samsung Push Platform in 2020.

12    With respect to Firebase Cloud Messaging, as the record

13    reflects, Samsung switched over from Samsung Push Platform to

14    Firebase Cloud Messaging in 2020.  And Firebase Cloud

15    Messaging is a Google service, and our view is that the only

16    potential users of that system or application servers, as I

01:10   17    stated, Google's the party that's responsible for -- if anyone

18    encourages application servers to use that system, it's

19    Google.

20    They're the ones who provide the developer documentation

21    that teaches application servers how to use it.  Samsung

22    doesn't -- to my knowledge, Samsung doesn't have literature

23    application servers to use Firebase Cloud Messaging.

01:11   24    With respect to contributory infringement of the '117

25    Patent, I don't think we heard any analysis of whether or not

1    Samsung imports a material part of the invention as mentioned,

2    the '117 consists of device messaging agents and servers.  I

3    don't think there was any analysis whether or not the device

4    messaging agent was a, quote, material part of the invention.

5    So we think we are entitled for both SPP and FCM for judgment

6    as matter of law for that issue as well.

01:12    7        And unless Your Honor would like to hear more, I think

8    that's about my portion of the presentation.

9            THE COURT:  Thank you, counsel.

10           MR. BRIGHT:  Thank you.

11           MR. GRAUBART:  With your permission, may I add one

12   point before we close on it?  I just -- my apologies.

13           THE COURT:  If you need to supplement your

14   co-counsel's argument on one point, that's fine.

15           MR. GRAUBART:  That's all I want to do.  Thank you,

16   Your Honor.  Noah Graubart on behalf of Samsung.

01:12    17       I want to make sure the record was clear on one point,

18   that Samsung's motion for judgment as a matter of law with the

19   respect to the issue of use, and Mr. Bright mentioned the line

20   of cases under *Centillion,* that our motion applies not only to

21   the extraterritorialty issue, but also regardless of the situs

22   of alleged infringement, Samsung moves for judgment as a

23   matter of law that there's insufficient evidence to

24   demonstrate use as that term is used in Section 271A under

01:12    25   *Centillio*n and its progeny based on the lack of sufficient

1    evidence regarding control and benefit.

2            THE COURT:  All right.  Thank you.

3            MR. GRAUBART:  Thank you.

4            THE COURT:  Your turn.

5            MR. GALLO:  Thank you, Your Honor.  Nicholas Gallo

6    again on behalf of Samsung.

7        Samsung moves for judgment as a matter of law of no

8    infringement of all asserted claims, and I'll start with the

9    '117 Patent.  The '117 Patent, claim 1 requires a network

01:13   10   message server that performs each of receiving requests to

11   transmit application data, generating messages based on the

12   receive request, and transmitting messages to end-user

13   devices.

14       Evidence shows that there is no server in either FCM or

15   SPP that meets these claim requirements.  Indeed, testimony

16   from Google engineer Mr. Hansen as well as Samsung's expert

17   witness, Dr. Foster, confirmed that the accused push messaging

18   systems consist of a divided architecture, which Dr. Foster

01:13   19   thereafter confirmed is inconsistent with the plain language

20   of the claim.

21       Headwater's expert, Mr. de la Inglesia, on cross

22   examination admitted that a claim requires one network message

23   server that is defined by doing the three claimed actions of

24   receiving, generating, and transmitting.

25       And Mr. -- excuse me.  Dr. Foster further confirmed that

01:14    1    Mr. de la Inglesia's analysis was technically inaccurate and

2    that no single server in either the SPP or FCM systems

3    performed each of the three claimed steps of receiving,

4    generating, and transmitting.

5        With respect to the '733 Patent, Dr. Foster explained

6    that the accused push message systems SPP and FCM do not

7    include the claimed service control link, but instead a

01:14    8    routine persistent connection which relies on decades-old TCP

9    connections.  Based on that evidence, Dr. Foster testified

10   that the accused push systems do not infringe the '733 Patent.

11       Plaintiff's expert, Mr. de la Inglesia, testified that

12   the patent specification makes clear that the service control

13   link is unique and must support control-plane communications,

14   yet offered no evidence that the accused systems enable

01:15   15   control-plane communications, never mentioning the phrase

16   control-plane once in his direct examination.

17       With respect to both asserted patents, neither patent

18   nor -- excuse me.  Neither the '117 nor '733 Patent infringe

19   because neither system forwards application -- let me start

20   over, Your Honor.  Why don't I just take these patents one at

21   a time.  I think that would be easier for the Court.

22           THE COURT:  That will be fine.

01:16   23           MR. GALLO:  Starting with claim 1 of the '117

24   Patent, claim 1 requires a device messaging agent to forward

25   application data in a message to a software process via secure

01:16

1    interprocess communication, and that's elements 1[i].  Mr. de

2    la Inglesia's testimony confirms that Headwater's infringement

3    theory relies on mapping application package names in the

4    accused systems to the claimed software process.

5         Dr. Foster explained that the plain meaning of the

6    at-issue limitation to a person of ordinary skill requires the

7    claimed delivery to be more specific than merely delivery to

8    an application.  Instead, the delivery must to be a

9    subcomponent or process within an application.

10        Based on this, Dr. Foster explained that the accused push

11   systems do not satisfy claim 1 of the '117 Patent.

01:16

12        With respect to the '733 Patent, Dr. Foster's testimony

13   was consistent.  Claim 1 of the '733 Patent similarly requires

14   a service control device link agent that's configured to

15   deliver message content to a particular device agent over an

16   agent communication bus.

17        Mr. de la Inglesia's testimony again, like his testimony

18   with respect to the '117 Patent, relies on mapping to

19   application package names as the particular device agent as

20   claimed.

01:17

21        Dr. Foster explained that, again, based on the plain

22   language of the at-issue limitation to a person of ordinary

23   skill, the claim requires the delivery to be more specific

24   than merely dropping off to an application at the door.  Based

25   on this, Dr. Foster concluded that the accused push systems do

1    not satisfy claim 1 of the '733 Patent.

2        And based on the non-infringement arguments that I just

3    discussed, Samsung further moves for judgment as a matter of

01:18   4    law on the -- all dependent claims as not infringed.

5            THE COURT:  All right, counsel.  Thank you.

6            MR. GALLO:  Thank you, Your Honor.

7            THE COURT:  All right.  Let's take up next the issue

8    of validity or invalidity under § 102, § 103, and § 112.  The

9    Defendants bear the burden here, so I'll hear from them on

01:18   10   this issue first.  If you want to split it up between

11   anticipation, obviousness, written description, or you want to

12   present the entirety of the argument, however you want to do

13   it is fine with me, counsel.

14           MR. GALLO:  Thank you, Your Honor.

15       Samsung moves for judgment as a matter of law of

16   invalidity based on anticipation for all asserted claims as

17   well as obviousness for all asserted claims as well as for

18   lack of written description.

01:18   19       Starting with anticipation, Samsung has shown by clear

20   and convincing evidence that claims 1, 12, and 16 of the '117

21   Patent and claims 1, 7, and 19 of the '733 Patent are all

22   anticipated under Headwater's interpretation of the claims.

23       For example, Mr. Hansen confirmed that GtalkService was

24   used in 2008 and it was included in the T-Mobile G1 device

01:19   25   which was sold in 2008.  Mr. Hansen as well as Dr. Foster

explained that the GtalkService operates in fundamentally the

same manner as later generations of GtalkService, including

C2DM, GCM, and FCM, which Headwater asserts practices the

asserted claims.  In response, Plaintiff's arguments is that

GtalkService is not secure and, therefore, cannot satisfy the

limitations of the '117 and 733 patents.

01:20    I'll first note that the '733 Patent does not require

secure communications.  That is a requirement exclusive to the

'117 Patent.

Second, Headwater's expert Mr. de la Inglesia relies on

pointing to the setPackage function that are relied on by the

accused systems.  However, Dr. Foster as well as Mr. Hansen

01:20  explained that developers could indicate a package name in the

set action field to allow for the identification of a package

name in the prior art GtalkService system.

Dr. Foster further explained to the jury and walked

through each element of both the '117 and '733 Patents to

explain that the GtalkService system anticipated each and

every limitation in both -- in all claims of each of the

01:20  asserted patents.  And, as I mentioned, that's claim 1, 12,

and 16 of the '117 Patent and claims 1, 7, and 19 for the '733

Patent.

And as I also mentioned, to the extent the GtalkService

system does not anticipate the asserted claims, Samsung also

moves for judgment as a matter of law that the asserted claims

01:21

1    are invalid as obvious in view of GtalkService in combination

2    with one or more of wireless application protocol push

3    architectural overview and U.S. Patent Publication No.

4    2007/0011736 to Kalibjian.

5    Dr. Foster explained that both the wireless application

6    protocol push architecture actual overview reference discloses

7    application identifiers and that the Kalibjian reference

8    discloses secure interprocess communications using

01:21  9    cryptographic techniques.  Dr. Foster also explained that

10    persons of ordinary skill would apply their own expertise in

11    leading these references and would consider ways that they

12    might use this technology in future designs.

13    Based on that, Samsung submits that the evidence shows

14    that the claims are anticipated in view of GtalkService or, in

15    the alternative, obvious under § 103 in view of GtalkService

01:22  16    in combination with wireless application protocol, push

17    architectural overview or Kalibjian.

18    Finally, Samsung moves for judgment as a matter of law

19    for invalidity for lack of written description under § 112.

20    With respect to the '117 Patent, clear and convincing

21    evidence showed that the network message server and

22    application server elements of the '117 Patent are not

23    supported by adequate written description.  Dr. Foster

01:22  24    explained that the original specification as filed in 2009

25    failed to include adequate written description support for

1    either of these elements, and the only mention of these

2    elements only occurring later when the claims and abstract

3    were added in 2015.

4        With respect to the '733 Patent, clear and convincing

5    evidence showed that the service control link element of the

6    '733 Patent lacks written description support.  Dr. Foster

01:23  7    explained to the jury that under Headwater's view of

8    infringement, i.e., that a service control link is the

9    equivalent to a persistent push link, the '733 Patent lacks

10    written description support.

11        THE COURT:  All right, counsel.  Thank you.

12        MR. GALLO:  Thank you, Your Honor.

13        THE COURT:  Let me hear from the Plaintiffs in

14    response and in regard to Plaintiff's affirmative motions on

15    these topics.

01:24  16        MR. LEDAHL:  Thank you, Your Honor.

17        I'd like to begin, if I may, with actually the § 103

18    obviousness issue because I think there the evidence is most

19    clear that there is no genuine issue that should be presented

20    to the jury.

21        The Court may recall that on cross examination Dr. Foster

22    admitted that he did no analysis of any kind regarding any

01:24  23    motivation to combine or any reasonable expectation of success

24    in any combination, or modification to the extent I didn't

25    hear any suggestion that Defendants are arguing single

01:24

01:25

01:25

reference obviousness, but that also was not presented.  So

there was no evidence presented to support a key element and a

necessary component under *KSR* of an obviousness defense.  And,

frankly, that was openly admitted by Defendants' expert.

Under those circumstances, it seems impossible to present that

obviousness defense to the jury given those admissions.

We don't think that -- we think there were other reasons

and I think the record shows that there were other aspects in

which Dr. Foster failed to adequately support his analysis and

to provide adequate analysis of obviousness under the various

-- either the GtalkService by itself or in combination.

I'll address the GtalkService generally with respect to §

102, but I did want to touch on those issues specific to

obviousness first.

THE COURT:  All right.

MR. LEDAHL:  With respect to § 102 and anticipation,

there were a number of elements that were not shown to be

present in the prior art system that was relied on, the

GtalkService or talk system that Dr. Foster spoke about.  He

did not identify an agent identifier or -- that was present in

the prior art system with respect to the '733 Patent.

With respect to the '117 Patent, he failed to identify an

application identifier, a secure interprocess communication,

and, indeed, on anticipation, Dr. Foster admitted that under a

proper interpretation of the claims, this reference does not

1    render the patent claims invalid, and that alone should also

2    end the inquiry on his § 102 theories.

01:26  3        Further on § 102, Defendants have failed to offer

4    evidence adequate to support proof of the existence and

5    operation of this contended Gtalk system that's required.  The

6    law clearly requires evidence that is not merely presented by

7    way of uncorroborated oral testimony to support the operation

8    and functioning of an alleged prior art system.

01:26  9        Here for many aspects of that system the only evidence

10   presented in court was Mr. Hansen's uncorroborated testimony

11   that certain functions existed or purported to exist, things

12   like application server -- a plurality of application servers

13   that that was not shown.  There was no showing of a secure

14   interprocess communication in the prior art system.

15       And while Mr. Hansen spoke about those subjects to some

01:27  16   degree, no evidence, no code, no documents, no contemporaneous

17   material of any kind was presented to corroborate his

18   testimony, as required under the law, which we believe

19   requires as a matter of law a finding that they failed to

20   establish the existence of that system as necessary to meet

21   their burden of showing the prior art anticipated or rendered

22   obvious any claim with respect to that system.

01:27  23       And finally, as to written description, Dr. Foster's sum

24   total of testimony on the written description requirement was

25   that he ran a word search on his computer to look for certain

1    words in the claim in the specification and that they weren't

2    there.  He did not testify that a person of ordinary skill in

3    the art would understand -- would not understand that the

4    inventor possessed the invention as claimed, the actual legal

5    requirement; he solely testified that he ran this word search

6    and didn't find certain words and that was the end of the

01:28    7    inquiry for him.  He spent maybe less than a minute or two on

8    this subject at the end of his testimony, and the case law

9    seems completely clear that reciting the words of the claim in

10    the specification is not the test for a written description;

11    that that is not required.  The law often uses the words

12    *in haec verba* as what's not required, and that is a clear

01:28    13    failure of proof by the Defendants on this element of proving

14    a violation of the written description requirement and

15    certainly does not meet the clear and convincing burden.

16            THE COURT:  All right.  Unless there's further

17    argument, let's move to the issue of damages.

18        Defendants are seeking judgment as a matter of law on

19    that matter, and in light of their motion let me hear from

20    them first.

21            MS. FISH:  Yes, Your Honor.  Sara Fish on behalf of

01:29    22    Samsung.

23            THE COURT:  Please proceed.

24            MS. FISH:  Samsung moves for a judgment as a matter

25    of law of damages for all asserted claims.

01:29

1    Damages are not appropriate because there can be no

2    finding of infringement of liability as a matter of law for

3    the reasons we have just discussed.  Headwater has also been

4    fully heard on its damages and its contentions in the

5    evidence, and there's no legally sufficient evidentiary basis

6    for a reasonable jury to award damages to Headwater, let alone

7    to award in the amount of $696 million.

8    Headwater's damages demand is legally improper, flawed,

9    and unsupported by evidence for several reasons.

10    First, Headwater's damages evidence fails because of a

11    failure to conduct a proper reasonable royalty analysis under

12    *Georgia-Pacific*.  Headwater primarily presented at trial

13    Mr. Dell's superficial recitation of the *Georgia-Pacific*

01:30

14    factors, and he failed to fully consider and present the

15    analysis required by the law.  For example, he failed to

16    consider the *Georgia-Pacific* factor 1, licenses that were

17    available and in evidence, such as the Headwater/ItsOn license

18    agreement, and did not account for such evidence in his

19    presentation to the jury.  He also failed to fully address or

20    account for in his analysis as a reasonableness check under

21    factor 1 the available Headwater/InterDigital letter of

22    intent.

01:30

23    Headwater's damages evidence as presented through

24    Mr. Dell also fails to address *Georgia-Pacific* factor 2

25    evidence available, such as Samsung's comparable licenses

01:31

01:31

01:32

available in this case, including a comparable license where there is unrebutted testimony as to the technical comparability of the license, namely the Seven Networks license. Mr. de la Inglesia did not testify as to the technical comparability of the Seven Networks license, but Dr. Foster did. Therefore, the technical comparability of Seven Networks is left unrebutted.

The next failure of Headwater's damages evidence at trial that is legally insufficient to support a jury verdict is their unsupported identification of an alleged benefit of the asserted patent and an unsupported calculation based thereon.

It's unsupported to the extent Mr. Dell offers a royalty rate based on an alleged benefit of push marketing. Mr. Dell at trial offered a royalty rate and an incremental royalty rate that he attributed to push marketing, but Headwater failed to present legally sufficient evidence to find that push marketing is, in fact, a benefit of the patent over the prior art.

Headwater's technical expert Mr. de la Inglesia offered no opinion that push marketing or sending marketing-related push notifications was a technical benefit or the footprint of the invention beyond what was known and what was available in the prior art. And Mr. Dell is not capable of offering that opinion to the jury without a technical expert to provide that supporting opinion.

01:33

1    In fact, the record supports the opposite conclusion that

2    push messages and sending push messages was fully known before

3    the priority date of the asserted patents and cannot be the

4    proper measure of incremental damages of the patents-in-suit.

5    And, therefore, Mr. Dell failed to properly apportion his

6    royalty rate to the footprint of the invention.

7    As to Headwater's allegation and presentation of evidence

8    that the benefit of the asserted patents could otherwise be

01:33    9    framed or allocated to battery life, Headwater has failed to

10   apportion damages as required by the Federal Circuit for a

11   battery life alleged benefit as well.  They failed to address

12   the value derived from any other technology and prior art that

13   was known.  For example, Mr. Dell bases his opinion and

14   evidence presented at trial on Mr. de la Inglesia's battery

01:33    15   calculations which fail to measure the incremental benefit

16   above the prior art and distinguish the contributions of

17   others.

18   Additionally, the evidence fails because Mr. Dell's

19   analysis is based on Dr. Groehn's conjoint analysis and

20   conjoint survey, which fails to measure the relevant

21   incremental benefit and fails to measure the benefit of

22   unknown prior art.

01:34    23   And Mr. Dell's additional apportionments offered,

24   including the 80 percent push notification opt-in rate or

25   using Samsung's ROIC are further legally insufficient to

1  render the damages evidence of a reasonable royalty presented

2  to the jury to be legally sufficient to support a verdict.

3      THE COURT:  Let me ask you this, counsel.  You've

4  several times said that the Plaintiffs failed to present a

01:34  5  proper argument on points A, B, and C.  Isn't that really a

6  *Daubert* argument.  If it survived pretrial and it was not

7  stricken through the *Daubert* process, how can you now tell the

8  Court that that's an improper argument if it survived *Daubert*

9  and was part of the evidence presented?

10      MS. FISH:  Yes, Your Honor; proper in the sense that

11  it would not support a jury's finding under the requirements

01:35  12  of the law, not that it was improper to be introduced at

13  trial.

14      THE COURT:  All right.  So I take it that 'proper'

15  as you're using it in this context might be more closely

16  related to 'insufficient'?

17      MS. FISH:  Yes, Your Honor.  Thank you.

18      THE COURT:  All right.  Thank you.

19      MS. FISH:  Samsung moves for judgment as a matter of

20  law for the failure of Headwater's damages to be legally

01:35  21  sufficient because there is a different technical footprint

22  between the two asserted patents, one being a device patent

23  and the other being a system patent, which Headwater's

24  evidence presented at trial fails to address and distinguish

25  between in their damages evidence.

01:36

1    The '733 Patent is a device claim.  The '117 Patent has

2    system claims.  Both, if found valid, must necessarily be

3    directed to different inventions that contain slightly

4    different elements, requirements, or steps, such as network

5    servers.  Headwater has offered no evidence of damages

6    attributable to each of these distinct patented device claims

7    or system claims that would be tailored to the separate

8    footprint of each invention.

9    And Mr. Dell offered no opinions to account for any

10   differences between the two asserted patents; rather, he

11   asserts only that the incremental benefit and total alleged

12   damages of each patent are identical and overlapping, which

01:36   13   cannot support the jury award here.

14   Next, Samsung moves for judgment as a matter of law as

15   seeking unreliable -- as an unreliable royalty that is

16   including and seeking future royalties presented in a lump

17   sum form.

18   Mr. Dell's lump sum calculation includes improper

19   speculation as to the extent of future use of the accused

20   products because it includes and incorporates future

01:37   21   projections of future infringement that has not yet occurred,

22   which is improper under, for example, *Lucent v. Gateway*.

23   He additionally uses an unreliable methodology for

24   forecasting those future sales which was demonstrated at

25   trial.  As Mr. Dell confirmed, when he compared his original

1    forecasts to later-produced Samsung financials prior to trial,

2    it was made clear that his forecasts were demonstrably off

01:38    3    from his -- the actual sales.

4            THE COURT:  So when you attack his methodology,

5    that's another *Daubert* challenge?

6            MS. FISH:  The facts that was put on the record at

7    trial was that Mr. Dell admitted his forecasts were

8    $32 million off for certain months, which is a new fact

9    shown in evidence at trial.

10           THE COURT:  But the fact that he based his lump sum

01:38    11   final opinions on a projection of future use is something that

12   you're telling me now is an improper methodology and, again,

13   I'm wondering why am I hearing about that at 50(a) instead of

14   at pretrial in *Daubert*.

15           MS. FISH:  Yes, Your Honor.

16       It was raised at *Daubert*, but given the new facts that

17   were put on the record at trial, we think the facts now show

18   that it's legally insufficient for the jury to rely on.

19           THE COURT:  All right.  What else do you have,

20   Ms. Fish?

21           MS. FISH:  Thank you.  Almost there.

01:38    22       Samsung moves for judgment as a matter of law as to the

23   '117 Patent for any indirect infringement due to a failure to

24   present evidence of damages limited to the post-filing damages

25   time period.

01:39

1    There is no evidence on the record as to what the damages

2  Headwater seeks would be starting only at the filing of the

3  complaint going forward.  Indirect infringement requires

4  knowledge and the evidence has shown that Samsung did not have

01:39 5  pre-suit knowledge of the two asserted patents.  Thus, the

6  damages for the '117 Patent, which could be the subject of a

7  finding of indirect infringement, must be limited to post-suit

8  filing damages, and how there was no testimony that would

9  support a finding of the amount of post-suit damages only.

10    As to -- further as to the appropriate damages window, as

01:39 11  we heard a little bit ago, there was -- Mr. de la Inglesia

12  testified that based -- sorry.  Mr. de la Inglesia testified

13  that alleged infringement based on FCM began in 2020 and

14  alleged infringement based on SPP stopped at 2020.  And so

01:40 15  Mr. Dell and Headwater has failed to present evidence of the

16  alleged appropriate damages keyed to either of these

17  individual alleging time periods for the accused separate

18  products.  And Samsung has requested a verdict form that

19  would differentiate between these accused products.

20    Finally, Samsung moves for judgment as a matter of law

21  that there is no evidence sufficient to support damages in

01:40 22  excess of -- let me try that again.  Samsung moves for

23  judgment as a matter of law that there is -- evidence is

24  insufficient to support damages in excess of 4.25 million to

25  6.94 million.

                    Thank you, Your Honor.

                         THE COURT:  All right, counsel.  Thank you.

                    Let me hear from Headwater in response.

01:41          Go ahead, Mr. Hoffman.

                         MR. HOFFMAN:  Thank you, Your Honor.

                    Samsung has requested an award or a finding of zero

          damages, and the Federal Circuit has been clear that there are

          only two circumstances in which such a finding is possible on

          a 50(a) motion.  One is where the evidence actually supports a

          reasonable royalty of zero, and there has been no evidence

01:41     whatsoever to support that argument; and the other is where

          there is a complete failure of proof of damages such that a

          jury cannot possibly come up with a number.

                    So, for example, the cases give the example of where

          there's not information about what the base is, so they have

          -- the jury has no way to apply a rate to a base.  And again,

          that's certainly not the case here where we have a great deal

          of evidence put in by both sides from which the jury is

01:42     capable of arriving at a damages number.  So JMOL is improper

          for that reason alone.  Moreover, as Your Honor pointed out,

          most of their attacks are attacks on Mr. Dell's methodology,

          which are not proper attacks under 50(a).

                    Just to respond to a couple of those, the main theme of

01:42     their attack is that Mr. Dell applied -- was supposed to

          measure the value of the infringement over the prior art, but

1   in cases like *Aqua Shield* and other Federal Circuit cases, the

2   Federal Circuit has repeatedly noted that an income approach

3   or An analytic approach where the expert measures the benefit

01:43   4   of the patented technology over the next best alternative is a

5   proper methodology, and that's the very methodology that was

6   done here.

7       We heard a great deal of evidence that there are, in

8   fact, no non-infringing alternatives, and that the so-called

9   prior art that they mentioned, they were unable to identify

10  any actual viable example of what that would be such that

11  there would be anything to measure the benefits over.

01:43   12      Simply put, all of the benefits that were measured could

13  be attributed to the patents-in-suit, both because the testing

14  done was specifically designed to test that, and because there

15  was no alternative but to use this system or abandon push

16  marketing entirely.

17      There was a criticism made that Mr. Dell didn't look at

18  every factor, but, of course, not -- it's the law that an

19  expert does not have to look at every *Georgia-Pacific* factor

01:44   20  or consider and should only look at the relevant ones.  But,

21  in fact, Mr. Dell did look at factor 1 in great detail.  And

22  it's strange that they criticize him for not looking at the

23  Headwater/ItsOn licenses when it's been their position up

24  until about five minutes ago that that's a non-comparable

25  license.

01:44    1          In terms of the criticisms of Mr. de la Inglesia's

2    testing, again, that's more of a *Daubert* issue that was

3    challenged on *Daubert*.  It survived *Daubert*.  He specifically

4    looked to tests or analyzed the benefits of the

5    patents-in-suit over the next best alternative, which was

6    polling.  That was, in fact, in the prior art.  And based

01:45    7    on that, we had an apportion-specific amount of benefit

8    attributable just to the patents-in-suit.  Dr. Groehn then

9    did a battery life survey that, when combined with

10    Mr. de la Inglesia's analysis, gave, again, a very specific

11    economic value attributable to only the patents-in-suit.

01:45    12          Further, Mr. Dell did further apportion -- having already

13    arrived at an incremental benefit, he still went on to

14    apportion -- even though, arguably, he could have stopped

15    there, but he went on to apportion further based on record

16    evidence in the possession -- that Samsung produced, and then,

17    in fact, did a marketing split that even apportioned again.

01:46    18          In terms of the argument that there was not a -- there is

19    not testimony about the benefits or damages relating to

20    specific patents, one or the other, Mr. de la Inglesia

21    specifically testified that the benefits from the '117 and the

22    '733 were the same; therefore, the economic measure of those

23    benefits would reasonably be the same.

01:46    24          And in terms of the question of whether -- and I should

25    say based on that, Mr. Dell was clear that if the jury finds

1147

1       that both patents are infringed, they should award his damages

2       amount not additively, not the same doubled for the two

3       patents, but because they have the same benefit, if they find

4       both they should award that amount, or if they find just one

5       they should make that amount.  And that was clearly expressed

6       to the jury.

01:47   7            There is some various criticisms about the time -- some

8       of these are very contingent arguments; for example, the

9       argument that if there's only a finding of indirect

10      infringement as to the '117, that that's a shorter period.

11      Presumably that would be non-infringement of the '733 and then

12      only indirect infringement of the '117, that that would be

01:47   13      damages just from the date of filing.  But Mr. Dell described

14      and put into evidence PTX 393 where he summarizes the

15      financial evidence and sales and breaks it up by time.  He's

16      provided the jury with a $5 per unit rate, and so the jury has

17      all the evidence in the record necessary to apply the rate to

18      the specific time in the very unlikely event that some shorter

01:48   19      period of time is the only damages at issue in this case.

20           And one other issue--and I'll address this last unless

21      Your Honor has any other questions or any questions--they

22      criticize Mr. Dell's calculation of the lump sum through

23      projection of future infringement.

01:48   24           There's no dispute in this case both experts agree that

25      the form of royalty is a lump sum, one-time payment covering

01:49

1    both past and future, so there's no question that in his model

2    it's reasonable and necessary to calculate future damages.  If

3    they had a problem with that methodology, they had a chance to

4    address it in *Daubert*.  And the fact that just before trial,

5    long after he did the report they produced updated sales

6    information that wasn't exactly the same as his projections is

7    in no way evidence that his methodology is faulty; it just

8    means that it was -- nobody can know the future exactly, Your

9    Honor.

10        And that -- so we request that the JMOL be rejected as to

11   damages.

12            THE COURT:  All right.  Thank you, counsel.

01:49
13        Anything further on this, Ms. Fish?

14            MS. FISH:  No, Your Honor.

15            THE COURT:  All right.  Have I overlooked any matter

16   that either party is seeking relief on under Rule 50(a)?

17            MR. GRAUBART:  Your Honor, if I may; one more point.

18            THE COURT:  Go to the podium, please.

19            MR. GRAUBART:  Noah Graubart for Samsung.

20        Your Honor, I wanted to note for completeness of the

21   record, Your Honor didn't hear argument from Samsung with

22   respect to Headwater's motions for judgment as a matter of law

23   on the issue U.S. of invalidity.  I'd just note that we have

01:50
24   -- obviously oppose.  We believe that more than sufficient

25   evidence supports each of the invalidity theories that Samsung

1    has asserted and presented to the jury and would support a

2    verdict on those, and we'd be -- I'd be happy to address any

3    of them individually, to the extent Your Honor has questions

4    on them.

5            THE COURT:  I'm satisfied at this point.  If you

6    feel compelled for completeness of the record, I'm not going

7    to tie your hands, but I'm not asking for additional argument.

8            MR. GRAUBART:  I'll do it in a very, very brief

9    manner.

10           With respect to the obviousness issues, we think that the

01:50    11    evidence is sufficient under *KSR* and its progeny, including

12    *Wyers versus Master Lock*, which includes the ability to rely

13    on common sense and logic.

14           With respect to the corroboration requirement, we think

15    more than sufficient evidence satisfies the corroboration

16    requirement.  And under the rule of reason that the Federal

17    Circuit has articulated, there was technical documentation,

18    source code, and not every single sub-element of a claim must

19    be tied to an additional piece of documentary evidence to

20    satisfy that.

01:51    21           In terms of § 102, dr. Foster expressly testified that --

22               THE COURT:  Slow down a little bit, please.

23           MR. GRAUBART:  Sure.  In terms of § 102, Dr. Foster

24    expressly testified that the claims were anticipated under the

25    -- under Headwater's application of the claim language, which

1   is consistent with the Federal Circuit's holding in *01*

2   *Communique versus Citrix.*

3       And then, finally, with respect to written description,

01:51   4   that -- Mr. Ledahl's characterization of Mr. Foster's

5   testimony on this we don't believe was accurate, and that the

6   more full recitation of his testimony on page 890 and 891 of

7   the transcript from April 23rd provides a sufficient testimony

8   to support his written description opinions, and support a

9   verdict on that.

10          THE COURT:  All right.

11          MR. GRAUBART:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13      All right, counsel.  With regard to the motions brought

14  by both competing parties for relief under Rule 50(a), which

01:52   15  allows the Court the discretion to grant, where the rule says

16  may grant judgment as a matter of law if a matter's been fully

17  heard on and no reasonable jury could come to a contrary

18  conclusion, with regard to the competing positions between the

19  parties as to the issue of infringement, both direct and

20  indirect, that motion is denied both from the Plaintiff and

01:52   21  from the Defendant.

22      With regard to the competing issues of validity and

23  invalidity under the various theories asserted, particularly

24  § 102, § 103, and § 112, those competing motions are both

25  denied.

01:53

1        And with regard to Defendants' motion for judgment as a

2   matter of law of no damages, that motion is also denied.

3        All right.  It's almost 2:00, counsel.  Let's take a

4   short break, and those of you that are going to participate in

5   the informal charge conference, if you'll come to chambers at

6   2:15, we will meet in my office and we'll have a fulsome and

7   open discussion about the most current draft of the final jury

8   instructions and verdict form.

9        Until then, we stand in recess.

10           (The proceedings were concluded at 1:54 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts                04/24/2025

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12       .

13

14

15

16

17

18

19

20

21

22

23

24

25